No. 22-15260

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

THE ESTATE OF ISABELLA "BELLA" HERNDON;
JOHN HERNDON; J.H., a minor; T.H., a minor;
on behalf of themselves and others similarly situated,

*Plaintiff-Appellants*,

v.

NETFLIX, INC.,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Northern District of California
No. 4:21-cv-06561-YGR
Hon. Yvonne Gonzalez Rogers, United States District Judge

_____

# APPELLANTS' OPENING BRIEF

_____

Ryan Hamilton
HAMILTON LAW LLC
5125 South Durango, Suite C
Las Vegas, Nevada 89113
(702) 818-1818
Ryan@HamLegal.com

Gregory Keenan
DIGITAL JUSTICE FOUNDATION
81 Stewart Street
Floral Park, New York 11001
(516) 633-2633
Gregory@DigitalJusticeFoundation.org

Andrew Grimm
DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive
Omaha, Nebraska 68154
(531) 210-2381
Andrew@DigitalJusticeFoundation.org

*Attorneys for Appellants*

## ORAL-ARGUMENT STATEMENT

This appeal presents the relatively rare opportunity for this Court—or any court—to address the "use of powerful algorithms" in a highly destructive manner. Cf. Gonzalez v. Google LLC, 2 F.4th 871, 912 (2021), cert. granted, 143 S. Ct. 80 (2022).

For the most part, the "pressing questions" that arise from the use of algorithms to cause real-world harms go unanswered. Id. at 913. That's because a provision of U.S. telecommunications law enacted in the mid-1990s, 47 U.S.C. § 230(c)(1), often blocks development of tort law as to algorithms on social media and search engines. That provision, however, does not apply here because it only precludes imposing "liability for material posted on the website *by someone else*." Gonzalez, 2 F.4th at 886-887.[1]

That's not the case here.

Here, Netflix, Inc., used its *own* algorithms to target children with materials that *Netflix itself* posted. It was warned in advance—by its *own* expert—that such targeting would end the lives of certain children. And, the breathtaking scope of its data collection permitted it to *know* which children were at high risk. Big Data means precise data.

---

[1] Throughout this Brief, emphasis is added in a quoted authority unless otherwise indicated. Likewise, internal brackets and quotations are often removed for the ease of reading.

Netflix took no precautions.

It could have. Given its insights into which children were at high risk and the individualized nature of algorithmic targeting, it could have avoided targeting *those* children with its algorithms. It could have at least warned *those* children—and their families—of dangers it had been informed of. It didn't. Instead, it blazed forward with targeting *those* children who it should have known were specifically vulnerable without providing any warning of known dangers. Scores of children died.

Oral argument should be granted because these facts raise many novel and complex issues. There are novel questions of California anti-SLAPP law because Defendant characterized this wrongful-death and survival action as <u>*strategically*</u> concocted by a dead girl's family. There are novel questions of California's wrongful-death and survival laws that entail, per the statute, excavating and synthesizing over a century of California case law. There are also novel questions about duty of care and products liability, implicating California Chief Justice Traynor's well-established vision of tort liability as applied to twenty-first-century technologies.

Oral argument should also be granted because these issues did not receive extended treatment below; because technological nuances could play a major role; and because these issues are of extraordinary significance.

The stakes could not be higher insofar as these are issues of life and death. Many children died. The societal issue is not one that will go away—especially if affirmed. And, here, given its radical notions of Free Speech and of California's anti-SLAPP, Netflix has been repeatedly threatening a grieving family with ruinous fees.

Although not directly addressed below, Defendant takes the position that it has a Free Speech right to do *exactly* as the allegations allege. It purports that it has the right to target a *specific* child with an algorithm in a way that it has been warned will end her life; that *does* end her life; and that, as Netflix says this is a Constitutional right, there is *nothing* Congress or the California Legislature can do about it.

Plaintiffs believe oral argument would be an important opportunity to address the Court's questions and, therefore, respectfully request as much oral argument time as the Court is willing to grant.

# TABLE OF CONTENTS

**Page**

ORAL-ARGUMENT STATEMENT ........................................................II

TABLE OF AUTHORITIES ................................................................ IX

JURISDICTIONAL STATEMENT ..........................................................1

RELEVANT STATUTORY PROVISIONS .................................................3

    I.    CALIFORNIA CODE OF CIVIL PROCEDURE § 366.1 ...................................3

    II.    CALIFORNIA CODE OF CIVIL PROCEDURE § 370.60 ...........................4

    III.    CALIFORNIA CODE OF CIVIL PROCEDURE § 425.16 ...............................6

ISSUES PRESENTED........................................................................9

    I.    CALIFORNIA ANTI-SLAPP ISSUES ......................................9

    II.    CALIFORNIA SURVIVAL AND WRONGFUL-DEATH ISSUES....................11

    III.    CALIFORNIA DUTY-OF-CARE AND PRODUCTS-LIABILITY ISSUES .........12

STATEMENT OF THE CASE................................................................13

    I.    BIG DATA & ALGORITHMIC TARGETING ...............................13

    II.    CHILD VULNERABILITY & SUICIDE CONTAGION ...................................16

    III.    URGENT WARNINGS THAT CHILDREN WOULD DIE ..............................18

    IV.    BELLA HERNDON AND OTHER CHILDREN DID DIE. ..............................20

    V.    PROCEEDINGS IN STATE COURT AND BELOW .......................................22

SUMMARY OF ARGUMENT ...............................................................25

STANDARD OF REVIEW ...................................................................28

ARGUMENT ................................................................................29

I.   THE DISTRICT COURT ERRED IN ITS APPLICATION OF CALIFORNIA'S
     ANTI-SLAPP STATUTE. ....................................................29

     A.   Anti-SLAPP Step 1(a): The District Court improperly recast
          the complaint as about "content" rather than algorithms and
          a failure to warn. ....................................................35

     B.   Anti-SLAPP Step 1(b): The District Court's improper
          recasting of the acts in suit led the rest of its anti-SLAPP
          analysis about rights and public issues astray...........................46

          i.   The District Court erred because Defendant did not
          establish a constitutional right to algorithmically target or to
          fail to warn of know dangers to high-risk individuals..............46

          ii.   The District Court erred because it adopted a forbidden
          synecdoche theory of "public issue" and confused a
          targeting algorithm with the creation and dissemination of a
          show. ........................................................................62

     C.   Anti-SLAPP Step 2: The District Court's errors on the
          motion to dismiss mean that the District Court also erred on
          the second step of the anti-SLAPP statute. ...............................66

     D.   Anti-SLAPP Applicability: California anti-SLAPP should
          not be applied to claims filed in state court and then
          removed....................................................................70

II.  THE DISTRICT COURT ERRED ON CALIFORNIA WRONGFUL-DEATH
     STANDING AND CALIFORNIA SURVIVAL LIMITATIONS. ........................83

     A.   The District Court erred in holding that Bella's death
          shortened the time to assert her survival claims. .....................83

          i.   The District Court ignored California's statute on
          survival limitations and shortened the time to sue....................89

          ii.   The operative California statute on survival limitations
          makes clear that death does not shorten the time to sue. ..........94

iii.   Under the applicable limitations period for Bella's survival claims, the survival claims are timely.......................106

B.    The District Court erred in holding that rules of intestate succession bar wrongful-death claims by Bella's brothers.....107

i.   The District Court held that siblings could only bring wrongful-death claims if they're intestate successors. ...........107

ii.   California law has repeatedly clarified that wrongful-death claims are not limited to intestate successors................115

III.   THE DISTRICT COURT ERRED IN ITS CONSTRUAL OF CALIFORNIA'S DUTY OF CARE AND PRODUCTS LIABILITY. ........................................118

A.    Given that the right to amend was preserved, the Court could simply remand rather than address additional issues.............118

B.    The District Court erred by on California duty of care by excusing a duty of care in the face of foreseeable and foreseen risk of death. ..............................................................119

i.   Defendant owed a special-relationship duty to Bella while she was on its platform, given its level of surveillance and control...............................................................................119

ii.   Defendant owed an ordinary duty of care because there is always one barring an exception. ........................................127

iii.   California's exceptions to duty for unforeseeable events do not apply here to facts that were foreseen..........................131

iv.   Defendant's owe a statutory duty based upon a recently enacted California statute........................................................138

C.    The District Court erred on products liability because software can be a product under California law. ....................143

i.   The District Court never addressed whether Defendant's targeting algorithms and software are products......................144

vii

ii.   Targeting algorithms and software can be products under California law. ............................................................154

iii.   Defendant's targeting algorithms and software are products under California law when targeted at consumers…178

IV.   Important Policy Interests Are at Stake. ...............................196

CONCLUSION ....................................................................................201

STATEMENT OF RELATED CASES ...............................................204

FORM 8.  CERTIFICATE OF COMPLIANCE FOR BRIEFS ...........................205

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Ahanchian v. Xenon Pictures, Inc.,
    624 F.3d 1253 (2009). ............................................................ 28, 61

Baral v. Schnitt,
    1 Cal. 5th 376 (2016). ............................................................ 37, 38

Bender v. Williamsport Area Sch. Dist.,
    475 U.S. 534 (1986).....................................................................1

Bonni v. St. Joseph Health System,
    11 Cal. 5th 995 (2021). ...................................... 36, 37, 38, 39, 42

Borden v. eFinancial, LLC,
    53 F.4th 1230 (9th Cir. 2022). ....................................................28

Bose Corp. v. Consumers Union of U.S., Inc.,
    466 U.S. 485 (1984)...................................................................57

Charles v. City of L.A.,
    697 F.3d 1146 (9th Cir. 2012). ...................................................59

Cohen v. Cowles Media Co.,
    501 U.S. 663 (1991)............................................................ 55, 57

CoreCivic, Inc. v. Candide Grp., LLC,
    46 F.4th 1136 (2022). .................................................... 66, 70, 71

Dinapoli v. Yelp Inc.,
    355 F. Supp. 3d 101 (D. Mass. 2019)..........................................82

Doe v. Gangland Prods.,
    730 F.3d 946 (9th Cir. 2013). .....................................................46

Elec. Constr. & Maint. Co., Inc. v. Maeda Pac. Corp.,
    764 F.2d 619 (9th Cir. 1985). .....................................................51

Exline v. Gilmore,
    67 Cal. App. 5th 129 (2021). ......................................................62

FCC v. Pacifica Foundation,
    438 U.S. 726 (1978)...................................................................60

ix

FilmOn.com Inc. v. DoubleVerify Inc.,
    7 Cal. 5th 133 (2019). ....................................................... 62, 63, 64

Fla. Bar v. Went for It,
    515 U.S. 618 (1995)...................................................................59

Flatley v. Mauro,
    39 Cal. 4th 299 (2006). ...........................................................73

Gonzalez v. Google LLC,
    2 F.4th 871 (2021). .................................................................. ii

Hamilton v. Wal-Mart Stores, Inc.,
    39 F.4th 575 (9th Cir. 2022). ...................................................74

Hoffmann v. Pulido,
    928 F.3d 1147 (9th Cir. 2019). ..................................................1

Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston,
    515 U.S. 557 (1995)...................................................................49

Jacoves v. United Merchandising Corp.,
    9 Cal. App. 4th 88 (1992). ................................................. 68, 69

James v. Meow Media, Inc.,
    300 F.3d 683 (6th Cir. 2002). ...................................................60

La Liberte v. Reid,
    966 F.3d 79 (2020). ............................................................ 78, 80

Latch v. United States,
    842 F.2d 1031 (9th Cir. 1988). ..................................................1

Makaeff v. Trump Univ., LLC, 736 F.3d 1180 (2013). .................................. 75, 76

McGary v. City of Portland,
    386 F.3d 1259 (9th Cir. 2004). .................................................51

Metabolife Int'l, Inc. v. Wornick,
    264 F.3d 832 (9th Cir. 2001). ...................................................50

Navellier v. Sletten,
    29 Cal. 4th 82 (2002). ..............................................................47

Park v. Board of Trustees of California State University,
    2 Cal.5th 1057 (2017). ......................................................... 37, 38

Planned Parenthood Fed'n of Am. v. Ctr. for Med. Progress,
    890 F.3d 828 (9th Cir. 2018). ........................................................ 66, 71, 80

Price v. Stossel,
    620 F.3d 992 (9th Cir. 2010). ........................................................28

Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.,
    768 F.3d 938 (9th Cir. 2014). ........................................................47

Rivera v. First DataBank, Inc.,
    187 Cal. App. 4th 709 (2010). ........................................................49

Rutherford v. Owens-Illinois, Inc.,
    16 Cal. 4th 953 (1997). ........................................................ 67, 68

Safari Club Int'l v. Rudolph,
    862 F.3d 1113 (9th Cir. 2017). ........................................................71

Sakamoto v. Duty Free Shoppers, Ltd.,
    764 F.2d 1285 (9th Cir. 1985). ........................................................71

Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,
    559 U.S. 393 (2010)........................................................73

Snyder v. Phelps,
    580 F.3d 206 (4th Cir. 2009). ........................................................ 56, 57

Stricklin v. Stefani,
    358 F. Supp. 3d 516 (W.D.N.C. 2018)........................................................ 57, 58, 59

United States ex rel. Newsham v. Lockheed Missiles & Space Co.,
    190 F.3d 963 (9th Cir. 1999). .................................... 29, 31, 33, 70, 71, 72, 81

Wilbanks v. Wolk,
    121 Cal. App. 4th 883 (2004). ........................................................30

Wilcox v. Superior Court,
    27 Cal. App. 4th 809 (1994). ........................................................30

Wilson v. Cable News Network, Inc.,
    7 Cal.5th 871 (2019). ........................................................37

World Fin. Grp., Inc. v. HBW Ins. & Fin. Servs., Inc.,
    172 Cal. App. 4th 1561 (2009). ........................................................64

Young v. Am. Mini Theatres,
    427 U.S. 50 (1976)........................................................59

Zauderer v. Office of Disc. Counsel,
    471 U.S. 626 (1985) .................................................................................59

**Statutes**

28 U.S.C. § 1332(d). ...................................................................................1

47 U.S.C. § 230. ......................................................................................... ii

Cal. Civ. Proc. Code § 366.1. ...............................................................3, 11

Cal. Civ. Proc. Code § 377.60. .............................................................4, 11

Cal. Civ. Proc. Code § 4. ........................................................................34

Cal. Civ. Proc. Code § 425.16. .... 6, 9, 31, 33, 35, 37, 38, 40, 44, 45, 48, 50, 62, 63, 74, 76

Cal. Civ. Proc. Code § 425.17. ................................................................81

California Age-Appropriate Design Act. ............................................ 44, 56

**Other Authorities**

"The Netflix Recommender System: Algorithms, Business Value, and Innovation:
    ACM Transactions on Management Information Systems." .......................15

"Using 'Big Data' To Reduce and Prevent Self-Harm and Suicide,"
    Swansea University (last accessed Jan. 3, 2023) ...........................................14

Alexander Gilmanov, "Here's Why Personalization Algorithms Are So Efficient,"
    TMS (June 9, 2021). .....................................................................................14

Bernardita Calzon, "21 Examples of Big Data Analytics in Healthcare That Can
    Save People,"
    The datapine (June 2, 2022). ........................................................................14

Charles Duhigg, "How Companies Learn Your Secrets,"
    The New York Times Magazine (Feb. 16, 2012) ..........................................13

Golden, Nina, "SLAPP Down: The Use (and Abuse) of Anti-SLAPP Motions to
    Strike,"
    12 Rutgers J.L. & Pub. Pol.y 426 (2014). .............................................. 29, 31

Madelyn S. Gould & Alison M. Lake, "The Contagion of Suicidal Behavior,"
    National Academy of Sciences (2013). ........................................................17

Marnie Eisenstadt, "'13 Reasons Why' is a hit, but suicide expert told Netflix not to release series,"
Syracuse.com (Apr. 26, 2017). ........................................................................18

Sophie Gilbert, What Went Wrong With 13 Reasons Why?,
The Atlantic (May 4, 2017). ............................................................18

Statement of Frances Haugen, U.S. Senate Committee on Commerce, Science and Transportation (Oct. 4, 2021). ............................................................... 19, 44

U.S. Cons. Art. III, § 2. ............................................................1

Vivek Murthy, "Protecting Youth Mental Health: The U.S. Surgeon General's Advisory," (2021). ............................................................16

Zara Adams, "Why Young Brains Are Especially Vulnerable to Social Media," American Psychological Association (Aug. 25, 2022). ................................17

**Rules**

Fed. R. Civ. P. 11 (1983). ............................................................74

Fed. R. Civ. P. 11 (2022). ............................................................74

# JURISDICTIONAL STATEMENT

(A)    This action was asserted with class allegations by California plaintiffs against a California defendant in California state court under California law.  6-ER-1137-1160.  No non-California citizen has ever been identified or joined into this action.  Nonetheless, the District Court purported to exercise diversity jurisdiction after removal based upon an erroneous reading of the provisions of the Class Action Fairness Act.  1-ER-28-39; see 28 U.S.C. § 1332(d); U.S. Cons. Art. III, § 2.

(B)    The District Court entered final judgment below.  1-ER-2.  This Court has appellate jurisdiction.  28 U.S.C. § 1291.

Even though the District Court lacked subject-matter jurisdiction, this Court nonetheless has the "inherent authority" to consider and correct the erroneous exercise of subject-matter jurisdiction below.  E.g., Hoffmann v. Pulido, 928 F.3d 1147, 1151 (9th Cir. 2019).  Indeed, "every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review[.]'"  Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986).

Upon appellate review, "if a district court has wrongfully exercised subject matter jurisdiction over a dispute, the appellate court *must* vacate the district court's decision[.]"  Latch v. United States, 842 F.2d 1031, 1033 (9th Cir. 1988).

1

(C)    Judgment was entered on January 19, 2022.  1-ER-2.  Plaintiffs

noticed their appeal on February 16, 2022.  7-ER-1282-1284.  The appeal is timely.

See 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A).

(D)    This appeal is from a final order and judgment.  1-ER-2.

# RELEVANT STATUTORY PROVISIONS

## I.   CALIFORNIA CODE OF CIVIL PROCEDURE § 366.1

### § 366.1. Death of person entitled to bring action before expiration of limitations period

If a person entitled to bring an action dies before the expiration of the applicable limitations period, and the cause of action survives, an action may be commenced before the expiration of the later of the following times:

   **(a)** Six months after the person's death.

   **(b)** The limitations period that would have been applicable if the person had not died.

## II.   CALIFORNIA CODE OF CIVIL PROCEDURE § 370.60

### § 377.60. Persons who may assert cause of action

A cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the following persons or by the decedent's personal representative on their behalf:

**(a)** The decedent's surviving spouse, domestic partner, children, and issue of deceased children, or, if there is no surviving issue of the decedent, the persons, including the surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession. If the parents of the decedent would be entitled to bring an action under this subdivision, and the parents are deceased, then the legal guardians of the decedent, if any, may bring an action under this subdivision as if they were the decedent's parents.

**(b)**

    **(1)** Whether or not qualified under subdivision (a), if they were dependent on the decedent, the putative spouse, children of the putative spouse, stepchildren, parents, or the legal guardians of the decedent if the parents are deceased.

    **(2)** As used in this subdivision, "putative spouse" means the surviving spouse of a void or voidable marriage who is found by the court to have believed in good faith that the marriage to the decedent was valid.

**(c)** A minor, whether or not qualified under subdivision (a) or (b), if, at the time of the decedent's death, the minor resided for the previous 180 days in the decedent's household and was dependent on the decedent for one-half or more of the minor's support.

**(d)** This section applies to any cause of action arising on or after January 1, 1993.

4

**(e)** The addition of this section by Chapter 178 of the Statutes of 1992 was not intended to adversely affect the standing of any party having standing under prior law, and the standing of parties governed by that version of this section as added by Chapter 178 of the Statutes of 1992 shall be the same as specified herein as amended by Chapter 563 of the Statutes of 1996.

**(f)**

   **(1)** For the purpose of this section, "domestic partner" means a person who, at the time of the decedent's death, was the domestic partner of the decedent in a registered domestic partnership established in accordance with subdivision (b) of Section 297 of the Family Code.

   **(2)** Notwithstanding paragraph (1), for a death occurring prior to January 1, 2002, a person may maintain a cause of action pursuant to this section as a domestic partner of the decedent by establishing the factors listed in paragraphs (1) to (6), inclusive, of subdivision (b) of Section 297 of the Family Code, as it read pursuant to Section 3 of Chapter 893 of the Statutes of 2001, prior to its becoming inoperative on January 1, 2005.

   **(3)** The amendments made to this subdivision during the 2003–04 Regular Session of the Legislature are not intended to revive any cause of action that has been fully and finally adjudicated by the courts, or that has been settled, or as to which the applicable limitations period has run.

### III. CALIFORNIA CODE OF CIVIL PROCEDURE § 425.16

**§ 425.16. Legislative findings; Special motion to strike action arising from "act in furtherance of person's right of petition or free speech under United States or California Constitution in connection with a public issue"**

**(a)** The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly.

**(b)**

    **(1)** A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

    **(2)** In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

    **(3)** If the court determines that the plaintiff has established a probability that the plaintiff will prevail on the claim, neither that determination nor the fact of that determination shall be admissible in evidence at any later stage of the case, or in any subsequent action, and no burden of proof or degree of proof otherwise applicable shall be affected by that determination in any later stage of the case or in any subsequent proceeding.

**(c)**

    **(1)** Except as provided in paragraph (2), in any action subject to subdivision (b), a prevailing defendant on a special motion to strike shall be entitled to recover that defendant's attorney's fees and costs. If the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to Section 128.5.

    **(2)** A defendant who prevails on a special motion to strike in an action subject to paragraph (1) shall not be entitled to attorney's fees and costs if that cause of action is brought pursuant to Section 11130, 11130.3, 54960, or 54960.1 of the Government Code, or pursuant to Chapter 2 (commencing with Section 7923.100) of Part 4 of Division 10 of Title 1 of the Government Code. Nothing in this paragraph shall be construed to prevent a prevailing defendant from recovering attorney's fees and costs pursuant to Section 7923.115, 11130.5, or 54960.5 of the Government Code.

**(d)** This section shall not apply to any enforcement action brought in the name of the people of the State of California by the Attorney General, district attorney, or city attorney, acting as a public prosecutor.

**(e)** As used in this section, "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

**(f)** The special motion may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper. The motion shall be scheduled by the clerk of the court for a hearing not more than 30 days after the service of the motion unless the docket conditions of the court require a later hearing.

**(g)** All discovery proceedings in the action shall be stayed upon the filing of a notice of motion made pursuant to this section. The stay of discovery shall remain in effect until notice of entry of the order ruling on the motion. The court, on noticed motion and for good cause shown, may order that specified discovery be conducted notwithstanding this subdivision.

**(h)** For purposes of this section, "complaint" includes "cross-complaint" and "petition," "plaintiff" includes "cross-complainant" and "petitioner," and "defendant" includes "cross-defendant" and "respondent."

**(i)** An order granting or denying a special motion to strike shall be appealable under Section 904.1.

**(j)**

    **(1)** Any party who files a special motion to strike pursuant to this section, and any party who files an opposition to a special motion to strike, shall, promptly upon so filing, transmit to the Judicial Council, by email or facsimile, a copy of the endorsed, filed caption page of the motion or opposition, a copy of any related notice of appeal or petition for a writ, and a conformed copy of any order issued pursuant to this section, including any order granting or denying a special motion to strike, discovery, or fees.

    **(2)** The Judicial Council shall maintain a public record of information transmitted pursuant to this subdivision for at least three years, and may store the information on microfilm or other appropriate electronic media.

## ISSUES PRESENTED

### I.  CALIFORNIA ANTI-SLAPP ISSUES

A.  *Anti-SLAPP Step 1(a)*: California's anti-SLAPP statute requires that the "act" from which a cause of action arose must be identified with precision, not via a general gist of what the claim is about.  The District Court's order recast the complaint in a broad way, applying anti-SLAPP to acts expressly disclaimed and ignoring acts from which claims about failure to warn and algorithmic targeting actually arose.  Did the District Court err in recasting the complaint in this way?

B.  *Anti-SLAPP Step 1(b)*: California's anti-SLAPP requires the movant to establish both that the acts in suit are in furtherance of its constitutional rights and, under the specific provision here, Cal. Civ. Proc. Code § 425.16(e)(4), connection with a public issue or issue of public importance.  Defendant made neither showing as to its personalized algorithmically targeting of a child that led to her death or as to its failure to warn her of known risks.  Such acts are not protected by the First Amendment.  Did the District Court's order err in granting the anti-SLAPP motion anyway?

9

C.   *Anti-SLAPP Step 2*: The viability of the claims goes to both the anti-SLAPP step two and the Rule 12(b)(6) analysis  <u>See</u> Section I.C, <u>see also</u> Section II-III, *infra*.   Did the District Court err in its merits analysis?

D.   *Anti-SLAPP Applicability in Federal Court*: <u>Newsham</u> adopted anti-SLAPP to claims brought *originally* in federal court based on an <u>Erie</u> policy analysis.  <u>Newsham</u>'s policy analysis comes out the other way for claims *removed* to federal court.   Does anti-SLAPP apply to claims *removed* to federal court?

## II.   CALIFORNIA SURVIVAL AND WRONGFUL-DEATH ISSUES

A.   *Survival Limitations*: The operative California statute on survival limitations indicates that survival claims may be brought under the "limitations period that would have been applicable if [Bella] had *not* died." See Cal. Civ. Proc. Code § 366.1(b).  Did the District Court err by failing to consider the limitations period that would have been applicable if Bella had *not* died—shortening the time to sue by over two years?

B.   *Wrongful-Death Standing*: The operative California wrongful-death statute clarifies that it was "*not* intended to adversely affect the standing of any party having standing under prior law[.]"  Cal. Civ. Proc. Code § 377.60(e).  Under prior California law, a collateral heir (*e.g.*, a decedent's brother) could sue even if the decedent had surviving parents.  Did the District Court err by adopting a method of deciding wrongful-death standing that entirely excludes collateral heirs when the decedent has surviving parents?

11

### III.   CALIFORNIA DUTY-OF-CARE AND PRODUCTS-LIABILITY ISSUES

A.   *Remand to Exercise Right to Amend*: Whether this Court is inclined to permit remand to amend because, before judgment, the District Court graciously offered Plaintiffs the opportunity to amend and Plaintiffs reserved the right to amend in case this Court reversed the ruling on survival limitations or wrongful death.

B.   *California Duty of Care*: Whether Defendant owed Bella a special-relationship duty (Section III.B.i) or ordinary duty (Section III.B.ii); whether the harm was excepted from duty as being unforeseeable or meeting California's high policy threshold (Section III.B.iii); and whether Defendant owes a statutory duty (Section III.B.iv).

C.   *California Products Liability*: Whether Defendant's algorithmic software is a product when is was being used to control and direct Bella's behaviors.

## STATEMENT OF THE CASE

### I.  BIG DATA & ALGORITHMIC TARGETING

We are now well into the era of Big Data.

Technology companies collect staggering amounts of personal data about users on their platforms that they run through their cutting-edge predictive models. Among other goals, the companies collect avalanches of user data to target users with content they find compelling or entertaining.

As the data-collection arms race ratchets up companies constantly search for ways to make even more precise predictions that will lead to even more user engagement with their platforms. To do so requires companies to intensify their data collection and analysis.

The predictive power these companies possess with their data is remarkable, if not downright astonishing. Armed with only their data sets, companies have, for example, been able to determine when a woman is pregnant before the people with whom she lives. Charles Duhigg, "How Companies Learn Your Secrets," The New York Times Magazine (Feb. 16, 2012).

Big Data also has become a powerful tool in healthcare diagnostics. For example, one company using years of insurance and pharmacy data has identified risk factors that can accurately predict whether a patient is at risk for opioids.

13

Bernardita Calzon, "21 Examples of Big Data Analytics in Healthcare That Can Save People," The datapine (June 2, 2022).

Presently, researchers are using Big Data to prevent self-harm and suicide. Gathering data across a variety of domains, researchers are creating models of persons deemed to be at risk for suicide as well as devising protocols for intervening to prevent persons from taking their own lives. "Using 'Big Data' To Reduce and Prevent Self-Harm and Suicide," Swansea University (last accessed Jan. 3, 2023).

Coupled with massive data collection, companies like Netflix also deploy personalized algorithms that make individualized recommendations tailored to each customer's particular habits (or data set). Alexander Gilmanov, "Here's Why Personalization Algorithms Are So Efficient," TMS (June 9, 2021). These personalized algorithms make use of powerful new technologies such as machine learning and artificial intelligence. For example, Netflix uses personalized algorithms to determine each user's preferences and then fills the user's homepage with carefully curated shows. Netflix has boasted that its personalized algorithms are so powerful that, in effect, the algorithm and not the user chooses what content the user watches.

With its personalized algorithms Netflix treats each user on its platform individually.

14

Based on the troves of data its algorithms receive for each person, Netflix promotes certain shows for that user while demoting others. What is clear is that Netflix's algorithms "know" intimate details about each viewer.

What is equally clear is that Netflix's data scientists plainly possessed the ability to know that Bella Herndon was psychologically vulnerable. Moreover, Netflix had not only the ability, but also the moral and legal obligation not to promote content destructive to her that preyed on her very vulnerability and could have avoided this result. See "The Netflix Recommender System: Algorithms, Business Value, and Innovation: ACM Transactions on Management Information Systems," Vol 6, No 4.

## II.    CHILD VULNERABILITY & SUICIDE CONTAGION

Their brains still developing, children are particularly vulnerable to mental health stressors.  Because of their biological vulnerabilities, in 2021 the U.S. Surgeon General Vivek Murthy, M.D., issued a health advisory exhorting social media and technology companies to minimize the damage from their platforms and to prioritize youth mental health by sharing their data with independent researchers.  Vivek Murthy, "Protecting Youth Mental Health: The U.S. Surgeon General's Advisory," 26 (2021).

The Surgeon General lamented that most technology companies are not transparent about the impacts of their products on children, preventing parents from making informed decisions about the risks their children run in using the products.  Id.  The Surgeon General called upon leaders of technology companies to take steps to prevent the harms their products cause children even if those steps lead to less youth engagement and profit.  Id.

With particular relevance to this case, the Surgeon General recommended that tech companies provide researchers with data about the youth most at risk of harm and how their algorithms are designed to deal with that subgroup facing the highest risk.  Id.  Finally, the Surgeon General warned that tech companies need to limit children's exposure to harmful content and develop products that safeguard youth mental health.  Id. at 27.

16

As Chief Science Officer of the American Psychological Association Mitch Prinstein, Ph.D., bluntly described the problem: "It's time [our society] stopped trying to make a profit on kids' developing brains." Zara Adams, "Why Young Brains Are Especially Vulnerable to Social Media," American Psychological Association (Aug. 25, 2022).

