No. 22-15260

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

THE ESTATE OF ISABELLA "BELLA" HERNDON;
JOHN HERNDON; J.H., a minor; T.H., a minor;
on behalf of themselves and others similarly situated,

*Plaintiff-Appellants*,

v.

NETFLIX, INC.,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Northern District of California
No. 4:21-cv-06561-YGR
Hon. Yvonne Gonzalez Rogers, United States District Judge

_____

## APPELLANTS' OPENING BRIEF

_____

Ryan Hamilton
HAMILTON LAW LLC
5125 South Durango, Suite C
Las Vegas, Nevada 89113
(702) 818-1818
Ryan@HamLegal.com

Gregory Keenan
DIGITAL JUSTICE FOUNDATION
81 Stewart Street
Floral Park, New York 11001
(516) 633-2633
Gregory@DigitalJusticeFoundation.org

Andrew Grimm
DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive
Omaha, Nebraska 68154
(531) 210-2381
Andrew@DigitalJusticeFoundation.org

*Attorneys for Appellants*

## ORAL-ARGUMENT STATEMENT

This appeal presents the relatively rare opportunity for this Court—or for any court—to address the "use of powerful algorithms" to tortiously cause death. Cf. Gonzalez v. Google LLC, 2 F.4th 871, 912 (2021), cert. granted, 143 S. Ct. 80 (2022).

For the most part, the "pressing questions" that arise from real-world harms caused by algorithms go unanswered. Id. at 913. That's because the development of tort law as to algorithmic harms is often blocked by a provision of U.S. telecommunications law enacted in the mid-1990s. See 47 U.S.C. § 230(c)(1). That law, however, only grants immunity against "liability for material posted on the website *by someone else*"—leaving websites responsible for their *own* tortious acts. Gonzalez, 2 F.4th at 886-887.[1]

Here, Defendant Netflix, Inc., used its *own* algorithms to target children with materials that *Netflix itself* posted on its *own* website. It was warned in advance— by its *own* expert—that its targeting would end the lives of certain children. And, the breathtaking scope of its data collection permitted it to know which specific children were at high risk.

Big Data means precise data.

---

[1] Throughout this Brief, emphasis is added in a quoted authority unless otherwise indicated. Likewise, internal brackets and quotations are often removed for the ease of reading.

Netflix took no precautions, despite known risks.

It could have, with two modest tweaks. First, given its insights into which children were at high risk and the personalized nature of algorithmic targeting, it could have avoided targeting *those* children with its algorithms. Second, it could have at least warned *those* children—and their families—of the dangers it had been informed of. It didn't. Instead, it blazed forward with targeting *those* children who it should have known were specifically vulnerable without providing any warning of known dangers. Scores of children died.

Oral argument should be granted because these facts raise novel and complex legal issues. There are complex questions of California anti-SLAPP law because Defendant characterized this wrongful-death and survival action as *strategically* concocted by a dead girl's family. There are novel questions of California's wrongful-death and survival laws that entail, per the statute, excavating and synthesizing over a century of California case law. There are also novel questions about duty of care and products liability, implicating California Chief Justice Traynor's visionary jurisprudence of tort liability as applied to twenty-first-century technology.

Oral argument should also be granted because these issues did not receive extended treatment below; because these issues are significant; and because personalized algorithmic-targeting technologies are at the crux of this action.

iii

Oral argument would permit counsel to address questions about the technology, *especially* its capacity for personalization.

As Netflix's then-engineering director leading its algorithms team has acknowledged, "our company has been known to have *personalization* at the core of our product." Xavier Amatriain, [Big & Personal: Data and Models Behind Netflix Recommendations](), Proceedings of the 2d Int'l Workshop on Big Data, at 1 (2013). "Netflix *personalization*" means that Netflix could have targeted its show at most of its subscribers while *not* targeting *those* children it knew would die from being targeted in this manner. See id. at 2.

Oral argument should also be granted because of the stakes. Many children died. And, given its radical notions of how California's anti-SLAPP applies to open legal questions, Netflix has been repeatedly threatening a grieving family with ruinous fees.

Indeed, Defendant takes the position that it could do it all again tomorrow, *i.e.*, that it has an *absolute* right to do *exactly* as the allegations allege: to algorithmically target a child in a way that it knows will tortiously cause her death. It purports that it has the right to target a *specific* child with an algorithm in a way that it has been warned will end her life; that *does* end her life; and that, as Netflix says this is a Constitutional right, there is *nothing* that Congress or the California Legislature can do about it.

* * * * *

Plaintiffs believe that oral argument would be an important opportunity to address the Court's questions and, therefore, respectfully request as much oral argument time as the Court is willing to grant.

# TABLE OF CONTENTS

**Page**

ORAL-ARGUMENT STATEMENT ...................................................................II

TABLE OF AUTHORITIES .................................................................... IX

JURISDICTIONAL STATEMENT ..........................................................1

RELEVANT STATUTORY PROVISIONS ............................................3

    I.    CALIFORNIA CODE OF CIVIL PROCEDURE § 366.1 ...................................3

    II.    CALIFORNIA CODE OF CIVIL PROCEDURE § 370.60 ...........................4

    III.    CALIFORNIA CODE OF CIVIL PROCEDURE § 425.16 ..............................6

STATEMENT OF ISSUES ..................................................................9

    I.    SURVIVAL AND WRONGFUL-DEATH ISSUES ..........................................9

    II.    DUTY-OF-CARE AND PRODUCTS-LIABILITY ISSUES ...........................10

    III.    ANTI-SLAPP ISSUES .........................................................11

STATEMENT OF THE CASE..............................................................12

    I.    BIG DATA & ALGORITHMIC TARGETING ...........................................16

    II.    URGENT WARNINGS THAT CHILDREN WOULD DIE ............................21

    III.    BELLA HERNDON AND OTHER CHILDREN DID DIE.............................23

    IV.    LITIGATION HISTORY AND COURT PROCEEDINGS.................................24

SUMMARY OF ARGUMENT ...............................................................26

STANDARDS OF REVIEW ..................................................................28

ARGUMENT ........................................................................................29

I.   THE DISTRICT COURT ERRED ON SURVIVAL LIMITATIONS AND ON WRONGFUL-DEATH STANDING. ............................................................29

     A.   The District Court erred in holding that Bella's death shortened the time to assert her survival claims. ......................29

     B.   The District Court erred in holding that rules of intestate succession bar wrongful-death claims by Bella's brothers.......36

II.  THE DISTRICT COURT ERRED ON DUTY OF CARE AND PRODUCTS LIABILITY. ...............................................................................43

     A.   Given that the right to amend was preserved, the Court could simply remand rather than address additional issues................43

     B.   The District Court erred by on California duty of care by excusing a duty of care in the face of foreseeable and foreseen risk of death. ................................................44

          i.    Special-relationship duty ......................................44

          ii.   Ordinary duty.......................................................45

          iii.  No *Rowland* exception ........................................46

          iv.   Statutory duty.....................................................49

     C.   The District Court erred on products liability because software can be a product under California law. ......................51

III. THE DISTRICT COURT ERRED WHEN APPLYING CALIFORNIA'S ANTI-SLAPP STATUTE.........................................................................57

     A.   Anti-SLAPP Step 1(a): The District Court improperly recast the complaint as about "content" rather than algorithms and a failure to warn. ........................................................59

     B.   Anti-SLAPP Step 1(b): The District Court's improper recasting of the acts in suit led the rest of its anti-SLAPP analysis about rights and public issues astray...........................64

        i.   The District Court erred because Defendant did not establish a constitutional right to algorithmically target or to fail to warn of know dangers to high-risk individuals. ............64

        ii.   The District Court further erred on anti-SLAPP because private algorithmic control over a child's behavior is not speech "in connection with a public issue." ...........................71

C.     Anti-SLAPP Step 2: The District Court's errors on the motion to dismiss mean it also erred on anti-SLAPP's second step. ...............................................................................77

D.     Anti-SLAPP Applicability: California anti-SLAPP should not be applied to claims filed in state court and then removed. ...................................................................................80

E.     Anti-SLAPP Application: Given threats of ruinous fees, Plaintiffs must preserve objections to anti-SLAPP entirely. ....84

CONCLUSION ...........................................................................................85

STATEMENT OF RELATED CASES- ...................................................88

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS ..............89

CERTIFICATE OF SERVICE ...............................................................90

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

Ahanchian v. Xenon Pictures, Inc.,
    624 F.3d 1253 (2009). ...................................................................28

Baral v. Schnitt,
    1 Cal. 5th 376 (2016). ..................................................................60

Bender v. Williamsport Area Sch. Dist.,
    475 U.S. 534 (1986)......................................................................1

Bonni v. St. Joseph Health System,
    11 Cal. 5th 995 (2021). ......................................................... 59, 60

Borden v. eFinancial, LLC,
    53 F.4th 1230 (9th Cir. 2022). ......................................................28

Burgos v. Tamulonis,
    28 Cal. App. 4th 757 (1994). ........................................................34

Burk v. Arcata & M. R. R. Co.,
    125 Cal. 364 (1899). ...................................................................38

Cox v. Heath,
    198 N.C. 503 (1930). ...................................................................39

Estate of Ryan,
    21 Cal. 2d 498 (1943). .................................................................38

FilmOn.com Inc. v. DoubleVerify Inc.,
    7 Cal. 5th 133 (2019). .............................................. 72, 73, 74, 75

Flatley v. Mauro,
    39 Cal. 4th 299 (2006). ................................................................81

Geiser v. Kuhns,
    13 Cal. 5th 1238 (2022). ..............................................................71

Gonzalez v. Google LLC,
    2 F.4th 871 (2021). ..................................................................... ii

Grant v. McAuliffe,
    41 Cal. 2d 859 (1953). .................................................................29

ix

Hamilton v. Wal-Mart Stores, Inc.,
    39 F.4th 575 (9th Cir. 2022). .........................................................................81

Hoffmann v. Pulido,
    928 F.3d 1147 (9th Cir. 2019). ........................................................................1

Howell v. Budd,
    91 Cal. 342 (1891). .......................................................................................38

In re Steele, 32 Cal. 4th 682 (2004). .......................................................................41

J.B. Painting & Waterproofing, Inc. v. RGB Holdings, LLC,
    650 F. App'x 450 (9th Cir. 2016). .................................................................43

Jacoves v. United Merchandising Corp.,
    9 Cal. App. 4th 88 (1992). ..................................................................... 78, 79

La Liberte v. Reid,
    966 F.3d 79 (2020). .......................................................................................83

Latch v. United States,
    842 F.2d 1031 (9th Cir. 1988). ........................................................................1

Lickter v. Lickter,
    189 Cal. App. 4th 712 (2010). .......................................................................30

Lowell v. Kier,
    50 Cal. 646 (1875). .......................................................................................31

Makaeff v. Trump Univ., LLC,
    736 F.3d 1180 (2013). ...................................................................................82

Miklosy v. Regents of University of California,
    44 Cal. 4th 876 (2008). .................................................................................40

Munro v. Pacific Coast Dredging & Reclamation Co.,
    84 Cal. 515 (1890). .......................................................................................29

Norris v. Hensley,
    27 Cal. 439 (1865). .......................................................................................39

Park v. Board of Trustees,
    2 Cal. 5th 1057 (2017). ......................................................................... 59, 60

Price v. Stossel,
    620 F.3d 992 (9th Cir. 2010). ........................................................................28

Redfield v. Oakland C. S. R. Co.,
    110 Cal. 277 (1895). ........................................................... 36, 37

Reich v. Purcell,
    67 Cal. 2d 551 (1967). ..................................................33

Rutherford v. Owens-Illinois, Inc.,
    16 Cal. 4th 953 (1997). ..................................................78

Safari Club Int'l v. Rudolph,
    862 F.3d 1113 (9th Cir. 2017). .......................................80

Sakamoto v. Duty Free Shoppers, Ltd.,
    764 F.2d 1285 (9th Cir. 1985). .......................................80

Segal v. ASICS America Corp.,
    12 Cal. 5th 651 (2022). ..................................................41

United States ex rel. Newsham v. Lockheed Missiles & Space Co.,
    190 F.3d 963 (9th Cir. 1999). ............................. 57, 58, 81, 82, 83

Wilbanks v. Wolk,
    121 Cal. App. 4th 883 (2004). ........................................57

Wilcox v. Superior Court,
    27 Cal. App. 4th 809 (1994). ..........................................57

Wilson v. CNN,
    7 Cal. 5th 871 (2019). ......................................... 60, 71, 72, 73, 75

World Fin. Grp., Inc. v. HBW Ins. & Fin. Servs., Inc.,
    172 Cal. App. 4th 1561 (2009). ......................................75

Young v. Haines,
    41 Cal. 3d 883 (1986). ...................................................34

**Statutes**

17 U.S.C. § 505. ...........................................................................82

28 U.S.C. § 1332(d). .......................................................................1

42 U.S.C. § 1988. .........................................................................82

47 U.S.C. § 230. ........................................................................... ii

Cal. Age-Appropriate Design Act §  1798.99.31. ................................62

Cal. Age-Appropriate Design Act § 1798.99.30. ....................................................62

Cal. Civ. Proc. Code § 335.1. ............................................................ 30, 32, 33

Cal. Civ. Proc. Code § 340.5. ....................................................................32

Cal. Civ. Proc. Code § 352. ............................................................ 29, 32, 33

Cal. Civ. Proc. Code § 366.1. .......................................... 3, 29, 30, 31, 32, 33, 34

Cal. Civ. Proc. Code § 366.2. ....................................................................32

Cal. Civ. Proc. Code § 377.20. ............................................................ 29, 34

Cal. Civ. Proc. Code § 377.30. ..................................................................30

Cal. Civ. Proc. Code § 377.60. ...............................................................4, 9

Cal. Civ. Proc. Code § 425.16. .................................... 6, 58, 59, 60, 71, 73, 74, 81

**Other Authorities**

"Using 'Big Data' To Reduce and Prevent Self-Harm and Suicide,"
Swansea University (last accessed Jan. 3, 2023)...........................................19

Amatriain, Xavier, Big & Personal: Data and Models Behind Netflix
Recommendations, Proceedings of the 2d Int'l Workshop on Big Data
(2013)................................................................................................. iv

Charles Duhigg, "How Companies Learn Your Secrets,"
The New York Times Magazine (Feb. 16, 2012).........................................19

Madelyn S. Gould & Alison M. Lake, "The Contagion of Suicidal
Behavior," National Academy of Sciences (2013). .....................................20

Marnie Eisenstadt, "'13 Reasons Why' is a hit, but suicide expert told Netflix
not to release series,"
Syracuse.com (Apr. 26, 2017). ...................................................................21

Sophie Gilbert, What Went Wrong With 13 Reasons Why?,
The Atlantic (May 4, 2017). .........................................................................21

Statement of Frances Haugen, U.S. Senate Committee on Commerce,
Science and Transportation (Oct. 4, 2021)..................................................22

U.S. Cons. Art. III, § 2. ................................................................................1

Zara Adams, "Why Young Brains Are Especially Vulnerable to Social
    Media,"
    American Psychological Association (Aug. 25, 2022). ...............................19

**Rules**

Fed. R. Civ. P. 11 (1983). .........................................................................82

## JURISDICTIONAL STATEMENT

(A)    This action was asserted with class allegations by California plaintiffs against a California defendant in California state court under California law.  6-ER-1137-1160.  No non-California citizen has ever been identified or joined into this action.   Nonetheless, the District Court purported to exercise diversity jurisdiction after removal based upon an erroneous reading of the provisions of the Class Action Fairness Act.  1-ER-28-39; see 28 U.S.C. § 1332(d); U.S. Cons. Art. III, § 2.