This problem becomes even more urgent as devices proliferate and tech companies spend enormous resources on keeping the youth engaged for longer periods of time on their platforms. At the same time, there is no evidence that tech companies such as Netflix have heeded any of the Surgeon General's warnings. Instead, they have continued prioritizing profits and youth engagement over the serious mental health risks their platforms pose for children.

The most serious risk this case highlights is that of child suicide. The phenomenon of suicide contagion is well-documented. Madelyn S. Gould & Alison M. Lake, "The Contagion of Suicidal Behavior," National Academy of Sciences (2013). Technology companies specifically targeting the most vulnerable members of society using their powerful and personalized algorithm has led predictably to children hurting themselves and even taking their own lives.

### III. URGENT WARNINGS THAT CHILDREN WOULD DIE

When 13 Reasons Why was in production, Defendant consulted with mental-health experts to discuss whether depicting the ugliness and brutality of suicide would deter teenage suicides. 6-ER-974-975 ¶¶ 27-31; Sophie Gilbert, What Went Wrong With 13 Reasons Why?, The Atlantic (May 4, 2017). These suicide-prevention experts warned Netflix that depicting suicide as the Show did could have potential suicide-contagion effects upon impressionable viewers. 6-ER-974 ¶ 28.

Specifically, Dr. Dan Reidenberg, the executive director of Suicide Awareness Voices of Education, was one of the experts that reviewed the Show prior to its release. 6-ER-975 ¶ 29. Upon his review, Dr. Reidenberg advised Netflix to cancel the release, but he was told by Netflix that doing so "wasn't an option." "They made that very clear to me," Dr. Reidenberg later told the press. Id. (citing Marnie Eisenstadt, "'13 Reasons Why' is a hit, but suicide expert told Netflix not to release series," Syracuse.com (Apr. 26, 2017).)

Netflix made the decision to air the Show, despite the warnings and advice from the mental-health experts that it engaged. 6-ER-974-975 ¶¶ 27, 32. In fact, Netflix released the Show anticipating that millions of children would view it within the first month. 6-ER-975 ¶ 32.

And, about 75% of viewer activity is driven by Netflix's sophisticated, targeted recommendation systems. 6-ER-982 ¶ 64. Thus, many vulnerable children were manipulated into watching it via the algorithm—without warning to their families. 6-ER-980 ¶ 55. In doing so, Netflix followed the troubling trend in refusing to take precautions in its algorithm.

It's not a matter that they cannot. The Facebook whistleblower, Frances Haugen, stated as much when she testified before the Senate Committee on Commerce, Science and Transportation, to the following reality of how this is but an egregious example of how precautions are not taken:

> I saw that Facebook repeatedly encountered conflicts between its own profits and our safety. Facebook consistently resolved those conflicts in favor of its own profits […and Facebook's] profit optimizing machine is generating self-harm and self-hate — especially for vulnerable groups, like teenage girls. These problems have been confirmed repeatedly by Facebook's own internal research. […] This is not simply a matter of some social media users being angry or unstable. Facebook became a $1 trillion company by paying for its profits with our safety, including the safety of our children.

Statement of Frances Haugen, U.S. Senate Committee on Commerce, Science and Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security (Oct. 4, 2021).

So too here. Netflix disregarded its own internal investigation about the effects of targeting and disregarded what its data was telling it about vulnerable children, including experts foreseeing dire results.

IV. **BELLA HERNDON AND OTHER CHILDREN DID DIE.**

Netflix targeted 15-year-old Bella Herndon with an individualized algorithms—one that ended up making her watch content that was destructive of her.

Although Netflix used its cutting-edge algorithm to recommend destructive content to a vulnerable teenage girl, Netflix failed to provide Bella or her family any warnings about the known dangers of the content it was recommending. The company failed to provide any warn despite its own expert's dire warning that Netflix's actions would cause children to hurt and even kill themselves.

Netflix recklessly disregarded its expert's advice. It targeted Bella without giving her any warning, causing her to suffer incredible mental harm and compulsions. She engaged in self-harm, ultimately taking her own life. On May 15, 2017, at Saint Charles Borromeo Church in Livermore, California, Bella was laid to rest.

Bella's death was not an isolated incident. Other vulnerable teens also took their own lives after being targeted with 13 Reasons Why. Avani Dias, After her daughter's 'copycat suicide,' this mother is warning young people about '13 Reasons Why'," ABC (Sept. 9, 2019). Child suicides spiked in the aftermath of 13 Reasons Why. Jeffrey A. Bridge & Lisa M. Horowitz, "Association Between the Release of Netflix's 13 Reasons Why and Suicide Rates in the United States: An

Interrupted Time Series Analysis," 59 Child & Adolescent Psychiatry 236, 236-243 (Feb. 1, 2020).

### V.    PROCEEDINGS IN STATE COURT AND BELOW

Mr. Herndon contacted Netflix seeking Netflix to make changes to protect children.

Despite multiple requests, Netflix ultimately refused to have a sit-down meeting with Mr. Herndon.  On April 30, 2021, Plaintiffs filed this case in California Superior Court, asserting claims for strict-liability failure to warn, wrongful death, and negligence, individually and as a class action.  6-ER-1137-1160.  The named plaintiffs in this case—the Estate of Isabella "Bella" Herndon, Mr. John Herndon, her father, and M.H. and T.H., her minor brothers—are all California citizens.  6-ER-1140 ¶ 8.  The sole defendant, Netflix, Inc., is a California citizen as well.  6-ER-1140 ¶ 9.

Plaintiffs' claims seek two modest tweaks to Netflix algorithmic targeting. First, Plaintiffs seek to make Netflix to warn of known dangers about its algorithm when the algorithm is targeting vulnerable children.  As noted, Netflix plainly has the ability to know who those children are based on its massive data collection and individualized algorithmic targeting. Likewise, Netflix plainly has the ability to warn those same children and their parents.

Second, Plaintiffs seek to make Netflix stop algorithmically targeting children where there is an advance warning of harm and the ability to know that a

specific child, like Bella, is highly susceptible to harm and different from the rest of the population.

After being served, Netflix removed the case to federal court asserting federal subject-matter jurisdiction under 28 U.S.C. § 1332(d), a provision of the Class Action Fairness Act of 2005 ("CAFA"). 6-ER-1052. Despite all named Plaintiffs and Defendant being citizens of California, the District Court purported to exercise diversity jurisdiction despite there no diverse parties nor any diverse class members identified. The Parties disputed subject-matter jurisdiction on Plaintiffs' motion to remand. 5-ER-912 (Plaintiffs' motion); 5-ER-845 (opposition); 4-ER-604 (reply); 3-ER-479 (sur-reply). The District Court denied the motion. 1-ER-28-40 (order).

Netflix also filed a combined motion seeking dismissal of the case under California's anti-SLAPP law and under Fed. R. Civ. P. 12(b)(6). 5-ER-871. After the Parties' briefed their positions, the District Court held oral argument. 1-ER-9 (minutes of January 11, 2022, oral argument). After oral argument the District Court granted Netflix's motion in most respects, holding that the anti-SLAPP statute applied and that Plaintiffs had failed to state a claim. 1-ER-3-8. The District Court, however, did not address Netflix's arguments on the Free Speech Clause of the First Amendment. Id.

23

Also, the District Court acknowledged that Plaintiffs "reserve[d] the possibility of amendment after exhausting their appeal." 1-ER-2. Specifically, Plaintiffs reserved the right to amend should they prevail on jurisdiction, wrongful-death standing, or minor tolling. Id. The Parties jointly agreed to stay any anti-SLAPP fees litigation until after appeal. 2-ER-44 (joint stipulation); 2-ER-42 (order granting stipulation).

Then, Plaintiffs timely appealed. 7-ER-1282.

## SUMMARY OF ARGUMENT

I.     *Anti-SLAPP Issues*:  The central flaw in the District Court's order was that it did not follow the California Supreme Court's guidance that it must precisely identify the act that underlies each claim, rather than simply identify what the claim is about at some level of generality.  In doing just that and  recasting the claims as based upon a show rather than an algorithmic targeting the District Court's order ran afoul of the anti-SLAPP analysis.  Moreover, the District Court's order overlooked that none of Defendant's cases established it had a constitutional right to use its algorithm in this way with absolute impunity—even thought the First Amendment doctrines lean the other way.  Furthermore, the District Court's order also erred on the merits issues and by holding anti-SLAPP applicable here under Newsham when Newsham's own policy analysis under Erie indicates that anti-SLAPP should not apply to claims *removed* to federal court (rather than originally filed here).  The anti-SLAPP order should be reversed—or at least vacated.

II.    *Survival Limitations and Wrongful-Death Standing*: The District Court's order on both survival limitations and wrongful-death standing overlooked key portions of the statute and, in the wrongful-death standing case, a seminal case from the California Supreme Court.  For survival limitations, the statute on survival limitations permits the claims to be brought under the limitations period that would have applied if the decedent "had *not* died." And, under this timeframe, the claims are clearly timely.   Yet, the District Court erred because its order ignored the operative statute and it only considered the limitations period as though the decedent here *had* died—the opposite of what the statute instructs.  On wrongful-death standing, the operative statute indicates that anyone having standing under prior law has standing today and decisional law earlier in California's history clarify that collateral heirs, *i.e.*, siblings of a decedent are able to sue for wrongful death as long as they can show harm, *even if* the decedent's parents are still alive. That's because the wrongful-death statute had previously "heirs" under the common-law definition that referred to

III.    This Court need not address these issues because Plaintiffs have preserved a

right to amend.  But, given the foreseeability and forewarning of the specific

harms here, there is no compelling basis for an exception to duty.  And,

California requires a compelling basis based upon fundamental public

policies not at issue here and based upon a lack of foreseeability as to the

harm as whole.  Indeed, given its level of supervision, control and the

vulnerability of the decedent, Defendant owed a special-relationship duty at

least as to activities on its platform.  Moreover, the algorithmic software

here is a product in the way that term of art is meant under California law.  It

readily fits California Chief Justice Traynor's vision for products liability—

an enduring vision that continues to guide the development of the California

appellate courts on products liability, among other issues, to this day.


IV.    There are important and grave policy issues at stake in this appeal.  They

relate to the protection afforded children

## STANDARD OF REVIEW

This Court "review[s] **de novo** a district court's decision to grant a motion to strike under California's anti-SLAPP statute." E.g., Price v. Stossel, 620 F.3d 992, 999 (9th Cir. 2010). See Section I, *infra*. In addition, this Court "reviews **de novo** [a] district court's decision to grant [a] motion to dismiss under Fed. R. Civ. P. 12(b)(6)." E.g., Borden v. eFinancial, LLC, 53 F.4th 1230, 1232 (9th Cir. 2022). See Sections II-III, *infra*.

If the Court believes it needs to reach the issue, see Section I.B.i, *infra*, a "district court's denial of an extension of time pursuant to Federal Rule of Civil Procedure 6(b) is reviewed for **abuse of discretion**[.]" Ahanchian v. Xenon Pictures, Inc., 624 F.3d 1253, 1258 (2009). Importantly, it "[i]s an abuse of discretion" for a district court to rule upon a Rule 6(b) motion without "identify[ing] the Pioneer-Briones standard or correctly conduct[ing] the Pioneer-Briones analysis[.]" Id. at 1261.

28

**ARGUMENT**

## I. THE DISTRICT COURT ERRED IN ITS APPLICATION OF CALIFORNIA'S ANTI-SLAPP STATUTE.

Defendant filed an anti-**SLAPP** motion below.  5-ER-871.

Its suggestion was that the Herndon family has brought a "SLAPP"—which, as this Court has explained, is a "***Strategic*** Lawsuit Against Public Participation." United States ex rel. Newsham v. Lockheed Missiles & Space Co., 190 F.3d 963, 965 n. 2 (9th Cir. 1999).

As its name suggests, a SLAPP is strategic.  And, it's strategic in a strange way.  Most lawsuits involve a genuine legal gripe by a plaintiff who wants to win and vindicate rights

Yet, "[u]nlike a standard lawsuit, the plaintiff's primary goal in a SLAPP suit is not to win, but to cause economic hardship on the defendant." Nina Golden, "SLAPP Down: The Use (and Abuse) of Anti-SLAPP Motions to Strike," 12 Rutgers J.L. & Pub. Pol.y 426, 432 (2014).

The "hallmark of a SLAPP suit is that it lacks merit and is **brought with the goals of obtaining an economic advantage over a *citizen* party**"—or exercising power to coerce a citizen party into silence about an issue near and dear to them. Newsham, 190 F.3d at 970-971.

29

For example, the "paradigmatic" SLAPP involves "large corporations, such as land developers, who file suit as a means to quell the environmental or political objections of community activists so that the developers may achieve their goals." Wilcox v. Superior Court, 27 Cal. App. 4th 809, 815 (1994). SLAPPs are "meritless suits brought *by large private interests to deter common citizens* from exercising their political or legal rights or to punish them for doing so." Wilbanks v. Wolk, 121 Cal. App. 4th 883, 891 (2004).

Frankly, this case is about as far afield from a SLAPP as imaginable. It's a wrongful-death suit, brought by a grieving family, who senselessly lost a child, due to a corporation's careless and dangerous use of powerful algorithms to target that child and other children, all the while knowing of dire risk, but refusing to take reasonable precautions.

This case involves a family asking if the ever-evolving field of tort law can do anything to address the novel harms being unleashed on society by large corporations targeting children in unprecedented (and previously unimaginable) ways and with catastrophic and fatal effects.

Thus, when Defendant calls this case a SLAPP, it's important to be quite clear about what Netflix is suggesting. Defendant characterization of this lawsuit as a **S**LAPP is suggesting that the Herndon family strategically suicided their loved one so they could bully Netflix through litigation.

It's a suggestion as offensive as it is absurd.

Indeed, one might be wonder, "How is it that a giant corporation could use such a tool against [such] individual[s]?" Nina Golden, 12 Rutgers J.L. & Pub. Pol'y at 427.

How is that a corporate behemoth like Netflix is using anti-SLAPP—a tool meant to protect "common citizens"—to threaten and punish this grieving family with ruinous fees? All because they came to court to see if the law could do anything about their loss. All because they dared "petition for the redress of grievances[.]" Cal Code Civ Proc § 425.16(a).

That seems to turn the very purpose on anti-SLAPP on its head. After all, the California legislature was trying to protect "_private citizens_" who were being "deter[ed] or punish[ed] …for exercising their political or legal rights." Newsham, 190 F.3d at 970. Thus, this appeal comes to this Court on appeal of a highly aberrant anti-SLAPP.

That order lost sight of the fundamental purposes of California's anti-SLAPP provision. It did so by making a host of errors when construing and applying California's anti-SLAPP statute to the asserted claims and allegations below.

Specifically, the District Court's order made the following errors in its analysis:

(1) The District Court's order did not properly construe  actions by Defendant the complaint's causes of actions "aris[e] from"—as is required to conduct a proper anti-SLAPP analysis.  Instead, the order anti-SLAPPED claims that were expressly disavowed while ignoring claims that were expressly asserted.  On this ground alone, this Court could simply vacate the anti-SLAPP order.  <u>See</u> Section I.A, *infra*.

(2) Given that the order misconstrued the acts which rise to the claims here, the order also failed to see that Defendant did not meet *its* burden of demonstrating that its acts were not "in furtherance of" any recognized Constitutional rights.  Indeed, Defendant simply could not muster any cases that establish a Constitutional to do what it did and a First Amendment analysis demonstrates that there isn't a right to do what it did.  Without that demonstration (which cannot be made because these are novel issues), the order should have been denied.  <u>See</u> Section I.B.i, *infra*.

(3) The anti-SLAPP order overlooks that anti-SLAPP still does not apply because algorithmically targeting and failing to warn aren't speech "in connection with a public issue or an issue of public interest" as the California Supreme Court has construed them.  <u>See</u> Section I.B.ii, *infra*.

32

(4) The order was mistaken in its merits analysis, so Plaintiffs also should have prevailed on the second step of the anti-SLAPP. <u>See</u> Sections I.C, II-IIII, *infra*.

(5) This dispute implicates open questions about whether California's anti-SLAPP provision should even apply to claims *removed* to federal court <u>See</u> Section I.D, *infra*.

\* \* \* \* \*

In reviewing these issues on appeal, it bears emphasizing that the anti-SLAPP statute must be construed with the original purpose in mind and must be interpreted so as to do justice.

That's not a call for atextual purposivism. Rather, the text commands as much: "Section 425.16(a) states its purpose[.]" <u>Newsham</u>, 190 F.3d at 971. And the text states the types of cases its concerned about—suits that are an "abuse of the judicial process." Cal. Civ. Proc. Code § 425.16(a). Then, the text commands that the following: "**<u>To this end</u>**, this section shall be construed broadly." <u>Id.</u> It's codified purposivism.

Thus, if this case—a case brought by a grieving father and brothers—doesn't *seem* like an abuse of judicial process (because it isn't), there's a good indication that

33

Beyond the anti-SLAPP provision itself, the California Code of Civil Procedure imposes an additional commands: that "its provisions and all proceedings under it are to be liberally construed, with a view to effect its objects and **to promote justice**."  Cal. Civ. Proc. Code § 4.

The statutory text on these issues commands that California's anti-SLAPP provision be construed "broadly" and "liberally" so as to achieve its purpose and so as "to promote justice."  The question then is whether this application of anti-SLAPP does those things, because the text is to be construed in light of those original purposes to protect common citizens against corporate abuses of the legal system.

### A. Anti-SLAPP Step 1(a): The District Court improperly recast the complaint as about "content" rather than algorithms and a failure to warn.

Below, the District Court did not base its anti-SLAPP analysis upon the acts from which the cause of action arose. Rather, it recast the complaint and chose different acts to focus its anti-SLAPP analysis on. That approach runs afoul of both the anti-SLAPP statute and against California Supreme Court authority explaining how to construe the first-step of the anti-SLAPP analysis.

That error alone is sufficient to vacate the District Court's anti-SLAPP order. Thus, should this Court rule that the District Court did not address the proper acts from which the cause of action arose, this Court could need not consider the additional anti-SLAPP issues that are on appeal. See Sections I.B-D, *infra*.

California's anti-SLAPP statute is clear. The text requires consideration of the "act" from which the cause of action "arise[s.]" Consider the plain text of the statute:

> A cause of action against a person **arising from any <u>act</u>** of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

Cal Code Civ Proc § 425.16 (b)(1).

35

The case law confirms that courts must identify the act from which the cause of action requires.  And, identifying the act must be done with precision.  Indeed, the California Supreme Court has recently elucidated the appropriate first step of the anti-SLAPP analysis:

> The issue before us concerns the first step of this process, **determining whether the plaintiff's claims <u>arise from</u>** protected activity.  At this first step, **courts are to "consider** the elements of the challenged claim and **what <u>actions</u> by the defendant** supply those elements and consequently form the basis for liability." (*Park, supra*, 2 Cal.5th at p. 1063.)

<u>Bonni v. St. Joseph Health System</u>, 11 Cal. 5th 995, 1009 (2021).

The California Supreme Court stressed that it is "The defendant's burden [...] **to identify what <u>acts</u> each challenged claim rests on** and to show how those acts are protected under a statutorily defined category of protected activity." <u>Bonni</u>, 11 Cal. 5th at 1009.

The California Supreme Court made clear that  identifying  and evaluating what act each a cause of action arises from must be done with careful, painstaking precision. In <u>Bonni</u>, plaintiff had filed a *<u>retaliation</u>* cause of action.  That "singular cause of action alleges multiple factual bases; the operative complaint contains a nonexhaustive list of *<u>at least 19 distinct acts</u>* or courses of conduct allegedly undertaken in retaliation[.]" <u>Id.</u>

Plaintiff urged that the Court should not "examine the underlying acts individually." <u>Id.</u> at 1009-1010.

36

The California Supreme Court disagreed.  Id. Thus, the Court stressed that it was critical to be very precise when identifying and evaluating the specific act(s) from which the cause of action arises.

Indeed, the failure to abide by this precise "act" by "act" approach would profoundly frustrate anti-SLAPP's purpose.  After all, the "**attempt to reduce a multifaceted cause of action into a singular 'essence' would predictably yield overinclusive and underinclusive results that would impair significant legislative policies.**" Bonni, 11 Cal. 5th at 1011.

In turn, **"[s]triking a cause of action that rests in part on unprotected activity constrains a plaintiff's ability to seek relief without advancing the anti-SLAPP's goals of shielding protected activity**[.]" Id.

Thus, it is critical to identify and evaluate the precise "act" from which the cause of action arises.  Cal Code Civ Proc § 425.16 (b)(1).  Failure to do so would not just frustrate the purpose of anti-SLAPP.  It would also run afoul of the Court's precedent.  See, e.g., Baral v. Schnitt, 1 Cal. 5th 376, 396 (2016); Park v. Board of Trustees of California State University, 2 Cal.5th 1057 (2017); Wilson v. Cable News Network, Inc., 7 Cal.5th 871 (2019).

In short, the act from which claim arises must be identified with precision.  In turn, "a claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of[.]" Park, 2 Cal. 5th at 1060 (emphasis in original).

37

A claim cannot be struck merely because the speech is "evidence of liability or **a step leading to some different act** for which liability is asserted." Id. Thus, evaluating the precise act from a cause of action arises is critical.

Associate Justice Groban's concurrence in Bonni expressed concern that this precise and nuanced hairsplitting would not result in the full and robust protections that many expect from anti-SLAPP statute. He worried that "**our now-settled construction** of section 425.16 does appear to erode" protections. Bonni, 11 Cal. 5th at 1027 (Groban, J., concurring). He acknowledged "[n]onetheless, **this is the dividing line that our case law compels**." Id. at 1029.

In sum, a plaintiff gets to choose what acts to allege and what claims to assert in his complaint. In an anti-SLAPP motion, the defendant must identify with precision "the acts" from which the cause of action arises. Bonni, 11 Cal. 5th at 1010 (opinion).

In turn, a court should examine with precision whether those facts are actually what the cause of action "arise[s] from[.]" Cal Code Civ Proc § 425.16 (b)(1). In other words, a court should examine" with precision "**whether those acts** are protected and **supply the basis for any claims**." Id.; see Baral, 1 Cal. 5th at 396. And, a claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of[.]" Park, 2 Cal. 5th at 1060 (emphasis in original).

Below, the District Court did not abide this well-settled construction and application of California's anti-SLAPP statute. 1-ER-4-5.

The complaint precisely and expressly identified the acts that **did not** form the basis for Plaintiffs' claims. 6-ER-974 ¶¶ 24-26 (expressly excluding ¶¶ 14-23); 6-ER-988 ¶ 78; 6-ER-989 ¶ 84. Indeed, the complaint made clear that the act of creation, the act of public dissemination, and the act of public promotion were **not** the basis of plaintiffs' claims.

The complaint also precisely and expressly identified the acts that **did** form the basis for plaintiffs' claims.

The complaint made clear that the claims arose from one act and one omission.

The act was Defendant's precise algorithmic targeting of Bella Herndon. 6-ER-980-984 ¶¶ 57-70 (describing how "Netflix used unprecedented levels of data collection, algorithmic data processing, and analytical insights to precisely target some of the most vulnerable members in society[.]"). And, the omission was Defendant's failure to warn Bella Herndon of known dangers to Bella Herndon when specifically and directly algorithmically targeting Bella Herndon. 6-ER-988 ¶ 79.

Thus, the complaint was precisely clear about what acts *did* and what acts *did not* "supply the basis for [the] claims." Bonni, 11 Cal. 5th at 1010. And, the

complaint was precise about what acts the cause of actions were "arising from." Cal Code Civ Proc § 425.16 (b)(1). It was also precise about what acts the cause of actions were not "arising from." <u>Id.</u>

Below, the Order improperly recast the complaint and side-stepped all the acts alleged as providing the bases for plaintiffs' claims.

The Order did not address the Complaint's specifically identified act, algorithmic targeting Bella Herndon, nor the Complaint's specifically identified omission, failing to warn Bella Herndon of known dangers to her when algorithmically targeting her.

Instead the Order recast the complaint and identified three acts out of which the District Court believed the cause of action arose out of. 1-ER-3-4. It then evaluated *those* acts–acts which did <u>not</u> serve as the basis of Plaintiff's cause of action. The three acts identified and evaluated by the District Court's order were:

(1)   Content

(2)   Creation

(3)   Dissemination

The first "act" which the District Court identified and evaluated as part of its § 425.16 (b)(1) analysis was "content." 1-ER-3-4. Of course, it bears stressing that "content" is not an act. Content is a noun, not a verb.

40

So, not only did Plaintiffs not assert that "content" was the §425.16(b)(1) "act" out of which their cause of action arose, it's not clear how "content" could be an "act" within the meaning of §425.16(b)(1). Indeed, liability does not arise from nouns like "content" standing in isolation; liability arises from what Defendants *do* with those things—*i.e.*, the specific and precise *act* from which the cause of action arises. §425.16(b)(1).[2]

The second "act" which the District Court identified and evaluated as part of its §425.16(b)(1) analysis was "creation." 1-ER-4-5.

But, as an initial matter, the act of creation was expressly identified in Plaintiffs' FAC as not the act out of which plaintiffs' causes of action arose. 6-ER-967. And, as a practical matter, if creation were the basis of plaintiffs' tort claims then there would be other defendants: a studio, director, producer, writer, etc. Here, there is just one defendant—Netflix—the party that algorithmically targeted Bella Herndon. That's because Netflix was not being sued for the creation of the show; it was being sued for algorithmically targeting Bella Herndon and failing to warn of known dangers when directly targeting Bella Herndon. 6-ER-967.

---

[2] Of course, factual allegations about content can be "evidence" or "context" supporting the nature of the claim, the extent or extremity of the harm. The District Court's footnote about perceived inconsistencies fails to distinguish allegations about content serving as evidence and background context, as opposed to factual allegations that serve as the precise "act" out of which Plaintiff's cause of action "arise[s.]" 1-ER-5 n.3.

41

The third "act" which the District Court identified and evaluated as part of its §425.16(b)(1) analysis was "dissemination." 1-ER-4-5. But, the act of public dissemination was also expressly identified in Plaintiffs' FAC as <u>not</u> the act out of which Plaintiffs' cause of action arose.

In a footnote, the District Court alleged that drawing these distinction between distinct acts constituted "clear inconsistency[.]" 1-ER-5 n.3. But there is nothing inconsistent about providing some factual allegations as "background context" and other facts as the "basis of the cause of action." That's not an inconsistency; it's precisely what the California Supreme Court envisioned. <u>Bonni</u> made clear that Courts should "consider whether [plaintiff's] various allegations supply the elements of a retaliation claim or **merely provide context**." <u>Bonni</u>, 11 Cal. 5th at 1012; 6-ER-974 ¶ 24 ("The above allegations in paragraphs 14-23 are **provided for background** and context but are **expressly not the basis** of why Netflix is being sued.").

Nor is there anything inconsistent about providing some factual allegations as "evidence" and other facts as the "basis of the cause of action." <u>Bonni</u> also made clear that courts must distinguish between acts alleged as evidence of liability versus acts alleged as the basis of the cause of action. 11 Cal. 5th at 1014. Providing background facts and evidence for why the algorithmic targeting was

tortious and harmful is not inconsistent with identifying the act of algorithmically targeting as the "act" from which the cause of action "arise[s.]"

The District Court also claimed that Plaintiff's could not have brought suit but for the public dissemination of the show: "But for the broadcast and Defendants' actions in connection with that broadcast, Plaintiff would have no reason to sue Defendants." 1-ER-4.

Yet that's just not true. Algorithmically targeting particular minors and publicly broadcasting are conceptually separable. If Defendant had only algorithmically targeted her but no one else, Plaintiffs could and would be able to bring the exact same claim. But the inverse is plainly not true. If Defendants had not algorithmically targeted Bella, then Plaintiffs could not sue under this cause of action. Put otherwise, absent the act of algorithmically targeting Bella there would be no cause of action. The same cannot be said of the act of public dissemination. The two are conceptually distinct.

Algorithmically targeting specific children and public dissemination are also historically separable. After all, movies have existed and been broadly and publicly distributed to theaters across the country for over a hundred years. But using machine learning algorithms to directly target specific children with individually tailored messaging is a quite new act. And that new act has come with unprecedented harms to the children being targeted with these powerful new tools.

43

Cf. Statement of Frances Haugen ("[T]heir profit optimizing machine is generating self-harm and self-hate—especially for vulnerable groups, like teenage girls. These problems have been confirmed repeatedly by Facebook's own internal research.").

Simply put, the large swaths of child deaths occurring in society and the associated cluster of wrongful death cases arriving at the courthouse doors due to vulnerable children being targeted by sophisticated company with powerful algorithms is a new phenomenon. And, it's a new act within the meaning of § 425.16 (b)(1) use of the phrase "arising from any act[.]" Simply put publicly disseminating a movie to the public at large and individually targeting specific children with algorithms is a different act.

Also, these distinct acts are legally separable under California law. California law plainly draws such distinctions between these distinct acts. For example, the California legislature did not struggle to distinguish between algorithmically targeting children and content. See California Age-Appropriate Design Act § 1798.99.31(a)(1)(B)(i). Nor, did it struggle to distinguish between the distinct acts of general broadcast to the public and directly targeting specific children with powerful algorithms. See, e.g., 1798.99.31(a)(1)(B)(vi); Section 1798.99.30(b)(6) (describing the host of distinct acts involved in the "profiling" conducted to target specific children with algorithms).

So, although the District Court characterized the FAC as artful pleading, the reality is that the FAC is drawing distinctions between acts that are distinct as a matter of logic, as a matter of history, and as a matter of law. And, the Court also overlooked the pragmatic and technological realities that distinguish acts like creation and public dissemination from directly targeting specific individuals algorithmically.

*  *  *  *  *

Below, the District Court recast the complaint and eliding distinct acts when conducting its § 425.16 (b)(1). That's not what the text of the anti-SLAPP statute commands. And it's not what binding authority from the California Supreme Court permits. By running afoul of both, the District Court erred in identification and analysis of the "act[s]" from which Plaintiff's "cause of action arise[s.]" § 425.16 (b)(1).

That's just one legal error that yielded an aberrant anti-SLAPP order that flipped the very purposes of anti-SLAPP on their head.

45

**B.** **Anti-SLAPP Step 1(b): The District Court's improper recasting of the acts in suit led the rest of its anti-SLAPP analysis about rights and public issues astray.**

    i.   <u>The District Court erred because Defendant did not establish a constitutional right to algorithmically target or to fail to warn of know dangers to high-risk individuals.</u>

Defendant did not meet its burden under the first step of the anti-SLAPP analysis because **(1)** it cited no cases demonstrating a Free Speech right to algorithmically target children or to fail to warn them of known harms and because **(2)** the First Amendment doctrines weigh against the idea that there was any speech involved at all that was not subject to a doctrinal exception. **(3)** Though it's likely unnecessary to consider because the initial briefing was sufficient, the District Court also erred in refusing to grant Plaintiffs' Rule 6(b) motion to allow it to correct its briefing below.