(B)    The District Court entered final judgment below.  1-ER-2.  This Court has appellate jurisdiction.  28 U.S.C. § 1291.

Even though the District Court lacked subject-matter jurisdiction, this Court nonetheless has the "inherent authority" to consider and correct the erroneous exercise of subject-matter jurisdiction below.  E.g., Hoffmann v. Pulido, 928 F.3d 1147, 1151 (9th Cir. 2019).  Indeed, "every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review[.]'"  Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986).

Upon appellate review, "if a district court has wrongfully exercised subject matter jurisdiction over a dispute, the appellate court _must_ vacate the district court's decision[.]"  Latch v. United States, 842 F.2d 1031, 1033 (9th Cir. 1988).

1

(C)    Judgment was entered on January 19, 2022.  1-ER-2.  Plaintiffs

noticed their appeal on February 16, 2022.  7-ER-1282-1284.  The appeal is timely.

See 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A).

(D)    This appeal is from a final order and judgment.  1-ER-2.

# RELEVANT STATUTORY PROVISIONS

## I. CALIFORNIA CODE OF CIVIL PROCEDURE § 366.1

### § 366.1. Death of person entitled to bring action before expiration of limitations period

If a person entitled to bring an action dies before the expiration of the applicable limitations period, and the cause of action survives, an action may be commenced before the expiration of the later of the following times:

**(a)** Six months after the person's death.

**(b)** The limitations period that would have been applicable if the person had not died.

## II. CALIFORNIA CODE OF CIVIL PROCEDURE § 370.60

### § 377.60. Persons who may assert cause of action

A cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the following persons or by the decedent's personal representative on their behalf:

**(a)** The decedent's surviving spouse, domestic partner, children, and issue of deceased children, or, if there is no surviving issue of the decedent, the persons, including the surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession. If the parents of the decedent would be entitled to bring an action under this subdivision, and the parents are deceased, then the legal guardians of the decedent, if any, may bring an action under this subdivision as if they were the decedent's parents.

**(b)**

    **(1)** Whether or not qualified under subdivision (a), if they were dependent on the decedent, the putative spouse, children of the putative spouse, stepchildren, parents, or the legal guardians of the decedent if the parents are deceased.

    **(2)** As used in this subdivision, "putative spouse" means the surviving spouse of a void or voidable marriage who is found by the court to have believed in good faith that the marriage to the decedent was valid.

**(c)** A minor, whether or not qualified under subdivision (a) or (b), if, at the time of the decedent's death, the minor resided for the previous 180 days in the decedent's household and was dependent on the decedent for one-half or more of the minor's support.

**(d)** This section applies to any cause of action arising on or after January 1, 1993.

**(e)** The addition of this section by Chapter 178 of the Statutes of 1992 was not intended to adversely affect the standing of any party having standing under prior law, and the standing of parties governed by that version of this section as added by Chapter 178 of the Statutes of 1992 shall be the same as specified herein as amended by Chapter 563 of the Statutes of 1996.

**(f)**

**(1)** For the purpose of this section, "domestic partner" means a person who, at the time of the decedent's death, was the domestic partner of the decedent in a registered domestic partnership established in accordance with subdivision (b) of Section 297 of the Family Code.

**(2)** Notwithstanding paragraph (1), for a death occurring prior to January 1, 2002, a person may maintain a cause of action pursuant to this section as a domestic partner of the decedent by establishing the factors listed in paragraphs (1) to (6), inclusive, of subdivision (b) of Section 297 of the Family Code, as it read pursuant to Section 3 of Chapter 893 of the Statutes of 2001, prior to its becoming inoperative on January 1, 2005.

**(3)** The amendments made to this subdivision during the 2003–04 Regular Session of the Legislature are not intended to revive any cause of action that has been fully and finally adjudicated by the courts, or that has been settled, or as to which the applicable limitations period has run.

### III.   CALIFORNIA CODE OF CIVIL PROCEDURE § 425.16

**§ 425.16. Legislative findings; Special motion to strike action arising from "act in furtherance of person's right of petition or free speech under United States or California Constitution in connection with a public issue"**

**(a)** The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.  The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process.  To this end, this section shall be construed broadly.

**(b)**

  **(1)** A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

  **(2)** In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

  **(3)** If the court determines that the plaintiff has established a probability that the plaintiff will prevail on the claim, neither that determination nor the fact of that determination shall be admissible in evidence at any later stage of the case, or in any subsequent action, and no burden of proof or degree of proof otherwise applicable shall be affected by that determination in any later stage of the case or in any subsequent proceeding.

6

**(c)**

> **(1)** Except as provided in paragraph (2), in any action subject to subdivision (b), a prevailing defendant on a special motion to strike shall be entitled to recover that defendant's attorney's fees and costs. If the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to Section 128.5.
>
> **(2)** A defendant who prevails on a special motion to strike in an action subject to paragraph (1) shall not be entitled to attorney's fees and costs if that cause of action is brought pursuant to Section 11130, 11130.3, 54960, or 54960.1 of the Government Code, or pursuant to Chapter 2 (commencing with Section 7923.100) of Part 4 of Division 10 of Title 1 of the Government Code. Nothing in this paragraph shall be construed to prevent a prevailing defendant from recovering attorney's fees and costs pursuant to Section 7923.115, 11130.5, or 54960.5 of the Government Code.

**(d)** This section shall not apply to any enforcement action brought in the name of the people of the State of California by the Attorney General, district attorney, or city attorney, acting as a public prosecutor.

**(e)** As used in this section, "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

**(f)** The special motion may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper. The motion shall be scheduled by the clerk of the court for a hearing not more than 30 days after the service of the motion unless the docket conditions of the court require a later hearing.

**(g)** All discovery proceedings in the action shall be stayed upon the filing of a notice of motion made pursuant to this section. The stay of discovery shall remain in effect until notice of entry of the order ruling on the motion. The court, on noticed motion and for good cause shown, may order that specified discovery be conducted notwithstanding this subdivision.

**(h)** For purposes of this section, "complaint" includes "cross-complaint" and "petition," "plaintiff" includes "cross-complainant" and "petitioner," and "defendant" includes "cross-defendant" and "respondent."

**(i)** An order granting or denying a special motion to strike shall be appealable under Section 904.1.

**(j)**

> **(1)** Any party who files a special motion to strike pursuant to this section, and any party who files an opposition to a special motion to strike, shall, promptly upon so filing, transmit to the Judicial Council, by email or facsimile, a copy of the endorsed, filed caption page of the motion or opposition, a copy of any related notice of appeal or petition for a writ, and a conformed copy of any order issued pursuant to this section, including any order granting or denying a special motion to strike, discovery, or fees.

> **(2)** The Judicial Council shall maintain a public record of information transmitted pursuant to this subdivision for at least three years, and may store the information on microfilm or other appropriate electronic media.

8

## STATEMENT OF ISSUES

### I. SURVIVAL AND WRONGFUL-DEATH ISSUES

A.  *Survival Limitations*: The operative California statute on survival limitations indicates that survival claims may be brought under the "limitations period that would have been applicable if [the decedent] had *not* died." Did the District Court err by ignoring the limitations period that would have been applicable if Bella had *not* died—shortening the time to sue by over two years?

B.  *Wrongful-Death Standing*: The operative California wrongful-death statute clarifies that it was "*not* intended to adversely affect the standing of any party having standing under prior law[.]" Cal. Civ. Proc. Code § 377.60(e). Under prior California law, a collateral heir (*e.g.*, a decedent's brother) could sue even if the decedent had surviving parents. Did the District Court err by ignoring this prior law?

## II.    DUTY-OF-CARE AND PRODUCTS-LIABILITY ISSUES

A.    *Remand to Exercise Right to Amend*: If this Court reverses on either wrongful-standing or survival limitations, should it remand for amendment or consider further issues?

B.    *California Duty of Care*: Did Defendant owe Bella an ordinary duty of care; a special-relationship duty or a statutory duty—and does <u>Rowland</u> give an exception such a duty?

C.    *California Products Liability*: Is Defendant's algorithmic targeting software a product when being used to control and direct Bella's behaviors online?

### III.   ANTI-SLAPP ISSUES

A.   *Anti-SLAPP Step 1(a)*: Did the District Court err in recasting the complaint and ignoring the liability-creating acts actually asserted?

B.   *Anti-SLAPP Step 1(b)*: Did the District Court's order err in granting the anti-SLAPP motion when Defendant never demonstrated a Free Speech Right to algorithmically target or to fail to warn and never demonstrated that its targeting was "in connection with" a public issue?

C.   *Anti-SLAPP Step 2*: Did the District Court err in its merits analysis such that step two of the anti-SLAPP analysis is satisfied?

D.   *Anti-SLAPP Applicability to Removed Claims*: Newsham adopted anti-SLAPP to claims brought *originally* in federal court based on an Erie policy analysis.  Does Newsham's policy analysis comes out the same way for claims *removed* to federal court?

E.   *Anti-SLAPP Applicability in Federal Court*:  Is anti-SLAPP applicable in federal court?  (Addressed by Newsham and CoreCivic.)

## STATEMENT OF THE CASE

Netflix is a self-described "pioneer" in the technology of delivering content. 7-ER-1185; 5-ER-725. It spends well over a billion dollars annually on its technology. 5-ER-747; 7-ER-1209 (nearly $2B in 2020). In 2014 alone, it spent over $150 million employing over 300 technologists just to maintain and improve its personalized algorithmic targeting.[2,3]

The central feature of Netflix's content-delivery technology is *personalization*. As a Netflix engineering director for its algorithms described it, "our company has been known to have *personalization* at the core of our product."[4] Or, as Netflix's co-CEO pithily put it: "Our brand is *personalization*."[5] To him, personalization is what makes Netflix a "tech company"—not a mere TV or movie studio.[6]

Concretely, personalization means three things.

---

[2] By motion, Plaintiffs will seek judicial notice of non-record sources. See Fed. R. Evid. 201. To distinguish these sources from the record, they are cited in footnotes.
[3] Janko Roettgers, "Netflix Spends $150 Million on Content Recommendations Every Year," Yahoo!News (Oct. 9, 2014).
[4] Amatriain, "Big & Personal", at 1.
[5] Josef Adalian, "Inside the Binge Factory," New York Magazine (June 2018) (quoting Netflix Co-CEO Ted Sarandos).
[6] See id.

Personalization means Netflix has personalized *knowledge* of its users. It means Netflix gives users a personalized *experience*. And, personalization means Netflix has a surprisingly high degree of personalized *control* over its users' individual decisions on its platform.

To obtain personalized knowledge, Netflix collects "streams of data" and conducts "(Big) Data Mining research" on its users.[7] When it's done, Netflix knows its individual users' "interests and *moods*"[8]—as well as their "demographics, location, language, or temporal data" then used to feed "predictive models" in order to better know each individual Netflix user with precision.[9] Personalization means precision knowledge of users.

Then, Netflix operates with a goal to "personalize as much of the experience as possible."[10] Each user has a different, *i.e.*, personalized, experience. Netflix's user experience is so personalized that Netflix has a "saying: Your Netflix is not my Netflix[.]"[11] Netflix personalizes the genres available, the shows recommended, *etc.*

In turn, Netflix's personalized experience gives it a surprisingly high degree of personalized *control* over its users' individualized decisions.

---

[7] Amatriain, "Big & Personal," at 1.

[8] Id. at 2.

[9] Id. at 5.

[10] Id. at 2.

[11] Adalian, "Binge Factory."

13

Circa 2013, Netflix's algorithm was determining 75% of viewing decisions by users on its platform:



6-ER-982. And, those numbers were for the general population—not for its more impressionable users.

Personalization means that Netflix knows its users intimately; delivers them personalized experiences; and has a surprising level of personalized control over their decisions on its platform.