Under the first step of the anti-SLAPP analysis, Defendant has the burden to show that the act that gives rise to the claims was "in furtherance of the right of speech[.]" <u>Doe v. Gangland Prods.</u>, 730 F.3d 946, 953 (9th Cir. 2013) ("Defendants must show").

Moreover, under this Court's <u>Planned Parenthood</u> case, defendants asserting an anti-SLAPP motion in federal court can choose to either raise a legal challenge or raise a factual challenge to a plaintiff's claims. As this Court has explained:

> When an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule

of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated. And, on the other hand, when an anti-SLAPP motion to strike challenges the factual sufficiency of a claim, then the Federal Rule of Civil Procedure 56 standard will apply. But in such a case, discovery must be allowed, with opportunities to supplement evidence based on the factual challenges, before any decision is made by the court.

Planned Parenthood Fed'n of Am. v. Ctr. for Med. Progress, 890 F.3d 828, 834 (9th Cir. 2018).

Here, Defendant chose to fight on the law. Defendant filed an anti-SLAPP motion challenging *only* the legal sufficiency of Plaintiffs' claims. 5-ER-884 n.1 ("For purposes of its anti-SLAPP and 12(b)(6) Motions, Netflix's arguments do not challenge Plaintiffs' factual allegations."); 1-ER-4 ("apply the FRCP 12(b)(6) standard"). Accordingly, under Planned Parenthood, the Rule 12(b)(6) standard applies. And, under that standard, we "must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party." Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am., 768 F.3d 938, 945 (9th Cir. 2014).

And to determine whether a defendant has met its initial burden, a court must focus on the "defendant's activity that gives rise to [its] asserted liability." Doe, 730 F.3d at 953 (citing Navellier v. Sletten, 29 Cal. 4th 82, 92 (2002)). As discussed above, see Section I.A, *supra*, here there were two discrete acts from which the cause of action arose:

(1)     Defendant's direct and individualized algorithmic targeting of a specific child, Bella Herndon, using its algorithms.  6-ER-980-984 ¶¶ 57-70; 6-ER-974 ¶ 26 ("Netflix's use of its trove of **individualized** data about its users to specifically target vulnerable children[.]").

(2)     Defendant's failure to warn that specific child, Bella Herndon, of a known danger and risk that she could die as a result of this targeting.  6-ER-974-980 ¶¶ 27-56.

Thus, Defendant has the burden of showing that *this particular act* and *this particular omission* were "in furtherance of [Defendant's] right of petition or free speech under the United States Constitution or the California Constitution[.]"  Cal Code Civ Proc § 425.16(b)(1).  Here, Defendant plainly failed to meet that burden.

Critically, Defendant's Motion did not rely on any case demonstrating that the acts here implicate any recognized or established First Amendment right.  None of those cases implicated any recognized or established First Amendment right to algorithmically target specific children in an individualized fashion.  And, none of these cases involved any recognized or established First Amendment right to refuse to warn of known health risks when targeting those children with powerful algorithms.

**Consider some examples:**

48

● <u>Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston</u>, 515 U.S. 557, 573-574 (1995) (holding that Massachusetts could not force private citizens organizing a parade to include a Gay activists imparting a message the parade organizers don't wish to convey). It's not clear what relevance this has.

● <u>Rivera v. First DataBank</u>, Inc., 187 Cal. App. 4th 709, 715 (2010) ("[T]he act on which the complaint against defendant is based is the confusing language and format of the monograph" in a prescription drug box.)" But this case did not involve a Defendant's refusal to file any warning whatsoever despite selling something with known harms or any First Amendment right not to warn of known harms.

Defendant tries to suggest that these claims are meritless because they implicate some sort of established and recognized First Amendment rights to algorithmically target specific children in an individualized fashion. But the lack of apposite authority in their anti-SLAPP Motion betrays the truth.

The truth is these claims, predicated on novel legal theories and implicating new technologies.

Thus, these claims present difficult questions with little precedent directly on point to provide guidance. That militates heavily ***against*** Defendant's anti-SLAPP motion.

49

But the California anti-SLAPP statute requires the complained of acts to be "in furtherance of [Defendant's] right of petition or free speech[.]" Cal Code Civ Proc § 425.16(b)(1). By contrast, the statute does not authorize dismissal where the complained of act raise difficult questions about what those rights are or if they even exist. Id.

And, California's anti-SLAPP statute is not a fast-pass to give short shrift to novel constitutional claims implicating new and complex fact patterns. Nor is it the appropriate vehicle to establish and recognize new First Constitutional rights. To the contrary, California's anti-SLAPP statute provides for the "early dismissal of **meritless** first amendment cases aimed at chilling expression through costly, time-consuming litigation." Metabolife Int'l, Inc. v. Wornick, 264 F.3d 832, 839 (9th Cir. 2001).

The truth here is that these claims are not meritless, but rather implicate novel legal theories and raise open questions of First Amendment law. Unsurprisingly the Courts have not yet decided many cases about algorithms and algorithmic targeting.

Nor has the First Amendment jurisprudence in this area been developed yet. Indeed, it is not at all clear that Defendants would have any First Amendment right to algorithmically target a specific child.

Moreover, courts should be properly hesitant to dismiss novel theories or novel legal questions under the 12(b)(6) standard (*i.e.*, the standard <u>Planned Parenthood</u> ordains the Court use to evaluate Defendants' Motion).  As this Court expressed in <u>McGary</u>:

> The fact that [Plaintiff's] claim does not fall within the four corners of our prior case law does not justify dismissal under Rule 12(b)(6).  On the contrary, Rule 12(b)(6) dismissals "are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development.

<u>McGary v. City of Portland</u>, 386 F.3d 1259, 1270 (9th Cir. 2004).  Indeed, "court[s]  should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since **it is important that new legal theories be explored and assayed in the light of actual facts**[.]"  <u>Elec. Constr. & Maint. Co., Inc. v. Maeda Pac. Corp.</u>, 764 F.2d 619, 623 (9th Cir. 1985) (quoting 5 Wright & Miller, Federal Practice and Procedure: Civil § 1357, at 601-603 (1969)).

Where open questions of First Amendment law exist, an affirmative

Simply put, anti-SLAPP is not meant to block the development of open questions of law about whether certain First Amendment rights even exist to begin. Defendant's attempt to do so is an abuse of anti-SLAPP.

The Court might also understandably have doubt about whether Defendant's technologies can really do what it's alleged they do. Or, the court might be skeptical about what is really practical to avoid these harms. And, Defendant has certainly tried to sprinkle the seeds of doubt throughout its briefing. See, e.g., 5-ER-884-885 n.1 ("That website directly refutes Plaintiffs' claim that the recommendation algorithm uses subjective or demographic information to target young, vulnerable people. It does not. Rigorous parental controls are available to Netflix's account holders, who may decide for themselves what content is appropriate for their families.").

But that's simply resisting the facts that must be taken as true at this juncture. And, more importantly, such concerns and questions about what is really practical or feasible here weigh in favor of developing the factual record, not using anti-SLAPP to evade or short-circuit open legal questions about novel technologies—open legal questions about whether certain First Amendment rights do *or* do not exist.

In sum, Defendants rely on a handful of wildly inapposite First Amendment cases that have nothing to do with the acts at issue here (algorithmically targeting children). They do so to avoid difficult questions about what their First Amendment rights.

**There are also First Amendment doctrines weighing against Defendant's view here**.

Above, Plaintiffs' show that Defendant's cases and authorities did not establish that Defendant had a First Amendment right implicated by the acts from which Plaintiff's causes of action arise. In other words, Defendant failed to show that they had a First Amendment right to algorithmically target specific vulnerable children in an individualized fashion. And, Defendant failed to show that they had a First Amendment right to refuse to warn those children of known serious health risks, including the prospect of death, caused by their algorithmic targetings of these children.

Here, Plaintiffs' further argue that Defendant's cannot show that they have any such First Amendment right. That's because the First Amendment doctrines, established by the Courts, are not compatible with Defendant's purported First Amendment Rights.

**These arguments apply both to undermine Defendant's arguments on their burden to satisfy anti-SLAPP step one, but also shows why their First Amendment defense fails as a substantive matter and does not bar Plaintiffs' claims.**

To start it's not at all clear that Defendant's data profiling and algorithmically targeting specific children constitutes protected speech within the

53

meaning of First Amendment jurisprudence. Regardless, even if such acts were protected speech, the First Amendment is not absolutist, as Defendant mistakenly suggests. There are doctrinal limits. Even protected speech is subject to tiers of scrutiny.

But Defendant's First Amendment position throughout this litigation has been at odds with these established jurisprudential contours. Indeed, Defendant's position, when assessed on this procedural posture, is as radical as it is unworkable. Defendant argues that they have a First Amendment right to refuse to warn of known health risks when algorithmically targeting children–even if they have reason to believe such conduct could kill that child. And, Defendant takes the position that they have an absolute First Amendment right to algorithmically target specific –no matter what the health consequences on those children up to and including causing death. At this procedural posture, this is the extremity of Defendant's positions about the scope of its First Amendment rights. That's a position that's as untenable as it is radical.

Perhaps, Defendant's First Amendment position is so untenable, because it rests on a faulty foundation. Below, Defendant made a truly bold claim and adopted an absolutist First Amendment position. Defendant explained below that "Supreme Court has long held that the law may not be used to punish protected expression by imposing civil liability." 5-ER-903.

54

Of course, that's not true. Defamation and a host of other counterexamples come immediately to mind.

And, indeed, Defendant's statement is not an accurate statement of the law. The First Amendment does not bar the imposition of civil liability categorically for protected expression. Defendant had cited Cohen v. Cowles Media Co., 501 U.S. 663 (1991), as standing for that absolutist position. In fact, Defendant was relying on Justice Blackmun's dissent from Cohen. 3-ER-331. Unsurprisingly, the *majority* in the Supreme Court's Cohen decision struck a more nuanced tune. As the Supreme Court explained:

> This case, however, is not controlled by this line of cases but, rather, by the equally **well-established line of decisions holding that generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects** on its ability to gather and report the news.

Cohen, 501 U.S. at 669.

Thus, there is no absolutist bar insulated speech from any restriction and any liability. Indeed, the established doctrine imposes a series of limiting principles. Indeed, numerous first amendment doctrines demonstrate that Defendant's radical position is incompatible with existing First Amendment jurisprudence.

**As an initial matter, it is not even clear that there is any protected speech at issue.** Plaintiffs' action, if successful, would not affect the public activities of Defendant—*i.e.*, it would not prohibit public dissemination; would not

55

curtail creation; or compel any sort of artistic speech; would not prohibit any artistic speech; and would not compel or set any sort of limits on editorial decision.

Defendant would simply need to add a common-sense label and not **use** its algorithms in certain reckless and dangerous fashions for commercial purposes on vulnerable children. Defendant's suggestion that these modest tweaks would run afoul of the First Amendment threatens not just Plaintiffs' claims but also threatens to jeopardize watershed legislative efforts to protect children from the real world harms such algorithmic products have been causing. See California Age-Appropriate Design Code Act. But such narrowly tailored modest tweaks in order to serve the compelling interest of saving the lives of vulnerable children would pass even the strictest scrutiny.

Regardless, it's not clear that algorithms, operating latently and clandestinely, invisible even to the user that they're operating on would even constitute speech. And, making minor modifications to how those algorithms are used and deployed and targeted would not improperly restrict speech even if they were.

Second, the Supreme Court has "long recognized that not all speech is of equal First Amendment protection." Snyder v. Phelps, 580 F.3d 206, 214 (4th Cir. 2009). The First Amendments protections are nuanced and subject to tiers of protection. Indeed, "[w]hen speech gives rise to civil tort liability, the level of

First Amendment protection varies depending on the nature and subject matter of the speech." Id. While the First Amendment does apply to a plaintiff seeking damages for repetitional, mental or emotional injury arising from defendant's speech, the "Supreme Court has deemed the First Amendment defense inapplicable to a state law tort claim only when the plaintiff seeks damages for actual pecuniary loss[.]" Id. at 218 n.11 (citing Cohen, 501 U.S. at 671 as "concluding that First Amendment did not bar economic damages resulting from defendant's tortious breach of promise").

Third, not all things called speech are speech within the meaning of the First Amendment. Indeed, "the Supreme Court has clearly defined five categories of speech which do not further First Amendment principles[.]" Stricklin v. Stefani, 358 F. Supp. 3d 516, 527 (W.D.N.C. 2018). These five categories of speech that fall outside the ambit of First Amendment protection are: (1) fighting words; (2) incitement to riot; (3) libelous speech; (4) obscenity; and (5) child pornography. Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 504 (1984).

Arguably Defendants algorithmically targeting children, whether it's colloquially called speech or not, would fit within the precluded categories of "incitement" or "obscenity". Latently and clandestinely manipulating and harming children via direct algorithmic targeting in an individualized fashion certainly

57

seems morally obscene, would shock the conscience and incites violence (albeit violence against the self in the form of suicide).

It's worth noting that "these categories are not all-encompassing of unprotected speech." Stricklin, 358 F. Supp. 3d at 527. Just because a type of speech falls outside those categories does not mean that speech is "automatically entitled to broad First Amendment protection." Id. That is especially so where the statements "actually **disserve society by creating the potential for disorder and danger**." Id.

In short, Defendant's acts arguably fall within several of the five categories of non-protected speech clearly defined by the Supreme Court. And, that list is not conceptually exhaustive of any and all such categories. Certainly, the courts, especially the Supreme Court, could fashion new categories in response to new and unprecedented harms.

And, the Stefani case is insightful here. There, singer Gwen Stefani "invited patrons to move towards the stage, prompting an alleged 'stampede crowd rush.'" Strickland, 358 F. Supp. 3d at 521. The court rejected defendant's analogy to McCollum (i.e., the Ozzy Osbourne case) and instead found the case more analogous to Weirum v. RKO General. The Stefani court noted that "**imbuing Stefani's invitation with artistic significance does not immunize her from**

**being held accountable for negligence and the resulting harm which flowed from her statements.**" <u>Id.</u> at 528. So too here.

The First Amendment simply does not provide speech with an absolute shield to any accountability for negligence and harm caused by statements, as Defendant's mistakenly have claimed throughout this litigation.

Finally, in order to prevail in their First Amendment defense, Defendant would need to overcome several different doctrines of First Amendment jurisprudence. But this they cannot do. Defendant would need to overcome the secondary effects doctrine. <u>See</u>, <u>e.g.</u>, <u>Young v. Am. Mini Theatres</u>, 427 U.S. 50, 52 (1976) (addressing "whether that statutory classification is unconstitutional because it is based on the content of communication protected by the First Amendment."). Defendant would also have to overcome limiting principles imposed by the commercial speech doctrine. <u>See</u>, <u>e.g.</u>, <u>Charles v. City of L.A.</u>, 697 F.3d 1146, 1151 (9th Cir. 2012) ("Commercial speech enjoys a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, and is subject to modes of regulation that might be impermissible in the realm of noncommercial expression."). Indeed, commercial speech restrictions are subject to "intermediate" scrutiny. <u>Fla. Bar v. Went for It</u>, 515 U.S. 618, 623 (1995). Perhaps most salient here, as to the failure to warn causes of action is <u>Zauderer v. Office of Disc. Counsel</u>, 471 U.S. 626 (1985).

59

And, the fact that the claims arise specifically from Defendant's treatment of minors also has significant bearing here. Speech targeted at minors can be treated differently than that targeted at adults. See, e.g., James v. Meow Media, Inc., 300 F.3d 683, 696 (6th Cir. 2002) (acknowledging that plaintiffs' position is "more nuanced: they do not seek to hold the defendants responsible merely for distributing their materials to anyone, but to young, impressionable children" and recognizing that "certain speech, while fully protected when directed to adults, may be restricted when directed towards minors."); FCC v. Pacifica Foundation, 438 U.S. 726, 749 (1978).

In sum, Defendant's purported First Amendment defense to the claims asserted here have a number of doctrinal hurdles to clear, and it's not even clear that Defendant's refusal to warn of known harms and it's latent, clandestine algorithmically targeting children even constitutes protected speech to begin.

**Finally**, Plaintiffs believe that this issue will likely not need to be addressed on appeal. That's because Plaintiff's believe that their timely filed Opposition below sufficiently raised and addressed Defendant's First Amendment Defendant. But because Defendant argued waiver below, out of an abundance of caution, Plaintiffs submit on appeal that the District Court abused its discretion in denying Plaintiffs' Rule 6(b) Motions to file an amended Opposition within 48 hours of the original filing.

It is respectfully submitted that the District Court's denial of Plaintiffs' Rule 6(b) motions was an abuse of discretion because the District Court denied these motions without applying the correct standard.  <u>Ahanchian</u>, 624 F.3d at 1261; <u>see</u> 2-ER-139-152; 3-ER-316.

Four factors determine whether a party's failure to meet a deadline constitutes "excusable neglect."  <u>Ahanchian</u>, 624 F.3d at 1261.  Those factors are: (1) the danger of prejudice to the opposing party.  Here there was no prejudice to the late filing because Plaintiffs had already stipulated to Defendant's request for 21 days to file their reply—*i.e.*, triple the ordinary time set by the Local Rules to reply.  6-ER-995-997; 4-ER-677-679.  (2) The length of the delay and its potential impact on the proceedings.  The delay in submitting the amended opposition was only two days after the deadline.  (3) The reason for the delay was in part due to the Thanksgiving Holiday and the need to consult at length with their clients regarding the complex matters in the case. And (4) whether the movant acted in good faith.  Plaintiff committed to assent to Defendant as much additional time as they felt necessary to prepare their reply.

The Rule 6(b) standard was satisfied below.

ii. The District Court erred because it adopted a forbidden synecdoche theory of "public issue" and confused a targeting algorithm with the creation and dissemination of a show.

The District Court Order's interpretation §425.16(e)(4) was overly broad. See 1-ER-4.

Several reasons demonstrate that §425.16(e)(4) is not triggered here.

First, the statutory cannon of *ejusdem generis* indicates that this catchall provision, §425.16(e)(4), should be construed more narrowly than it might seem when read in isolation. Importantly, the California courts have repeatedly turned to the doctrine of ejusdem generis to interpret California's anti-SLAPP statute. See, e.g., Exline v. Gilmore, 67 Cal. App. 5th 129, 139 (2021); FilmOn.com Inc. v. DoubleVerify Inc., 7 Cal. 5th 133, 144-145 (2019). Ejusdem generis means that the "general term or category is restricted to those things that are similar to those which are enumerated specifically." In FilmOn, the California Supreme Court applied the ejusdem generis canon and explained that §425.16(e)(4)'s broad catchall phrase "other conduct in furtherance" must be cabined to encompass only that "conduct and speech similar to what is referenced in section 425.16, subdivision (e)(1) through (3)." FilmOn.com, 7 Cal. 5th at 144. So too with §425.16(e)(4)'s use of the broad term "issue of public interest[.]" That phrase must be read to encompass only conduct and speech similar to what is specifically enumerated throughout §425.16(e).

62

<u>Second</u>, Defendant's use of latent, clandestine and invisible algorithms to target and manipulate children is not meaningfully connected to a public issue. All the more so because these algorithmic targetings are also individualized and personalized to each recipient. In <u>FilmOn</u>, made clear that "the context of a defendant's statement is relevant, though not dispositive, in analyzing whether the statement was made "in furtherance of" free speech "in connection with" a public issue.  § 425.16 (e)(4); <u>FilmOn.com</u>, 7 Cal. 5th at 140.  On that rationale FilmOn considered digital private communications to paying clients as not triggering the scope §425.16(e)(4).  <u>See generally</u> <u>id.</u>  So too here—only more so.  In <u>FilmOn.com</u>, the emails were private.  Here, the algorithmic targetings are individualized and personalized.  In FilmOn, it was sent to paying customers.  Here, the targetings are happening behind a paywall.  Indeed, here the algorithmic targeting are for all practical purposes invisible and going undetected by the users receiving them. Under <u>FilmOn.com</u>'s contextually-sensitive approach, Defendant's individualized, personalized, clandestine, for-profit, paywalled algorithmic targetings do not trigger §425.16(e)(4).

<u>Third</u>, the District Court relied on a thoroughly discredited "synecdoche" theory.  The District Court ruled that "There is no dispute here that youth suicide, depression, and sexual assault are of great public interest."  1-ER-4. But two recent California Supreme Court cases, <u>FilmOn.com</u> and <u>Wilson</u>, decisively foreclose that

63

synecdoche strategy of triggering §425.16(e)(4).  The California Supreme Court rejected improper "'synecdoche theor[ies]' of public interest, defining [a] narrow dispute by its slight reference to the broader public issue." FilmOn.com, 7 Cal. 5th at 152.  So, while the issue of suicide is a matter of public interest,  Hannah Baker's fictional suicide is not a matter of public interest.  See 6-ER-983 ¶ 68.  By treating that the mere depiction of a suicide or a sexual assault as the same thing as a referent to the public issue of suicide and sexual assault writ large, the Order relied on the "oft-rejected, so-called 'synecdoche theory of public issue in the anti-SLAPP statute[.]'"  World Fin. Grp., Inc. v. HBW Ins. & Fin. Servs., Inc., 172 Cal. App. 4th 1561, 1570 (2009). But one cannot just abstract to "society's general interest" in a broad topic without any showing of how its "specific speech or conduct" is a matter of public interest.  Id.

*Fourth*, and here getting to §425.16(e)(4) would require a double synecdoche.  That's because the particular act is algorithmic targeting.  So here one would have to not just make the jump from the show's depiction of a fictional suicide to the larger social issue of suicide.  One would also have to make the jump from the algorithm to the show.  So, suicide might very well be a matter of public interest. But just because suicide is a matter of public interest that does not make an algorithm that targets a show about suicide *itself* a matter of public interest. Indeed, regardless of what content it may be delivering its hard to imagine how a

64

clandestine, invisible, individually tailored algorithmic targeting could. No one ever sees the algorithm. And here, the algorithmic targeting was *two* synecdoche theories away from the matter of public interest the Order identified: "youth suicide, depression, and sexual assault are of great public interest." 1-ER-4.

For this reason too, the anti-SLAPP order could be reversed.

**C.  Anti-SLAPP Step 2: The District Court's errors on the motion to dismiss mean that the District Court also erred on the second step of the anti-SLAPP statute.**

Because Defendant challenged the legal sufficiency of Plaintiffs' claims through a Rule 12(b)(6) motion, 5-ER-886, the second step of Defendant's anti-SLAPP motion to strike is decided by using the familiar Rule 12(b)(6) standards, see Planned Parenthood Fed'n of Am. v. Ctr. for Med. Progress, 890 F.3d 828, 833 (9th Cir. 2018); CoreCivic, Inc. v. Candide Grp., LLC, 46 F.4th 1136, 1143 (2022) (same).

Below, the District Court addressed four issues regarding sufficiency of Plaintiffs' claims, each of which is raised on appeal and briefed in the merits sections of this Brief. Those sections are hereby incorporated by reference and reapplied to the second step of the anti-SLAPP analysis:

- The District Court's order erred on survival limitations. See 1-ER-6, Section II.A, *infra*.

- The District Court's order erred on wrongful-death standing. See 1-ER-5-6, Section II.B, *infra*.

- The District Court's order erred on duty of care. See 1-ER 6-7, Section III.B, *infra*.

- The District Court's order erred on products liability. See 1-ER-6, Section III.C., *infra*.

Also, Defendant made Free Speech arguments below. 5-ER-901-906; 2-ER-113-116. It's unclear whether these arguments need to be considered by this Court for the second step of its anti-SLAPP analysis because the District Court's order did not rule upon them. See 1-ER-7.

To the extent that issues raised by an anti-SLAPP movant but not addressed by a district court's order *must* be raised on appeal to challenge the anti-SLAPP ruling, Plaintiffs incorporate by reference and reapply their arguments on this issue made above, *i.e.*, that Defendant's Free Speech arguments are incorrect. See Section I.B.i, *supra*.

Furthermore, Defendant made causation arguments below. 5-ER-900-901; 2-ER-124. The District Court's order did not rule upon them, so, again, its unclear if this Court need to address them. In any event, Defendant's causation arguments were plainly incorrect, both on the California standard for causation generally and on the doctrine of superseding cause specifically.

California uses a substantial-factor test of causation: "California has definitively adopted the substantial factor test of the Restatement Second of Torts for cause-in-fact determinations." E.g., Rutherford v. Owens-Illinois, Inc., 16 Cal. 4th 953, 968 (1997). This test is broad, encompassing "independent or concurrent causes in fact." Id.

The substantial-factor test is significant here.  *Even if* other factors (*e.g.*, mental health) are believed to be significant causes of the physical harm that occurred here (*i.e.*, suicide), Defendant can still have *caused* harm to *Bella* via its algorithmic targeting of her.  See id.  In turn, the fact that the algorithm played such a role in Bella's death is the central point of Plaintiffs' pleadings.  See generally 6-ER-967-994.

Furthermore, Defendant's arguments pertaining to superseding cause, are, respectfully, quite confused.  As demonstrated by the case of Jacoves v. United Merchandising Corp., 9 Cal. App. 4th 88 (1992), negligence that later contributes to suicidal death is not excused under California law on a pass-the-buck theory that the suicide itself or the possible negligence of another party absolves the tortfeasor for *its* negligence.  See id. at 111.

Jacoves involved the "suicide death of 20-year-old Jonathan Jacoves."  Id. at 95.  Mr. Jacoves was negligently discharged from the hospital, met with other doctors on an outpatient basis, but, eleven days later, bought a gun and died via a "self-inflicted gunshot wound."  Id. at 99.

In court, the negligently-releasing hospital tried to absolve itself by arguing that both the failure of the outpatient doctors to protect Mr. Jacoves and the purchase of the gun each constituted a "superseding cause relieving the Hospital of liability."  Id. at 111.

68

They weren't: "If the Hospital's *negligence* was the proximate cause of Jonathan's *suicide*, the failure of his [outpatient] doctors and parents to subsequently prevent that suicide is *not* a superseding cause relieving the Hospital of liability." Id.  The "**suicide***, itself, was the foreseeable risk* and **cannot, therefore, be a superseding cause**." Id. at 112.[3]

Importantly, the argument that the suicide itself was a "superseding cause" has a repugnance concealed by its doctrinal verbiage.  *In plain English*, this argument is the argument that a wrongdoer can *never* be called to account for their contributions to suicide because suicide is really the fault of the decedent.  But cf. 5-ER-906 (making this argument when characterizing the "intention to kill himself" as an "intervening force").

California rejects such a short-sighted and callous position.  Jacoves, 9 Cal. App. 4th at 112 (The "**suicide**, itself, was the foreseeable risk and **cannot, therefore, be a superseding cause**.").

---

[3] And, importantly, it's not Plaintiffs burden to *disprove* superseding causes, but rather Defendant's burden—"***its*** burden of demonstrating that any subsequent superseding causes of [Bella's] death existed"—which is has not met here.  See id. at 112.

### D. Anti-SLAPP Applicability: California anti-SLAPP should not be applied to claims filed in state court and then removed.

There is also the issue of whether California anti-SLAPP motions can be brought against claims *removed* to federal court.

Although Plaintiffs originally filed these claims in *state* court, 6-ER-1137, Defendant removed them to *federal* court, 6-ER-1062-1067. Then, Defendant filed its anti-SLAPP motion. 5-ER-871. In response, Plaintiffs asserted that anti-SLAPP motions "should *not* apply in federal courts" pointing to other Courts of Appeals that have rejected federal application of state anti-SLAPP, including California's. 3-ER-435.

Plaintiffs openly acknowledged that this Court has held otherwise for claims and counterclaims *originally* filed in federal court. 3-ER-436 (citing United States ex rel. Newsham v. Lockheed Missiles & Space Co., 190 F.3d 963, 972 (9th Cir. 1999)). Moreover, this Court has since held that its Newsham holding is not "clearly irreconcilable" with the Supreme Court's decision in Shady Grove. CoreCivic, 46 F.4th at 1143.

With this background in mind, Plaintiffs press three points:

1. Newsham is distinguishable because the claims there were *not* removed.

2. Newsham's rationales do not apply to claims that *were* removed, as here.

3. If this Court feels bound, it should at least acknowledge the Circuit split.

***First***, <u>Newsham</u> did *not* arise in the removal context like this case and is, therefore, distinguishable.

<u>Newsham</u> arose under original jurisdiction. <u>Newsham</u>, 190 F.3d at 967 (permitting anti-SLAPP motion against counterclaims first asserted in federal court). The same is true of <u>Planned Parenthood</u>. 890 F.3d at 830-831 ("sued" in "federal district court"). So too with <u>CoreCivic</u>. 46 F.4th at 1139 ("filed this suit" in "the Central District of California"). None of these cases arose in the context of *removal* jurisdiction or involved removed claims.

Furthermore, although a few appeals have applied anti-SLAPP in cases removed to federal court, <u>e.g.</u>, <u>Safari Club Int'l v. Rudolph</u>, 862 F.3d 1113, 1118 (9th Cir. 2017), it does not appear that any such cases raised the specific issue of anti-SLAPP's applicability to claims that are removed from state court to federal court. None of them inquired whether <u>Newsham</u>'s <u>Erie</u> analysis was applicable in the context of claims so removed.

Instead, it appears that in such cases, the Court "simply *assumed* that [anti-SLAPP] applied, but the issue was never raised or discussed" by the parties as an issue before the Court. <u>See</u> <u>Sakamoto v. Duty Free Shoppers, Ltd.</u>, 764 F.2d 1285, 1288 (9th Cir. 1985).

"**Such unstated assumptions on non-litigated issues are not precedential holdings binding future decisions**." <u>Id.</u>

71

Thus, whether Newsham's Erie analysis and holding on anti-SLAPP apply to *removed* claims appears to be an open question.

***Second***, when Newsham's analysis is examined in the context of claims first filed in state court, its Erie analysis either does not apply or pulls in the opposite direction.

Newsham identified four reasons for its Erie analysis:

1. *Forum-Shopping Concerns*: Not applying anti-SLAPP would give "a significant incentive to shop for a federal forum." 190 F.3d at 973.

2. *Substance vs. Procedure*: Anti-SLAPP furthered "important, substantive state interests[.]" Id.

3. *Lack of Federal Interests*: No one had "identified any federal interests that would be undermined by application of the anti-SLAPP provisions[.]" Id.

4. *Inequitable Administration*: There was concern that giving plaintiffs loophole to wholly deprive defendants of the anti-SLAPP procedure would be an "inequitable administration of the law[.]" Id.