* * * * *

Yet, personalization isn't just at the core of Netflix's product. It's also at the core of this appeal. Here, Netflix was warned by its own retained expert that certain planned corporate strategies would cause widespread death among some of society's most vulnerable children. 6-ER-974-975. Yet, Netflix did not heed these warnings—or use any of its personalization technologies to avoid deaths that were not only foreseeable but foreseen.

It could have. <u>See</u> 6-ER-980-991.

Netflix could have used its personalized *knowledge* of its users to know which ones were at risk. Netflix could have deployed its personalized *experience* to warn at-risk children and their families or even have avoided pushing dangerous material at them. Netflix could have used its personalized *control*—of over 75% of decisions on the platform—to ensure that the most at-risk children were not harmed by its powerful algorithms.

After all, Netflix personalizes all the time when trying to grow its business—just not when children's lives are at stake.

It wasn't resource constraints. Netflix spends over $150 million on its algorithms, with over 300 technologists, and nearly $2 billion on its technologies annually. Even two modest tweaks—warning at-risk children and their families and not targeting them—would have saved lives.

Yet, Netflix didn't personalize when it was warned about the gravest of consequences. In turn, as a result of its callous disregard to deploying its technology to avoid death, scores of children died. One of those children who died is Bella Herndon, the daughter and sister of Plaintiffs John Herndon, J.H., and T.H in this appeal. 6-ER-983-984.

## I.   BIG DATA & ALGORITHMIC TARGETING

We are now well into the era of Big Data.

Netflix is no exception.[12]  Underlying Netflix's personalized experience and its powerful algorithms are its Big Data analytics.  6-ER-980-982.  These analytics feed Netflix's algorithms that in turn is, as a Netflix engineering director explained, "**how they control what you watch**":

> We know what you played, searched for, or rated, as well as the time, date and device.  We even track user interactions such as browsing or scrolling behavior.

6-ER-980-981 (Tom Vanderbilt, "The Science Behind the Netflix Algorithms That Decide What You'll Watch Next," Wired (Aug. 7, 2013)).  And, this was back in 2013.

Netflix tracks each user's every scroll and click in an effort to control users and maximize profits.  And, with these Big Data analytics, Netflix knows a surprising about each user—and uses that information to personalize the user experience.

For example, public controversy arose when Netflix's algorithms began treating viewers differently based on race.

---

[12] Adalian, "Binge Factory" ("Big Data is unquestionably part of the DNA at Netflix.").

16

Netflix began personalizing movie posters based on a user's race, with white viewers were shown white actors, while Black viewers were shown Black actors[13]:



Other companies employing Big Data have also displayed surprising knowledge about each user. For example, Target developed an algorithm to identify pregnant customers and sent pregnancy-related coupons. One set of parents were surprised to learn that, ala Big Data, "Target knew before anyone else that the[ir] daughter was pregnant."[14]

---

[13] Nosheen Iqbal, "Film Fans See Red over Netflix 'Targeted' Posters for Black Viewers," The Guardian (Oct. 20, 2018).

[14] Jens-Erik Mai, "Big Data Privacy: The Datafication of Personal Information," 32.3 The Information Society 192, 192 (2016).

With Big Data, companies know a staggering amount about each individual user. For example, mere "Facebook Likes, can be used to automatically and accurately predict a range of highly sensitive personal attributes including: sexual orientation, ethnicity, religious and political views, personality traits, intelligence, happiness"—and others.[15]

In fact, with Big Data, companies know each user better than that user's closest associates. After studying just "10, 70, 150, and 300 Likes, respectively" machine-learning algorithms know more about a user than a "work colleague, cohabitant or friend, family member, and spouse."[16] With Big Data analytics and machine-learning algorithms, _companies know each user better than his or her own spouse_.

It's against this technological backdrop that this dispute arises. 6-ER-980-982. Here, Netflix used cutting-edge technologies to constantly track and control each user in an attempt to maximize profit. And, armed with that Big Data, Netflix knew each user more intimately than even her parents and family members—yet for Bella did nothing to protect or warn her.

---

[15] Michal Kosinki, et al., "Private Traits and Attributes are Predictable from Digital Records of Human Behavior," 110 Proceedings of the National Academy of Sciences (Mar. 11, 2013).

[16] Wu Youyou, et al., "Computer-Based Personality Judgments Are More Accurate than Those Made by Humans," 112 Proceedings of the National Academy of Sciences 1036 (Jan. 12, 2015).

18

And Big Data is why it would be readily possible for Netflix to ascertain who—which users—were at high risk. It's a predictive power that is remarkable, if not downright astonishing. See Charles Duhigg, "How Companies Learn Your Secrets," The New York Times Magazine (Feb. 16, 2012); see also "Using 'Big Data' To Reduce and Prevent Self-Harm and Suicide," Swansea University (last accessed Jan. 25, 2023).

* * * * *

As Chief Science Officer of the American Psychological Association Mitch Prinstein, Ph.D., bluntly described the problem: "It's time [our society] stopped trying to make a profit on kids' developing brains." Zara Adams, "Why Young Brains Are Especially Vulnerable to Social Media," American Psychological Association (Aug. 25, 2022).

This problem becomes even more urgent as devices proliferate and tech companies spend enormous resources on keeping the youth engaged for longer periods of time on their platforms. At the same time, there is no evidence that tech companies such as Netflix have heeded any of the Surgeon General's warnings. Instead, they have continued prioritizing profits and youth engagement over the serious mental health risks their platforms pose for children.

The most serious risk this case highlights is that of child suicide. The phenomenon of suicide contagion is well-documented. Madelyn S. Gould &

Alison M. Lake, "The Contagion of Suicidal Behavior," National Academy of Sciences (2013). Technology companies specifically targeting the most vulnerable members of society using their powerful and personalized algorithm has led predictably to children hurting themselves and even taking their own lives.

## II. URGENT WARNINGS THAT CHILDREN WOULD DIE

When 13 Reasons Why was in production, Defendant consulted with mental-health experts to discuss whether depicting the ugliness and brutality of suicide would deter teenage suicides. 6-ER-974-975 ¶¶ 27-31; Sophie Gilbert, What Went Wrong With 13 Reasons Why?, The Atlantic (May 4, 2017). These suicide-prevention experts warned Netflix that depicting suicide as the Show did could have potential suicide-contagion effects upon impressionable viewers. 6-ER-974 ¶ 28.

Specifically, Dr. Dan Reidenberg, the executive director of Suicide Awareness Voices of Education, was one of the experts that reviewed the Show prior to its release. 6-ER-975 ¶ 29. Upon his review, Dr. Reidenberg advised Netflix to cancel the release, but he was told by Netflix that doing so "wasn't an option." "They made that very clear to me," Dr. Reidenberg later told the press. Id. (citing Marnie Eisenstadt, "'13 Reasons Why' is a hit, but suicide expert told Netflix not to release series," Syracuse.com (Apr. 26, 2017).)

Netflix made the decision to air the Show, despite the warnings and advice from the mental-health experts that it engaged. 6-ER-974-975 ¶¶ 27, 32. In fact, Netflix released the Show anticipating that millions of children would view it within the first month. 6-ER-975 ¶ 32.

And, about 75% of viewer activity is driven by Netflix itself. 6-ER-982 ¶ 64. Thus, at-risk children were manipulated into watching it via the algorithm—without warning to their families. 6-ER-980 ¶ 55. In doing so, Netflix followed the troubling trend in refusing to take precautions in its algorithm.

It's not a matter that they cannot. The Facebook whistleblower, Frances Haugen, stated as much when she testified before the Senate Committee on Commerce, Science and Transportation, to the following reality of how this is but an egregious example of how precautions are not taken:

> I saw that Facebook repeatedly encountered conflicts between its own profits and our safety. Facebook consistently resolved those conflicts in favor of its own profits […and Facebook's] profit optimizing machine is generating self-harm and self-hate — especially for vulnerable groups, like teenage girls. These problems have been confirmed repeatedly by Facebook's own internal research. […] This is not simply a matter of some social media users being angry or unstable. Facebook became a $1 trillion company by paying for its profits with our safety, including the safety of our children.

Statement of Frances Haugen, U.S. Senate Committee on Commerce, Science and Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security (Oct. 4, 2021).

So too here. Netflix disregarded its own internal investigation about the effects of targeting and disregarded what its data was telling it about vulnerable children, including experts foreseeing dire results.

### III.   BELLA HERNDON AND OTHER CHILDREN DID DIE.

Netflix targeted 15-year-old Bella Herndon with an individualized algorithms—one that ended up making her watch content that was destructive of her. Although Netflix used its cutting-edge algorithm to recommend destructive content to a vulnerable teenage girl, Netflix failed to provide Bella or her family any warnings about the known dangers of the content it was recommending. The company failed to provide any warning despite its own expert's dire warning that Netflix's actions would cause children to die.

Netflix recklessly disregarded its expert's advice. It targeted Bella without giving her any warning, causing her to suffer incredible mental harm and compulsions. She died. On May 15, 2017, at Saint Charles Borromeo Church in Livermore, California, Bella was laid to rest.

## IV.  LITIGATION HISTORY AND COURT PROCEEDINGS

After Bella died, Mr. Herndon repeatedly attempted to discuss changes with Netflix that could avoid similar harms in the future—to no avail.  Netflix never met with him.  Later, represented by nonprofit counsel, Mr. Herndon tried again. Netflix still never met with him.

Then, Mr. Herndon and Bella's brothers brought suit.  6-ER-1069.  The gravamen of their suit is that two modest tweaks could have avoided foreseeable harm to Bella.  First, Netflix's personalized targeting algorithms could have avoided targeting Bella.  6-ER-1089-1091.  Second, a warning could have alerted Bella and her family of known risks that Netflix itself was warned about.  6-ER-1088-1089.

Upon service, Netflix removed.  6-ER-1062-1067.  The Parties disputed subject-matter jurisdiction.  3-ER-479-502 (sur-reply); 4-ER-505-676 (reply); 4-ER-692-5-ER-870 (opp.); 5-ER-912-960 (motion).  The District Court denied remand.  1-ER-28-39.

Then, the Parties briefed Defendant's anti-SLAPP and Rule 12(b)(6) motion. 2-ER-107-128 (reply); 3-ER-419-459 (opp.); 5-ER-871-911 (motion).  During briefing, Defendant intensely fought Plaintiffs' efforts to file an amended opposition after Plaintiffs realized Defendant had cited a Supreme Court dissent as controlling law.  See 3-ER-330 (errata); 2-ER-129-3-ER-411.

24

The District Court held a hearing on the anti-SLAPP and Rule 12(b)(6) motion, 1-ER-9-27, granted the motion, 1-ER-3-8, and entered judgment dismissing the case, 1-ER-2. After entry, Netflix made clear that it intends to seek ruinous fees against the Herndon family. <u>See</u> 2-ER-42-51. Plaintiffs appealed. 7-ER-1284.

## SUMMARY OF ARGUMENT

I.   *Survival Limitations and Wrongful-Death Standing*: The District Court's order on both survival limitations and wrongful-death standing overlooked key portions of the statute and, in the wrongful-death standing case, a seminal case from the California Supreme Court.  For survival limitations, the statute on survival limitations permits the claims to be brought under the limitations period that would have applied if the decedent "had *not* died." And, under this timeframe, the claims are clearly timely.  Yet, the District Court erred because its order ignored the operative statute and it only considered the limitations period as though the decedent here *had* died—the opposite of what the statute instructs.  On wrongful-death standing, the operative statute indicates that anyone having standing under prior law has standing today and decisional law earlier in California's history clarify that collateral heirs, *i.e.*, siblings of a decedent are able to sue for wrongful death as long as they can show harm, *even if* the decedent's parents are still alive.

II.  *Duty and Products Liability*: This Court need not address these issues because Plaintiffs have preserved a right to amend.  But, given the foreseeability and forewarning of the specific harms here, there is no compelling basis for an exception to duty.  Indeed, given its level of supervision, control and the vulnerability of the decedent, Defendant owed a

special-relationship duty at least as to activities on its platform. Moreover, the algorithmic software here is a product in the way that term of art is meant under California law. It readily fits California Chief Justice Traynor's vision for products liability—an enduring vision that continues to guide the development of the California appellate courts on products liability, among other issues, to this day.

III.  _Anti-SLAPP_:  The central flaw in the District Court's order was that it did not follow the California Supreme Court's guidance that it must precisely identify the act that underlies each claim, rather than simply identify what the claim is about at some level of generality.  In doing just that and recasting the claims as based upon a show rather than an algorithmic targeting the District Court's order ran afoul of the anti-SLAPP analysis. Moreover, the District Court's order overlooked that none of Defendant's cases established it had a constitutional right to use its algorithm in this way with absolute impunity—even thought the First Amendment doctrines lean the other way.  Furthermore, the District Court's order also erred on the merits issues.  And by holding anti-SLAPP applicable here under Newsham when Newsham's own policy analysis under Erie indicates that anti-SLAPP should not apply to claims _removed_ to federal court (rather than originally filed here).  The anti-SLAPP order should be reversed—or at least vacated.

27

## STANDARDS OF REVIEW

This Court "review[s] **de novo** a district court's decision to grant a motion to strike under California's anti-SLAPP statute." <u>E.g.</u>, <u>Price v. Stossel</u>, 620 F.3d 992, 999 (9th Cir. 2010). <u>See</u> Section I, *infra*.

This Court "reviews **de novo** [a] district court's decision to grant [a] motion to dismiss under Fed. R. Civ. P. 12(b)(6)." <u>E.g.</u>, <u>Borden v. eFinancial, LLC</u>, 53 F.4th 1230, 1232 (9th Cir. 2022). <u>See</u> Sections II-III, *infra*.