Each point, however, applies differently here in the context of removed claims. Each point is addressed in order.

**1.** Forum-shopping seemed to be the biggest concern in <u>Newsham</u>.  Here, forum shopping is not a serious concern because Plaintiffs *<u>filed their claims in</u>* *<u>state court</u>*.

On this procedural posture, there is simply no question of forum shopping whatsoever.  Here, Plaintiffs filed their claims in *state* court—where anti-SLAPP is indisputably applicable.  6-ER-1137.  Then, it was Defendant who removed these claims to *federal* court.  6-ER-1062-1067.  Accordingly, the astute forum shopping concerns that animated <u>Newsham</u> simply do not support application of anti-SLAPP to claims brought to federal court on removal.

**2.**  On substance versus procedure, the California Supreme Court has now authoritatively stated that an anti-SLAPP motion is a "*<u>**procedural**</u>* device[.]"  <u>E.g.</u>, <u>Flatley v. Mauro</u>, 39 Cal. 4th 299, 312 (2006).

That's not dispositive for <u>Erie</u>, but it bears some weight.  <u>See</u> <u>Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.</u>, 559 U.S. 393, 423 (2010) (Stevens, J., concurring in the judgment) (noting the possibility of "a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right").

Furthermore, the anti-SLAPP statute itself makes clear that it *<u>cannot</u>* have substantive effect.

The anti-SLAPP statute says as much.  See Cal. Civ. Proc. Code § 425.16(b)(3) (denial of anti-SLAPP motion not "admissible in evidence at any later stage" with no effect upon "burden of proof" as to either side).  By way of comparison, "for purposes of an Erie analysis, PAGA in general quite probably qualifies as substantive rather than procedural" because it conveys a right to recover on a substantive claim.  See Hamilton v. Wal-Mart Stores, Inc., 39 F.4th 575, 584 n.3 (9th Cir. 2022).

The only real effect of federal anti-SLAPP motions is their fee-shifting.  Cal. Civ. Proc. Code § 425.16(c)(1) ("shall" impose fees).  Yet, anti-SLAPP fee-shifting functions more like a mandatory sanction than as a substantive portion of the claim itself.  In this sense, anti-SLAPP fee-shifting is much more akin to the 1983 version of Rule 11 that mandated sanctions for frivolous claims, a harsh rule that has since been abolished in federal court.  Compare Fed. R. Civ. P. 11 (1983) ("shall impose") with Fed. R. Civ. P. 11(c)(1) (2022) ("may impose").

Indeed, given the above, it's no longer clear that anti-SLAPP is in any way substantive, except insofar as forum-shopping concerns arise.  Hanna's concerns about forum shopping would still apply to claims originally filed in federal court.  Yet, the inapplicability of that forum-shopping worry as to removed claims, coupled with the lack of a substantive effect of anti-SLAPP, *weighs against* applying anti-SLAPP to claims *removed* from state court.

74

**3.** There *are* federal policies that favor not applying anti-SLAPP for claims removed to federal court.

Several federal interests weigh upon anti-SLAPP application. There are federal interests for claims that are first filed in *state* court and for claims that are first filed in *federal* court. But, these federal interests point in opposite directions depending upon where the claim first originated.

Refusing to apply anti-SLAPP to claims first filed in the federal courts would, in turn, "put the federal courts at risk of being swept away in a rising tide of frivolous state actions that would be filed in [the Ninth Circuit's] federal courts." See Makaeff v. Trump Univ., LLC, 736 F.3d 1180, 1187 (2013) (Wardlaw, J., and Callahan, J., concurring in the denial of rehearing en banc). *That* would invite a federal defamation docket—an abusive, frivolous defamation docket to clog federal courts at that.

In the Newsham scenario (state counterclaims first filed in *federal* court) or CoreCivic scenario (state claims first filed in *federal* court), forum shopping is clearly part of the strategy—and it burdens the federal courts, trial and appellate courts alike.

The incentives of litigants, however, are **not** the same for claims that are removed.[4] *If* claims removed to federal court from state court were *not* subject to anti-SLAPP motions, then those sued in state courts would be more likely to *keep* the most frivolous of claims in state court, reducing the burden on federal courts of both deciding removal jurisdiction and of deciding anti-SLAPP motions after jurisdiction is decided.

Likewise, there's another federal interest: federalism itself. There is a strong interest in state courts developing their own law. Notably, frivolous claims are subject to anti-SLAPP motions, but state-law claims raising open questions of state-law are also at risk to such motions. And, if removal of those open questions barred anti-SLAPP motions, then the incentive would be to keep cases raising open question of state law in the *state courts*. State courts be fielding more of the complex, novel questions that arise under their alw.

In sum, the federal policy interesta point in the opposite direction, *i.e.*, *against anti-SLAPP application*, when the claims at bar are those *removed* to federal court from state court.

---

[4] The <u>Makaeff</u> concurrence does mention of the possibility of SLAPP plaintiffs having an "incentive to file *or remove* to federal courts [their] strategic, retaliatory lawsuits[.]" <u>Id.</u> Counsel understand the concurrence to be referring to counterclaims filed in federal court, as in <u>Newsham</u>. <u>See</u> Cal. Civ. Proc. Code § 425.16(b)(1) (anti-SLAPP only filed against a cause of action); <u>id.</u> § 425.16(h) (anti-SLAPP motions apply to cross-claims). This analysis would not apply to claims first filed in federal court.

These federal policy interests are reversed for claims first filed in state court because adopting anti-SLAPP procedures in this context incentivize removal of either (1) novel state-law claims for which federal courts cannot as readily develop the common law (and for which comity interests militate in favor of state-court adjudication) _**or**_ (2) frivolous claims, which purely burden the federal courts and sap time, attention, and resources from meritorious claims and litigation of federal questions.

**4.**  Finally, <u>Newsham</u> got the equities right for claims _originally_ filed in federal court because an opposite result on that procedural posture that would create a loophole through which defendants could never exercise anti-SLAPP rights against forum shoppers.

That same loophole doesn't apply to claims first filed in state court.  And, application of anti-SLAPP _after_ removal works a whole host of inequities to a plaintiff who _has_ filed in a good-faith desire to petition for redress of genuine grievances, as here.  (Plaintiffs filed suit out of a deep desire to see the reasonable, sensible changes that would have avoided Bella's death—such as a warning about genuine risks of the algorithmic targeting upon children.)

For example, removal on _novel_ claims or _frivolous_ claims slows the development—either way—of state law.

Removal increases the costs and burdens on parties as they dispute jurisdictional and removal questions. Furthermore, this additional cost of litigation is inequitable to plaintiffs because plaintiffs face the risk of greater anti-SLAPP fee-shifting from the additional steps in the litigation.

Insofar as "California's anti-SLAPP statute was enacted to provide 'an *efficient procedural mechanism for the early and inexpensive dismissal* of nonmeritorious claims[,]" plaintiffs facing the risk of mandatory fee-shifting as they try to develop the law have every bit as much of an interest in procedures that lead to prompt resolution anti-SLAPP and without the additional burdens imposed by removal. Cf. La Liberte v. Reid, 966 F.3d 79, 85 (2020). Therefore, permitting anti-SLAPP on claims *removed* from state court works inequity against plaintiffs and—given that defendants can file such motions in state court works far less inequity against them.

Thus, refusing to apply anti-SLAPP for claims originally filed in *federal* court inequitably burdens defendant's anti-SLAPP procedural rights. By contrast, refusing to apply anti-SLAPP for claims originally filed in state court and then removed to federal court *balances the equities* because each side bears some of the burden of our complex federal system of adjudication.

In sum, Newsham's astute analysis of the Hanna concerns turns out the *opposite* way in claims that are removed from state court.

78

First, claims filed by a plaintiff in *state* court raise no forum-shopping concern.  Second, the procedural nature of anti-SLAPP means that it doesn't—and cannot by the plain text—affect the substantive claims.  Third, there are federal interests in incentivizing suits raising frivolous claims and also those raising open questions to <u>*stay*</u> in state court—interests in reducing the federal judicial workload and in the robust development of state law by state courts.  And, fourth, given that anti-SLAPP is meant to be "early and inexpensive" dismissal and that the mandatory fee-shifting gives plaintiffs as much of an interest early disposition of the anti-SLAPP motion as well, the delay and expense imposed by removal and removal litigation works hardship and inequity upon plaintiffs.

For all these reasons, Plaintiffs respectfully submit that (1) <u>Newsham</u> does not control as to claims removed to federal court and (2) the <u>Erie</u> analysis tips decidedly the other way in the context of any claim that was first filed in state court and then removed.

***<u>Third</u>***, if the Court feels bound by <u>Newsham</u> here or extends <u>Newsham</u> to the removal context, Plaintiffs respectfully request that this Court expressly acknowledge the Circuit split.

Plaintiffs—grieving family members who lost their daughter and sister—have been and are being repeatedly threatened with ruinous anti-SLAPP fees by Defendant here.

Given such threats, Plaintiffs assert and preserve whether California anti-SLAPP motions can be asserted in federal court at all. See La Liberte, 966 F.3d at 85-88.

In Planned Parenthood, Circuit Judge Gould authored a thoughtful concurrence that candidly acknowledged the "circuit split" on the *general* issue of whether anti-SLAPP procedures can be applied in federal court. 890 F.3d at 836 (Gould, J., concurring) ("[T]he use of anti-SLAPP procedure in federal courts has been squarely rejected by three circuits, the D.C. Circuit, the Seventh Circuit, and the Tenth Circuit.").

Since then, the Second Circuit has reached the opposite conclusion from Newsham on the *specific* issue of whether *California*'s anti-SLAPP laws can apply in federal court at all. La Liberte, 966 F.3d at 83 ("[W]e hold that *California*'s anti-SLAPP statute is inapplicable in federal court[.]"). The Second Circuit declined "to follow the Ninth Circuit" and referenced its "circuit split" with this Court. Id. at 87.

Accordingly, Plaintiffs respectfully request that this Court acknowledge the direct Circuit split on the precise issue of whether *California*'s anti-SLAPP law can apply and also acknowledge the entrenched Circuit split among the Courts of Appeals on the broader issue of whether anti-SLAPP laws in general can apply in federal court.

* * * * *

In sum, the <u>Erie</u> analysis of anti-SLAPP turns out quite differently from <u>Newsham</u> when applied to claims removed from state court. Certainly, anti-SLAPP is well-intentioned and there are likely many cases where it makes sense. Yet the policy guidance of <u>Erie</u>—on forum shopping, federal interests, and equitable administration of our complex federal system—comes out differently for claims that are first filed in state court and then removed.

Indeed, anti-SLAPP is well-intentioned, but it is also subject to abuse. After all, here, Defendant is asserting that *this* is a *Strategic* Lawsuit Against Public Participation. It's plainly not on <u>Newsham</u>'s understanding of what that means: "*<u>The hallmark of a SLAPP suit is that it lacks merit, and is brought with the goals of obtaining an economic advantage **over a citizen party**</u>*[.]" <u>Newsham</u>, 190 F.3d at 970-971.

Plaintiffs are the only citizen parties here. And, the very insinuation that the death of their daughter and sister was some *<u>Strategic</u>* ploy to attack Defendant's algorithm is as offensive as it is absurd. The anti-SLAPP procedure is being decidedly abused by Defendant here.

Furthermore, this type of abuse of the anti-SLAPP procedure has been acknowledged by the California Legislature. <u>See</u> Cal. Civ. Proc. Code § 425.17(a).

The irony of the way in which large corporations have used anti-SLAPP to terrorize citizen parties been noted by esteemed federal jurists.  E.g., Dinapoli v. Yelp Inc., 355 F. Supp. 3d 101, 104 n.2 (D. Mass. 2019) (Young, D.J.) ("It is perhaps ironic that here a large corporation is using the [anti-SLAPP] statute against an individual dentist who alleges mistreatment at its hands and who sought to exercise his legal rights.").

One way to reduce the abuse is to withdraw anti-SLAPP from claims removed to federal court, while still keeping with Newsham's "additional, unique weapon to the pretrial arsenal" for claims original brought in federal court.  190 F.3d at 973.

## II.   THE DISTRICT COURT ERRED ON CALIFORNIA WRONGFUL-DEATH STANDING AND CALIFORNIA SURVIVAL LIMITATIONS.

### A.   The District Court erred in holding that Bella's death shortened the time to assert her survival claims.

When Bella Herndon died at fifteen years of age, her personal-injury claims "survive[d]" her death.  See Cal. Civ. Proc. Code § 377.20(a).  In turn, California's statute on survival limitations instructs that Bella's claims may be brought until the end of the "limitations period that would have been applicable if [Bella] *had not died*."  See id. § 366.1(b).  This makes sense.

It makes sense to apply the limitations period as though Bella had *not* died because these survival claims are merely the same "right of action which [Bella] would have had *if [s]he had survived the injury*"—*i.e.*, if she had *not* died.  E.g., Munro v. Pacific Coast Dredging & Reclamation Co., 84 Cal. 515, 524 (1890); Grant v. McAuliffe, 41 Cal. 2d 859, 864 (1953) (Survival of claims "do[es] not create a new cause of action[.]").

If Bella had *not* died, the limitations period that would have been applicable would have expired upon her twentieth birthday, *i.e.*, on May 1, 2021.  See 3-ER-472 (Bella's date of birth was May 1, 2001.); Cal. Civ. Proc. Code§ 352(a) (limitations period doesn't begin until "age of majority"); id. § 335.1 ("two years" limitation period for personal injury).

Thus, under the operative §366.1(b), Bella's survival claims are timely.

Yet, the District Court's order concluded otherwise. It did so by ignoring the operative California statute on survival limitations, 1-ER-6 (never citing Cal. Civ. Proc. Code § 366.1), and by overlooking the statutory mandate to determine the limitations period as though Bella "had _not_ died." In fact, it did the _opposite_ of what the operative statute instructs.

Where the statute says to determine limitations as though Bella had _not_ died, the District Court's order decided the limitations period under the fact that Bella _had_ died—_i.e._, by looking to her successor in interest. This is an understandable approach because Bella has, in truth, died. Yet, it's wholly untenable because the statute commands consideration of the period that "___would have been__ applicable if [Bella] had __not__ died_. See Cal. Civ. Proc. Code § 366.1(b).

Indeed, it's been long and well established that the California statute on survival limitations, as originally enacted and later codified, "_may_ under some circumstances _prolong the time originally limited, [but] **cannot operate in any case to shorten it**_." E.g., Lowell v. Kier, 50 Cal. 646, 648 (1875). Yet, that's _exactly_ what the District Court's order did.

Its ruling _shortened_ the time to sue by over two years—from May 1, 2021, to April 28, 2019—effectually holding that minor tolling cannot apply to a decedent child. See 1-ER-6.

84

By shortening the time to sue on account of Bella's death, this ruling runs deeply afoul of the statutory purpose for survival limitations. Moreover, such a ruling is without textual support.

If Bella "had _not_ died," her limitations period indisputably _would have been_ tolled until she was eighteen. And, _nothing_ in Section 366.1 says to dispense with tolling when determining the limitations period that "would have been applicable if [Bella] had not died." See Cal. Civ. Proc. Code § 366.1(b).

Indeed, where a California statute operates as a restriction on generally applicable tolling, it says so expressly. Yet, no such express statutory tolling applies here. Section 366.1 has none.

By comparison, the broader _survival statute_ does have some restrictions on tolling, but none apply _here_. Compare Cal. Civ. Proc. Code § 366.**2**(b) (barring all tolling with enumerated exceptions) with id. § 366.**1** (no such tolling restrictions here). The _minor-tolling statute_ also has restrictions on tolling, but none apply _here_. See id. § 352(b) (inapposite tolling restrictions). And, certain causes of action, like medical malpractice, have restrictions on tolling, e.g., id. § 340.5 (restrictions on tolling), but the limitations period for personal-injury claims doesn't restrict tolling at all, id. 335.1.

Where the California Legislature wants to restrict tolling, it says so. Yet, one would comb the California Code of Civil Procedure in vain to find _any_

restriction on otherwise generally applicable tolling, like minor tolling, that applies here to these survival claims for personal injury.

This *absence* of *any* applicable restrictions on tolling in the operative statute on survival limitations, id. § 366.1, in the minor-tolling statute, id. § 352(b), *or* in the statute on personal-injury limitations, id. § 335.1, speaks volumes. The text simply does not support any restrictions on minor tolling for the survival claims— minor tolling that indisputably would have applied if the decedent child "had *not* died"—merely because the child has died.

Moreover, the *absence* of any applicable restrictions on tolling is no mistake. Rather, it's a statutory indication that when tortfeasors end the lives of children, the California Legislature did not intend to reward them with a shortened timeframe for suit on those children's survival claims.

To the contrary, the result below of shortening the time to sue by over two years on account of Bella's death is aberrant to California policies on limitations, on survival, and on minor tolling. After all, on limitations, a "defendant cannot reasonably complain" when sued under claims that would be indisputably timely had that defendant merely injured her—instead of ending her life. Cf. Reich v. Purcell, 67 Cal. 2d 551, 556 (1967) (Traynor, C.J.).

Likewise, the point of a *survival* claim is that it "*survives*" the deceased would-be plaintiff, Cal. Civ. Proc. Code § 377.20(a), thereby "prevent[ing] the

abatement of the cause of action of the injured person," see <u>Burgos v. Tamulonis</u>, 28 Cal. App. 4th 757, 761 (1994).

The point of a *survival* claim is that the claims *survive* the decedent. Yet, here, the District Court's order shortened the time to sue on these claims by over two years *as a result of death*. The claims did not survive in full.

Finally, California courts have "have repeatedly recognized the strong public policy protecting minors against the loss of their ***rights due to the operation of statutes of limitations***." <u>Young v. Haines</u>, 41 Cal. 3d 883, 898 (1986). The purpose of minor tolling is not just to protect *minors*, but also "to protect the ***rights of minors***." <u>Id.</u>

And, these survival claims *are* Bella's rights. They're *her* claims. And the fact that she is no longer here to prosecute them doesn't change that fact. Her rights were extinguished contrary to plain text of the survival statute and the minor-tolling statute.

* * * * *

Ultimately, the District Court's order ignored the operative statute on survival limitations; contravened the statutory command to decide the limitations period by ascertaining the period that would have been applicable if Bella "had *not* died;" shortened the time to sue by over two years; and, in so doing, undermined

longstanding and foundational policies intended to protect children, children's rights, and the dead.

Under a straightforward application of the plain text of California's statutory framework, these survival claims *are* timely because they were commenced within the limitations period that would have been applicable if Bella had *not* died. The survival claims are timely, and, thus, the District Court's order dismissing them was error. It should be reversed.

      i.   The District Court ignored California's statute on survival limitations and shortened the time to sue.

Bella Herndon died at fifteen.  3-ER-472 (death certificate).

Had she lived, Bella could have asserted what are now her survival claims until May 1, 2021, *i.e.*, until her twentieth birthday.  See Cal. Civ. Proc. Code § 335.1 ("two years" limitation period for personal injury); id. § 352(a) (limitations period doesn't begin until "age of majority").  In other words, the applicable limitations period for what are now Bella's survival claims would have begun upon her eighteenth birthday (May 1, 2019) and would have expired upon her twentieth birthday (May 1, 2021).

Because Bella is dead, her survival claims were instead brought by her successors in interest, *i.e.*, her estate and her father John Herndon.  6-ER-975 ¶ 9; 3-ER-469 ¶ 5; see Cal. Civ. Proc. Code § 377.11 (defining "decedent's successor in interest").  They asserted Bella's survival claims on April 30, 2021, before what would have been her twentieth birthday.  6-ER-1074.  Thus, Bella's survival claims were filed *before* the expiration of the limitations period that would have been applicable if Bella had not died.

Below, Defendant argued the survival claims were too late.  5-ER-897-898.  Yet, Defendant did not cite California's statute on survival limitations.  Id. (never citing Cal. Civ. Proc. Code § 366.1).  Nor did Defendant cite any cases construing this statute.  Id.

In response, Plaintiffs cited the operative statute that Defendant had overlooked—California's statute on survival limitations. 3-ER-445.

Under this statute, survival claims can be brought under the "limitations period that would have been applicable if the person had *not* died." Cal. Civ. Proc. Code § 366.1(b). If Bella had *not* died, she could have asserted these claims until her twentieth birthday—until May 1, 2021. 3-ER-445. Thus, Plaintiffs asserted that Bella's survival claims are timely because they were brought within the "limitations period that would have been applicable if [Bella] had not died." See Cal. Civ. Proc. Code § 366.1(b).

In reply, Defendant ignored California's statute on survival limitations. 2-ER-123-124. Defendant cited neither the operative statute on survival limitations nor any cases construing it. Id. Likewise, Defendant nowhere disputed the fact that Bella could have brought what are now her survival claims until May 1, 2021, if she had not died. Id.

Instead, Defendant sought to shorten the time to sue by arguing that minor tolling was inapplicable to the successor in interest (Bella's *father*), while ignoring the limitations period and tolling that would have been applicable to *Bella* if she had not died. Id. But see Cal. Civ. Proc. Code § 366.1(b) (permitting survival claims to be asserted under the "limitations period that would have been applicable if the person had *not* died").

90

Defendant cited no California authority that endorsed its preferred approach on how to address limitations for California survival claims. Id. In fact, none of Defendant's cited cases discussed limitations for California survival claims at all. Id.[5]

At oral argument, the District Court seemed to think that Plaintiffs were seeking *minor* tolling for Bella's *father*—ignoring the minor tolling that would have applied if Bella had not died. 1-ER-20:20-21 ("Minor tolling does not apply to the father, the parent who's bringing the claim."). In truth, Plaintiffs were asking the District Court to apply §366.1(b). 3-ER-445.

In its order, the District Court ignored §366.1(b), adopted Defendant's approach, shortened the time to sue by over two years, and nowhere considered the limitations period that would have been applicable if Bella had not died. 1-ER-6. But see Cal. Civ. Proc. Code § 366.1(b) ("limitations period that would have been applicable if the person had *not* died").

---

[5] Defendant did cite a *Montana* medical-malpractice case, but it nowhere construes *California*'s survival limitations. 2-ER-24 (citing Runstrom v. Allen, 191 P.3d 410, 413 (Mont. 2008). Instead, Defendant's case, Runstrom, construes a Montana medical-malpractice statute of limitations that expressly restricts tolling. 191 P.3d at 412 (construing Mont. Code Ann. § 27-2-205). California has a similar medical-malpractice statute of limitations. Cal. Civ. Proc. Code § 340.5. Notably, California's medical-malpractice statute *restricts* tolling, id., while California's statute on survival limitations, id. § 366.1, and personal-injury limitations, id. § 335.1, do *not*. That difference supports *Plaintiffs* here. See also Section II.A.iii, *infra*.

The entirety of the District Court's ruling on survival limitations is the following bullet-pointed paragraph:

- ***Second***, the negligence and strict liability claims are time-barred. There is no dispute that both claims are subject to a two-year statute of limitations. *See* Cal. Civ. Proc. Code § 335.1. The claims here are brought four years after B.H. died. The real party in interest for these claims is plaintiff John Herndon. Pursuant to Section 377.30 of the California Code of Civil Procedure, "[a] cause of action that survives the death of the person entitled to commence an action or proceeding ***passes to the decedent's successor in interest . . . and an action may be commenced by the decedent's personal representative, or if none, by the decedent's successor in interest***." (emphasis supplied). Minor tolling does not apply. *See* Cal. Civ. Proc. Code § 352(a) (applying to "a person entitled to bring an action"); *cf. Schultz v. Harney*, 27 Cal. App. 4th 1611, 1623 (1994) ("Of course, the statute of limitations is tolled during Christopher's minority, ***at least as to causes of action in which Christopher is the real party in interest***." (emphasis supplied)).

1-ER-6 (all emphasis in District Court's order).

In its order, the District Court never cited the operative statute on survival limitations. 1-ER-6 (nowhere citing Cal. Civ. Proc. Code § 366.1). It never cited a case on survival limitations. Id. And, it never analyzed what limitations period would have been applicable if Bella had not died. Id.

It erred. California survival claims may be brought under the "limitations period that would have been applicable if the [decedent] had *not* died" See Cal. Civ. Proc. Code § 366.1(b). *That* limitations period was undisputed below—and cannot be seriously disputed: if she had not died, Bella would have had until May 1, 2021, to sue.

That's because Bella Herndon was under eighteen when her claims accrued. 3-ER-472 (died at 15).

Because *Bella* was "under the age of majority" when the "cause of action accrued" and because *Bella* was the "person entitled to bring" her personal-injury claims, the period prior to her eighteenth birthday "is *not* part of the time limited for the commencement of the action." See Cal. Civ. Proc. Code § 352(a). Her eighteenth birthday would have been May 1, 2019. 3-ER-472. Any date *prior* to May 1, 2019, could *not* be "part of the time limited"—*i.e.*, could *not* be part of the two-year limitations period for her personal-injury claims.

Thus, because her two-year limitations period to sue would have begun on May 1, 2019, her claims would have been timely until May 1, 2021. Cal. Civ. Proc. Code § 335.1 *That's* the limitations period that indisputably would have been applicable if Bella had not died.

In turn, under California's statute on survival limitations, *that's* the limitations period the District Court should have applied. See Cal. Civ. Proc. Code § 366.1(b).

* * * * *

The District Court should be reversed because its order below is contrary to California's statute on survival limitations, a statute both the District Court and Defendant entirely ignored below.

93

    ii.   The operative California statute on survival limitations makes clear that death does not shorten the time to sue.

Since statehood, California has consistently adhered to a simple statutory framework for determining the limitations period under which survival causes of action can be asserted.

The terminology "survival action" or "survival claim" can be somewhat confusing, so it's worth clarifying what it means. Survival merely refers to a claim that continues to be actionable even though the person who originally could have asserted that claim has since died. In other words, the "survival" claim *survives* the decedent.

At common law, the death of the person entitled to bring a claim often extinguished the claim. Sullivan v. Delta Air Lines, Inc., 15 Cal. 4th 288, 293 (1997) (discussing common-law maxim "*actio personalis moritur cum persona*, i.e., a personal action dies with the person"). "California followed the common law rule." Id. at 294.

Nearly all claims evaporated upon death at common law. Hunt v. Authier, 28 Cal. 2d 288, 290-291 (1946). Then, exceptions were made for property and real-estate claims, but the "nonsurvivability" of personal-injury claims continued. Id. Later legislation provided for survival of claims in "specified cases" including for personal-injury claims. Id. at 291.

94

Thus, the trend has been to "enlarge rather than to restrict the causes of action which will survive." Id.  Today, almost all California causes of action, *including personal-injury claims*, survive the death of the person entitled to bring them:

> Except as otherwise provided by statute, a cause of action for or against a person is not lost by reason of the person's death, ***but survives*** subject to the applicable limitations period.

Cal. Civ. Proc. Code § 377.20(a); Ruiz v. Podolsky, 50 Cal. 4th 838, 850 n.3 (2010) ("A decedent's *personal injury action does indeed survive* the decedent's death and may be brought by his or her estate."  (citing Cal. Civ. Proc. Code § 377.20)).

Notably, these "survival" claims are *not* new causes of action.  "The survival statutes do *not* create a new cause of action, as do the wrongful death statutes." Grant v. McAuliffe, 41 Cal. 2d 859, 864 (1953).  A survival claim is same claim as before death—and term survival merely means that the claim "did not abate with the death of a party."  Sullivan, 15. Cal. 4th at 293.

So, although it is called a survival claim, such a claim is not a different claim but is merely "the right of action which the deceased person would have had if he had survived the injury."  E.g., Munro v. Pacific Coast Dredging & Reclamation Co., 84 Cal. 515, 524 (1890).  Thus, Bella's survival claims are the claims that she would have brought if she had not died.

_The question here is what period acts as the limitations period for Bella's survival claims._

To answer that question, California supplies a statutory framework for survival limitations when a would-be plaintiff dies before commencement of an action. That framework is now codified in Section 366.1 of the California Code of Civil Procedure:

> If a person entitled to bring an action dies before the expiration of the applicable limitations period, and the cause of action survives, an action may be commenced before the expiration of the later of the following times:
>
> (a) Six months after the person's death.
>
> (b) The limitations period that would have been applicable if the person had not died.

Cal. Civ. Proc. Code § 366.1.

There are three notable and highly relevant aspects of this California statute on survival limitations:

(1) Section 366.1 permits commencement of a survival action until the "later" of two times.

(2) The applicable limitations period in Section 366.1(b) is determined as though the decedent "had _not_ died."

(3) Section 366.1 is intended to ensure that the time to sue is not curtailed by the decedent's death.

96

***First***, Section 366.1 permits commencement of a survival action until the "**later**" of two times.

This operative statute speaks of two separate times under which such a survival "action may be commenced[.]" Cal. Civ. Proc. Code § 366.1. These two times are stated in the two subdivisions of Section 366.1. Compare id. § 366.1*(a)* ("[s]ix months" after death) with id. § 366.1*(b)* ("limitations period that would have been applicable if the person had not died").

In addition, the statute expressly states that an action may be commenced upon the "**later**" of those two times. Id.; H.S.W. Enters. v. Woo Lae Oak, Inc., 171 F. Supp. 2d 135, 143-144 (S.D.N.Y. 2001) ("whichever is *later*"); Estate of Betty Goldberg v. Goss-Jewett Co., 2016 U.S. Dist. LEXIS 196270, *2 (C.D. Cal. Jan. 5, 2016) ("whichever is *longer*").

Thus, although Bella's survival claims were not asserted within six months after her death, 3-ER-472 (Bella's death on "04/28/2017"), Bella's survival claims are timely under the second timeframe, *i.e.*, timely under the "limitations period that would have been applicable if [she] had not died[,]" see Cal. Civ. Proc. Code § 366.1(b).

That's because her survival claims were brought before what would have been her twentieth birthday. Id. § 335.1 ("two years"); id. § 352(a) (time before age of majority "*not* part of the time limited for the commencement of the action").

97

***Second***, the time permitted in Section 366.1(b) applies as though Bella, the decedent, "had **not** died."

The plain text says as much. Where the "person entitled to bring an action dies[,]" a survival "action may be commenced before the expiration of[,] Cal. Civ. Proc. Code § 366.1, "**[t]he limitations period that would have been applicable if the person had *not* died**[,]" id. § 366.1(b).

The verb tense is important. <u>E.g.</u>, <u>Hughes v. Board of Architectural Examiners</u>, 17 Cal. 4th 763, 776 (1998) ("In construing statutes, the use of verb tense by the Legislature is considered significant."); <u>see also</u> <u>United States v. Wilson</u>, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in construing statutes.").

Here, the conditional perfect tense—"*would have been* applicable" is telling. It's instructing courts to consider a counterfactual. And, the statute on survival limitations doesn't leave it to guesswork what that counterfactual is because it immediately follows with text stating the applicable condition: "if the person had *not* died." Cal. Civ. Proc. Code § 366.1(b).