If the Court believes it needs to reach the issue, <u>see</u> Section I.B.i, *infra*, a "district court's denial of an extension of time pursuant to Federal Rule of Civil Procedure 6(b) is reviewed for **abuse of discretion**[.]" <u>Ahanchian v. Xenon Pictures, Inc.</u>, 624 F.3d 1253, 1258 (9th Cir. 2009).

28

## ARGUMENT

### I. THE DISTRICT COURT ERRED ON SURVIVAL LIMITATIONS AND ON WRONGFUL-DEATH STANDING.

#### A. The District Court erred in holding that Bella's death shortened the time to assert her survival claims.

Bella Herndon died at fifteen. 3-ER-465 (death certificate).

Even though Bella died, her personal-injury claims "survive[d]" her death. See Cal. Civ. Proc. Code § 377.20(a). And, California's statute on survival limitations permits Bella's survival claims to be brought until the end of the "limitations period that would have been applicable if [Bella] *had **not** died*." See id. § 366.1(b).

It makes sense to apply the limitations period as though Bella had *not* died because these survival claims are the same "right of action which [Bella] would have had *if [s]he had survived the injury*[.]" E.g., Munro v. Pacific Coast Dredging & Reclamation Co., 84 Cal. 515, 524 (1890); Grant v. McAuliffe, 41 Cal. 2d 859, 864 (1953) (Survival "do[es] not create a new cause of action[.]").

If Bella had *not* died, the limitations period for her claims wouldn't have begun until her eighteenth birthday because the period before her eighteenth birthday "is *not* part of the time limited for the commencement of the action." See Cal. Civ. Proc. Code § 352(a).

Bella's eighteenth birthday would have been May 1, 2019. 3-ER-465. Thus, if Bella had lived, her limitations period would have expired upon her twentieth birthday, *i.e.*, on May 1, 2021. See 3-ER-472 (born May 1, 2001); Cal. Civ. Proc. Code § 335.1. ("two years" personal-injury limitation period). As such, Bella's survival claims are timely because they were asserted before what would have been her twentieth birthday. 6-ER-1069.

The District Court concluded otherwise. It did so by ignoring the operative California statute on survival limitations. 1-ER-6 (bullet-point starting "***Second***" never citing Cal. Civ. Proc. Code § 366.1).

Instead, the District Court cited California Code of Civil Procedure Section 377.30. Id. Section 377.30, however, says nothing about limitations. It governs to whom a "cause of action that survives" passes ("the decedent's successor in interest") and who may "commence[]" a survival action (the "personal representative" or "successor in interest"). §337.30.

Section 377.30 concerns "who *succeeds* to such a cause of action and who may *prosecute*" it, not the time in which a survival action may be brought. Lickter v. Lickter, 189 Cal. App. 4th 712, 721 (2010). It's a statute about "*standing* to sue"—not a statute of limitations. Maleti v. Wickers, 82 Cal. App. 5th 181, 227 (2022).

30

Even after being briefed on the operative statute on survival limitations, 3-ER-404 (citing Cal. Civ. Proc. Code § 366.1(b)), the District Court never cited this operative statute, 1-ER-6. It never analyzed what limitations period would have been applicable if Bella had *not* died. But see Cal. Code Civ. Proc. § 366.1(b) ("had *not* died").

In fact, the District Court did the *opposite* of what the operative statute commands. Where the statute says to determine survival limitations as though Bella had *not* died, the District Court decided the limitations period under the fact that Bella *had* died—*i.e.*, by determining limitations with respect to her successor in interest. 1-ER-6.

Its contra-statutory approach is understandable because Bella has, in truth, died.

Yet, this approach is wholly untenable because the statute commands consideration of the period that "***would have been** applicable if [Bella] had **not** died*. See Cal. Civ. Proc. Code § 366.1(b). Indeed, it's been long and well established that the California statute on survival limitations, as originally enacted and later codified, "*may* under some circumstances *prolong the time originally limited, [but] **cannot operate in any case to shorten it**.*" See, e.g., Lowell v. Kier, 50 Cal. 646, 648 (1875).

Yet, that's *exactly* what the District Court's order did.

31

Its ruling *shortened* the time to sue by over two years—from May 1, 2021, to April 28, 2019—effectually holding that minor tolling cannot apply to a decedent child's survival claims. See 1-ER-6. By shortening the time to sue on account of Bella's death, this ruling runs deeply afoul of the statutory purpose for survival limitations. Moreover, such a ruling is without textual support.

If Bella "had *not* died," her limitations period indisputably *would have been* tolled until she was eighteen. And, *nothing* in Section 366.1 says to dispense with tolling when determining the limitations period that "would have been applicable if [Bella] had not died." See Cal. Civ. Proc. Code § 366.1(b).

Indeed, where a California statute operates as a restriction on generally applicable tolling, it says so expressly. Yet, no such express statutory tolling applies here. Section 366.1 has none.

By comparison, the broader *survival statute* does have some restrictions on tolling, but none apply *here*. Compare Cal. Civ. Proc. Code § 366.**2**(b) (barring all tolling with enumerated exceptions) with id. § 366.**1** (no such tolling restrictions here). The *minor-tolling statute* also has restrictions on tolling, but none apply *here*. See id. § 352(b) (inapposite tolling restrictions). And, certain causes of action, like medical malpractice, have restrictions on tolling, e.g., id. § 340.5 (restrictions on tolling), but the limitations period for personal-injury claims doesn't restrict tolling at all, id. § 335.1.

32

Where the California Legislature wants to restrict tolling, it says so. Yet, one would comb the California Code of Civil Procedure in vain to find _any_ restriction on otherwise generally applicable tolling, like minor tolling, that applies here to these survival claims for personal injury.

This _absence_ of _any_ applicable restrictions on tolling in the operative statute on survival limitations, id. § 366.1, in the minor-tolling statute, id. § 352(b), _or_ in the statute on personal-injury limitations, id. § 335.1, speaks volumes. The text simply does not support any restrictions on minor tolling for the survival claims—minor tolling that indisputably would have applied if the decedent child "had _not_ died"—merely because the child has died.

Moreover, the _absence_ of any applicable restrictions on tolling is no mistake. Rather, it's a statutory indication that when tortfeasors end the lives of children, the California Legislature did not intend to reward them with a shortened timeframe for suit on those children's survival claims.

To the contrary, the result below of shortening the time to sue by over two years on account of Bella's death is aberrant to California policies on limitations, on survival, and on minor tolling. After all, on limitations, a "defendant cannot reasonably complain" when sued under claims that would be indisputably timely had that defendant merely injured her—instead of ending her life. Cf. Reich v. Purcell, 67 Cal. 2d 551, 556 (1967) (Traynor, C.J.).

33

Likewise, the point of a *survival* claim is that it "*survives*" the deceased would-be plaintiff, Cal. Civ. Proc. Code § 377.20(a), thereby "prevent[ing] the abatement of the cause of action of the injured person," see Burgos v. Tamulonis, 28 Cal. App. 4th 757, 761 (1994). The point of a *survival* claim is that the claims *survive*. Yet, here, the District Court's order shortened the time to sue on these claims by over two years *as a result of death*. Here, because the District Court ignored the operative statute, the claims did not survive in full.

Finally, California courts have "have repeatedly recognized the strong public policy protecting minors against the loss of their ***rights*** *due to the operation of statutes of limitations*." Young v. Haines, 41 Cal. 3d 883, 898 (1986). The purpose of minor tolling is not just to protect *minors*, but also "to protect the ***rights of minors***." Id.

And, these survival claims *are* Bella's rights. They're *her* claims. And the fact that she is no longer here to prosecute them doesn't change that fact. Her rights were prematurely extinguished below contrary to the plain text of the survival statute and the minor-tolling statute.

\* \* \* \* \*

California survival claims may be brought until the expiration of the "limitations period that would have been applicable if the person had *not* died." Cal. Civ. Proc. Code § 366.1(b).

34

Yet, the District Court's order ignored this operative statute on survival limitations; contravened its statutory command to decide the limitations period by ascertaining the period that would have been applicable if Bella "had *not* died;" shortened the time to sue by over two years; and, in so doing, undermined longstanding and foundational policies intended to protect children, children's rights, and the dead.

Under a straightforward application of the plain text of California's statutory framework, these survival claims *are* timely because they were commenced within the limitations period that would have been applicable if Bella had *not* died. The survival claims are timely, and, thus, the District Court's order dismissing them was error. It should be reversed.

**B.    The District Court erred in holding that rules of intestate succession bar wrongful-death claims by Bella's brothers.**

Bella's brothers, Plaintiffs J.H. and T.H., have asserted wrongful-death claims for the death of their sister. 6-ER-994 ¶ 84. They were harmed by her death. And, they were *no less* harmed by the death of their sister because their mother and father are alive.

Bella's brothers have standing to sue under California's wrongful-death statute because, *inter alia*, Subdivision (e) of this statute clarifies that California's current wrongful-death statute was "*not* intended to adversely affect the standing of any party having standing under prior law":

> The addition of *this section* [377.60] by Chapter 178 of the Statutes of 1992 *was not intended to adversely affect the standing of any party having standing under prior law*[.]

Cal. Code Civ Proc § 377.60(e). Thus, if a party had standing to sue for wrongful death under prior interpretations of California's wrongful-death statute, then the current statute is no bar to that prior standing.

The seminal case is Redfield v. Oakland C. S. R. Co., 110 Cal. 277 (1895). In Redfield, "Adeline B. Redfield" had died. Id. at 283. Later, "her husband, Horace A. Redfield, and her two minor children" sued for wrongful death. Id. Back then, "upon the death of the wife the entire community property, without administration, belongs to the surviving husband"—*nothing* to the kids. Id. at 290.

36

So, under a method of determining wrongful-death standing based solely upon how the probate codes say property passes (what Defendant asserted below), *only* Mr. Redfield—and *not* his children—would have had wrongful-death standing. Indeed, the tortfeasor in Redfield made just this argument for this method of determining wrongful-death standing. Id. at 289 (noting the defendant's argument that wrongful-death standing goes to "heirs" and that "the husband is the only heir of the wife").

The California Supreme Court rejected this probate-code method as "mistaken in its construction of" the wrongful-death statute. Redfield, 110 Cal. at 289. Redfield clarified how wrongful-death standing *does* work:

> [N]or does ***the word "heirs,"*** as there used [in the wrongful-death statute], refer to those persons who would succeed to the money so recoverable if it had been in the possession of the community as community property at the time of Mrs. Redfield's death; but *the word is used in its **common-law sense**, and **denotes those who are capable of inheriting from the deceased person generally**, and without the limitation resulting from statutes relating to the distribution of community property*.

Id. at 290.

Because the children were "capable of inheriting" from their mother, they had standing even if they were not first in line. See id. And, so, the probate-code *method* commits a category error, mixing up a *survival* action (where intestacy statutes are decisive for how property passes absent a will) with a *wrongful-death* action (where those "*capable* of inheriting" have standing).

37

Redfield clarifies that the persons with standing to sue for wrongful death must be "capable of inheriting" under the common-law understanding. The question then becomes: When are a decedent's siblings "capable of inheriting" from that decedent at common law?

The answer is that siblings are capable of inheriting whenever the decedent did not have children: "It was the rule at common law that on failure of lineal descendants the inheritance descended to the decedent's collateral relations who were of the blood of the first purchaser." Estate of Ryan, 21 Cal. 2d 498, 500 (1943).

At common law, if the decedent had kids, such lineal descendants would end the possibility of inheritance by "collateral kindred" and render the collateral line incapable of inheriting. See Howell v. Budd, 91 Cal. 342, 350 (1891) (noting that a "child of said John, deceased" would be "entitled to all of his estate *to the exclusion of kindred of the collateral line*"); Burk v. Arcata & M. R. R. Co., 125 Cal. 364, 365 (1899) (permitting "a sister and two brothers" of decedent to sue for wrongful death as "[c]ollateral heirs" where decedent had no children).

Redfield's wisdom stems from the fact that "the words 'their heirs' do not designate particular persons, but is a *nomen collectivum*, comprehending the whole succession of heirs, lineal  and collateral[.]" E.g., Norris v. Hensley, 27 Cal. 439, 447-448 (1865).

Thus, when the wrongful-death statute spoke of heirs under prior law, it was not speaking of a particular person, but a whole line of persons. See also, e.g., Cox v. Heath, 198 N.C. 503, 506 (1930) ("*An heir* is he who succeeds by descent to the inheritance of an ancestor, and in this, its appropriate sense, the word comprehends all heirs, and the heirs of heirs *ad infinitum*, as they are called by the law to the inheritance.").

Thus, suppose a decedent has issue—children and grandchildren. The children receive property intestate but <u>*all*</u> of the issue are *capable* of inheriting through a canon of descent. Siblings, however, would not be capable because lineal descendants extinguished the collateral line of descent.

By contrast, here, Bella Herndon had no lineal descendants (*i.e.*, had no children), so her brothers remain "capable of inheriting" under common law as collateral heirs. Therefore, under Subdivision 377.60(e) and <u>Redfield</u>, Bella's brothers have standing to sue for wrongful death.

The District Court concluded otherwise, 1-ER-5, but entirely overlooked <u>Redfield</u> as well as Section 377.60(e) after being briefed on them, <u>see</u> <u>id.</u>

Jointly, <u>Redfield</u> and Subdivision 377.60(e) clarify that siblings (*i.e.*, collateral heirs) have standing to sue for wrongful death when the decedent did not have children (*i.e.*, lineal heirs). And, <u>*none*</u> of the authorities cited by Defendant below or by the District Court engaged or addressed either (1) <u>Redfield</u> or (2)

39

Section 377.60**(e)**.  Nor did any of them involve a dispute as to the *method* of determining wrongful-death standing, as Redfield did.