Thus, the plain text of the statute in Section 366.1(b) permits a survival action to be commenced within the limitations period that would have applied in a counterfactual reality where the decedent "had *not* died"—*i.e.*, in a world where Bella had *lived*.

98

Therefore, although there is an understandable temptation to calculate the limitations period as though Bella *had* died (because, after all, she *is* dead), the California statute on survival limitations expressly instructs the courts to take the opposite approach.

Emphatically, the relevant California statute instructs to determine the limitations period as though Bella "had *not* died." Cal. Civ. Proc. Code § 366.1(b); see, e.g., Estate of Jackson v. City of Modesto, 2021 U.S. Dist. LEXIS 199638, *22 (E.D. Cal. Oct. 14, 2021) ("The relevant survival related statutes discuss a decedent's cause of action and the limitations period that would have applied if the decedent had *not* died. That is, the statutes' focus is the decedent, they do not discuss a different limitations period applicable to the estate[.]" (citing Cal. Civ. Proc. Code § 366.1)).

Thus, to do otherwise—to recalculate a different limitations period for the decedent's estate or successor in interest *rather than* determining the applicable limitations period where the decedent "had not died"—is an untenable approach. It's contrary to the direct instructions of the operative statute.

In short, the operative California statute says to determine the limitations period as though Bella "had *not* died." Thus, any determination that begins with the fact of Bella's death and ends without consider a counterfactual reality where she lived is contrary to the California statute, and, therefore, is error.

***Third***, Section 366.1 is intended to ensure that the time to sue is **not** shortened by death.

California's statute on survival limitations has a long pedigree. Its earliest instantiation was as Section 24 of California's 1850 Act of Limitation. Yeh v. Tai, 18 Cal. App. 5th 953, 964 (2017). Then, in 1872, the California Legislature codified the law on survival limitations as Section 353 in the newfound California Code of Civil Procedure. Hibernia Sav. & Loan Soc. v. Conlin, 67 Cal. 178, 181 (1885).

Finally, the Code of Civil Procedure was revised in 1992, with the former Section 353 split into two sections. The new Section 366.1 applied where a would-be plaintiff dies, Cal. Civ. Proc. Code § 366.1 (applying where "a person *entitled to bring an action* dies"), and the new Section 366.2 applied where a would-be defendant dies, id. § 366.2(a) (applying where "a person *against whom an action may be brought* […] dies").

In other words, prior to the 1992 recodification, the California statute on survival limitations had *one* statutory section, *i.e.*, Section 353, that governed both the situation where the would-be plaintiff died and the situation where the would-be defendant died.

Critically, under these predecessor statutes, the California courts made repeatedly clear the statutory purpose was *not* to shorten the time to sue.

The California courts have repeatedly emphasized that the California statute of survival limitations was not meant to "curtail" the time to sue because of the death of the decedent.[6]

*Before* codification, the California Supreme Court stated that the "object [of Section 24 of the 1850 Act of Limitation] was ***not to curtail***, but to prolong the period for suing in the given category." Smith v. Hall & Huggins, 19 Cal. 85, 86 (1861).

*After* codification, the California Supreme Court again reiterated the point that, while the newly codified Section 353 of the Code of Civil Procedure "*may* under some circumstances *prolong the time originally limited, [it] **cannot operate in any case to shorten it***." Lowell v. Kier, 50 Cal. 646, 648 (1875).

And, the California Supreme Court has reiterated this point several times since then. E.g., Berger v. O'Hearn, 41 Cal. 2d 729, 732 (1953) ("The provision is applicable only when necessary to extend the general statute of limitations and *cannot be used to curtail it*."); Estate of Bullard, 116 Cal. 355, 357 (1897) ("The object was *not to curtail*, but to prolong, *the period for suing* in the given category.").

---

[6] Although these following opinions were written in the context of disputes where a would-be *defendant* had died, they were speaking of the pertinent section *before* it was partitioned, *i.e.*, when it applied where either a would-be *plaintiff* or a would-be *defendant* had died. Compare Cal. Civ. Proc. Code § 353 (1872-1992) with id. § 366.1 (1992-) and id. § 366.2 (1992-).

Likewise, the California Court of Appeal has echoed these sentiments. County of Santa Clara v. Vargas, 71 Cal. App. 3d 510, 519 (1977) (same); Dep't of Mental Hygiene v. Lucas, 243 Cal. App. 2d 464, 469 (1966) ("cannot be used to *curtail* it" (italics in original)).

In sum, the California statute on survival limitations "cannot operate in any case to shorten" the time to sue. It cannot "curtail" the time permitted to sue. Therefore, a pretty good clue that an interpretation on survival limitations is erroneous is that it operates to shorten the time to sue.

With these three points in mind, it becomes clear that the District Court's order erred in three different ways on this question:

(1) The District Court's order ignored the operative California statute on survival limitations for a decedent plaintiff, *i.e.*, ignored Section 366.1 of the Code of Civil Procedure.

(2) The District Court's order determined the limitations periods on the basis that Bella *had* died when the statute says to so decide as though Bella "had *not* died"—*i.e.*, to do the opposite.

(3) The District Court's order applied an extra-statutory framework in a fashion that shortened the time to sue by over two years than what it would have been had Bella *not* died.

102

*__First__*, the District Court's order ignored the operative statute.

Even after being briefed on the operative California statute on survival limitations, 3-ER-404 (citing Cal. Civ. Proc. Code § 366.1(b)), the District Court's order never cited the statute, 1-ER-6.  It never cited any cases citing to the operative statute.  Id.  It never cited any cases discussing limitations period for survival claims whatsoever.  Id.

Instead, the District Court's order cited California Code of Civil Procedure 377.30.  Section 337.30 says nothing about limitations.  See generally Cal. Civ. Proc. Code § 377.30.  Rather, it governs to whom as "cause of action that survives" passes (*i.e.*, "the decedent's successor in interest") and who may "commence[]" a survival action (*i.e.*, "the decedent's personal representative or, if none, [] the decedent's successor in interest").  Id.

Section 377.30 concerns "who *succeeds* to such a cause of action and who may *prosecute* such a cause of action"—not about the time in which that action may be brought.  Lickter v. Lickter, 189 Cal. App. 4th 712, 721 (2010).  It's about "*standing* to sue"—not limitations periods.  See Maleti v. Wickers, 82 Cal. App. 5th 181, 227 (2022).

Thus, the District Court's order erred by ignoring the operative statute on survival limitations (Section 366.1) and instead applying a statute that is inapposite to the issue (Section 377.30).

***Second***, the District Court's order adopted an untenable approach that is directly contrary to the operative statute's framework.

The operative statute directs that Plaintiffs could sue under the limitations period that would have been applicable if Bella "had *not* died." <u>See</u> Cal. Civ. Proc. Code § 366.1(b). If Bella had not died, the applicable limitations period would have been May 1, 2019 (her eighteenth birthday) to May 1, 2021 (her twentieth birthday). 3-ER-472 (date of birth: "05/01/2001"). The fact that this period would have been the applicable period if Bella had not died was nowhere disputed by Defendant below. 2-ER-123-134.

Yet, the District Court's order never considered what the limitations period would have been if Bella had <u>*not*</u> died. Instead, it did the <u>*opposite*</u>. It focused on the fact that Bella <u>*had*</u> died. It started by focusing on who inherited Bella's rights <u>*after*</u> shed died, *i.e.*, taking as its starting point that Bella's father "John Herndon" was Bella's successor, *i.e.*, "***decedent's successor in interest***[.]" 1-ER-6 (bolding and italics in original); <u>see also</u> Cal. Civ. Proc. Code § 377.11 (defining "<u>decedent's</u> successor in interest").

Of course, living persons don't yet have "successors in interest" as that term is defined in California's code. Decedents do. <u>Id.</u> And, the order never considered the time period within which Bella could have sued if she had *not* died.

Below, the District Court's order got off on the wrong footing and never recovered. It determined the limitations period as though Bella *had* died when the statute says to do so as though Bella had *not* died, *i.e.*, the <u>*opposite*</u>. That's an untenable aberration from a statutory command.

<u>***Third***</u>, the District Court's order ignored a statute that was intended to insure that death never "curtailed" the time to sue and then did just that—curtailed the last day to sue from May 1, 2021, to April 28, 2019. The District Court's shortened the time to sue by over two years.

*  *  *  *  *

Below, the District Court's order ignored the operative statute on survival limitations; applied a statute that does not pertain to limitations; adopted an untenable approach that does the opposite of what the operative statute instructs; and shortened the period to sue by over two years because the tortious activity killed a girl, not merely harmed her.

The District Court's order should be reversed.

iii.    <u>Under the applicable limitations period for Bella's survival claims, the survival claims are timely.</u>

Applying the text of §366.1(b) is quite simple. First, simply assume Bella had not died.

The limitations period that would have been applicable if she had not died would not have begun until her eighteenth birthday. §352(a). And, with the two-year period beginning upon her eighteenth birthday, she would have had until her twentieth birthday to sue. §335.1.

The claims are timely.

**B.** **The District Court erred in holding that rules of intestate succession bar wrongful-death claims by Bella's brothers.**

    i. <u>The District Court held that siblings could only bring wrongful-death claims if they're intestate successors.</u>

Bella's brothers, Plaintiffs J.H. and T.H., have asserted wrongful-death claims for the death of their sister. 6-ER-994 ¶ 84. They were harmed by her death. And, they were *no less* harmed by the death of their sister because their mother and father are alive.

Below, Defendant argued that Bella's brothers lacked standing to sue for wrongful death. 5-ER-898-899.

Defendant's theory is that the ***<u>method</u>*** of deciding wrongful-death standing is predicated upon "statutory rank" in the intestacy statutes. 5-ER-898. Under Defendant's theory, a decedent's siblings cannot sue for wrongful death if the decedent's parents are alive because, under California intestate succession, inheritable property "*<u>passes</u>*" to "parents" first, Cal. Prob. Code § 6402, 6402(b), and, only if no parents, to siblings, <u>id.</u> § 6402(c).

In support of this theory, Defendant cited cases from the California Court of Appeal. 5-ER-898-899. Yet, all of these cited cases simply *<u>assumed</u>* Defendant's preferred method of determining wrongful-death standing and then decided *<u>other</u>* issues working under this assumption.

In _none_ of them was the threshold question of the _method_ of determining wrongful-death standing raised as a disputed issue among the parties. Because a dispute as to Defendant's preferred _method_ "was _not_ raised" in its cited cases, those cases are "**_not_ authority**" when that threshold issue is actually raised, as it has been here. Cf. Miklosy v. Regents of University of California, 44 Cal. 4th 876, 900 n.7 (2008) ("**It is axiomatic that cases are _not_ authority for propositions not considered**.").

A few of Defendant's cases disputed who counts as a parent or a spouse. Scott v. Thompson, 184 Cal. App. 4th 1506, 1509 (2010) (whether non-"biological father" was the father); Rosales v. Battle, 113 Cal. App. 4th 1178, 1183 (2003) (whether "concubinage" under Mexican law is sufficiently similar to a "common law marriage" to be a "surviving spouse").

Another cited case involved a dispute about whether there were or were not surviving children. Nelson v. County of Los Angeles, 113 Cal. App. 4th 783, 790 (deciding whether to credit "untrustworthy" statements of incarcerated decedent who "suffered from hallucinations" but had variously stated in prison that that he had "one 'kid,' two 'kids,' or three 'kids'").

Two other cited cases decided whether a disclaimer of inheritance could adjust statutory rank and, by extension, confer wrongful-death standing. Lewis v. Reg'l Ctr. of the E. Bay, 174 Cal. App. 3d 350, 352 (1985) (disclaimer from

"parents and half-brother" in favor of "paternal grandparents"); <u>Mayo v. White</u>, 178 Cal. App. 3d 1083, 1086 (disclaimer from "parents" to "decedent's siblings").

The common thread running through all of these cited cases is that the ***method*** of statutory rank was *not in dispute*, *i.e.*, was not a point in contention between the parties or an issue before the court. Thus, Defendant's "***[c]ases are not*** *authority, of course, for issues not raised and resolved*." <u>See</u>, e.g., <u>San Diego Gas & Electric Co. v. Superior Court</u>, 13 Cal. 4th 893, 943 (1996); <u>In re Noah S.</u>, 67 Cal. App. 5th 410, 416 (2021) (same).

Critically, Plaintiffs *did* dispute below that Defendant's preferred *method* for determining wrongful-death standing was the correct method under California law in their opposition to Defendant's combined anti-SLAPP motion to strike and Rule 12(b)(6) motion to dismiss.  3-ER-445-446.  So, here, unlike in *any* of Defendant's cited cases, Defendant's method ***is*** in dispute.

Plaintiffs made two key arguments disputing this method.

***First***, Plaintiffs cited a *California Supreme Court* case where the *method* of deciding wrongful-death standing ***was*** in contention, *i.e.*, <u>Redfield v. Oakland C. S. R. Co.</u>, 110 Cal. 277 (1895) (cited at 3-ER-445).

In <u>Redfield</u>, "Adeline B. Redfield" had died.  <u>Id.</u> at 283.  Later, "her husband, Horace A. Redfield, and her two minor children" sued for wrongful death.  <u>Id.</u>  At that time, "upon the death of the wife the entire community

property, without administration, belongs to the surviving husband"—with *nothing* to the children.  Id. at 290.

So, under Defendant's preferred statutory-rank *method* of determining wrongful-death standing, *only* Mr. Redfield—and his children—would have had standing to assert wrongful-death claims.  Indeed, the defendant in <u>Redfield</u> raised this argument for the statutory-rank method, id. at 289 (noting the defendant's argument that wrongful-death standing goes to "heirs" and that "the husband is the only heir of the wife"), just as Defendant did below, 5-ER-898.

Yet, the California Supreme Court rejected this statutory-rank method as "mistaken in its construction of" the wrongful-death statute.  <u>Redfield</u>, 110 Cal. at 289.  <u>Redfield</u> clarified how wrongful-death standing *does* work—rejecting Defendant's statutory-rank method:

> [N]or does ***the word "heirs,"*** as there used [in the wrongful-death statute], refer to those persons who would succeed to the money so recoverable if it had been in the possession of the community as community property at the time of Mrs. Redfield's death; but *the word is used in its common-law sense, and **denotes those who are capable of inheriting from the deceased person generally**, and without the limitation resulting from statutes relating to the distribution of community property*.

<u>Id.</u> at 290.  Because children are "capable of inheriting" from their mother, they had standing even if they were not first in line.  <u>See</u> id.

In other words, Defendant's *method* commits a category error, confusing a *survival* action (where intestacy statutes are decisive for standing in absence of a

110

will), <u>see</u> Section II.A.ii, *supra*, with a *<u>wrongful-death</u>* action (where all those "capable of inheriting" via intestacy have standing).

***<u>Second</u>***, Plaintiffs cited a subdivision of the wrongful-death statute that Defendant had overlooked. This subdivision, Subdivision 377.60(e), clarifies that the most recent instantiation of the California's wrongful-death statute was "*<u>not</u>* intended to adversely affect the standing of any party having standing under prior law":

> The addition of *<u>this section</u>* [377.60] by Chapter 178 of the Statutes of 1992 *<u>was not intended to adversely affect the standing of any party having standing under prior law</u>*, and the standing of parties governed by that version of this section as added by Chapter 178 of the Statutes of 1992 shall be the same as specified herein as amended by Chapter 563 of the Statutes of 1996.

Cal Code Civ Proc § 377.60(e). The point is that Subdivision (e) means that favorable authorities for standing under prior versions of the wrongful-death statute remain good law.

In reply, Defendant refused to engage—ignoring <u>Redfield</u> and Subdivision (e). 2-ER-124-125. Instead, Defendant argued that Plaintiffs' cited cases "d[id] not involve sibling standing." 2-ER-125 n.2.

That assertion was both false and mixed up.

It's ***<u>false</u>*** because Plaintiffs *<u>did</u>* cite a case involving siblings: <u>A.S. v. Miller</u>, 34 Cal. App. 5th 284 (2019). 3-ER-445. <u>A.S.</u> noted that crediting a certain person

as a child, *i.e.*, as issue, "would deprive the _decedent's parents **and siblings**_ of standing to sue for his wrongful death." 34 Ca. App. at 288.

So, contrary to Defendant's false assertion, Plaintiffs *did* cite a case that involved siblings.

Moreover, Plaintiff's case involving siblings is telling. Defendant's statutory-rank position is that a decedent's _sibling_ can _never_ sue for wrongful death under California law if a _parent_ is alive. 5-ER-898. Yet, Defendant's position cannot be squared with <u>A.S.</u> where the decedent's "_mother **and siblings**_" were the plaintiffs with standing. <u>See</u> <u>id.</u> at 298; <u>id.</u> ("Thus, a decedent's **parents and siblings** do not have standing to sue for wrongful death *unless* the decedent leaves behind no 'children.'" (italics in original)).

Defendant was also mixed up. Its purported issue of "_sibling_ standing" is a misnomer. See 2-ER-125 n.2 ("sibling standing"); 1-ER-22:15 ("issue of "_sibling_ standing"). The dispute between the Parties isn't about siblings *per se*. After all, there's no dispute that J.H. and T.H. _are_ Bella's brothers. Nor is there any dispute that Bella's parents are alive or about how intestate succession operates when property is at stake.

_Rather_, the dispute is whether _wrongful-death standing_ is determined exclusively by a statutory-rank method (Defendant's position) or whether wrongful-death goes to those "who are _capable of inheriting_ from the deceased

person generally." <u>A.S.</u>, 34 Cal. App. 5th at 294 (italics in original); <u>Redfield</u>, 110

Cal. at 290 ("capable of inheriting").

Yet, the District Court's order didn't engage this methodological debate.

At oral argument, the District Court simply insisted a statutory-rank method

*without* engaging <u>Redfield</u> and Subdivision (e).  1-ER-20:13-20, 1-ER-22:2-3.

Neither did the District Court's order.  1-ER-5-6.  The entirety of the District

Court's ruling on wrongful-death standing is contained in the following bullet-

pointed paragraph:

- *First*, plaintiffs J.H. and T.H. as siblings lack standing to bring a wrongful death claim because B.H. has surviving parents as demonstrated by this suit.  There is no dispute here that the California wrongful death cause of action is statutory.  The category of persons eligible to bring wrongful death actions is strictly construed.  *A.S. v. Miller*, 34 Cal. App. 5th 284, 290 (2019).  A sibling is barred from bringing a wrongful death action unless the decedent has no surviving issue or parents.  *See* Cal. Civ. Proc. Code § 377.60(a); Cal. Prob. Code § 6402(c); *see also Scott v. Thompson*, 184 Cal. App. 4th 1506 (2010) (affirming denial of half-sibling's claim for lack of standing); *Stoddard-Nunez v. City of Hayward*, No.13-cv-04490-KAW, 2015 WL 6954963, at *4 (N.D. Cal. Nov. 10, 2015) ("A sibling is barred from bringing a wrongful death action unless the decedent has no surviving issue or parents."); *Medrano v. Kern Cty. Sheriff's Officer*, 921 F. Supp. 2d 1009, 1018 (E.D. Cal. 2013) (granting motion to dismiss siblings' wrongful death claim).

1-ER-6 (emphasis in original).

Yet, the District Court erred because it simply adopted Defendant's

statutory-rank method as though it is commanded by the statute and *all* "prior law"

made applicable through Subdivision 377.60(e).  <u>See</u> Cal. Civ. Proc. Code

113

§ 377.60(e).  It ignored the <u>Redfield</u> doctrine—a direct contraindication that

California wrongful-death standing arises by statutory rank.

ii.     California law has repeatedly clarified that wrongful-death
        claims are not limited to intestate successors.

Questions pertaining to claims of wrongful death depend "primarily, if not entirely, on the application and construction of state statutes[.]"  George H. Genzel, Brothers and Sisters of Deceased as Beneficiaries within State Wrongful Death Statute, 31 A.L.R. 379 § 1a.

With respect to this question of whether siblings can sue for wrongful death, different states take different approaches.  Id. § 2a.  Some state explicitly clarify that siblings _have_ the "capacity to be wrongful death beneficiaries under statutes expressly designating them as such[.]"  Id.  Other states categorically exclude siblings.  Id.  Yet, the "_great bulk_" of states determine standing to assert wrongful-death claims based upon "statutory beneficiary-class designations" using the words heirs, next of kin, _etc._ Id.

Even within these states, however, there is still significant divergence in how to interpret the statutes and decide upon the relevant class.  Some states permit siblings "to recover _only_ in the event that other persons" like parents are not alive, but other states hold that siblings "alternatively, _are_ entitled to recover along with others," such as parents.  Id. § 3a.

Resolving this interpretive difference is often resolved by looking to how the key word—heirs, next of kin, _etc._, are used by the particular state's wrongful-death statute and interpreted by its courts.

115

Whether a term like heirs, next of kin, or the like "*confers beneficiary status upon* **all persons generally included in the term[s] (which, in a general sense, admittedly, extends to brothers and sisters**), *or only upon the nearest surviving next of kin or 'heir at law,' to the exclusion of brothers and sisters.*" Id.

A number of reasons apply in favor of the ability of collateral heirs to bring wrongful-death suits, at least where the decedent had no issue and they follow roughly under Section 377.60's Subdivision (a), Subdivision (e), and the way in which the California Courts have characterized the wrongful-death cause of action in contradistinction to the survival action.

As discussed above, Redfield used the word heirs in a general common law sense. What did that mean at common law? After all, an authority no less than Blackstone indicated that the word heirs and heirs at law were such complicated verbiage that it would the be "necessary to call in the assistance of lawyers" to address the question.

Indeed, the California Supreme Court has recognized that there are "two common law canons of descent." Estate of Ryan, 21 Cal. 2d 498, 500-501; Norris v. Hensley, 27 Cal. 439, 447-448. These authorities indicate that collateral heirs like brothers are part of the line of common law descent even if there are parents, but not if there are issue—children or not. That distinction tracks the current statute as well.

116

The word heirs means an indefinite succession of persons. Jones v. Stone, 52 N.C. App. 502, 507. And failure of the lineal issue (meaning someone had not kids) meant that the collateral kindred or issue could inherit. Fidler v. Higgins, 21 N.J. Eq. 138, 148. Indeed, blackstone noted that heirs of the body was the language that would exclude collateral heirs—but California has never used that language. See Lytle v. Hulen, 128 Ore. 483, 503-504.

All of this means that when Redfield uses the word heirs, it is stating that if there are no children, then the collateral heirs, the brothers can inherit—but that a child would work the exclusion of the collateral line. Howell v. Budd, 91 Cal. 342, 350. The California Supreme Court has expressly adopted the theory that the collaterals can inherit and are proper persons generally—without any limitations upon the grant of standing except for the requirement of a showing of some pecuniary harm. See generally Burk v. Arcata & M. R. R. Co., 125 Cal. 364.

There are also a number of indicators in Subdivison (a) of 377.60. Even with issue, it's a community, so would be strange not to be a community. The conditional "would be entitled" is significant because it indicates a conditional sense beyond the death of the decedent. The lack of the use of the verb "pass" or the term "successor in interest" or "beneficiary" indicates that it was not intended to use those definitions, as Defendant's use would require. Likewise, the verb entitled is significant.

117

## III. THE DISTRICT COURT ERRED IN ITS CONSTRUAL OF CALIFORNIA'S DUTY OF CARE AND PRODUCTS LIABILITY.

### A. Given that the right to amend was preserved, the Court could simply remand rather than address additional issues.

Below, Plaintiffs made clear that if they won on survival standing or wrongful-death standing on appeal that they would prefer to amend their pleadings. 2-ER-60-66. The District Court graciously acknowledged this request in its judgment. 1-ER-2 ("Given the Court's order, plaintiffs agree at this time that amendment would be futile and reserve the possibility of amendment after exhausting their appeal.").

Accordingly, if either the District Court's order on survival limitations or wrongful-death standing is reversed, Plaintiffs respectfully request that this Court grant a remand in order to address these issues. See, e.g., J.B. Painting & Waterproofing, Inc. v. RGB Holdings, LLC, 650 F. App'x 450, 455 (9th Cir. 2016) (permitting remand for amendment after reversing district court on limitations grounds).

**B.** **The District Court erred by on California duty of care by excusing a duty of care in the face of foreseeable and foreseen risk of death.**

    i.    <u>Defendant owed a special-relationship duty to Bella while she was on its platform, given its level of surveillance and control.</u>

Below, Plaintiffs argued that Defendant owed a special-relationship duty to Bella but one limited to its interactions with her on its platform where she was a child being subjected to extraordinary levels of surveillance, manipulation, and control, *i.e.*, continually "being subjected to its immense data-gathering facilities and algorithmic analysis[.]" 3-ER-452.

After all, the "California Supreme Court ha[d] recently described a certain type of special-relationship duty" in the case of <u>Regents of University of California v. Superior Court</u>, 4 Cal. 5th 607 (2018), that supported a special-relationship duty here. 3-ER-452 (quoting <u>Regents</u>). <u>Regents</u> had held that "universities have a special relationship with their students" in light of the "unique features of the collegiate environment"—*i.e.*, the college's level of supervision, the "vulnerability" of the students, and the college's ability to control the environment. 4 Cal. 5th at 613, 620-621.

Relying principally on <u>Regents</u>, Plaintiffs argued that Defendant owed Bella a special-relationship duty here. 3-ER-452. That's because the allegations in the complaint establish that Defendant had exerted an astonishing degree of supervision, surveillance, and control over a vulnerable child, Bella, *while* Bella

119

was on Defendant's platform and *while* Defendant was algorithmically targeting her.  6-ER-985-989 ¶¶ 57-70.

In turn, those allegations meet, and arguably exceed, what was required to impose a special-relationship duty in Regents.  After all, the touchstones for a special-relationship duty are *supervision, vulnerability, and control*.  Regents, 4 Cal. 5th at 620-621.

*First*, Regents noted the "substantially different ***supervision*** being appropriate in elementary schools as opposed to colleges" as a reason that some courts had been reluctant to impose a special-relationship duty upon colleges.  Id. at 620.  Nonetheless, the California Supreme Court reasoned that the "*closed environment* of a school campus" and the capability to "supervise foreseeable dangerous activities occurring *on its property*" weighed in favor of a special-relationship duty.  Id. at 625, 627.

*Second*, Regents noted that plaintiffs in a special-relationship situation often have an "aspect of dependency" in that they are "particularly ***vulnerable***" in some sense.  Id. at 620-621.  To the court, college students are vulnerable: "Although college students may no longer be minors under the law, they may still be learning how to navigate the world as adults."  Id. at 625.

*Third*, the flip side of the plaintiff's vulnerability is the defendant's control, *i.e.*, a defendant "who, correspondingly, has ***some control*** over the plaintiff's

welfare." Id. at 621. Defendant had these in spades over Bella while she was on its platform.

Furthermore, Regents noted two situations in which a special burden would not be unduly burdensome: (4) where the defendant *benefits* from the special relationship and (5) where the special duty is *limited in scope*

***Fourth***, Regents noted that "many special relationships especially benefit the party charged with a duty of care." Id. at 621. "Retail stores and hotels could *not* successfully operate, for example, without visits from their customers and guests." Id. (citing RESTATEMENT (THIRD) TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 40, comment h).

***Fifth***, special relationships have "defined boundaries"—to specific persons in specific contexts. Id. The defined boundaries of the special relationship make it "less burdensome and more justifiable"—while still protecting vulnerable persons from harm. Id.

Regents' considerations heavily weigh in favor of finding that Defendant owed Bella a limited special-duty here: (1) the high degree of supervision; (2) vulnerability of an impressionable child, (3) near-complete control; (4) special benefits to the Defendant from the relationship; and (5) the limited scope of duty to specific individuals in specific contexts, *i.e.*, to children on Defendant's platform. Based on these considerations, the complaint's allegations amply support a special-

relationship between Defendant and Bella, the decedent child, while she was on its platform.

Worth emphasizing, the complaint showed that Defendant engages in pervasive supervision—that rises to the level of constant surveillance—of its underage users.  See, e.g., 6-ER-985 ¶ 57.

Pointedly, the allegations quote a *Netflix engineering director's* explanation of how its algorithm and software products supervised and surveilled Bella's usage:

> *We know what you played, searched for, or rated, as well as the time, date, and device.  We even track user interactions such as browsing or scrolling behavior.*

6-ER-985 ¶ 57 (italics in original) (quoting Tom Vanderbilt, "The Science Behind the Netflix Algorithms That Decide What You'll Watch Next," Wired (Aug. 7, 2013) (interview with Netflix's engineering director, Xavier Amtraiain, describing how "**how they *control* what you watch**").

Defendant meticulously tracked every movement Bella carried out on their online platform.  Defendant watched and tracked every click, every mouse hover, every scroll every date, every time stamp, and every device used by the children using their online platform.  They did this for each and every child, surveilling and documenting each and every movement spent on Defendant's product.

As to **_supervision_**, colleges don't constantly supervise everything that goes on in their dorms or in every nook of their campus. See Regents, 4 Cal. 5th at 622 (noting collegiate shift away from "in loco parentis" model).

Netflix _itself_ will tell you that it _does_ supervise everything on its platform—just not in court.

Moreover, Defendant doesn't just supervise and surveil. It record, tracks, and analyzes too. Then, Defendant used that recorded information, gathered via constant surveillance, to manipulate and influence—indeed to **_control_**—what its child users like Bella do on the platform. It has extraordinary control users would watch next. Defendant used big data analytics to create

It then specifically and uniquely targeted each individual child user with individually tailored recommendations via its sophisticated recommendation engine and algorithms. Perhaps unsurprisingly, Defendant's were incredibly effective at exerting "control" of what its users watched. Indeed, Defendants content-delivery products, its recommendation engine and algorithms already controlled and actively manipulated the vast majority of what its users decide[d] to watch[.]" 6-ER-986, ¶58.

As Netflix itself publicly boasted, its algorithms accounted for the overwhelming majority of what was watched on its online platform.



6-ER-987, ¶ 63.

**In short, Defendant used its remarkably powerful and sophisticated targeting algorithms and software to achieve unfathomable and unprecedented levels of control, surveillance, and manipulation when individually targeting its underage users, like Bella Herndon.**

Based on these facts, Plaintiffs argued that Defendant had a special-relationship duty with it minor users *while* those users were using Defendant's online platform and *while* Defendant was actively engaged in the process of surveilling and documenting their every move and actively manipulating and controlling their behaviors and decisions on the platform.

After all, <u>Regents</u> had found a special duty in an instance of substantially less control than in the present case. <u>Regents of University of California v. Superior Court</u>, 4 Cal. 5th 607, 625. Indeed, <u>Regents</u> had found a special duty because "college administrators and educators 'have the **power to influence** [students'] values, their consciousness, their relationships, and **their behaviors**.'")