Moreover, *none* of their authorities raised this threshold question of the *method* of determining wrongful-death standing as a disputed issue.  Because a dispute as to Defendant's preferred *method* "was *not* raised" in its cited cases, those cases are "***not* authority**" when that threshold issue is actually raised, as here.  Cf. Miklosy v. Regents of University of California, 44 Cal. 4th 876, 900 n.7 (2008) ("**It is axiomatic that cases are *not* authority for propositions not considered**.").

Although not necessary given the points made above, there are also several textual indications that the District Court's statutory interpretation of Section 377.60**(a)** is incorrect too.

*First*, perhaps the strongest statutory indication that the wrongful-death statute does not merely track the intestate-succession statute is that the wrongful-death statute does not use the language of succession.

The wrongful-death statute does *not* use the phrase "successor in interest" (§377.11) or "beneficiary of the decedent's estate" (§377.10(b))—the defined terms that would readily apply if Defendant's statutory-rank/probate-code method were correct.

40

*Second*, when a statute wants to speak of who in fact would receive property, it speaks of someone "who **succeeds**" to it. §377.10(a) ("who succeed"); §377.10(b) ("who succeed"); §377.11 ("who succeeds"). Likewise, the intestacy statute speaks of how property "passes[.]" Cal. Prob. Code § 6402 ("passes as follows"); § 6402.5 ("passes as follows"). But, the wrongful-death statute merely speaks of those "who would be *entitled* to the property of the decedent by intestate succession." Cal. Civ. Proc. Code § 377.60(a). This difference indicates that one does not need to be the person who would "succeed" to property or to whom it "passes" intestate, but merely a person who "would be *entitled*."

*Third*, the verb tense is important. The statute says "would be entitled[.]" Id. That *conditional* tense reinforces the Redfield reading about being *capable* of inheriting. See In re Steele, 32 Cal. 4th 682, 695-696 (2004) ("Use of the conditional perfect tense—'would have been'—indicates the Legislature intended broader discovery than just materials to which the defendant *was* entitled."); Segal v. ASICS America Corp., 12 Cal. 5th 651, 662 (2022) (discussing if matters "*were* reasonably helpful" —"not if they 'would be' or 'could be'").

*Fourth*, Defendant and the District Court misread Section 377.60(a). It does not require an *immediate* entitlement through intestate succession, but merely that the person with standing be someone who "would be entitled" to intestate succession, *i.e.*, whose collateral descent with respect to the decedent has not been

41

extinguished. They would read the statute to mean those who are *immediately* entitled to succeed to intestate property—rather than merely capable of doing so in a line of succession and/or descent.

* * * * *

Questions pertaining to standing to sue for wrongful death depend "primarily, if not entirely, on the application and construction of state statutes[.]" George H. Genzel, Brothers and Sisters of Deceased as Beneficiaries within State Wrongful Death Statute, 31 A.L.R. 379 § 1a.

And, where a term like heirs, next of kin, or the like "*confers beneficiary status upon **all persons generally included in the term[s] (which, in a general sense, admittedly, extends to brothers and sisters)***" as in California, the statute is referencing more than simply the person who is first in line. See id. Here, where Bella had no issue, her collateral heirs—her brothers—have standing to sue for her wrongful death under §377.60(a) and §377.60(e).

The District Court should be reversed.

## II. THE DISTRICT COURT ERRED ON DUTY OF CARE AND PRODUCTS LIABILITY.

### A. Given that the right to amend was preserved, the Court could simply remand rather than address additional issues.

Plaintiffs made clear below that, if they prevailed on appeal as to survival limitations or wrongful-death standing, they would prefer to amend their complaint. 2-ER-53-57; <u>see</u> Sections I.A-B, *supra*. The District Court graciously acknowledged Plaintiffs' request. 1-ER-2 ("Given the Court's order, plaintiffs agree at this time that amendment would be futile and reserve the possibility of amendment after exhausting their appeal.").

Accordingly, if this Court reverses on either survival limitations or wrongful-death standing, Plaintiffs respectfully request that this Court remand with instructions that Plaintiffs be permitted leave to amend. <u>See</u>, <u>e.g.</u>, <u>J.B. Painting & Waterproofing, Inc. v. RGB Holdings, LLC</u>, 650 F. App'x 450, 455 (9th Cir. 2016) (permitting remand for amendment after reversing district court on limitations grounds).

If this Court reverses on either of those issues and permits amendment, it would be unnecessary to consider California duty-of-care or products-liability issues. <u>See</u> Sections II.B-II.C, *infra*.

43

**B.** **The District Court erred by on California duty of care by excusing a duty of care in the face of foreseeable and foreseen risk of death.**

i.    Special-relationship duty

California recognizes special-relationship duties.  Regents of University of California v. Superior Court, 4 Cal. 5th 607, 620-621 (2018) (holding "universities have a special relationship with their students" because of the college's level of supervision; "vulnerability" of students; and college's ability to control its environment)

Regents supports finding a special-relationship duty here.  Here, a child was subjected to extraordinary surveillance, manipulation, and control  While on Netflix's platform, she was continually subjected to personalized data-gathering, data-analytics, and algorithmic targeting practices.  6-ER-985-989¶¶57-70.  Netflix tracked her every mouse click, all to control and manipulate her behaviors with startling effectiveness. 6-ER-985¶57, 6-ER-987¶63.

These allegations meet (and arguably exceed) what was required to impose a special-relationship duty in Regents.  Here, all the hallmarks of a special-relationship duty are met: (1) high degree of supervision, e.g., 6-ER-985¶57; (2) vulnerability of an impressionable child, e.g., 6-ER-975¶29; (3) near-complete control on the platform, e.g., 6-ER-987¶63; 6-ER-985¶57 ("control what you watch").

Regents explained two instances where a special duty isn't unduly burdensome: (1) where defendant benefits from the relationship and (2) where the duty is limited in scope. Regents, 4 Cal. 5th at 620-621. Netflix benefits from its users subscriptions and the special-relationship duty would be readily limited to on-platform activities—like algorithmic targeting. Pursuant to Regents, Netflix has a special relationship duty to its minor users, like Bella.

### ii. Ordinary duty

Defendant plainly owed an ordinary duty of care.

"Generally speaking, all persons have a duty to take reasonable care in their activities to avoid causing injury[.]" Brown v. USA Taekwondo, 11 Cal. 5th 204, 209 (2021).

Nevertheless, Defendant took the extreme position below that it didn't owe *any* duty of care whatsoever when algorithmically targeting minors. 6-ER-985. Defendant argued that "[u]nder California law, duty can be established through [...] the multi-factor duty analysis set forth in Rowland[.]" 5-ER-903. Adopting Defendant's position, the order said Plaintiffs failed "to identify a duty to support the negligence-based claims." 1-ER-6. Yet, the order erred in thinking that Rowland imposed a test to *establish* a duty.

45

Rather, as Rowland itself explained, the Rowland factors are used to establish an "***exception***" to the general duty of care.  Rowland, 69 Cal.2d at 113; Kesner at 1143 ("we rely on these [Rowland]  factors **not** to determine whether a *new duty* should be created, but whether an *exception* [...] should be created.").  So, in truth, Defendant's asking for an exception from the ordinary duty of care that governs nearly every other activity carried out in daily life.

Often "the existence of **a duty to exercise reasonable care is obvious**, [so] neither the plaintiff's nor the defendant's counsel will raise an issue regarding the existence of such a duty." 1 CALIFORNIA TORTS § 1.02 (2022). Thus, the "duty issue arises primarily in "the exceptional cases in which the defendant may insist that [he or she] is under no legal obligation to be careful." Id.

Here, Defendant caused a 30% spike in child suicides in a month.  6-ER-983-984¶¶44-53.  Defendant's catastrophic increase in child suicides was foreseeable—indeed, was foreseen.  6-ER-979-980¶¶27-32.  There is simply no sensible reason to carve out an exception to the ordinary duty for such destructive conduct.

### iii.   No Rowland exception

The Rowland "factors fall into two categories": (1) those addressing foreseeability, and (2) those addressing policy concerns. Regents at 629.

### (1)   Foreseeability

46

"The most important factor to consider [...] is whether the injury in question was foreseeable." <u>Regents</u> at 629. Here, that's easy. Yes, the injury was highly foreseeable; in fact, it was foreseen. 6-ER-979-983, ¶27-¶43. That weighs decidedly against a <u>Rowland</u> exception. Moreover, Defendant algorithmically targeted Bella, constantly surveilling and documenting the child's every move. 6-ER-985-989, ¶57-¶70. This constant surveillance and big data analytics, lead to a personalized knowledge that dramatically increased foreseeability of harm to Bella. 6-ER-985-989, ¶57-¶70.

### (2)    **Policy**

The Rowland factors also ask **"whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy."** <u>Regents</u> at 629. Here, that's easy. No.

Critically, <u>Rowland</u> exceptions are made only when "policy considerations justify a categorical no-duty rule[.]" <u>Kesner</u> at 1144. In short, the Rowland exceptions are **categorical**, not case specific. <u>Id.</u>

Thus, Defendant watns an exception for an "entire category of cases"--i.e. where companies algorithmically target vulnerable children. Netflix would like *that* entire category of cases excused from the ordinary, general duty of care.

There is simply no clear policy reason to categorically exclude corporations wielding powerful algorithms over children from the ordinary duty of care. To the contrary, California's public policy clearly tilts the other way. See e.g. California Age-Appropriate Design Code Act; see also Escola v. Coca Cola Bottling Co., 24 Cal. 2d 453, 462 (Traynor, J., concurring).

In Regents, the Rowland factors did "**not** justify categorically barring an injured student's claims against the university." Regents, 4 Cal. 5th 607, 629. Regents decided protecting children, incentivizing universities to create safer environments, and compensating those tragically injured was better policy. So too here.

Netflix should be encouraged to protect children, create safer online environments and compensate those tragically injured by its choices to disregard expert warnings, opting instead for profit-maximization at any price.

Applying the Rowland factors here makes clear that Defendant does not even remotely merit an exception to its ordinary duty of reasonable care. 6-ER-99625 ¶ 91-92.

iv.   Statutory duty

An "act or failure to act below the statutory standard is negligence per se, or negligence as a matter of law." Satterlee v. Orange Glenn School Dist., 29 Cal. 2d 581, 588 (1947); see also Ramirez v. Nelson, 44 Cal. 4th 908, 918 (2008). In other words, statutes "may be used to establish duties and standards of care in negligence actions." Elsner v. Uveges, 34 Cal. 4th 915, 927 (2004).

This negligence-per-se doctrine, applies where the injured person was "one of the class of persons for whose protection the statute" was adopted. Ramirez, 44 Cal. 4th at 918.

The California Age-Appropriate Design Code Act is such a statute. The Act is designed specifically to "create a safer online space" for children. §1(a)(3). It recognizes that "the impact of the design of online products and services on children's well-being has become a focus of significant concern." §1(a)(2). And, it specifically asks "[w]hether algorithms used by the online product, service, or feature could harm children." §1798.99.31(a)(v).

Moreover, the Act imposed a list of duties for companies operating online products and platforms:

- "**Shall not** [...] profile a child by default[.]" 1798.99.31(b)(2). That includes, "analyzing or predicting aspects concerning a natural person's

[...] personal preferences, interests, reliability, behavior, location, or movements." §1798.99.30(b)(6).

- **should** prioritize the privacy, safety, and well-being of children over commercial interests." §1798.99.29(b).

Here, Netflix's conduct fell tortiously below these statutorily codified standards of care, creating a basis for negligence-per-se claims under California law.

**C.    The District Court erred on products liability because software can be a product under California law.**

Whether Defendant's ***algorithms*** are products for purposes of California's products liability is a question of immense social importance.  6-ER-993-994¶¶78-83, 6-ER-993¶79.

To answer that question, courts must "return to the principles underlying [California's] doctrine of strict products liability to determine whether it applies." Bolger v. Amazon.com, LLC, 53 Cal. App. 5th 431, 438 (2021).  That didn't happen below. 1-ER-6.

Instead, the order side-stepped the question whether algorithms are products: "There is no strict liability for books, movies, or other forms of media." 1-ER-6 (citing Winter v. G.P. Putnam's Sons, 938 F.2d 1033, 1024-36 (9th Cir. 1989)). That was error because (1) the scope of *California's* products liability law is determined by Chief Justice Traynor's foundational policy considerations and  (2) Winter *supports* Plaintiffs' products-liability claims.

"California's product liability jurisprudence, traces back to Justice Roger Traynor's famed concurrence in Escola[.]"  Jimenez v. Superior Court, 29 Cal. 4th 473, 477-478 (2002) (citing Escola v. Cocoa Cola Bottling Co., 24 Cal. 2d 453 (1944) (Traynor, C.J., concurring)).

In <u>Greenman</u>, the California Supreme Court "embraced Justice Traynor's view, and California became the first state to allow recovery for strict products liability." <u>Id.</u> at 477-478 (discussing <u>Greenman v. Yuba Power Products, Inc.</u>, 59 Cal. 2d 57 (1963)).   Traynor, California's "most esteemed jurist" explained that "tort doctrine must aim to minimize the social costs of accidents." <u>Loomis v. Amazon.com LLC</u>, 63 Cal.App.5th 466, 491 (2021) (Wiley, J., concurring).   As the California Supreme Court observed:

> In our contemporary complex industrialized society, advances in science and technology create fungible goods which may harm consumers [...] The response of the courts can be either to adhere rigidly to prior doctrine, denying recovery to those injured by such products, or to fashion remedies to meet these changing needs.

<u>Sindell v. Abbott Laboratories</u>, 26 Cal. 3d 588, 610 (1980).