124

<u>Regents of University of California v. Superior Court</u>, 4 Cal. 5th 607, 625. Here, Defendant was admitting that its algorithms control user's behaviors in 75-80% of decisions. 6-ER-987 ¶63; 6-ER-986, n. ¶60.

Faced with these allegations, the District Court's Order stated without explanation "The allegations of targeting in plaintiffs' FAC do not arise to this degree of control [discussed in <u>Regent</u>]." 1-ER-7, n. 7. It did not elaborate. And it did not consider any of the technologies contained in the allegation or the truly unfathomably degrees of control and supervision alleged in the complaint.

And, it's worth noting that this Court has acknowledged just how powerful and controlling these types of recommendation algorithms are. In a concurrence, Judge Berzon noted that "platforms' algorithms suggest new connections between people and groups and recommend long lists of content, targeted at specific users." <u>Gonzalez v. Google LLC</u>, 2 F.4th 871, 914 (9th Cir. 2021) (concurrence, Berzon, J.). Indeed, she further notes that the algorithms used by platforms "amplify and direct such content…to people the algorithm determines to be interested in or susceptible to those messages and thus willing to stay on the platform to watch more." <u>Gonzalez v. Google</u> LLC, 2 F.4th 871, 914 (concurrence, Berzon, J.). Such novel technologies are significant in their "**power to influence** [users'] values, their consciousness, their relationships, and **their behaviors**.'" <u>Regents of University of California v. Superior Court</u>, 4 Cal. 5th 607, 625.

But the Order below turned a blind eye to all that. It gave little consideration to the allegations. It ignored the technologies in play. And it turned a blind eye to the real-world effects of such powerful algorithms and software.

Regardless, Regent supports applying a special-relationship duty here. Afterall, (1) Defendant exercised constant and pervasive surveillance over and recordation of its users every move; (2) Defendant exercised remarkable and empirically documented control over its users every decision using its targeting algorithms; (3) Defendant benefits immensely from this special relationship; and (4) this special duty to Bella would be limited in scope, applying only *while* Bella was on Defendant's online platform and only *while* Defendant was algorithmically targeting and manipulating Bella's decisions on the Platform.

Moreover, two additional equitable and policy considerations should tilt the question of a special duty decidedly in favor of finding a special relationship here. First, Bella is a minor. The asymmetry in power and control between a minor and Defendant who is targeting that minor with unprecedentedly powerful algorithms is truly staggering. And, second, Defendant has "superior control over the environment and the ability to protect" its minor users on the platform. Regents of University of California v. Superior Court, 4 Cal. 5th 607, 625.

ii.   Defendant owed an ordinary duty of care because there is always one barring an exception.

Below, Defendant argued that it owed no duty to Bella–a vulnerable child whom Defendant specifically and individually targeted with its unprecedentedly powerful recommendation algorithms. 6-ER-985. That's an untenable position. After all, Defendant used its algorithms to watch her every move, track her every mouse click, and control and manipulate her viewing decisions with shocking effectiveness. 6-ER-985 ¶57, 6-ER-987, 63. Accordingly Defendant arguably owed a special-relationship duty to Bella.

But even if this Court does not think that Defendant had a special-relationship duty to Bella, Defendant plainly owed a duty to decedent:

> Generally speaking, **all persons have a duty to take reasonable care in their activities to avoid causing injury**, though particular policy considerations may weigh in favor of limiting that duty in certain circumstances.

Brown v. USA Taekwondo, 11 Cal. 5th 204, 209 (2021); Lugtu v. California Highway Patrol, 26 Cal. 4th 703, 716 (2001). There plainly is a duty owed by Defendant. The duty of reasonable care that is the "default rule." Brown, 11 Cal. 5th at 209.

Yet, Defendant takes the extreme position that it did not owe any duty whatsoever–not even the ordinary duty of care when directly targeting its powerful algorithms at children.

127

Below, Defendant argued that "[u]nder California law, duty can be established through either the multi-factor duty analysis set forth in Rowland v. Christian[.]" 5-ER-903. On that basis, the Order decided that "plaintiffs also fail to identify a duty to support the negligence-based claims." 1-ER-6.

Plaintiff identified the duty owed by Defendant. 3-ER-408, citing Brown v. USA Taekwondo, 11 Cal. 5th 204, 209 (2021). And the approach adopted by the Order and Defendant below profoundly misconstrues the proper relationship between that default, general duty and the Rowland exception. The California Supreme Court recently clarified that relationship In its Brown decision:

Rowland itself referred to this multifactor test as a guide for determining whether to recognize an "exception" to the general duty of care under section 1714. (Rowland, supra, 69 Cal.2d at p. 113.) And in numerous cases since Rowland, we have repeated that the Rowland factors serve to determine whether an exception to section 1714's general duty of reasonable care is warranted, not to determine whether a "'new duty'" should be created. (Kesner v. Superior Court, supra, 1 Cal.5th at p. 1143 ["Because Civil Code section 1714 establishes a general duty to exercise ordinary care in one's activities, … **we rely on these factors not to determine 'whether a *new duty* should be created, but whether an *exception* to Civil Code section 1714** … should be created,'"

<u>Brown v. USA Taekwondo</u>, 11 Cal. 5th 204, 218 (2021)

So, in truth, Defendant was asking for an *exception* from the ordinary duty of care that governs nearly every other activity carried out in daily life. And there was no serious argument that Plaintiff had failed to identify a duty as the Order suggests. After all, under "general negligence principles, … a person ordinarily is obligated to exercise due care in his or her own actions so as not to create an unreasonable risk of injury to others[.]" <u>Lugtu v. California Highway Patrol</u>, 26 Cal. 4th 703, 716 (2001).

Indeed, often "the existence of a **duty to exercise reasonable care is obvious**, and neither the plaintiff's nor the defendant's counsel will raise an issue regarding the existence of such a duty." 1 Neil M. Levy, et. al., California Torts § 1.02 (2022). Thus, the "duty issue arises primarily in "'**the exceptional cases in which the defendant may insist that [he or she] is under no legal obligation to be careful.**" 1 California Torts § 1.02 (2022).

Thus, Defendant's position is that this is the "exceptional case" where Defendant is "under no legal obligation to be careful". Indeed, Defendant is arguing for an exception and a "carve out" to the ordinary obligation to be careful that attaches to nearly every other part of everyday life. But not applying the general duty would be as unwise as it would be unsound.

129

Here, Defendant caused a 30% spike in child suicides in a month. 6-ER-983-984 ¶¶ 44-53. The National Institutes of Health was alarmed. Id. at 4 ¶ 7. And, not only was Defendant's catastrophic increase in child suicides foreseeable, it was foreseen. It was foreseen by its own retained expert, Dr. Dan Reidenberg, among others, but Defendant simply greedily, recklessly, knowingly, unreasonably, and purposefully chose to override its own experts at the cost of hundreds of lives. 6-ER-979-9808-9 ¶¶ 27-32. There is simply no sensible reason to carve out an exception to the ordinary, general duty that attaches to nearly everyone other person and nearly every other action.

Moreover, this outrageous result was also foreseen by decades of research into suicidal contagion that form a scientific consensus. It was foreseen by media guidelines and advisories that prudently advise not to target vulnerable individuals with this type of content—especially children. It was almost certainly foreseen by Defendant's own targeting algorithms, which learned to target vulnerable viewers. Frankly, given how easy and limited the fixes necessary to avoid this catastrophic outcome would have been, the imposition of a legal duty to behave reasonably under California law is a no brainer.

iii.    California's exceptions to duty for unforeseeable events do not apply here to facts that were foreseen.

The California Supreme Court recently clarified that Rowland's "multifactor test [i]s a guide for determining whether to recognize an 'exception' to the general duty of care[.]" Brown v. USA Taekwondo, 11 Cal. 5th 204, 218 (citing Rowland, 69 Cal.2d at p. 113.).

These Rowland "factors fall into two categories." Regents of University of California v. Superior Court, 4 Cal. 5th 607, 629. The first group of factors "involves foreseeability and the related concepts of certainty and the connection between plaintiff and defendant." Id.[7] And, the second group of factors addresses the "policy concerns of moral blame, preventing future harm, burden, and insurance availability."  Id.[8]

---

[7] Specifically, Rowland's foreseeability factors include: (1)"The foreseeability of harm the plaintiff, (2)"The degree of certainty that the plaintiff suffered injury, (3) "The closeness of the connection between the defendant's conduct and the injury suffered. Regents of University of California v. Superior Court, 4 Cal. 5th 607, 628-629, citing Rowland v. Christian (1968) 69 Cal.2d 108, 113.

[8] Specifically, Rowland's policy factors include: (1) "The moral blame attached to the defendant's conduct", (2)"The policy of preventing future harm", (3) "The extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach,; and (4) "The availability, cost, and prevalence of insurance for the risk involved." Regents of University of California v. Superior Court, 4 Cal. 5th 607, 628-629, citing Rowland v. Christian (1968) 69 Cal.2d 108, 113.

Thus, at core, the <u>Rowland</u> factors fall into two broad groups: (1) those addressing foreseeability and (2) those addressing policy concerns. <u>Regents</u>, 4 Cal. 5th 607 at 629.

And, the California Supreme Court has made clear that the task of the <u>Rowland</u> factors is to determine "**whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy.**" <u>Regents of University of California v. Superior Court</u>, 4 Cal. 5th 607, 629. Accordingly, exceptions to the general duty are made "only when foreseeability and policy considerations justify a **categorical** no-duty rule[.]" <u>Kesner v. Superior Court</u>, 1 Cal. 5th 1132, 1144 (2016). In short, the <u>Rowland</u> exceptions are categorical, not case specific. See <u>Kesner</u>, at p. 1144.

Thus, the question here is whether carving out an "entire category of cases"--i.e. Cases where companies algorithmically target vulnerable children–is one which should be categorically excused from the ordinary, general duty of care. Indeed, the operative question being addressed by the <u>Rowland</u> factors here is whether Are cases involving the most sophisticated companies, using unprecedentedly powerful algorithms to specifically and individually target particular children "an entire category of cases" that should be "carved out" from the "general duty rule" because such a categorical carve out is "justified by clear considerations of [California] policy[.]" See <u>Regents</u>, 4 Cal. 5th at 628-629

132

The answer is clear. No. <u>Rowland</u> itself stressed that "**no such exception should be made unless <u>clearly</u> supported by public policy**." <u>Rowland v. Christian</u>, 69 Cal. 2d 108, 112. And, there is simply no clear public policy reason to categorically exclude them.

To the contrary, California's public policy clearly tilts in favor of protecting children from online harms and in favor of discouraging companies from algorithmically targeting and profiling children in harmful ways. See the California Age-Appropriate Design Code Act.

This Act was unanimously passed by the California State Senate specifically to address and correct the types of harms at the center of this case. And, this Act reflected the broad "bipartisan agreement at the international level, in both the United States and in the State of California, that more needs to be done to create a safer online space for children to learn, explore, and play." Section 1(a)(3).

Thus, California public policy is crystal clear. Children need to be protected from companies "profiling" and algorithmically targeting children. There is plainly not compelling policy reasons to carve out a categorical <u>Rowland</u> exception for this category of cases and this category of defendants–i.e. Sophisticated companies deploying powerful technological tools to algorithmically target vulnerable children. To the contrary, where the California public policy lies on this issue and this category of cases (algorithmic targeting of children cases) could not be clearer.

In <u>Regents</u>, the California Supreme Court held that the <u>Rowland</u> factors did "not justify categorically barring an injured student's claims against the university." Regents of University of California v. Superior Court, 4 Cal. 5th 607, 629. After all, <u>Regents</u> rejected carving out an exception based on the <u>Rowland</u> factors, opting instead to protect children, incentivize universities to create safer environments, and compensate those tragically injured. So too here, the <u>Rowland</u> factors do not justify categorically barring a deceased child's claims against a company using powerful technologies to algorithmically target vulnerable children.

Applying the <u>Rowland</u> factors here makes clear that Defendant does not even remotely merit an exception to its duty of reasonable care. 6-ER-99625 ¶ 91-92.

**(a)    The Foreseeability Factors**

"The most important factor to consider in determining whether to create an exception to the general duty to exercise ordinary care … is whether the injury in question was *foreseeable*." <u>Regents of University of California v. Superior Court</u>, 4 Cal. 5th 607, 629. Here, that answer is a resounding yes–the injury was highly foreseeable; in fact, it was foreseen.

Had Defendant bothered to heed its own experts or consult the longstanding consensus of scientific data—or even listen to what its own data scientists and

algorithms would have indicated. Again, this catastrophe was foreseen and Defendant was warned that it would happen ahead of time. 6-ER-979-9838-12, ¶27-¶43.

And the foreseeability of these harms in this *category* of case (algorithmic targeting cases) is especially high. Indeed, these companies use "unprecedented levels of data collection, algorithmic data processing, and analytical insights to precisely target" individual children. 6-ER-985, "F".

When companies like Defendants algorithmically target children with content they constantly surveille and document the children's every move. 6-ER-985-989, ¶57-¶70 The surveillance is constant, omnipresent, and omniscient. Then they feed all that data through incredibly sophisticated big data analytics. They study the child's every click, scroll, etc. 6-ER-985-989, ¶57-¶70. And then they unleash incredibly powerful machine learning algorithms that are constantly learning from and adapting to the child's each and every move. They are creating specific profiles on . And gathering, processing, and using a truly unfathomable amount of data about each child in the process of specifically, individually and algorithmically target each child. They learn things like moods, preferences, patterns of activity, etc. about each child.

So for those like Defendants, engaged in this incredibly sophisticated and involved process of algorithmically targeting children, these types of harms are

eminently foreseeable. Thus, the foreseeability factors strongly weigh against carving out a categorical <u>Rowland</u> exception for companies that algorithmically target vulnerable children.

### (b) The Policy Factors

"The policy analysis evaluates whether certain kinds of plaintiffs or injuries should be excluded from relief." <u>Regents of University of California v. Superior Court</u>, 4 Cal. 5th 607, 629, citing <u>Kesner</u>, 1 Cal.5th at p. 1145.

In <u>Regent</u>, the California Supreme Court "conclude[d] that violence against students in the classroom or during curricular activities, while rare, is a foreseeable occurrence, and considerations of public policy do not justify categorically barring an injured student's claims against the university." So too here. There is no compelling public policy reason to categorically bar injured (or deceased) children from bringing claims against sophisticated companies using powerful technological tools to algorithmically target vulnerable children in a reckless manner.

Indeed, the California legislature has joined a chorus of policy makers throughout the state, country and world who are deeply troubled by the way this category of defendants uses these types of technologies to profile and target

children using online products like Defendants. California. California Age-Appropriate Design Code Act Section 1(a)(3).

This would also completely derail Justice Traynor's foundational vision of California's tort law: "public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market." Escola v. Coca Cola Bottling Co., 24 Cal. 2d 453, 462 (Traynor, J., concurring).

Thus, the policy factors also strongly weigh against carving out a categorical Rowland exception for companies that algorithmically target vulnerable children.

* * * * *

In sum, there is no basis for carving out a categorical Roland exception for companies algorithmically targeting vulnerable children, the way Defendant targeted Bella Herndon. The harms were entirely foreseeable. Netflix itself was warned of the harm. But it chose to do nothing about it. It took no basic precautions to warn, avoid, or mitigate the knowne harms. Instead, Netflix used power technological tools to target Bella, exposing her to harm. Now, after killing her due to its recklessly, callous, and greedy, Netflix wants like the courts to carve out a categorical Rowland exception for powerful companies targeting vulnerable children with powerful technologies.

137

iv.   Defendant's owe a statutory duty based upon a recently enacted California statute.

**a.   California's Strict Liability Doctrine**

Under the doctrine of strict liability, an "act or failure to act below the statutory standard is negligence per se, or negligence as a matter of law." Satterlee v. Orange Glenn School Dist., 29 Cal. 2d 581, 588 (1947); see also Ramirez v. Nelson, 44 Cal. 4th 908, 918 (2008).

In other words, "statutes and regulations may be used to establish duties and standards of care in negligence actions." Elsner v. Uveges, 34 Cal. 4th 915, 927 (2004). And, accordingly, "statutes and regulations are admissible to show negligence per se in tort actions and are subject for this purpose to judicial notice." SeaBright Ins. Co. v. US Airways, Inc., 52 Cal. 4th 590, 607 (Cal. Supreme Court 2011) (concur. Werdegar, J.), citing Cal. Evid. Code, § 669, and citing Elsner,34 Cal.4th 915 at pp. 927–928, 935–936.

The negligence per se doctrine, applies where the ""person suffering … the injury … was one of the class of persons for whose protection the statute … was adopted." Ramirez v. Nelson, 44 Cal. 4th 908, 918 (2008) (citing Walters v. Sloan, 20 Cal.3d 199, 206–207 (1977))

**b.   California's Age-Appropriate Design Code Act**

On August 29, 2022, the California State Senate unanimously approved the California Age-Appropriate Design Code Act ("the Act"). On September 15, 2022, California Governor signed the Bill into law. This Act reflected the "bipartisan agreement at the international level, in both the United States and in the State of California, that more needs to be done to create a safer online space for children to learn, explore, and play." Section 1(a)(3).

The purpose of this watershed Act was clear. "As children spend more of their time interacting with the online world, the impact of the design of online products and services on children's well-being has become a focus of significant concern." Section 1(a)(2). Specifically, the Act was concerned, *inter alia*, with "[w]hether algorithms used by the online product, service, or feature could harm children." 1798.99.31(a)(v).

And, the Act was also clear about the class of persons it intended to protect: children using online products. See e.g. Section 1(a)(2); Section 1(a)(3); 1798.99.30 (defining children as those "who are under 18 years of age"). Accordingly, California's Age-Appropriate Design Code Act prohibited certain conduct and imposed certain obligations on businesses that provide an online product to children.

First, the Act prohibited certain conduct by businesses providing online products to children. The Act made clear that such online products:

- **"shall not [...] use the personal information of any child in a way** that the business knows, or has reason to know, is **materially detrimental to the physical health, mental health, or well-being of a child**." 1798.99.31(b)(1)

- **"Shall not [...] profile a child by default[]"** absent certain codified exceptions. 1798.99.31(b)(2). The Act expressly defined "profiling" to mean "**any form of automated processing of personal information that uses personal information to** evaluate certain aspects relating to a natural person, including **analyzing or predicting** aspects concerning a natural person's performance at work, economic situation, health, **personal preferences, interests,** reliability, **behavior, location, or movements**." 1798.99.30(b)(6)

The Act also imposed certain affirmative obligations on businesses that provide an online product to children. The Act made clear that such online products:

- **"should** offer strong privacy protections **by design and by default**, including by **disabling features that profile children using their previous behavior, browsing history**, or assumptions of their similarity to other children, to offer detrimental material." Section 1(a)(8).

140

- "**should consider the best interests of children when designing, developing, and providing that online service, product, or feature**." 1798.99.29 (a)

- If a conflict arises between commercial interests and the best interests of children, **companies should prioritize** the privacy, **safety, and well-being of children over commercial interests**. 1798.99.29(b).

In short, the Act expressly protects the class of children under age 18 who are likely to use online products. It makes clear that businesses cannot profile a child by default unless the business has appropriate safeguards in place. It makes clear that businesses cannot use the personal information of any child in a way that the business knows, or has reason to know, is materially detrimental to the physical health, mental health or well-being of a child. It makes clear that businesses must consider the best interest of children when designing and providing online products. And, it makes clear that businesses must prioritize the safety and well-being of children over commercial interests.

Here, Defendant's alleged harm fell egregiously short of these standards. 6-ER-980-984 ¶¶ 57-70. Defendants engaged in acts prohibited by the Act. Id. And, Defendant failed to engage in acts obligated by the Act. Id. Defendant behaved in a truly careless, callous and reckless fashion towards children. Id. Defendant put profit over the safety and well-being of the children it targeted with its

sophisticated and powerful online products. And, Defendant did so to truly devastating consequences. 6-ER-983 ¶ 69 ("28.9% spike in child suicides"); 6-ER-984 ¶ 70 ("Bella Herndon was laid to rest at the age of 16 at Saint Charles Borromeo Church[.]").

In light of the California Age-Appropriate Design Code Act, Defendant's conduct was negligent per se–i.e. negligent as a matter of law. See <u>Satterlee v. Orange Glenn School Dist.</u>, 29 Cal. 2d 581, 588 (1947) ("An act or failure to act below the statutory standard is negligence per se, or negligence as a matter of law.").

* * * * *

California's watershed legislative efforts emerged from widespread consensus and growing concern about the pressing needs to protect children from the pervasive and unacceptable harms that businesses have been exposing children to and inflicting upon children with their sophisticated algorithms and other online products. Section 1(a)(3). For those like Bella Herndon, one of the scores of children killed by Defendant's reckless and careless use of its powerful online products, the California Age-Appropriate Design Code Act provides a basis for negligence per se–i.e. negligence as a matter of law.

142

**C.** **The District Court erred on products liability because software can be a product under California law.**

The question of whether a computer algorithm can be a product as that term of art is used in California products liability is a question of massive social significance.

Yet, Defendant's motion to dismiss simply ignored that an algorithmic-product claim was at the heart of this case. Then, the District Court's order did not meaningfully engage that issue and question, when rejecting the claim. <u>See</u> Section III.C.i, *infra*.

Yet, given that California Chief Justice Traynor's vision of products liability is now well established in California cases.

i.  <u>The District Court never addressed whether Defendant's targeting algorithms and software are products.</u>

After Bella was exposed to, targeted with, and harmed by Defendant's technologies, *i.e.*, by Defendant's targeting algorithms and software, Bella's surviving family members brought suit. 6-ER-972.

Her family asserted a products-liability claim for failure to warn under California law, 6-ER-993-994 ¶¶ 78-83, alleging Defendant had "manufactured, distributed and/or sold a product[,]" 6-ER-993 ¶ 79. In turn, the complaint specifically identified the product at issue as Defendant's "*<u>content-delivery systems, recommendation algorithms, and other means of targeting children with its Show</u>*[.]" 6-ER-993 ¶ 79.

The complaint described in detail Defendant's use of its sophisticated and powerful algorithms to individually target *Bella*—with fatal consequences. 6-ER-895-989 ¶¶ 57-70. The complaint expressly asserted that Defendant's *<u>algorithm</u>* was a product. 6-ER-993 ¶ 79. In addition, it alleged that this algorithm, as a product, is subject to products liability under California law. 6-ER-993-994 ¶¶ 78-83; <u>see also</u> 3-ER-446-448.

Furthermore, the complaint also *<u>expressly</u>* clarified that Plaintiff's product liability "cause of action does <u>*not*</u> arise from Netflix's manufacture or creation of the Show[.]" 6-ER-993 ¶ 79.

144

Bella's family wanted to know whether the California law of products liability could help avoid such senseless tragedies from happening to other families in the future. They wanted to know whether products-liability law could help incentivize companies who are targeting children with powerful algorithms to improve the safety of those powerful technological products. <u>See</u> 6-ER-993-994 ¶¶ 78-83.

Defendant filed a motion to dismiss and took the position that "Plaintiffs' Strict Liability Claim Fails Because **13 Reasons Why** Is Not a 'Product.'" 5-ER-877 (header); 5-ER-900-901 (Section I.B.2.(a)). Defendant's motion nowhere addressed whether **algorithms or software** are "products" under California's products liability law. <u>Id.</u>

In this sense, Defendant's motion was entirely non-responsive. Instead, Defendant's Motion misattributed to Plaintiffs a position not taken, *i.e.*, that "Plaintiffs allege that the failure-to-warn claim is subject to strict liability because *13 Reasons Why* is a product." 5-ER-900. <u>But</u> 6-ER-993 ("This cause of action does not arise from Netflix's manufacturer or creation of the Show[.]"). Then, the motion attacked that strawman.

Then, Defendant asserted that "strict liability for failure to warn applies only to tangible products[.]" 5-ER-900. Defendant simply fiated that "no tangible product is at issue here." <u>Id.</u>

Yet, Defendants did not address—or even acknowledge——the algorithms and software that were discussed at length in, and formed the centerpiece of, Plaintiff's complaint. <u>Compare</u> 5-ER-900 (no discussion of algorithm in motion on this issue) <u>with</u> 6-ER-985-988 ¶¶ 57-69 (discussion of algorithm in complaint). Defendant's motion never addressed whether algorithms and software can be "tangible" <u>*as that term of art is used within California's law of products liability*</u>. 5-ER-900-901.

Next, Defendant argued that numerous Courts had rejected a theory <u>*not advanced by Plaintiffs*</u>: "Numerous courts have specifically rejected the theory advanced by Plaintiffs here—the proposition that media is a 'product' subject to strict liability[.]" 5-ER-901. <u>But see</u> 6-ER-993 ¶ 79 ("Netflix manufactured, distributed and/or sold a product, *i.e.*, paywalled platform and streaming content-delivery systems, recommendation algorithms, and other means of targeting children with its Show[.] This cause of action does not arise from Netflix's manufacturer or creation of the Show[.]").

Defendant's motion didn't address whether Defendant's algorithms and software were "products" subject to products liability law. 5-ER-900-901. And, Defendant's motion did not cite a single case finding that algorithms and software were not "products."

Instead, Defendant's motion relied on <u>Winter</u>, which Defendant describes as "holding products liability law did not apply to The Encyclopedia of Mushrooms." 5-ER-900 (citing <u>Winter v. G.P. Putnam's Sons</u>, 938 F.2d 1033, 1034 (9th Cir. 1991). On that basis, Defendant argued that Plaintiff's products liability claim—a claim regarding Defendant's algorithms and software—was foreclosed as a matter of law. 5-ER-900-901.

In short, Defendant's Motion completely ignored Defendant's algorithm—the product specifically and expressly identified in Plaintiff's products-liability claim—and the related legal questions. 5-ER-900-901.

Plaintiffs responded by explained that the products liability claim should not be dismissed. 3-ER-446-448.

Plaintiffs noted that Defendant's motion was "unresponsive" and did not "engage the claims actually asserted here." 3-ER-446. Plaintiffs further explained that their products liability claim expressly identified the products at issue: "Defendant's content-delivery platform and the software implementing its targeting algorithms." 3-ER-446.

Defendant had simply ignored "the platform, software, and algorithms that caused the harm." 3-ER-446. Indeed, "Defendant ha[d] not cited a single case indicating that algorithms or internet platforms or sophisticated software are not products." 3-ER-448.

147

Then, Plaintiffs advanced several arguments explaining that "Defendant's platform and targeting algorithms are tangible software products" that are subject to California's products liability law. 3-ER-446. Three of those arguments are worth reiterating here.

*First*, Plaintiffs explained that Defendant had misconstrued the term "tangible" as that term of art is used in products liability law. Therefore, in law, electricity and software can be a "tangible" products, even though it's not something you could hold in your hand 3-ER-446-447. Plaintiffs reiterated their central claim that Defendant's "targeting algorithms are tangible software products." 3-ER-446.

*Second*, Plaintiff argued that Defendant had misread this Court's <u>Winter</u> decision, explaining that the rationale in <u>Winter</u> actually supports Plaintiffs' position Defendant's software and algorithms are "products" for the purposes of products liability. 3-ER-446.

After all, <u>Winter</u> had clarified that "highly technical tools" are tangible products. 3-ER-446 (citing <u>Winter</u>, 938 F.2d at 1036). And, <u>Winter</u> acknowledged that "computer software" may be a product subject to products liability. <u>Id.</u> Accordingly, Plaintiff argued that, under <u>Winter</u>'s rationale, Defendant's "targeting algorithms are tangible software products." <u>Id.</u>

_Third_, Plaintiff argued that Defendant had completely "ignore[d] the animating policy goals that continue to guide the development of California products liability." 3-ER-447.

Plaintiff explained that California courts adopt a pragmatic and functional approach under which the "scope of strict liability was expanded when necessary to account for new market realities[.]" 3-ER-448 (quoting Loomis v. Amazon.com LLC, 63 Cal. App. 5th 466, 479(2021). California's elastic approach mean that California courts reject the use of formalistic "labels or dictionary definitions" to constrict the scope of products liability. Id.

Instead, California courts "primarily look to the purposes of the doctrine" when developing the common law of products liability. Id. Among the fundamental purposes of products liability include ensuring the "protection of consumers in an increasingly complex and mechanized society." 3-ER-448 (quoting Loomis, 63 Cal. App. 5th at 479). For this reason too, Plaintiffs argued that Defendant's "targeting algorithms are tangible software products" under California law.

In reply, Defendant simply adopted new positions. 2-ER-125-129. Earlier, Defendant's motion had not addressed whether software and algorithms can be products and had not even acknowledge Defendant's software and recommendation algorithms. 5-ER-900-901.

149

Now, in reply, Defendant argued for the first time that "Netflix's 'content-delivery platform,' 'software,' 'algorithms,' and 'other technologies' are not 'products' within the meaning of products liability law[.]" 2-ER-126. **Despite the bold claim, Defendant again failed to cite a single case finding that online platforms, computer software, or algorithms were *not* products under California law**. 2-ER-125-129.

Defendant's reply argued that "software is *generally* not a 'product'[.]" 2-ER-126. To support that position, Defendant cited Pierson v. Sharp Mem'l Hosp., Inc., 216 Cal. App. 3d 340 (1989), a case nowhere discussing software or algorithms but instead pertaining to whether the "provision of a hospital room is properly categorized as a product[.]" Id. at 345.

Then, Defendant attempted to explain away Plaintiff's cited authorities recognizing software as a product. 2-ER-127.

In a contrast with its motion, Defendant now acknowledged that in Winter this Court "observed that computer **software** that 'guide[s] an individual who is engaged in an activity requiring certain knowledge of nature features **may be a 'product**[.]'" 2-ER-127. But, Defendant somehow concluded that that Winter's statement that software *could* be a product was confined to singular example of where the software would "literally lead the user 'over a cliff' and thus directly cause a physical injury." Id.

Then, Defendant explained that in <u>Hardin</u>, the "plaintiff sued after the defendant's software produced a monograph that omitted safety information about the drug that had caused her injuries. The [California] appellate court allowed the plaintiff's products liability claim to proceed past the pleading stage because the defendant had not argued that the defective software was not a 'product[.]'" 2-ER-127 n.5, citing <u>Hardin v. PDX, Inc.</u>, 227 Cal. App. 4th 159 (2014).

<u>Third</u>, Defendant quickly attempted to distinguish a host of Plaintiff's cited authorities from the California courts of appeals, explaining the scope and rationale of California's products liability law. Defendant did so, in a footnote, by simply identifying the precise product type in each case, without ever engaging the rationales and legal propositions for which those cases were cited. 2-ER-129, n. 6. For instance, Defendant acknowledged that the California Courts of Appeals had applied products liability to electricity, but did nowhere engage its rationale. Instead, Defendant merely replied: "*Stein v. Southern Cal. Edison Co.*, 7 Cal. App. 4th 565 (1992) (electricity)". 2-ER-129, n. 6.