California courts have consistently chosen the latter—fashioning new remedies and eschewing the "wooden formalisms of traditional tort" law.  <u>Daly v. General Motors Corp.</u>, 20 Cal. 3d 725, 735 (1978).   California courts have repeatedly rejected attempts to restrict California's products liability law by resort to formalistic labels.  <u>Pierce v. Pac. Gas & Elec. Co.</u>, 166 Cal. App. 3d 68, 81-82; n.6 (rejecting arguments that electricity's not "tangible", not "a product" and not "an article"); <u>Loomis</u> 63 Cal.App.5th at 479 (rejecting argument that online platform was "service").

Since its inception, the "scope of strict liability has been expanded, where necessary[.]" Bolger 53 Cal.App.5th at 438. And, Justice Traynor's policy-focused vision imbues California's products liability law with an "**infinite capacity for growth to meet changing needs and mores**." Id. at 462.

Indeed, California has stayed a step ahead of the narrower approaches taken by other jurisdictions and the Restatement. See Cronin v. J.B.E. Olson Corp., 8 Cal. 3d 121, 131 (1972) ("**We have not hesitated to reach conclusions contrary to those set forth in Restatement section 402A.**"); see also, Stein v. Southern Cal. Edison Co., 7 Cal. App. 4th 565, 570.

And, these courts have seen "no difficulty in applying [Traynor's] Greenman formulation to the full range of products liability situations[.]" Cronin at 134. California's electricity cases are instructive. They cautioned not to get tripped up on formalisms, rigid labels, and crimped definitions:

> **[L]liability should <u>not</u> depend simply upon whether electricity is or is not labeled a 'product.' More significantly, we believe the policy justifications for strict liability in tort support its imposition in this case.**

Pierce v. Pac. Gas & Elec. Co., 166 Cal. App. 3d 68, 83.

Applying products liability to electricity, California courts eschewed restrictions imposed by other states and the Restatement. Stein v. Southern Cal. Edison Co., 7 Cal. App. 4th 565, 571 ("***in California*, a sale of the product is not necessary for imposition for products liability**[.]").

53

And, unrestricted by formalisms, California's doctrine of products liability has also acknowledged the possibility of treating software as a product. See <u>Hardin v. PDX, Inc.</u>, 227 Cal. App. 4th 159, 179 (4th Dist. 2014) ("**Hardin's theory is that PDX's software program, _not the information it produces_, is the defective product.** PDX has not argued, let alone shown, that Hardin cannot prevail **under _that_ theory**."); see 6-ER-993-994 ¶¶78-83, 6-ER-993 ¶ 79 (asserting algorithms, <u>not</u> content, was the product); compare 1-ER-6 (nowhere addressing *that* theory).

From electricity to software to online platforms, California courts continue to apply Traynor's policy aims lockstep with an "increasingly complex and mechanized society." <u>Daly</u> at 733. That approach ensures California's law continues to evolve alongside technology with an "**infinite capacity for growth to meet changing needs and mores**." <u>Bolger</u> at 462.

Accordingly, when faced with new technological realities, the courts must "return to the principles underlying the doctrine of strict products liability to determine whether it applies." <u>Bolger</u> at 438. The order below disregarded that. It didn't examine Justice Traynor's policy considerations. It didn't examine the new technologies here. Instead, it turned a blind eye to both. 1-ER-6.

Below, the order dismissed Plaintiffs' strict liability claim based on this Court's <u>Winter</u> decision (a case applying the Restatement to hold an encyclopedia of mushrooms was not a product). 1-ER-6.

54

That overlooked several matters.

First, <u>Winter</u>'s rationale actually *supports* Plaintiff. <u>Winter</u> suggested that "computer software" may be subjected to products liability just like other "highly technical tools" <u>Winter v. G.P. Putnam's Sons</u>, 938 F.2d 1033, 1035-1036 (9th Cir. 1991). Here, Defendant's software and algorithms are "highly technical tools[.]" <u>Id.</u> Indeed, "courts and legal scholars" alike rely on <u>Winter</u> to suggest that "computer software may give rise to strict products liability in tort." <u>Schafer v. State Farm Fire & Cas. Co.</u>, 507 F. Supp. 2d 587, 601 (E.D.L.A. Aug. 22, 2007); Restat 3d of Torts: Products Liability, § 19. Thus, <u>Winter</u> supports Plaintiffs' theory.

Second, <u>Winter</u> was applying the Restatement §402A. But, California's products liability isn't restricted by the Restatement. See <u>Bolger</u> at 459 ("Our Supreme Court, which originated the doctrine of strict products liability, **has not hesitated to disagree with the Restatement where it has unduly limited the doctrine**."). So, *even if* <u>Winter</u> didn't support plaintiffs' strict liability claim, that's not dispositive of *California* law. Instead, the scope of California law is set by Traynor's time-honored policy considerations.

California embraces the approach that "courts should assign tort liability to ensure those best situated to prevent injuries are incentivized to do so." <u>Loomis</u> at 492 (concurrence, Wiley, J.).

55

And, products liability applies where defendant can take cost-effective measures to minimize the social costs of accidents. Kesner v. Superior Court, 1 Cal.5th 1132, 1153 (2016).

Here, Defendant targets children with unprecedentedly powerful algorithms. 6-ER-985-987¶¶57-65.

When harms arise from Defendant's technologies, 6-ER-988-989, ¶ 69-70, Defendant is best positioned to correct the harms, avoid similar accidents in the future, and spread the cost across its millions of users. In short, applying strict products liability here, creates a safer society and is attuned to the everyday realities of our "increasingly complex and mechanized" world. Because application of strict liability to Defendant's algorithms advances justice Traynor's enduring vision, California's product liability law should apply.

## III.    THE DISTRICT COURT ERRED WHEN APPLYING CALIFORNIA'S ANTI-SLAPP STATUTE.

Defendant filed an anti-SLAPP motion below.  5-ER-871.

Defendant's assertion is that the Herndon family brought a "SLAPP"— a "***Strategic*** Lawsuit Against Public Participation."  United States ex rel. Newsham v. Lockheed Missiles & Space Co., 190 F.3d 963, 965 n.2 (9th Cir. 1999).  Yet, the "hallmark of a SLAPP suit is that it lacks merit and is **brought with the goals of obtaining an economic advantage over a *citizen* party**"—an abuse to coerce a citizen into silence.  Id. at 970-971.

The "paradigmatic" SLAPP involves "large corporations, such as land developers, who file suit as a means to quell the environmental or political objections of community activists so that the developers may achieve their goals."  Wilcox v. Superior Court, 27 Cal. App. 4th 809, 815 (1994).  SLAPPs are "suits brought *by large private interests to deter common citizens*" from exercising their rights.  Wilbanks v. Wolk, 121 Cal. App. 4th 883, 891 (2004).  Frankly, this case is about as far afield from a SLAPP.

It's a wrongful-death action, brought by a grieving family, who senselessly lost a child, due to a corporation's careless and dangerous use of powerful algorithms to target that child, all the while knowing of dire risk, but refusing to take precautions.

57

Applying anti-SLAPP here turns the very purpose on anti-SLAPP on its head.

And, the fact that the District Court applied anti-SLAPP contrary to its purposes matters. It bears emphasizing that the anti-SLAPP statute must be construed in accordance with its purpose. That's not a call for atextual purposivism.

The text commands as much: "Section 425.16(a) states its purpose[.]" Newsham, 190 F.3d at 971. And the text states the types of cases its concerned about—suits that are an "abuse of the judicial process." Cal. Civ. Proc. Code § 425.16(a). Then, the text commands that the following: "**To this end**, this section shall be construed broadly." Id.

It is with this purpose—of avoiding litigation abuses by large corporations against ordinary citizens—that this Court should be considering these anti-SLAPP issues. Ultimately, if this case—a case brought by a grieving father and brothers—doesn't *seem* like an abuse of judicial process (because it isn't), that's a meaningful indicator.

A.     **Anti-SLAPP Step 1(a): The District Court improperly recast the complaint as about "content" rather than algorithms and a failure to warn.**

Below, the District Court didn't base its anti-SLAPP analysis upon the acts from which the cause of action arose.

Rather, it recast the complaint and chose different acts to assess. 1-ER-4-5; 1-ER-5 n.3. That's error. And, this error alone is sufficient to vacate. Should this Court find the order didn't address the acts from which the cause of action arose, then this Court need not consider further anti-SLAPP issues. See Sections III.B-E, *infra*.

California's anti-SLAPP statute requires consideration of the "**act**" from which the cause of action "arise[s.]" Cal. Civ. Proc. Code § 425.16(b)(1). A defendant must identify the specific act from which the cause of action arises precisely. It's "defendant's burden [...] to identify what acts each challenged claim rests on[.]" Bonni v. St. Joseph Health System, 11 Cal. 5th 995, 1009 (2021). A defendant must "show how *those acts* are protected under a statutorily defined category of protected activity." Id.

And, "a claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of[.]" Park v. Board of Trustees, 2 Cal. 5th 1057, 1060 (2017) (emphasis in original).

59

The California Supreme Court has been clear that identifying the specific "act" must be done with precision. In <u>Bonni</u>, a plaintiff filed a "singular cause of action" with "multiple factual bases[.]" 11 Cal. 5th at 1009. The "operative complaint contain[ed] a nonexhaustive list of at least **19 distinct acts** or courses of conduct allegedly" giving rise to the claim. <u>Id.</u>

The California Supreme Court required examination of the "underlying acts *individually*." <u>Id.</u> at 1009-1010. Its rationale was that "**[s]triking a cause of action that rests in part on unprotected activity** constrains a plaintiff's ability to seek relief** without advancing the anti-SLAPP's goals of shielding protected activity[.]" <u>Id.</u> Such an approach "would impair significant legislative policies." <u>Id.</u> at 1011. Indeed, this precision-identification approach is "now-settled[.]" <u>Id.</u> at 1029 (Groban, J., concurring).

To avoid anti-SLAPP overbreadth, it's critical to identify and evaluate each "act" from which the cause of action arises *with precision*. Cal Code Civ Proc § 425.16(b)(1). Failure to do so contravenes established precedent. <u>Park</u>, 2 Cal.5th at 1057; <u>Baral v. Schnitt</u>, 1 Cal. 5th 376, 396 (2016); <u>Wilson v. CNN</u>, 7 Cal.5th 871 (2019). And, "a claim may be struck **only if** the speech or petitioning activity *itself* is the wrong complained of[.]" <u>Park</u>, 2 Cal. 5th at 1060. Nor can courts strike "a cause of action that rests **in part** on unprotected activity[.]" <u>Bonni</u>, 11 Cal. 5th at 1011.

60

Yet, the District Court didn't abide this well-settled requirement. 1-ER-4-5. The complaint precisely identified the acts that formed the basis for Plaintiffs' claims:

> (1) Defendant's algorithmic targeting of Bella Herndon, 6-ER-980-984 ¶¶ 57-70; and
>
> (2) Defendant's failure to warn Bella Herndon of known dangers, 6-ER-988 ¶ 79.

The complaint also expressly identified the acts that did **not** form the basis for Plaintiffs' claims. 6-ER-974 ¶¶ 24-26; 6-ER-988 ¶ 78; 6-ER-989 ¶ 84.

Nevertheless, the order improperly recast the complaint and side-stepped the acts identified as providing the bases for Plaintiffs' claims. Instead, the order examined three acts that were expressly *not* the basis of the claims: (1) Content; (2) Creation; and (3) public broadcast. 1-ER-3-4. But see 6-ER-967; 6-ER-974 ¶¶ 24-26; 6-ER-988 ¶ 78; 6-ER-989 ¶ 84. That's error.

The order seems to believe that these acts, such as *public* broadcast, couldn't be distinguished from the act of algorithmically targeting a particular child. The order claimed that Plaintiffs couldn't have brought suit "[b]ut for the broadcast and Defendants' actions in connection with that broadcast[.]" 1-ER-4.

Yet, that's false.

Algorithmically targeting a particular minor and publicly broadcasting are *conceptually separable*. If Defendant had *only* algorithmically targeted Bella but no one else, Plaintiffs could and would be able to bring the exact same claim. Conversely, if Defendant had **not** algorithmically targeted Bella, then Plaintiffs could not sue under its theory of liability (even if Defendant had otherwise broadcast to the world).

Likewise, algorithmically targeting a specific children and public dissemination are also *historically* separable. After all, film has existed and been broadly and publicly distributed to theaters for over a hundred years. But using machine-learning algorithms fueled by Big Data to directly target a specific child with individually-tailored, personalized messaging is new.

Moreover, algorithmically targeting a specific child and publicly broadcasting are *legally separable*. California law draws such distinctions. Indeed, the California legislature has not struggled to distinguish acts of general public broadcast as distinct from directly targeting a specific child with powerful algorithms. See Cal. Age-Appropriate Design Act §§ 1798.99.31(a)(1)(B)(vi); 1798.99.30(b)(6).

Nor did the California Legislature struggle to distinguish between algorithmically targeting children and the content itself. Id. § 1798.99.31(a)(1)(B)(i).

62

So, although the District Court insisted that no distinction could be drawn, the reality is that the complaint is drawing distinctions between distinct acts that are distinct as a matter of logic, as a matter of history, and as a matter of California law.

* * * * *

The District Court recast the complaint and ignored specifically identified acts giving rise to the claims: algorithmic targeting and failure to warn. This threshold error yielded a highly aberrant anti-SLAPP order that flipped the very purpose of anti-SLAPP on its head—punishing Plaintiffs for something they didn't sue about and overextending anti-SLAPP.

That approach contravenes "well-settled" authority from the California Supreme Court and should be vacated.