<u>Finally</u>, Defendant presented a newfound entanglement theory for the first time in reply. Defendant suggested that because Plaintiff's products liability claim involves recommendation algorithms and software that are entangled with "the show's content, it is squarely foreclosed by <u>Winter</u>[.]" 2-ER-126.

Plaintiff moved to file a sur-reply, so as to be able to address the new positions and new arguments that Defendant adopted for the first time in reply. 2-ER-95. The District Court denied Plaintiff's request for a sur-reply. 2-ER-93.

The District Court addressed Plaintiffs' products liability claim regarding Defendant's algorithms and software in a bullet point and a footnote. The bullet points reads in full:

● Third, plaintiffs' strict liability claim fails because it is premised on the content and dissemination of the show. There is no strict liability for books, movies, or other forms of media. See Winter v. G.P. Putnam's Sons, 938 F.2d 1033, 1034-36 (9th Cir. 1989) (holding that the content of a book concerning mushrooms did not support a products liability claim and basing its holding on the restatement relied upon by California courts as well as numerous authorities reaching the same). Again, plaintiffs' efforts to distance the claims from the content of the show do not persuade. Without the content, there would be no claim. The authority provided by plaintiffs do not support the application of strict liability to content.
    1-ER-6.

The District Court's Order adopted Defendant's unresponsive position asserted in Defendant's Motion–i.e. that there "is no strict liability for books, movies or other forms of media[.]". 1-ER-6.

The Order did not address Defendant's software or recommendation algorithms, discussed at length in the complaint. 1-ER-6. Nor did the District Court address whether algorithms or software can be "products" under California's products liability law. Id.

152

The District Court also distinguished *some* of Plaintiffs' appellate California authorities, in a footnote, without ever engaging their rationale. 1-ER-6, n. 5. But the District Court never addressed or distinguished any of Plaintiffs' cited authorities discussing the availability of products liability for electricity and software. 1-ER-6; 1-ER-6, n. 5.

Finally, the Order never discussed any of the foundational policy purposes that California Courts have consistently used to define the scope of California's products liability law since Justice Traynor first created the doctrine. And, the Order nowhere acknowledged California's products liability law's commitment to the "protection of consumers in an increasingly complex and mechanized society." Loomis v. Amazon.com LLC, 63 Cal. App. 5th 466, 479 (2021)

ii.   Targeting algorithms and software can be products under
      California law.

A

Recommendation algorithms and software can be "products" under California products liability law.

First, applying products liability to such technologies advances the foundational policy considerations that have consistently established and expanded the broad scope of California's products liability law since Justice Traynor's creation of the doctrine in Greenman. And the California Courts have eschewed reliance on "wooden formalisms", "dictionary definitions", and labeling games to artificially limit the scope of California's products liability. See Section 3Ciia, infra.

Second, since Greenman, the California court's electricity cases have made clear that formalistic labels like "tangible" and "physician" will not artificial constrict the scoop of California's products liability law. Accordingly, the legal term of art tangible product is broad enough to encompass things such as electricity and software within the scope of product liability. Indeed, this Court's Winter decision expressly acknowledges that software can be a product. And, the rationale articulated in the Winter's decision supports treating software and recommendation

algorithms as a "product" for purposes of products liability. See Section 3Ciib, infra.

Accordingly, the technologies at issue here–i.e., recommendation algorithms and software–can be "products" under California's products liability law.

"California's product liability jurisprudence, traces back to Justice Roger Traynor's famed concurrence in Escola[.]" Jimenez v. Superior Court, 29 Cal. 4th 473, 477-478 (Cal Supreme Court 2002), citing Escola v. Cocoa Cola Bottling Co. (1944_ 24 Cal.2d 453) (conc. op. of Traynor).

Nearly eighty years ago, Justice Roger Traynor, laid out the vision for what would become California's products liability jurisprudence. In Escola, "Justice Roger Traynor–California's most esteemed jurist–explained tort doctrine must aim to minimize the social costs of accidents." Loomis v. Amazon.com LLC, 63 Cal. App. 5th 466, 491 (concurrence, Wiley, J). As such, Justice Traynor explained, "public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market." Escola v. Coca Cola Bottling Co., 24 Cal. 2d 453, 462 (Traynor, J., concurring).

And, Justice Traynor explained that tort law must keep up with an increasingly complex and mechanized society in which the "consumer no longer

has means or skill enough to investigate for himself the soundness of a product[.]"
Escola v. Coca Cola Bottling Co., 24 Cal. 2d 453, 467 (concurrence). Accordingly,
to be responsive to an evolving society, tort law should afford the public "general
and constant protection and the manufacturer is best situated to afford such
protection." Id.

Thus, Traynor's famed concurrence in Escola articulated a new, modern
approach: strict products liability. And, in 1963, the California Supreme Court's
Greenman decision unanimously adopted Justice Traynor's modern approach to
tort law–ushering in strict products liability. Greenman v. Yuba Power Products,
Inc. (1963) 59 Cal.2d 57)

In Greenman, the California Supreme Court "embraced Justice Traynor's
view, and California became the first state to allow recovery for strict products
liability." Jimenez v. Superior Court, 29 Cal. 4th 473, 477-478 (Cal Supreme Court
2002); See Greenman v. Yuba Power Products, Inc., 59 Cal. 2d 57, 63 (citing the
Escola concurrence's rationales for imposing strict liability on the manufacturer).

Greenman held that a "manufacturer is strictly liable in tort when an article
he places on the market, knowing that it is to be used without inspection for
defects, proves to have a defect that causes injury to a human being." Greenman v.
Yuba Power Products, Inc., 59 Cal. 2d 57, 62. And, under this modern approach, to

establish liability it was sufficient that plaintiff showed "that he was injured while using the [product], in a way it was intended to be used, as a result of a defect in design and manufacture of which plaintiff was not aware that made the [product] unsafe for its intended use." Greenman v. Yuba Power Products, Inc., 59 Cal. 2d 57, 64.

From the start, "strict products liability was created judicially because of the economic and social need for the protection of consumers in an increasingly complex and mechanized society." Loomis v. Amazon.com LLC, 63 Cal. App. 5th 466, 479. The evolving and "increasingly complex and mechanized society" birthed a "dissatisfaction with the wooden formalisms of traditional tort" law's ability to protect consumers. Daly v. General Motors Corp., 20 Cal. 3d 725, 735 (California Supreme Court 1978). It was from this "combination of economic and sociological forces" that the "doctrine of strict liability in tort" was born. Daly v. General Motors Corp., 20 Cal. 3d 725, 732 (California Supreme Court 1978). And since its birth, the "scope of strict liability has been expanded, where necessary, to account for 'market realities' and to cover new transactions" in an ever-evolving and increasingly mechanized society. Bolger v. Amazon.com, LLC, 53 Cal. App. 5th 431, 438.

Stressing an "increasingly complex and mechanized society", the California Supreme Court's "avowed purpose [has been to] insure that the costs of injuries resulting from defective products are borne by the manufacturer that put such products on the market rather than by the injured persons who are powerless to protect themselves." Daly v. General Motors Corp., 20 Cal. 3d 725, 733.

Indeed, the California Supreme Court has been clear about the pragmatic foundation of California's product liability jurisprudence:

"In our contemporary complex industrialized society, advances in science and technology create fungible goods which may harm consumers and which cannot be traced to any specific producer. The response of the courts can be either to adhere rigidly to prior doctrine, denying recovery to those injured by such products, or to fashion remedies to meet these changing needs."

Sindell v. Abbott Laboratories, 26 Cal. 3d 588, 610

California courts have consistently chosen the later approach–fashion[ing] remedies to meet the[] changing needs" brought on by "advances in science and technology[.]" Id. And, the California courts have rejected "adhere[nce] to prior doctrine, denying recovery to those injured" by new technological products. Id.

Accordingly, the California Courts reject "wooden formalisms" when determining the scope of California's products liability. Daly v. General Motors Corp., 20 Cal. 3d 725, 735 (California Supreme Court 1978); see also Bolger v. Amazon.com, LLC, 53 Cal. App. 5th 431, 438. And, the "scope of strict liability" is not set by "labels or dictionary definitions". Loomis v. Amazon.com LLC, 63 Cal. App. 5th 466, 479; Pierce v. Pac. Gas & Elec. Co., 166 Cal. App. 3d 68, 83 ("liability should not depend simply upon whether [something] is or is not labeled a 'product'[.]")

Instead, California's product liability is "expanded when necessary[.]" Id.

As a result, California has stayed a step ahead of the narrower approach taken by other jurisdictions. Thus, while the Restatement (along with the majority of the states) adopted California's doctrine of strict products liability [see Daly v. General Motors Corp., 20 Cal. 3d 725, 733, citing 402A of the Restatement Second of Torts], the California Supreme Court has not been shy in explaining that the scope of California's products liability exceeds the scope of the Restatement.

Indeed, the California Supreme Court made clear that it did not feel bound to the limits of the Restatement. See Cronin v. J.B.E. Olson Corp., 8 Cal. 3d 121, 131 (California Supreme Court) ("We have not hesitated to reach conclusions contrary to those set forth in Restatement section 402A."); c.f. Stein v. Southern Cal. Edison

159

Co., 7 Cal. App. 4th 565, 570 (distinguishing California's application of products liability to electricity from the narrower treatment of electricity under the "Restatement Second test.").

Indeed, since Greenman, the scope of California's products liability law has continued to expand so as to keep pace with an increasingly complex and mechanized society. Just one year after Greenman, the California Supreme Court expanded liability to retailers, not just manufacturers. Vandermark v. Ford Motor Co. (1964). The rationale for the expansion was pragmatic and straightforward: applying strict liability on retailers as well as manufacturers "affords maximum protection to the injured plaintiff and works no injustice to the defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship." Jimenez v. Superior Court, 29 Cal. 4th 473, 477-478, citing Vandermark at pp. 262-263.

Vandermark was followed by a string of decisions affirming the importance and vast scope of California's strict liability doctrine.[9] And, that's because the

_____

[9] See, e.g., Cronin v. J.B.E. Olson Corp. (1972) 8 Cal.3d 121, 132-134 (rejecting any "unreasonably dangerous" restriction of Rest.2d Torts, § 402A); Luque v. McLean (1972) 8 Cal.3d 136, 141-146 [104 Cal. Rptr. 443, 501 P.2d 1163] [applying strict liability to patent as well as latent defects]; Price v. Shell Oil Co. (1970) 2 Cal.3d 245, 248 [85 Cal. Rptr. 178, 466 P.2d 722] [applying the doctrine to bailors and lessors]; Pike v. Frank G. Hough Co. (1970) 2 Cal.3d 465, [continued]

California Supreme Court remains steadfastly committed to the animating policy considerations of <u>Greenman</u>: "We can see no difficulty in applying the *Greenman* formulation to the full range of products liability situations[.]." <u>Cronin v. J.B.E. Olson Corp.</u>, 8 Cal. 3d 121, 134 (California Supreme Court 1972) (rejecting the Restatement Second's "unreasonably dangerous" restriction of the scope of products liability).

Thus, California courts have remained fully committed to fulfilling <u>Greenman</u>'s policy formulation, so as to give full effect to Justice Traynor's vision–even when doing so entails exceeding the scope of the Restatement or the scope of other states' products liability regimes. Id. at 134.

Accordingly, when new technological and economic realities emerge, Courts "**<u>must</u> therefore return to the principles underlying the doctrine** of strict products liability to determine whether it applies." <u>Bolger v. Amazon.com</u>, LLC,

---

475-477 [85 Cal. Rptr. 629, 467 P.2d 229] [applying strict liability to a defectively designed, as opposed to a defectively manufactured, product]; Becker v. IRM Corporation, supra, 38 Cal.3d at p. 464 [applying the doctrine to lessors of an apartment complex who purchased it after the defective product was installed]; see also Barth v. B. F. Goodrich Tire Co. (1968) 265 Cal. App. 2d 228, 252-253 [71 Cal. Rptr. 306] [applying the doctrine to suppliers and distributors]; Kriegler v. Eichler Homes, Inc. (1969) 269 Cal. App. 2d 224, 227 [74 Cal. Rptr. 749] [builders of mass-produced homes]; Garcia v. Halsett (1970) 3 Cal. App. 3d 319, 324-326 [82 Cal. Rptr. 420] [licensors].)

53 Cal. App. 5th 431, 438. In recent years, the California Courts have reiterated the need to go back to first principles in determining whether California's products liability scope should be expanded.

And, the California courts have repeatedly rejected attempts to evade California products liability law by hiding behind formalistic labels. Pierce v. Pac. Gas & Elec. Co., 166 Cal. App. 3d 68, 81-82; n.6 (rejecting arguments that electricity is not "tangible", not "a product" and not "an article"); Loomis v. Amazon.com LLC, 63 Cal. App. 5th 466, 479 (rejecting Amazon's argument that its online platform was a service not subject to strict liability); Bolger v. Amazon.com, LLC, 53 Cal. App. 5th 431, 445 (same).

Thus, the "scope of strict liability" is not set by "labels or dictionary definitions". Loomis v. Amazon.com LLC, 63 Cal. App. 5th 466, 479. Rather, the scope of product liability responds to the new "market realities"; to "new transactions" that are "in widespread use in today's business world[.]" Id. And, the Courts apply Greenman's policy aims so as to keep step with an "increasingly complex and mechanized society." Daly v. General Motors Corp., 20 Cal. 3d 725, 733.

As such, the scope of California product's liability is determined by a return to first principles and by the evaluation of several foundational policy aims. The four main policy grounds for the imposing the strict liability doctrine are:

"(1) to provide a "short cut" to liability where negligence may be present but is difficult to prove; (2) to provide an economic incentive for improved product safety;

(3) to induce the reallocation of resources toward safer products; and

(4) to spread the risk of loss among all who use the product."

Pierce v. Pac. Gas & Elec. Co., 166 Cal. App. 3d 68, 83 (3rd District Court of Appeal March 26, 1985), citing Escola v. Coca-Cola Bottling Co. (1944) 24 Cal.2d 453, 461-462 [150 P.2d 436] (Traynor, J., conc.).) Accordingly California courts ask pragmatic and policy oriented questions when deciding whether to impose strict product liability:

"(1) whether [Defendant] may play a substantial part in insuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end,

163

(2) whether [Defendant] may be the only member in the distribution chain reasonably available to the injured plaintiff, and

(3) whether [Defendant] is in a position to adjust the costs of compensating the injured plaintiff amongst various members in the distribution chain."

Loomis v. Amazon.com LLC, 63 Cal. App. 5th 466, 476 (discussing the "public policies articulated in Greenman and Vandermark that set the scope for the application of strict liability).

Applying these public policies to set the scope of products liability, the California courts ensure that tort law is "enhancing product safety, maximizing protection to the injured plaintiff, and apportioning costs among the defendants." Loomis v. Amazon.com LLC, 63 Cal. App. 5th 466, 477. It will impose liability where Defendant "is situated swiftly to learn of and to contain the emerging problem, thereby reducing accidental injuries." Loomis v. Amazon.com LLC, 63 Cal. App. 5th 466, 488 (concurrence, Wiley, J.). And, it will impose liability so that "tort law force[s] the manufacturer to internalize the costs of accidents from its product." Loomis v. Amazon.com LLC, 63 Cal. App. 5th 466, 494 (concurrence). Thus, the "case is easy" where "Defendant is well situated to take cost-effective measures to minimize the social costs of accidents. Strict liability will prompt this

beneficial conduct." Loomis v. Amazon.com LLC, 63 Cal. App. 5th 466, 502 (concurrene Wiley, J.)

And, the California Supreme Court, in 2016, reiterated that the California "tort system contemplates that the cost of an injury, instead of amounting to a 'needless' and 'overwhelming misfortune to the person injured,' will instead 'be insured by the [defendant] and distributed among the public as a cost of doing business.'" Kesner v. Superior Court (2016) 1 Cal.5th 1132, 1153, citing (Escola v. Coca Cola Bottling Co. (1944) 24 Cal.2d 453, 462 (conc. opn. of Traynor, J.); citing Calabresi, The Cost of Accidents: A Legal and Economic Analysis (1970). This approach stresses that "courts should assign tort liability to ensure those best situated to prevent injuries are incentivized to do so." Loomis v. Amazon.com LLC, 63 Cal. App. 5th 466, 492 (CONCURRENCE).

****

"California courts **must** consider the policies underlying the doctrine to determine whether to extend strict liability in a particular circumstance." Loomis v. Amazon.com LLC, 63 Cal. App. 5th 466, 476. Below, the District Court failed to do that. 1-ER-6 (nowhere addressing Justice Traynor's foundational policy considerations). And, it ignored the factual and technological realities of Defendant's recommendation algorithms and software. 1-ER-6.

Yet when one considers the public policies underlying strict liability it becomes clear that recommendation algorithms and software comfortably fit within the scope of California's products liability regime–regardless of 'wooden formulisms", "dictionary definitions" or semantic labels.

Treating recommendation algorithms and software as a "product" subject to products liability advances "the deep structure of modern tort law: a judicial quest to minimize the social costs of accidents—that is, the sum of the cost of accidents and the cost of avoiding accidents." Loomis v. Amazon.com LLC, 63 Cal. App. 5th 466, 490 (concurrence Wiley, J.). And, it will incentivize the party best situated to prevent injuries to do so.

By contrast, Defendant's unsupported resort to arcane, wooden formalisms and labeling games, is fundamentally at odds with California's functional approach to products liability. That approach to evade liability has been rejected by California Courts time and time again. And, Defendant's preferred approach would derail Justice Traynor's modern vision of tort law. And, it would do so at a time when society is becoming more automated and mechanized and complex than ever before.

166

**b) The case law demonstrates that the terms of art like "tangible" and "product" do not preclude products liability for things like electricity, software and algorithms.**

When determining the scope of California's products liability law, courts should resist the unexamined impulse to decide the matter by resorting to formalistic labels and dictionary definitions of terms such as "tangible" and "product". That's because California courts are motivated by foundational policy considerations, not formalistic labels. See Section 3Ciia, supra.

But, it's also because these terms of are (i.e. "tangible" and "product") are far more flexible and broad than they may initially appear. On this point, the California courts' application of products liability to electricity is particularly enlightening.

Indeed, the California courts have recognized that it "is now firmly settled that electricity can be a product within the meaning of Greenman" and that electricity can be "subject to principles of strict liability in appropriate cases." Fong v. Pac. Gas & Elec. Co., 199 Cal. App. 3d 30, 35 (1st dist Court of appeals January 29, 1988) (collecting cases).[10] And the California courts have rejected

_____

[10] Pierce v. Pacific Gas & Electric Co. (1985) 166 Cal.App.3d 68, 83-84 [212 Cal.Rptr. 283, 60 A.L.R.4th 709]; see also Smith v. Home Light and Power Co. (Colo. 1987) 734 P.2d 1051, 1054; Ransome v. Wisconsin Elec. Power Co. (1979) 87 Wisc.2d 605 [275 N.W.2d 641, 648]; Houston Lighting & Power Co. v. [continued]

arguments that electricity is not "tangible", not "an article", or not "a product[.]" Pierce v. Pac. Gas & Elec. Co., 166 Cal. App. 3d 68, 81-82; n.6

That's because the Greenman approach holds a defendant "strictly liable in tort when an article he **places on the market**, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being[.]" Greenman v. Yuba Power Products, Inc 59 Cal.2d 57 (1963). And, "[p]lacing an article on the market under the Greenman test is the functional equivalent of putting a product '**in the stream of commerce**'[.]" Fong v. Pac. Gas & Elec. Co., 199 Cal. App. 3d 30, 35, citing Price v. Shell Oil Co. (1970) 2 Cal.3d 245, 254.

Accordingly, the Pierce court stressed that the "courts "have not dwelled unduly on electricity's physical properties." Pierce v. Pac. Gas & Elec. Co., 166 Cal. App. 3d 68, 81. Rather, the Pierce court noted that "courts of other states have had little trouble in concluding that electricity delivered to homes and businesses is a 'product[,]'" within the meaning of products liability. Pierce v. Pac. Gas & Elec. Co., 166 Cal. App. 3d 68, 82 (3rd Dist Court of Appeal March 26, 1985). That

---

Reynolds (Tex.App. 1986) 712 S.W.2d 761, 766; Elgin Airport Inn v. Commonwealth (1980) 88 Ill.App.3d 477 [410 N.E.2d 620, 623-624]; Petroski v. Northern Indiana Pub. Service Co. (1976) 171 Ind.App. 14 [354 N.E.2d 736, 747]; Schriner v. Pa. Power & Light Co. (1985) 348 Pa.Super. 177 [501 A.2d 1128, 1133].

functional, rather than formalistic approach, rendered terms like "tangible" and "physical" no barrier to extending products liability to electricity.

Of course, electricity is not "tangible" in the sense that one can touch or hold electricity. But, electricity is tangible in the sense that it can cause physical harm. And, it can be introduced into the stream of commerce and delivered to homes and businesses[.]" Pierce v. Pac. Gas & Elec. Co., 166 Cal. App. 3d 68, 82. That's why "the courts of other states have had little trouble in concluding that electricity **delivered to homes** and businesses is a 'product.'" Pierce v. Pac. Gas & Elec. Co., 166 Cal. App. 3d 68, 82 (collecting cases).[11] For example, electricity still at the utility factory, not yet delivered to the consumer's home might not be within the ambit of products liability. But once the electricity is delivered to the consumers' home and introduced into the stream of commerce it is.

That functional approach, focusing on harms emerging from things put into the stream of commerce and entering into consumers' homes, led courts to treat electricity as a tangible product subject to the doctrine of products liability. In short, tangibility requires little more than that (1) it caused physical harm and (2) it was "in the 'stream of commerce'" and was "delivered to the customer's premises." Pierce v. Pac. Gas & Elec. Co., 166 Cal. App. 3d 68, 84.

---

[11]

It's also worth noting that California Courts have taken an even broader approach on this issue than have other jurisdictions' courts and the Restatement, when recognizing electricity as within the scope of products liability law. In <u>Stein</u> the Court observed that: "***other jurisdictions*** which discuss electricity as a 'product' for the purposes of imposition of strict liability generally rely on either the Restatement Second test which requires a sale of the product or are decided in jurisdictions whose statutory or case law require a sale of a product for imposition of strict liability in tort." <u>Stein v. Southern Cal. Edison Co.</u>, 7 Cal. App. 4th 565, 570. But the <u>Stein</u> court then clarified the California approach was broader:"**However, in California, a sale of the product is not necessary for imposition of products liability[.]**" <u>Stein v. Southern Cal. Edison Co.</u>, 7 Cal. App. 4th 565, 571. Rather, what is required in California, is that it is "placed into the stream of commerce[.]" <u>Stein v. Southern Cal. Edison Co</u>., 7 Cal. App. 4th 565, 570. And, "electricity is considered to be placed into the stream of commerce when it reaches its destination in a home[.]" <u>Stein v. Southern Cal. Edison Co</u>., 7 Cal. App. 4th 565, 570

Accordingly, Plaintiffs cited California's application of products liability to electricity. 3-ER-447, n. 2, quoting <u>Stein v. S. Cal. Edison Co.</u>, 7 Cal. App. 4th 565, 571 (1992). Defendant's reply dismissed <u>Stein</u> as "far afield" because it was about "electricity." 2-ER-129, and 2-ER-129, n. 6. And, the Order below simply

ignored the parties' citations to the <u>Stein</u> case altogether, nowhere addressing California's electricity product liability jurisprudence.

But, Defendant and the District Court missed the point. <u>Stein</u> demonstrates the breadth of California's products liability law and elucidates the animating reasons for the breadth. Cases like <u>Stein,</u> demonstrate that California's products liability is broader than other jurisdictions' and is even broader than the Restatement itself.

Moreover, California's electricity cases caution not to get tripped up on formalisms, rigid labels, and crimped definitions. Indeed, the <u>Pierce</u> court was clear: **"liability should not depend simply upon whether electricity is or is not labeled a 'product.'** More significantly, we believe the policy justifications for strict liability in tort support its imposition in this case."

<u>Pierce v. Pac. Gas & Elec. Co.</u>, 166 Cal. App. 3d 68, 83, citing Daly v. General Motors Corp. (1978) 20 Cal.3d 725, 736.

Accordingly, California courts did not struggle to apply products liability to electricity despite defendants' repeated red herrings about "tangible" and "physical" requirements, that posed no impediment to liability and found no basis in California's products liability law.

Similarly, like electricity, software too can be subject to the doctrine of products liability. Indeed, "courts and legal scholars have suggested that defective computer software may give rise to strict products liability in tort." Schafer v. State Farm Fire & Cas. Co., 507 F. Supp. 2d 587, 601 (E.D.L.A. Aug. 22, 2007), citing Winter v. G.P. Putnam's *Sons,* 938 F.2d 1033, 1035 (9th Cir. 1991).

And, California courts have allowed claims of products liability based on computer software" to proceed past the pleading stage. See Hardin v. PDX, Inc., 227 Cal. App. 4th 159 (2014). In Hardin, the plaintiff sued after the defendant's software produced a "drug information pamphlet" that omitted safety information about the drug that had caused her injuries. Id. at 164. "Defendant had modified its software to allow Safeway to distribute abbreviated drug monographs that automatically omitted warnings of serious risks[.]" Hardin v. PDX, Inc., 227 Cal. App. 4th 159, 170. Defendant argued that plaintiff's products liability claims were barred as a matter of law. Over these arguments, the appellate court allowed the plaintiff's products liability claim, based on the defective software's omitted safety information, to proceed past the pleading stage. Hardin v. PDX, Inc., 227 Cal. App. 4th 159, 170 ("Hardin's theory is that PDX's software program, not the information it produces, is the defective product. PDX has not argued, let alone shown, that Hardin cannot prevail under that theory.")

172

Indeed, this Court's <u>Winter</u> decision supports subjecting software to products liability. In <u>Winter</u>, this Court, applying the Restatement (Second) of Torts, §402A, suggested that "computer software" "may be" subjected to products liability just like other "highly technical tools" <u>*Winter v. G.P. Putnam's Sons,*</u> 938 F.2d 1033, 1035-1036 (9th Cir. 1991). <u>Winter</u> observed that "aeronautical charts' ' which had been subjected to products liability by multiple jurisdictions, pursuant to the Restatement's approach. Id. <u>Winter</u> then contemplated other such "technical tools" that could be subjected to products liability. Indeed, when discussing the types of "technical tools" that could be subject to products liability, <u>Winter</u> expressly identified "**Computer software** that fails to yield the result for which it was designed may be another." <u>Winter v. G.P. Putnam's Sons</u>, 938 F.2d 1033, 1036.

That's why, since this Court first decided <u>Winter</u>, other courts have cited <u>Winter</u> as *supporting* the possibility of subjecting software to product liability. See 3-ER-446-447; See id.; <u>Hou-Tex, Inc. v. Landmark Graphics</u>, 26 S.W.3d 103, 107, n.2 (Tex. App. – Houston [14th Dist.] 2000) ("We accept that the SeisVision **software is a product** for purposes of this appeal because [...] it is a highly technical tool used to create a graphic representation from technical data. ") (relying on <u>Winter</u>); see also <u>Schafer v. State Farm Fire & Cas. Co.</u>, 507 F. Supp. 2d 587, 601 (E.D.L.A. Aug. 22, 2007) (citing <u>Winter</u>)

173

Indeed, the Restatement Third of Torts addresses <u>Winters</u> as follows: "The Ninth Circuit suggested in dictum that computer software might be considered a product for purposes of strict products liability in tort." Restat 3d of Torts: Products Liability, § 19, citing <u>Winter v. G.P. Putnam's Sons</u>, 938 F.2d 1033, 1035 (9th Cir.1991). In that same vein, the Restatement (Third) also notes that "numerous commentators have discussed the issue and urged that software should be treated as a product." Restat 3d of Torts: Products Liability, § 19 (collecting secondary sources arguing the software should be treated as a product).[12]

Thus, it is submitted that Defendant and the District Court both misread <u>Winter</u>, in taking <u>Winter</u> to foreclose plaintiff's products liability claim about Defendant's recommendation algorithms and software.

---

[12] See, e.g., Gemignani, Product Liability and Software, 8 Rutgers Computer & Tech. L.J. 173, 196-99 (1981) (arguing that the same policies that gave rise to strict liability apply as well to soft-ware); Note, Strict Products Liability and Computer Software: Caveat Vendor, 4 Computer L.J. 373 (1983) (predicting that mass-marketed, off-the-shelf software will be subject to strict products liability); Note, Negligence: Liability for Defective Software, 33 Okla. L. Rev. 848, 855 (1980) ("In terms of software, [analysis of public policy considerations] . . . means that when software is distributed to the public through mass merchandising, strict liability in tort should be an available theory for a consumer who is injured because of a defect in the software."); Note, Computer Software and Strict Products Liability, 20 San Diego L. Rev. 439 (1983) (arguing that strict products liability should be extended to the computer industry); see also Note, Easing Plaintiffs' Burden of Proving Negligence for Computer Malfunction, 69 Iowa L. Rev. 241 (1983).

Finally, it's also worth noting that the scope of California's products liability law may be even broader than Winter. Winter was applying the Restatement (Second) §402A approach, and grappling with certain restrictions imposed by the Restatement on the scope of product liability. But, as the California Supreme Court has made clear it does "not hesitate[] to reach conclusions contrary to those set forth in Restatement section 402A." Cronin v. J.B.E. Olson Corp., 8 Cal. 3d 121, 131 (California Supreme Court). And, as California's electricity cases make clear, there are restrictions imposed by the Restatement that the California Courts do not recognize as restricting the scope of California's products liability law. See e.g. Stein v. Southern Cal. Edison Co., 7 Cal. App. 4th 565, 570 (discussing restrictions adopted by "***other* jurisdictions**" due to reliance on the "Restatement Second test.").

So, while Winter's rationale actually *supports* applying products liability to software; it is worth stressing that the scope of California's products liability may well be broader than Winter's determination of the scope of the Restatement (Second) §402A.

***

In sum, California law defines the scope of its products liability based on Justice Traynor's time-honored policy considerations as recognized in <u>Greenman</u> and the <u>Escola</u> concurrence. And, California law does not define the scope of products liability based on wooden formalism, dictionary definitions, or labeling games.

Accordingly, California's products liability has had no trouble evolving alongside an increasingly "complex and mechanized" society. And California products liability law has often kept a few steps ahead of the Restatement and other jurisdictions' approach in applying Justice Traynor's policy considerations to the everyday realities and technologies.