**B.** **Anti-SLAPP Step 1(b): The District Court's improper recasting of the acts in suit led the rest of its anti-SLAPP analysis about rights and public issues astray.**

    i.   <u>The District Court erred because Defendant did not establish a constitutional right to algorithmically target or to fail to warn of know dangers to high-risk individuals.</u>

***First***, Defendant "bears the initial burden" of showing its acts were "in furtherance of" Free Speech rights. <u>Doe v. Gangland Prods.</u>, 730 F.3d 946, 953 (9th Cir. 2013).

Defendant didn't meet that burden. The complaint alleged two acts giving rise to the claims:

(1) Defendant's personalized algorithmic targeting of a specific child. 6-ER-980-984¶¶57-70; 6-ER-974¶26

(2) Defendant's failure to warn that specific child of known danger. 6-ER-974-980¶¶27-56.

Yet, Defendant's anti-SLAPP motion didn't cite a single case demonstrating a Free Speech right to engage in such acts. 5-ER-887-891 (identifying no case involving algorithms whatsoever).

Instead, Defendant's motion clung to inapposite cases such as <u>Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston</u>, 515 U.S. 557, 573-574 (1995) (holding Massachusetts couldn't force private parade organizers to include a gay activist group in parade).

64

It's not clear what relevance <u>Hurley</u> has to algorithmically targeting children. Frankly, Defendant's inability to find any cases meeting its burden betrays the truth that these claims involve novel legal theories and *open* legal questions. There is simply no *established* First Amendment right to algorithmically target specific children or to fail to warn those children (or their families) while doing so.

Given that these are *<u>open</u>* questions, anti-SLAPP is an inappropriate vehicle to address them. anti-SLAPP was meant to provide "early dismissal of *<u>meritless</u>* first amendment cases"—not of open questions. <u>Metabolife Int'l, Inc. v. Wornick</u>, 264 F.3d 832, 839 (9th Cir. 2001). Anti-SLAPP's not a fast-pass to give short shrift to open Constitutional questions.

Indeed, Defendant acknowledges that anti-SLAPP is adjudicated using the Rule 12(b)(6) standard. 5-ER-884 n.1; 5-ER-887 (citing <u>Planned Parenthood</u>). And, under this Rule 12(b)(6) standard, early dismissal of a "novel legal theory" is "especially disfavored":

> **<u>Rule 12(b)(6) dismissals are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development.</u>**

<u>McGary v. City of Portland</u>, 386 F.3d 1259, 1270 (9th Cir. 2004).

District courts should be "especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel[.]" Elec. Constr. & Maint. Co., Inc. v. Maeda Pac. Corp., 764 F.2d 619, 623 (9th Cir. 1985). That's because it's "**important that new legal theories be explored and assayed in the light of actual facts**[.]" Id.

In short, Defendant failed to meet *its* burden to demonstrate that algorithmic targeting and failure to warn about algorithmic targeting were among *its* Free Speech rights. Inapposite cases that don't involve algorithms don't meet *its* burden of demonstrating that this is a "meritless" suit or that its Free Speech rights are actually implicated.

Given that these are open questions, Defendant's aggressive anti-SLAPP strategy is an abuse. See Cal Civ. Proc. §425.17(a) (noting "disturbing abuse" of anti-SLAPP).

**_Second_**, Defendant took an extreme First Amendment position below. Defendant argued that the "Supreme Court has long held that the law may not be used to punish protected expression by imposing civil liability." 5-ER-903. Notably, Defendant inadvertently cited Justice Blackmun's *dissent* from Cohen v. Cowles Media Co., 501 U.S. 663 (1991) as the foundation for its extreme position. See also 3-ER-331 (notice of errata).

66

Perhaps unsurprisingly, the *majority opinion* in <u>Cohen</u> struck a more nuanced tune, discussing the **"[w]ell-established line of decisions holding that generally applicable laws do not offend the First Amendment simply because their enforcement** [...] **has incidental effects**[.]" <u>Cohen</u>, 501 U.S. at 669; <u>see also</u> <u>Wilson</u>, 7 Cal. 5th at 894 (anti-SLAPP case citing <u>Cohen</u>).

Indeed, numerous First Amendment doctrines betray that Defendant's radical position that it has an absolute First Amendment right to recklessly target children and harm them is unsupported by the actual First Amendment jurisprudence.

To start, it's not clear that Defendant's data profiling and algorithmically targeting of specific children even constitutes speech. The threshold question is whether algorithms, operating latently and clandestinely, invisible even to the user that they're surveilling children and manipulating them would even constitute speech. <u>See</u>, <u>e.g.</u>, <u>Corales v. Bennett</u>, 567 F.3d 554, 562 (9th Cir. 2009) ("First Amendment protection applies only when [conduct] is intended to convey a 'particularized message' and the likelihood is great that the message would be so understood.").

Even if it were speech, the Supreme Court has "long recognized that not all speech is of equal First Amendment protection." <u>Snyder v. Phelps</u>, 580 F.3d 206, 214 (4th Cir. 2009).

67

Indeed, the "Supreme Court has clearly defined five categories of speech which do not further First Amendment principles[.]" Stricklin v. Stefani, 358 F. Supp. 3d 516, 527 (W.D.N.C. 2018). Among them is incitement to violence. Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 504 (1984). Arguably Defendants algorithmically targeting fits "incitement" on these specific facts given the way Defendant recklessly, foreseeably, and predictably incited self-violence (*i.e.*, suicide) for a specific person.[17]

Even if these acts were protected, "First Amendment protection varies depending on the nature and subject matter of the speech." Id.; see, Fla. Bar. v. Wnt for It, 515 U.S. 618, 623 (1995) ("intermediate scrutiny" applied to commercial-speech restrictions).

Moreover, the claims here are not based upon the content but upon its secondary effects, so there is a strong argument that the secondary-effects doctrine would apply in a straightforward manner. See e.g., Young v. Am. Mini Theatres, 427 U.S. 50, 52 (1976). Likewise, "certain speech, while fully protected when directed to adults, may be restricted when direct towards minors." E.g., James v. Meow Media, Inc., 300 F.3d 683, 696 (6th Cir.2002); FCC v. Pacifica Foundation, 438 U.S. 726, 749 (1978).

---

[17] And, "these [excluded] categories are not all-encompassing[.]" Stricklin, 358 F.Supp 3d at 527. Courts could fashion new categories in response to unprecedented harms.

"Commercial speech enjoys a limited measure of protection[.]" _E.g._, <u>Charles v. City of L.A.</u>, 697 F.3d 1146, 1151 (9th Cir. 2012); <u>Serova v. Sony Music Entertainment</u>, 13 Cal. 5th 859, 875-876 (2022). Intermediate scrutiny would be readily met here.

Indeed, given that the tort law here seeks _modest tweaks_ to prevent _loss of human_ strict scrutiny would be met here. The compelling interest the protection of children from death. The narrow tailoring would be to simply not target _that_ children (who Big Data shows as high risk) via algorithm with content likely to gravely harm her.

_**Third**_, Plaintiffs' timely opposition below sufficiently addressed Defendant's First Amendment arguments. 3-ER419-451. Yet, out of an abundance of caution, Plaintiffs argue the denial of their Rule 6(b) motion to submit an amended opposition was an abuse of discretion because the District Court failed to apply this Court's mandatory factors. 2-ER-139-152; 3-ER-316. These factors are:

(1) Danger of prejudice to the opposing party.

(2) Length of delay.

(3) Reason for the delay.

(4) Whether the movant acted in good faith.

Ahanchian, 624 F.3d at 1261.

The District Court abused its discretion by failing to apply the four factors. And, regardless, those factors were satisfied here. There was no prejudice because Plaintiffs had already stipulated to Defendant's request for 21 days to file their reply—*triple* the time set by the Local Rules—and had offered whatever more Defendant needed.  6-ER-995-997.

The delay was short.  Ahanchian at 1262 ("**mere three days**").  The delay was due to the Thanksgiving Holiday, counsel's need to consult with their clients regarding anti-SLAPP implications, and the fact that Defendant's Motion miscited a Supreme Court dissent as if it were controlling law.  See 3-ER-330.  Indeed, Plaintiffs' nonprofit counsel have never opposed an extension request by an opposing counsel in any case in any court.

.

> ii.   The District Court further erred on anti-SLAPP because private
>       algorithmic control over a child's behavior is not speech "in
>       connection with a public issue."

Defendant used personalized algorithms to individually target a specific child for the purpose of clandestinely controlling that child for profit on its private, pay-walled platform. 6-ER-980-983. Such private, for-profit, personalized algorithmic targeting and control of a specific child is **not** conduct "in connection with' a public issue[.]" Cal Code Civ Proc § 425.16(b)(1).

Below, Defendant argued it was, relying on §425.16(e)**(3)**. 5-ER-889. That argument is foreclosed: "**private context eliminates any possibility of protection under section 425.16, subdivision (e)(3)**[.]" Wilson v. CNN, 7 Cal. 5th 871, 903 (2019).

The District Court, however, relied on subsection (e)**(4)** to conclude that Defendant's conduct was "'in connection with' a public issue[.]" 1-ER-4. It reasoned that "youth suicide, depression, and sexual assault are of great public interest." 1-ER-4.

Based on that generalization, it concluded Defendant's specific conduct was "in connection with" that public issue under Section 425.16(e)**(4)**. Id. Yet, the California Supreme Court has called such generalized analysis "less than satisfying"—i.e., an erroneous application of anti-SLAPP. See Geiser v. Kuhns, 13 Cal. 5th 1238, 1249 (2022).

Indeed, the California Supreme Court "articulated the two-part test in FilmOn to steer courts *away* from this mode of analysis." Id. (citing FilmOn.com Inc. v. DoubleVerify Inc., 7 Cal. 5th 133, 149 (2019)). Yet, the District Court disregarded FilmOn's two-part test; adopted an incorrect mode of analysis; and made two errors—a *context* error and a *content* error.

**Context Error**:

The California Supreme Court's been clear that "within the framework of section 425.16, subdivision (e)(4), a court ***must* consider the context** as well as the content[.]" FilmOn, 7 Cal. 5th at 149.

The District Court didn't. It never considered a whole host of "contextual cues[.]" Id. at 148. It never considered whether the conduct "was private or public, to whom it was said, and for what purpose." See id. It ignored the "commercial context" here. See id. It overlooked the personalized algorithmic targeting's "location, its audience, and its timing." See Wilson, 7 Cal. 5th at 900. It ***didn't*** consider *any* of that context. Thus, it entirely disregarded FilmOn's demand to evaluate *context*, not just content.

Context is essential here. Defendant's conduct was private, personalized specifically to Bella, occurred on Defendant's password-protected platform. It was a for-profit and commercial context. 6-ER-990.

72

Indeed, a corporation using an algorithm to individually target a specific child with private, personalized messages on its private, paywalled platform is not conduct "in connection with" a *public* issue. The District Court concluded otherwise—but only by erroneously disregarding <u>FilmOn</u>'s demands and entirely failing to evaluate factual context.

Moreover, the order ignored *statutory* context too. Courts construing 425.16(e)(4)'s "catch-all" provision must remember that §425.16(e)(4) refers to "***other*** conduct in furtherance[.]" <u>FilmOn</u>, 7 Cal. 5th at 144.

The word other "supports the inference that this [§425.16(e)(4) catchall] provision encompasses conduct and speech *similar to what is referenced in section 425.16, subdivision (e)(1) through (3)*." <u>Id.</u> After all, "when a general provision follows specific examples, as subdivision (e)(4) follows subdivision (e)(1) through (3), we generally understand that provision as restricted to those things that are similar to those which are enumerated specifically." <u>Wilson</u>, 7 Cal. 5th at 900 (applying *ejusdem generis*).

Here, Defendant algorithmically targeted Bella in a personalized, individually-tailored fashion on Netflix's private, paywalled platform—for profit and for commercial gain. Such targeting isn't like a "writing made before a legislative, executive, or judicial proceeding[.]" <u>See</u> §425.16(e)**(1)**.

73

Personalized algorithmic targeting isn't remotely like the type of "writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body[.]"    See §425.16(e)**(2)**.    Algorithmic techniques operating uniquely on Bella specific to her never occurred in a "place open to the public or a public forum"—but rather were uniquely presented to her.    See §425.16(e)**(3)**.  This personalized targeting of Bella isn't close to being a good fit for anti-SLAPP categories (e)(1)-(e)(3)—and that's a strong sign it's not a good fit for subdivision (e)(4) either.

In short, Defendant's conduct is outside the scope of §425.16(e)(4)'s catch-all provision, as the overlooked factual and statutory ***context*** make clear.

**Content Error**:

Furthermore, the District Court thought Defendant's conduct was in connection with a public issue because "youth suicide, depression, and sexual assault are of great public interest." 1-ER-4.

But, the California Supreme Court is clear that the "inquiry **must** be on the *specific* nature of the [conduct], rather than on any generalities that might be abstracted from it."  FilmOn, 7 Cal. 5th at 152.  The "fact that 'a broad and amorphous public interest' can be connected to a specific dispute is **not enough**." Id. at 150.

Rather, there must be "**requisite nexus** between the challenged [conduct] and the asserted issue of public interest—to give meaning [...] to the 'in connection with' requirement" of §425.16(e)(4).  <u>Id.</u> at 149.

That's why the California Supreme Court has repeatedly rejected a "synecdoche theory" of the in-connection-with requirement: a defendant "cannot merely offer a 'synecdoche theory' of public interest, defining their narrow dispute by its slight reference to the broader public issue." <u>FilmOn</u>, 7 Cal. 5th at 152.  For example, a defendant's "alleged statements about an isolated plagiarism incident did not contribute to public debate about when authors may or may not borrow without attribution." <u>Wilson</u>, 7 Cal. 5th at 903.