Thus, the scope of products liability has been broad enough to encompass electricity, online platforms, and software alike. And, California's case law, especially its electricity cases, elucidates that the scope of product liability is not artificially limited by red herrings about the limited scope of words like "tangible" or "product". To the contrary, "scope of strict liability has been expanded, where necessary," to account for an ever-evolving and technologically complex society. <u>Bolger v. Amazon.com, LLC</u>, 53 Cal. App. 5th 431, 438. Indeed, California's products liability law has reflected an "**has <u>infinite capacity</u> for growth to meet changing needs and mores**." <u>Bolger v. Amazon.com, LLC</u>, 53 Cal. App. 5th 431, 462 (discussing the "recent developments in the field of products liability).

Below, the Order held that this Court's <u>Winter</u> decision foreclosed Plaintiffs' products liability claims regarding Defendant's online platform, recommendation algorithms and software. But, to the contrary, this Court's <u>Winter</u> decision supports the application of products liability to software. And, California's the scope of California's products liability, guided by Justice Traynor's time-honored policy considerations, is broad enough to encompass the harms arising from the products addressed in Plaintiff's complaint. See Section 3Ciii, infra.

iii.   Defendant's targeting algorithms and software are products
       under California law when targeted at consumers.

Defendant's Recommendation Algorithms and Software are "products"

subject to California's strict products liability jurisprudence. 6-ER-985 ¶ 57-65,

"Section F" (describing Defendant's product)' 6-ER-993 ¶ 78-83 (asserting strict

product liability based on Defendant's "product").

    That's the case for several reasons.

    First, treating them as products makes sense linguistically. Everyday speech

uses the phrase "software product". Indeed, Netflix *itself* refers to its software as

products. And legislators and whistleblowers addressing algorithmic harms to

children also refer to these recommendation algorithms and online platforms as

products. Accordingly, it is natural to treat Defendant's recommendation

algorithms and software as just that – "products." Every day speech does, Netflix

itself does, and those addressing the pressing societal problem of algorithmic

harms to children also do.

    Second, treating them as "products" also makes sense doctrinally. Courts

and scholars addressing product liability often use legal terms of art like "tangible"

and "product." But those terms of art are broader than they might initially appear.

For instance, the California courts consistently treat electricity as a tangible

"product". A number of sources, such as the Restatement and this court's own

Winter decision, intimate that software is also a tangible "product" for doctrinal

178

purposes. And, even a sitting member of this court has recognized that recommendation algorithms are "products" within the meaning of products liability doctrine. Accordingly, it is doctrinally sound to treat Defendant's recommendation algorithms and software as "products" under traditional products liability doctrine.

Third, treating them as "products" comports with and advances Justice Traynor's time-honored policy considerations that set the boundaries of California's products liability law. In short, under California's Greenman approach, Defendant's recommendation algorithms and software are products. Defendant releases these technologies into the stream of commerce and into the homes of millions. Defendant targets children with them. 6-ER-985-987, ¶57-¶65. When harms arise from Defendant's technologies, 6-ER-988-989, ¶ 69-70, Defendant is best positioned to correct the harms, avoid similar accidents in the future, and spread the cost across its millions of users. In short, applying strict products liability here, creates a safer society and is attuned to the everyday realities of our "increasingly complex and mechanized" world. For that reason especially, Defendant's recommendation algorithms and software are products subject to California's products liability law.

While the first two considerations (linguistic conventions and doctrinal categorizations) are persuasive, this last point is dispositive. That's because the scope of California's products liability law is set by Justice Traynor's time-

179

honored policy considerations and the <u>Greenman</u> approach. See Section 3Cii,

supra. For these reasons, as explained in turn below, Defendant's recommendation

algorithms and software are products for purposes of California's products liability

law.

 <u>First</u>, there's the social convention and everyday speech practice of referring

to "software products."

 Everyday speech refers to software as a "product." Indeed, the phrase

"software product" is a commonplace phrase found in everyday parlance,

publications and headlines. See e.g. "This Slide Shows Why HealthCare.gov

Wouldn't Work at Launch

[https://www.npr.org/sections/alltechconsidered/2013/11/19/246132770/this-slide-shows-why-healthcare-gov-wouldnt-work-at-launch](https://www.npr.org/sections/alltechconsidered/2013/11/19/246132770/this-slide-shows-why-healthcare-gov-wouldnt-work-at-launch) (NPR) ("Waterfall

development favors listing a huge set of requirements for a system up front, letting

developers go away for months (if not longer) and expecting a huge **software**

**product** in the end.")

([https://www.npr.org/sections/alltechconsidered/2013/11/19/246132770/this-slide-shows-why-healthcare-gov-wouldnt-work-at-launch](https://www.npr.org/sections/alltechconsidered/2013/11/19/246132770/this-slide-shows-why-healthcare-gov-wouldnt-work-at-launch)); see also Forbes, "Time

Estimation: How Long Should it take to Develop a Product" ("Once you come up

with the idea of creating a **software product** and have proof of concept, you can

start thinking about how much it takes to bring it to life.");

(https://www.forbes.com/sites/forbesbusinesscouncil/2022/12/02/software-development-time-estimation-how-long-should-it-take-to-develop-a-product/?sh=425edb8876ce).

      "Software products" are routinely recognized as just that–products.

      <u>Second</u>, Netflix itself describes its own software as a product. One need only look to Netflix's own, publicly available terms of use which requires users to agree that they will not: "decompile, reverse engineer or disassemble **any software or other products** or processes accessible through the Netflix service[.]" (Terms of Use Section 4.6(iv)) (https://help.netflix.com/legal/termsofuse) (last accessed January 2, 2023).

      <u>Third</u>, whistleblowers and legislators tackling the emerging harms caused by algorithms, like defendant's, routinely employ the phrase "product" or "online product" to describe these algorithms.

      For example, when Facebook whistleblower Frances Haugen captured national headlines, she had a simple message for Congress: "I am here today because I believe that Facebook's products harm children[.]" (October 4, 2021, Statement of Frances Haugen to Sub-Committee on Consumer Protection, Product Safety, and Data Security). Those products that were harming children: "**algorithmic products**" and "recommendation systems." Id. Ms. Haugen had

worked as a "product manager" at large tech companies where her job "largely focused on **algorithmic products** […] and recommendation systems[.]" Id.

Fourth, the California Legislature similarly employed the phrase "**online product**" to describe these dangerous algorithms in its recently enacted legislation: the California Age-Appropriate Design Code Act (AB 227).[13] The Act recognizes that "[a]s children spend more of their time interacting with the online world, the impact of the **design of online products** and services on children's well-being has become a focus of significant concern." 2022 Cal ALS 320, 2022 Cal AB 2273, 2022 Cal Stats. ch. 320. And this Bill is concerned with addressing "Whether algorithms used by the **online product**, service, or feature could harm children." 1798.99.31(a)(1)(B)(v). The Bill also recognizes "online products" as distinct from "delivery or use of a physical product."1798.99.30(b)(5)(C). In short, under California law, there is nothing even remotely odd about having an "online product."

Below, Defendant claimed that treating Netflix's platform, recommendation algorithms, and software as products "defies common sense[.]" 2-ER-127. But that's just not true.

---

[13] This Act was unanimously enacted by the California Legislature and subsequently enacted into law by California's Governor on September 15, 2022.

182

Everyday speech and publications use the phrase "software products." Netflix's own terms of service refer to their software as a "product". A former big-tech *product* manager turned industry whistleblower referred to recommendation algorithms and online platforms as "products" when testifying on Capitol Hill about the harms that such products are reeking on this nation's children. And the California legislature refers to such online platforms and recommendation algorithms as "online products".

Thus, there's nothing unusual about treating recommendation algorithms and software, like Defendant's, as products. It does not "defy commonsense" as Defendant claims. 2-ER-127. To the contrary it is commonplace. And, here Defendant's products are precisely the types of "online products", "algorithmic products", and "software products" society commonly refers to in everyday speech.

Moreover, treating Defendant's online platforms, recommendation algorithms and software as "products" also makes sense doctrinally.

First, California's electricity law cases make clear there is nothing in the terms of art "tangible" or "products" that forecloses the application of products liability law to Defendant's online platforms, recommendation algorithms and software.

In these cases, the California courts have explained that courts have not been dissuaded by red herring arguments about the definitions of "physical" and "tangible". In treating electricity as a tangible product, subject to product liability, "The courts, however, have not dwelled unduly on electricity's physical properties." Pierce v. Pac. Gas & Elec. Co., 166 Cal. App. 3d 68, 81; see also Fong v. Pac. Gas & Elec. Co., 199 Cal. App. 3d 30, 35 ("**firmly settled** that **electricity can be a product** within the meaning of Greenman and section 420A of the Restatement Second of Torts[.]").

Of course, electricity is not "tangible" in the sense that one can touch or hold electricity. But, electricity is tangible in the sense that it can cause physical harm. And, it is tangible in the sense that it can be introduced into the stream of commerce and "delivered to homes and businesses[.]" Pierce v. Pac. Gas & Elec. Co., 166 Cal. App. 3d 68, 82. That's why "the courts of other states have had little trouble in concluding that electricity **delivered to homes** and businesses is a 'product.'" Pierce v. Pac. Gas & Elec. Co., 166 Cal. App. 3d 68, 82 (collecting cases).[14]

Thus, tangibility requires little more than that (1) it caused was physical harm and (2) it was "in the 'stream of commerce'" and was "delivered to the customer's premises." Pierce v. Pac. Gas & Elec. Co., 166 Cal. App. 3d 68, 84.

---

14

For example, electricity still at the utility factory, not yet delivered to the consumer's home might not fall within the ambit of products liability. But once the electricity is delivered to the consumers' home and introduced into the stream of commerce it is.

So too with Defendant's products here. Algorithms and software sitting idly on a computer or server at Netflix's premises, not yet introduced into consumers' homes might not be tangible products. But once they are unleashed into the stream of commerce and enter the consumers' homes, they are subject to products liability for the harms they cause. And once they were unleashed into the stream of commerce and targeting Bella Herndon in her home and on her personal devices, they are subject to California's products liability law. 6-ER-985-987. Under California law that's enough to fit within the scope of products liability law.

As California's electricity cases illuminate, Defendant's tangibility arguments pose no difficulties for treating Defendant's recommendation algorithms and software as products subject to California's products liability law here. And, it's also worth reiterating that California law readily recognizes "online products" that are distinct from the "delivery or use of a physical product." See California Age-Appropriate Design Code Act. Plainly the concept of a "product" under California law is not artificially limited by crimped definitions of "physical" or "tangible".

185

Second, this Court's Winter decision and Restatement (Third) of Torts support treating Defendant's software as a product. Winter expressly noted that "computer software" may be eligible for products liability. See e.g. Restat 3d of Torts: Products Liability, § 19.

Here, Defendants' online platform, recommendation algorithms and software are "highly technical tools" that "may be used to guide" an individual's actions and decisions. Winter at 1036. See 6-ER-985-989. Netflix engineers have publicly explained how these technologies are used to "control what you watch". 6-ER-985-986 ¶57. These technologies are used to constantly surveille everything you "played, searched for, or rated, as well as the time, date, and device." Id. These technologies are even used to "track user interactions such as browsing or scrolling behavior." Id. That constant surveillance is then fed through big data analytics and incredibly sophisticated and powerful recommendation algorithms directly target individual children with uniquely tailored messages meant to influence their choices. See e.g. 6-ER-985-986 ¶ 57, 60, 62. Netflix itself claims that approximately "75% of Netflix viewing is driven by the recommendation algorithm." 6-ER-987 ¶ 63.

Third, it's worth addressing that sitting members of this Court have recognized the possibility of applying traditional products liability to address the nascent issues of algorithmic harm–i.e. treating recommendation algorithms that

186

"cause unreasonably dangerous consequences" as products subject to products liability. <u>Gonzalez v. Google LLC</u>, 2 F.4th 871, 938 (9th Cir. 2021) (dissent, Gould, J.) (dissenting on application of Section 230). Judge Gould proposed that recommendation algorithms could be subject to product liability: "If social media companies use 'neutral' algorithms that cause unreasonably dangerous consequences [...] they might be held responsible." <u>Gonzalez v. Google LLC</u>, 2 F.4th 871, 938 (9th Cir. 2021) (dissent, Gould, J.), citing *Restatement (Second) of Torts*, § 402A (1965).

Thus, Defendant's protestations that their online platforms, recommendation algorithms, and software are not "tangible" or are not "products" misunderstands those terms of art as employed in products liability. The California courts consistently treat electricity as a tangible "product". A number of sources, such as the Restatement and this court's own Winter decision, intimate that software is also a tangible "product" from a doctrinal perspective. And, even sitting members of this court have recognized the possibility that recommendation algorithm are "products" within the meaning of products liability doctrine. Accordingly, is doctrinally sound to treat Defendant's recommendation algorithms and software as "products" under traditional products liability doctrine.

<u>Finally</u>, and most importantly, is that treating Defendant's recommendation algorithms and software as products advances Justice Traynor's foundational

policy considerations under the <u>Greenman</u> approach. Under California law, this consideration is dispositive of whether Defendant's algorithms and software are product or not.

Here, these policy considerations make clear that they should be treated as a product. Treating them as a product will "provide an economic incentive for" Defendant to improve the "safety" of its algorithms and software. <u>Pierce v. Pac. Gas & Elec. Co.</u>, 166 Cal. App. 3d 68, 83 (3rd District Court of Appeal March 26, 1985), citing <u>Escola v. Coca-Cola Bottling Co</u>. (1944) 24 Cal.2d 453, 461-462. Moreover Defendant is well-positioned to "spread the risk of loss among all who use" Defendant's online platform. Id. Moreover, treating them as products recognizes that Defendant is "the only member in the distribution chain reasonably available to the injured plaintiff." <u>Loomis v. Amazon.com LLC</u>, 63 Cal. App. 5th 466, 476 (discussing the "public policies articulated in <u>Greenman</u> and <u>Vandermark</u> that set the scope for the application of strict liability).

Finally, treating them as products realizes that Defendant is best positioned to avoid future harms. After all, Defendant "is situated swiftly to learn of and to contain the emerging problem, thereby reducing accidental injuries." <u>Loomis v. Amazon.com LLC</u>, 63 Cal. App. 5th 466, 488 (concurrence, Wiley, J.).

Thus, Defendant's recommendation algorithms and software are plainly products under California's product liability–a legal instrument with an "infinite capacity for growth to meet changing needs and mores." Bolger v. Amazon.com, LLC, 53 Cal. App. 5th 431, 462. Indeed, under California products liability law, these policy considerations are dispositive of whether Defendant's recommendation algorithms and product are products subject to strict liability. Yet below, Defendants and the Order nowhere addressed California's discussed or addressed Justice Traynor's foundational policy considerations that set the scope of California's products liability law. 1-ER-6 (second bullet point on the page, addressing products liability). But under California law, these considerations are dispositive.

For the foregoing reasons, treating Defendant's online platform, recommendation algorithms and software as "products" comports with: (1) commonplace usage of terms like "software products" and "online product"; (2) the common law's treatment of "product" under the doctrine of products liability; and (3) California's use of several foundational policy rationales to determine the scope of "product" under California products liability law.

*********

189

Plaintiffs strongly disagree that their products liability claim turns on content. The complaint was clear about what was and what was not the basis of Plaintiffs' products liability claim.

But, in arguendo, even if Defendant were right that Plaintiffs' claim about recommendation algorithms and software were somehow entangled with content, Defendant's entanglement theory would still not preclude the application of California products liability claim here.

First, Defendant's overread Winter. Winter simply stands for the proposition that the ideas in a book are not *themselves* subject to strict liability. It did not go so far as to categorically preclude products liability for any product that is entangled with information. Thus, Defendant's entanglement theory is not a straightforward application of Winter, rather it is arguing for a radical extension of Winter.

Second, Defendant did not cite any *California* case adopting or supporting Defendant's entanglement theory. Regardless, Defendant's entanglement theory is at odds with California cases that disentangle and distinguish between content/information, on the one hand, and products liability applied to software and online platforms, on the other hand. Put otherwise, California courts have demonstrated an ability and willingness to disentangle and distinguish products from content and information when necessary. For example:

- Hardin v. PDX, Inc., 227 Cal. App. 4th 159, 170 ("But Hardin's theory is that PDX's software program, not the information it produces, is the defective product.").

- Bolger v. Amazon.com, LLC, 53 Cal. App. 5th 431, 464 ("The content of the product listing is not determinative, and it need not be attributed to Amazon to support strict liability. Instead, Amazon's own involvement in the distribution of an allegedly defective product supports strict liability for the reasons we have already discussed."

Indeed, even Winters disentangles content from products: "A book containing Shakespeare's sonnets consists of two parts, the material and print therein, and the ideas and expression thereof. The first may be a product, but the second is not. Winter v. G.P. Putnam's Sons, 938 F.2d 1033, 1034.

Third, Defendants rely on Winter to support its entanglement theory. Winter in turn based its holding on restrictions imposed by the Second Restatement. In other words, Winter was determining the scope of the Second Restatement. But the scope of California products liability law is not restricted by the Restatement and California Courts openly discard restrictions imposed by the Restatement. Indeed, the California Courts, in addressing whether  have taken umbrage at arguments that do not "attempt to assess whether the exclusion is consistent with California law.

**Our Supreme Court, which originated the doctrine of strict products liability, has not hesitated to disagree with the Restatement where it has unduly limited the doctrine.**" Bolger v. Amazon.com, LLC, 53 Cal. App. 5th 431, 459.

191

So, even if Winter supported Defendant's entanglement theory (it doesn't) based on the scope of the Restatement, Defendant has made no showing that *California* law would recognize any such limitation imposed by the Restatement.

Finally, it's worth dressing that California's products liability jurisprudence emphatically eschews categorical rules and restrictive formalisms. Even if Defendant were correct to label its algorithms and software as entangled with content, that label "entangled with content" should not end the matter. Rather one must still look to Justice Traynor's policy consideration to decide whether products entangled with content should be treated as products under California law.

After all, in California's electricity cases, the California courts stressed that: **"liability should not depend simply upon whether electricity is or is not labeled a 'product.'** More significantly, we believe the policy justifications for strict liability in tort support its imposition in this case." Pierce v. Pac. Gas & Elec. Co., citing Daly v. General Motors Corp. (1978) 20 Cal.3d 725, 736. By the same token, liability should not depend upon whether something is or is not labeled as somehow "entangled with content."

More recently California's appellate courts, like those in Loomis and Bolger, have echoed this lesson in the 21st Century's digital context, when applying products liability to online platforms. See e.g. Bolger v. Amazon.com, LLC, 53 Cal. App. 5th 431, 438 (discussing "dissatisfaction with the wooden formalisms").

Defendant cavalierly dismissed cases like <u>Loomis</u> (online platform), <u>Bolger</u> (online platform), and <u>Stein</u> (electricity) as "cases that are far afield". 2-ER-129 n. 6. And, the Order (ignoring <u>Stein</u>) similarly discounted <u>Loomis</u> and <u>Bolger</u> as "not support[ing] the application of strict liability to content." 1-ER-6; 1-ER-6 n.5.

Below, Defendant and the Order below missed the central lesson from these cases. The scope of California's product liability law is not set by resort to a formalistic "labels analysis." 3-ER-447 (discussing <u>Loomis</u>, <u>Bolger</u>, <u>Stein</u>). California law does not impose categorical rules. And, that scope does not turn on whether something is labeled a "product" or "tangible" or an "article" or "physical" or "entangled with content" or a "seller" or a "distributor. C.f., <u>Bolger v. Amazon.com, LLC</u>, 53 Cal. App. 5th 431, 455 ("Dictionary definitions of seller and distributor do not define the scope of strict liability in California[.]"). California's electricity and online platform cases demonstrate that the scope of California's product liability is set by a careful examination of first principles applied to new technological and new societal realities–not by resort to abstract categorizing and labeling.

Indeed, any such categorical rule against any product liability for anything labeled "content", derived from the restatement, is at odds with <u>Bolger</u>'s elucidation of California law's unique approach to products liability.

The present case involves harms resulting from Defendant's targeting children with recommendation algorithms and software "presents important issues that have not been fully addressed in prior precedents." Bolger v. Amazon.com, LLC, 53 Cal. App. 5th 431, 462. Needless to say, Winter certainly did not address *that* issue or *those* facts. Thus, regardless of whether the Defendant's recommendation algorithms and software are entangled or disentangleable the content, this case raises novel issues of California product liability law.

As the Bolger court explained about California's doctrine of strict liability: [T]he novelty of these issues does not prevent us from applying the doctrine where, as here, it is warranted. 'Law, as an instrument of justice, **has infinite capacity for growth to meet changing needs and mores.** Nowhere is this better illustrated than in the recent developments in the field of products liability. The law should be based on current concepts of what is right and just and the judiciary should be alert to the never-ending need for keeping legal principles abreast of the times.'" Bolger v. Amazon.com, LLC, 53 Cal. App. 5th 431, 462 (2020).

Critically, Defendant made no showing that this theory is compatible with Justice Traynor's foundational policy considerations that set the scope of California's products liability law. Thus, it is far from clear that California would adopt Defendant's entanglement theory. And in light of the foundational policy considerations, this theory, does not preclude products liability for the harms

(indeed deaths) caused by Defendant's recommendation algorithms and software, unleashed into the stream of commerce, unleashed into consumers' homes, resulting in fatal real-world harms.

## IV.  IMPORTANT POLICY INTERESTS ARE AT STAKE.

Technology companies collect an unprecedented amount of information about the users of their platforms.  Companies, like Netflix, goal is to keep users engaged and using their platform.  The digital currency is attention. And, with a companies' unfettered access to information about users, keeping the attention of its users has become an easy task.  But with great amounts of information comes great responsibility.

Yet, this responsibility is hard to find. Instead, a troubling trend has emerged. Companies are prioritizing the attention and profit-generating acts of their business over the physical and mental well-being of their users. Indeed, the largest tech companies of today are all embroiled in scandals of mishandling or ignoring user information.

The public's first taste of information misuse was in 2018 when the Facebook Cambridge Analytica scandal broke. In March of 2018, the New York Times reported that Cambridge Analytica, a data analysis firm, stole the data of 50 million Facebook users and secretly kept it. The story raised awareness of Facebook's poor data practices which allowed Cambridge Analytica to use the stolen data to influence the presidential election. Valdez, Andrea Everything You Need to Know About Facebook and Cambridge Analytica posted Mar 23, 2018

196

10:00 AM https://www.wired.com/story/wired-facebook-cambridge-analytica-coverage/ last accessed Jan 3, 2023 at 7pm.

Since then, the stories about harmful information uses have continued to leak out of Silicon Valley.

Whistleblowers have been coming forward and exposing harmful acts against users, including children, undergone by tech giants in the name of profit.

In 2021, Frances Haugen, came forward as a whistleblower against Facebook. In her written testimony she stated that she "saw that Facebook repeatedly encountered conflicts between its own profits and our safety. Facebook consistently resolved those conflicts in favor of its own profits." In some cases "their profit optimizing machine is generating self-harm and self-hate — especially for vulnerable groups, like teenage girls. These problems have been confirmed repeatedly by Facebook's own internal research." Indeed, she notes that "Facebook became a $1 trillion company by paying for its profits with our safety, including the safety of our children." US Senate Committee on Commerce, Science and Transportation Sub-Committee on Consumer Protection, Product Safety, and Data Security (October 4, 2021) "Statement of Frances Haugen".

And insiders aren't the only ones seeing these harms firsthand. Courts throughout the country have been seeing a deluge of cases addressing the issue of

tech companies' prioritization of engagement and use of powerful algorithms to

manipulate behavior.

- "Mounting evidence suggests that providers designed their algorithms to drive users toward content and people the users agreed with—and that they have done it too well, nudging susceptible souls ever further down dark paths." Force v. Facebook, Inc., 934 F.3d 53, 86-87 (2nd Cir. 2019) Katzmann dissenting. (discussing CDA §230 liability and Facebook's algorithms that bring groups of people together, including terrorists)

- "The platforms' algorithms suggest new connections between people and groups and recommend long lists of content, targeted at specific users." The "algorithms used by YouTube do not merely publish user content. Instead, they amplify and direct such content, including violent ISIS propaganda, to people the algorithm determines to be interested in or susceptible to those messages and thus willing to stay on the platform to watch more." Gonzalez v. Google LLC, 2 F.4th 871, 914 (9th Cir. 2021) Berzon concurring (discussing the CDA §230 liability of Google, Twitter, and Facebook for allowing ISIS to post videos and other content to communicate the terrorist group's message, to radicalize new recruits)

- "Snapchat is being sued for the predictable consequences of designing Snapchat in such a way that it allegedly encourages dangerous behavior." Lemmon v. Snap, Inc., 995 F.3d 1085, 1094 (9th Cir. 2021) (discussing Snapchat's CDA §230 liability and Snapchat's product designs that keep individuals engaged, such as its "speed filter" that allowed individuals to superimpose a filter showing the speed they are going over a photo or video).

Yet, despite courts seeing an influx of cases discussing the powerful algorithms

that tech companies employ, many don't get the ability to make any decisions on

these issues because of the Communications Decency Act 47 U.S.C. §230 ("CDA

§230").

CDA §230's original purpose was to protect minors from offensive online material. Force v. Facebook, Inc., 934 F.3d 53, 79. Katzmann dissenting. CDA §230 can provide immunity to operators of interactive computer services if they partake in the good faith removal or moderation of third-party material they deem obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected. 47 U.S.C. § 230(c)(2). This statute was well-intentioned, and still serves an important purpose. However, unintended consequences have occurred i.e., CDA §230 has chilled the development of the common law. By creating a broad immunity, CDA §230 has chilled the common law's ability to address novel issues of algorithmic targeting and the poor information practices afflicting society.

The common law allows the courts to build upon the wisdom of previous judges when addressing novel issues. Indeed, "[t]he life of the law has not been logic, it has been experience." Oliver Wendell Holmes, Jr., The Common Law, Lecture I (1881). And this case gives this Court the ability to use that experience to address novel issues about the algorithmic targeting of children.

This case about algorithmic targeting is unique in that there is no CDA §230 question. Indeed, this case presents a novel issue of algorithmic targeting without CDA §230 blocking the ability to develop the common law's answer. This case

allows this Court to advance the common law doctrine in response to the algorithmic harms presented in this case.

The novel issues here explore the negligent under-use of information. Companies are collecting massive amounts of information on its users. Indeed, [i]t's a truth universally acknowledged that [algorithms know] you better than you know yourself." Cummings, Eleanor The Creepy TikTok Algorithm Doesn't Know You WIRED posted Jan 3, 2023 7am https://www.wired.com/story/tiktok-algorithm-mental-health-psychology/ last accessed Jan 3, 2023 at 10am. Yet, despite the unprecedented amount of information that companies yield, most technology companies do not put the well-being of their users first.

When a company collects massive amounts of information about its users, it has a great responsibility to that user. Especially if that user is a child.

The current trend is to utilize user information as it suits the company and ignore the rest. It when the companies are "paying for [their] profits with our safety, including the safety of our children." As Frances Haugen stated.

As the wise justice Traynor said, "public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market." Escola v. Coca Cola Bottling Co., 24 Cal. 2d 453, 462 (1944).

## CONCLUSION

This appeal presents many issues—California anti-SLAPP issues; California wrongful-death and survival issues; and California issues of products liability and duty of care.

First, there are anti-SLAPP issues. If this Court agrees with the position taken in Section I.A, *supra*, then the Court can simply vacate the anti-SLAPP order without further consideration of any other anti-SLAPP issue. Furthermore, if this Court agrees with the position taken in one of Sections I.B.i, I.B.ii, I.C, *or* I.D, *supra*, then any of them alone is a sufficient basis to reverse the anti-SLAPP order and this Court is respectfully requested to do so.

Second, there are issues of wrongful-death standing and survival limitations. If the Court agrees with the position taken in Section II.A, *supra*, then the Court is respectfully requested to reverse the Rule 12(b)(6) order with regard to the survival claims. Likewise, if the Court agrees with the position taken in Section II.B, *supra*, then the Court is respectfully requested to reverse the Rule 12(b)(6) order with respect to the wrongful-death claims.

Third, there are issues on duty of care and on products liability.

Given that the right to amend was preserved below, see Section III.A, *supra*, this Court could simply remand for further proceedings with instructions to permit amendment.

Alternatively, if this Court wishes to reach one or more of these duty-of-care or products-liability issues, then it can. If this Court agrees with the position taken in Section III.B, *supra*, it is respectfully requested to reverse the Rule 12(b)(6)'s order as to the negligence and wrongful-death claims. If this Court also agrees with the position taken in Section III.C, *supra*, it is respectfully requested to reverse the Rule 12(b)(6) order with regard to the products-liability and failure-to-warn claims.

* * * * *

This appeal pertains to an extremely powerful tool—one that can be highly destructive when wielded without basic precautions.

Here, that led to a dire result. The result was not just foreseeable. It was foreseen. It was also preventable because the same tools that can cause devastation can also be finely crafted to know who faces risk, to take precautions, and to avoid doing harm.

Two modest tweaks would have avoided death here. A meaningful warning to a vulnerable girl. Some reticence to exercise the tool's full power upon those most vulnerable. These two tweaks are so miniscule and so readily achievable, and with such impact upon human life, it's wholly unclear why these modest tweaks weren't made.

The District Court's order below, however, reinforces a world where they never will be.

Date: January 3, 2023                         Respectfully submitted,

                                              DIGITAL JUSTICE FOUNDATION

                                              */s/ Gregory Keenan*
                                              Gregory Keenan
                                              DIGITAL JUSTICE FOUNDATION
                                              81 Stewart Street
                                              Floral Park, NY 11001
                                              (516) 633-2633
                                              Gregory@DigitalJusticeFoundation.org

                                              *Attorney for Appellants*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, the undersigned hereby certifies that there are no related cases:

a. There is no other case pending in this Court that arises out of the same case in the District Court.

b. There is no other case pending in this Court raising the same or closely related issues.

c. There is no other case pending in this Court involving the same transaction or event.

Date: January 3, 2023                  Respectfully submitted,

*/s/ Gregory Keenan*
Gregory Keenan

# FORM 8.  CERTIFICATE OF COMPLIANCE FOR BRIEFS

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 22-15260

I am the attorney or self-represented party.

**This brief contains 39,230 words,** including 20 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f).  The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [  ] it is a joint brief submitted by separately represented parties.

    [  ] a party or parties are filing a single brief in response to multiple briefs.

    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[X] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Gregory Keenan*     **Date** January 3, 2023
*(use "s/[typed name]" to sign electronically-filed documents)*

205

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users have been served by the appellate CM/ECF system.

Date: January 3, 2023                    Respectfully submitted,


                                         */s/ Gregory Keenan*
                                         Gregory Keenan