So too here.  Defendant's conduct—targeting Bella personally with personalized algorithmic techniques—isn't pertaining to a broader public issue. Even Defendant's depiction of an isolated, fictional suicide cannot be synecdoched into a "public discussion or resolution" of suicide writ large.  <u>See id.</u> at 900.  While the issue of suicide <u>is</u> a matter of public interest, the depiction of Hannah Baker's fictional suicide is not.

The strategy below was to attempt, once again, the "oft-rejected, so-called synecdoche theory[.]  <u>World Fin. Grp., Inc. v. HBW Ins. & Fin. Servs., Inc.</u>, 172 Cal. App. 4th 1561, 1570 (2009).

Indeed, here, Defendant relies on a *double-synecdoche*.  The specific act at issue is Defendant's algorithmic targeting of Bella Herndon.  Yet, Defendant wants to jump from its algorithmic targeting of a specific child, to an isolated depiction of a fictional suicide in its show, to the general public issue of suicide writ large.  That's two jumps too far:



Two recent California Supreme Court cases, <u>FilmOn</u> and <u>Wilson</u>, decisively foreclose Defendant's double-synecdoche strategy of satisfying §425.16(e)(4) via generalizations from algorithm to show and from show to suicide.

* * * * *

Below, the District Court disregarded <u>FilmOn</u>'s two-step mode of analysis; disregarded the requirement to evaluate context; disregarded the prohibition on synecdoche theories; and disregarded the need to limit §425.16(e)(4)'s catchall provision using statutory context (*ejusdem generis*).

**C.**     **Anti-SLAPP Step 2: The District Court's errors on the motion to dismiss mean it also erred on anti-SLAPP's second step.**

Because Defendant challenged the legal sufficiency of Plaintiffs' claims, 5-ER-886, Rule 12(b)(6)'s standard decides the second step of the anti-SLAPP analysis, <u>Planned Parenthood Fed'n of Am. v. Ctr. for Med. Progress</u>, 890 F.3d 828, 833 (9th Cir. 2018).

The District Court addressed four merits issues—erring on each. It erred on survival limitations, <u>see</u> Section I.A, *supra*; erred on wrongful-death standing, <u>see</u> Section I.B, *supra*; erred on duty, <u>see</u> Section II.B, *supra*; and erred on products liability, <u>see</u> Section II.C, *supra*. Each argument is incorporated by reference here for anti-SLAPP's second step.

Defendant also made First Amendment arguments below, 5-ER-901-906; 2-ER-113-116, that the District Court declined to rule upon, 1-ER-7. If these arguments are considered for anti-SLAPP's second step, Plaintiffs incorporate by reference here their arguments on the First Amendment as well. <u>See</u> Section III.B.i, *supra*.

Likewise, Defendant raised causation arguments below that were not ruled upon. 5-ER-900-901; 2-ER-124. These causation arguments are wrong, both regarding California's standard for causation generally and California's doctrine of superseding causes specifically.

"California has definitively adopted the substantial factor test […] for cause-in-fact determinations." E.g., Rutherford v. Owens-Illinois, Inc., 16 Cal. 4th 953, 968 (1997). This test is broad. It reaches "beyond [the 'but for' test] to satisfactorily address other situations [...] involving independent or concurrent causes in fact." Id. at 969.

Thus, even if one believed there were other "independent or concurrent causes" here (e.g., mental illness), that would not preclude Netflix's algorithmic targeting from being a substantial factor in Bella's death. See id. Indeed, the operative pleadings stressed that Defendant's algorithmic targeting played a significant role. See 6-ER-967-994.

Defendant also argued that a wrongdoer can't be liable for contributions to suicide. 5-ER-901-902 (characterizing "intention to kill himself" as "intervening force"). Yet, California courts reject this pass-the-buck theory that suicide absolves a tortfeasor for its negligence. E.g., Jacoves v. United Merchandising Corp., 9 Cal. App. 4th 88, 112 (1992) (**"[S]uicide, *itself*, was the foreseeable risk and cannot, therefore, be a superseding cause**.")

Jacoves involved a "suicide[.]" Id. at 95. The decedent was negligently discharged from a hospital, subsequently met with different doctors, and ultimately died via "self-inflicted gunshot[.]" Id. at 99.

The <u>Jacoves</u> court rejected the negligently-releasing hospital's attempts to absolve itself by arguing that suicide constituted a "superseding cause[.]" <u>Id.</u> at 111. The court held that the "intervening act of a third person does <u>*not*</u> relieve the original wrongdoer of liability if the intervening act was a reasonably foreseeable result of the original actor's wrongdoing." <u>Id.</u>

Here, "suicide, itself, was the foreseeable risk and cannot, therefore, be a superseding cause." <u>See</u> <u>id.</u> at 112.

### D. Anti-SLAPP Applicability: California anti-SLAPP should not be applied to claims filed in state court and then removed.

Applying an "unguided <u>Erie</u>" analysis, this Court in <u>Newsham</u> held that California anti-SLAPP applied to claims **originally filed in *federal* court**. <u>United States ex rel. Newsham v. Lockheed Missiles & Space Co.</u>, 190 F.3d 963, 973 (9th Cir. 1999).

The claims here, however, were ***not originally filed in federal court***. 6-ER-1069. They were removed. 66-ER-1062.

And, although some appeals have applied anti-SLAPP to removed claims, <u>e.g.</u>, <u>Safari Club Int'l v. Rudolph</u>, 862 F.3d 1113, 1118 (9th Cir. 2017), the parties "simply *assumed* that [anti-SLAPP] applied, but the issue was never raised or discussed" as an issue before the Court, <u>see</u> <u>Sakamoto v. Duty Free Shoppers, Ltd.</u>, 764 F.2d 1285, 1288 (9th Cir. 1985).

"**Such unstated assumptions on non-litigated issues are *not* precedential holdings binding future decisions**." <u>Id.</u> (collecting cases). Because anti-SLAPP's applicability to *removed* claims hasn't been decided, this present context presents a distinct posture—and an **open question**.

The open question is **whether, for claims first filed in state court and then removed, do <u>Newsham</u>'s <u>Erie</u> rationales weigh in favor or against application of anti-SLAPP?**

80

They weigh *against*.

*First*, Newsham's primary concern was "**forum-shopping**[.]" 190 F.3d at 973. Newsham's forum-shopping concern makes sense for claims filed in *federal* court, but it's forum-shopping concern is wholly **inapplicable** for claims first filed in *state* court, *i.e.*, in a forum where anti-SLAPP indisputably applies. Plainly, plaintiffs who file claims in *state* court are *not* forum-shopping to *avoid* anti-SLAPP.

Thus, this first Newsham factor does *not* support application of anti-SLAPP to removed claims.

*Second*, Newsham also viewed anti-SLAPP as essentially "*substantive*[.]" Id. at 973. California has since clarified, however, that anti-SLAPP is "***procedural***[.]" E.g., Flatley v. Mauro, 39 Cal. 4th 299, 312 (2006). Indeed, the anti-SLAPP statute makes plain that it *cannot* have substantive effects because an anti-SLAPP ruling cannot affect "any later stage of the case" or "any subsequent action[.]" Cal. Civ. Proc. Code § 425.16(b)(3).

Even anti-SLAPP's mandatory fee-shifting provision, id. § 425.16(c)(1) ("shall"), does not qualify as substantive under Erie because it does not convey a right to recover on a *substantive* claim, cf. Hamilton v. Wal-Mart Stores, Inc., 39 F.4th 575, 584 n.3 (9th Cir. 2022) (noting, by contrast, PAGA "probably qualifies as substantive").

81

That's because anti-SLAPP fee-shifting isn't a remedy on a claim like copyright fees, 17 U.S.C. § 505, or civil-rights fees, 42 U.S.C. § 1988. Rather, it's akin to former Federal Rule of Civil **Procedure** 11's mandatory fee-shifting. <u>See</u> Fed. R. Civ. P. 11 (1983) ("shall impose"). What's more, this Court now treats an anti-SLAPP motion as a procedural vehicle to be decided under the "standards" of Federal Rules of Civil **Procedure** 8, 12, and 56. <u>Planned Parenthood</u>, 890 F.3d at 833.

Post-<u>Newsham</u> California and Ninth Circuit authorities confirm that anti-SLAPP is procedural—weighing *against* an extension of <u>Newsham</u> to removed claims.

*Third*, <u>Newsham</u> did not identify "any **federal interests**" relevant to anti-SLAPP. 190 F.3d at 973. The highly persuasive <u>Makaeff</u> concurrence, however, did. <u>Makaeff v. Trump Univ., LLC</u>, 736 F.3d 1180, 1187 (2013) (Wardlaw, J., and Callahan, J., concurring in denial of rehearing en banc).

*Refusing* to apply anti-SLAPP to claims ***originally*** filed in federal court would "put the federal courts at risk of being swept away in a rising tide of frivolous state actions that would be ***filed*** in [the Ninth Circuit's] federal courts." <u>Id.</u> By contrast, for claims first *filed in state court*, it is the *application* of anti-SLAPP that would incentivize the removal of a "rising tide of frivolous state actions[.]" <u>Cf.</u> <u>id.</u>

Thus, whereas federal interests favor applying anti-SLAPP to claims first filed in federal court, *federal interests weigh against applying anti-SLAPP to **removed** claims*.

*Fourth*, Newsham worried that refusal to apply anti-SLAPP would be "inequitable" by creating an anti-SLAPP loophole. 190 F.3d at 973. Again, that concern doesn't apply to claims *removed* from state court because anti-SLAPP applies in state court.

Anti-SLAPP is meant to be an "*efficient procedural mechanism for the early and **inexpensive** dismissal*" of claims. Cf. La Liberte v. Reid, 966 F.3d 79, 85 (2020). Therefore, procedural forum-changing maneuvers like removal are inequitable to plaintiffs insofar as they increase the burden of mandatory fee-shifting upon plaintiffs who must bear the risk of anti-SLAPP overbreadth. Thus, this fourth factor too weighs against federal anti-SLAPP application when applied to *removed* claims.

\* \* \* \* \*

In sum, Newsham's unguided Erie considerations are either inapplicable to removed claims—or they apply against anti-SLAPP application to removed claims. On the this posture of *removed* claims, this Court should refuse to extend Newsham because Newsham's rationales weigh the other way here.

**E.      Anti-SLAPP Application: Given threats of ruinous fees, Plaintiffs must preserve objections to anti-SLAPP entirely.**

Finally, Plaintiffs—grieving family members who lost their daughter and sister—have been and are being repeatedly threatened with ruinous anti-SLAPP fees by Defendant here.

Given such threats, Plaintiffs must assert and preserve whether California anti-SLAPP motions can be asserted in federal court at all.  See La Liberte, 966 F.3d at 85-88.  Recognizing Newsham's holding, Plaintiffs hereby preserve this issue—including such additional arguments as whether anti-SLAPP conflicts with Rule 11 or with rights of petition.

## CONCLUSION

This appeal presents many issues.

First, there are issues of survival limitations and wrongful-death standing. The Court is respectfully requested to reverse the Rule 12(b)(6) order with regard to survival limitations, see Section I.A, *supra*, and wrongful-death standing, see Section I.B, *supra*.

Second, for the duty-of-care and products-liability issues, this Court is respectfully requested to remand with instructions to permit amendment. See Section II.A, *supra*. Alternatively, this Court is respectfully requested to reverse. See Sections II.B-II.C, *supra*.

Third, there are anti-SLAPP issues. If this Court agrees with the position taken in Section III.A, *supra*, then the Court can simply vacate the anti-SLAPP order without further consideration of any other anti-SLAPP issue. Furthermore, if this Court agrees with any position taken in either Sections III.B.i, III.B.ii, III.C, *or* III.D, *supra*, then any of them standing alone is a sufficient basis to reverse the anti-SLAPP order.

* * * * *

This appeal pertains to an extremely powerful tool—one that's highly destructive when wielded without precautions.

85

Here, that led to a dire result. Children died. That result was not just foreseeable. It was foreseen. It was also preventable because the same data-fed algorithms that can cause devastation also permit knowing precisely who faces risk and personalization to avoid those harms.

Two modest tweaks would have avoided death here. A meaningful warning to a vulnerable girl. Reticence to exercise the tool's full power upon those most vulnerable. These two tweaks are so miniscule and so readily achievable, and with such impact upon human life, it remains unclear why these modest tweaks weren't made.

The District Court's order below, however, reinforces a world where they never will be.

Date: January 25, 2023   Respectfully submitted,

DIGITAL JUSTICE FOUNDATION

*/s/ Gregory Keenan*
Gregory Keenan
DIGITAL JUSTICE FOUNDATION
81 Stewart Street
Floral Park, NY 11001
(516) 633-2633
Gregory@DigitalJusticeFoundation.org

*Attorney for Appellants*

## STATEMENT OF RELATED CASES-

Pursuant to Ninth Circuit Rule 28-2.6, the undersigned hereby certifies that there are no related cases:

a. There is no other case pending in this Court that arises out of the same case in the District Court.

b. There is no other case pending in this Court raising the same or closely related issues.

c. There is no other case pending in this Court involving the same transaction or event.

Date: January 25, 2023               Respectfully submitted,

                                   */s/ Gregory Keenan*
                                   Gregory Keenan

## FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 22-15260

I am the attorney or self-represented party.

**This brief contains 13,960 words,** including 20 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.

    [ ] a party or parties are filing a single brief in response to multiple briefs.

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Gregory Keenan*      **Date** January 25, 2023
        *(use "*s/[typed name]*" to sign electronically-filed documents)*

89

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users have been served by the appellate CM/ECF system.

Date: January 25, 2023

Respectfully submitted,

*/s/ Gregory Keenan*
Gregory Keenan