*Dr. Michal Lavi, Ph.D (Law)*
SSRN :https://papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?per_id=3076735
Research Gate: https://www.researchgate.net/profile/Michal-Lavi

## Appeal No. 22-15260

───────────────────────────────────────

## United States Court of Appeals

## for the Ninth Circuit Court.

───────────────────────────────────────

THE ESTATE OF ISABELLA "BELLA" HERNDON; JOHN HERNDON; J.H., a minor; T.H., a minor

*Plaintiff-Appellants,*

v.

NETFLIX, INC.

*Defendant-Appellee*

───────────────────────────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

No. 4:21-cv-06561-YGR

Hon. Yvonne Gonzalez Rogers, United States District Judge

───────────────────────────────────────

BRIEF OF AMICUS CURIAE DR. MICHAL LAVI IN SUPPORT OF APPELLANTS

───────────────────────────────────────

Dr. Michal Lavi

THE HADAR JABOTINSKY CENTER FOR INTERDISCIPLINARY RESEARCH OF FINANCIAL MARKETS, CRISIS AND TECHNOLOGY
29 Ha'Oren St., P.O Box 80, Timrat 3657600, Israel
(+972) 506384770

michal24000@walla.com

- 1 -

Contents

A. List of Authorities……………………................................................- 2 -
    **Cases**............................................................................................- 2 -
    **Laws** ...........................................................................................- 3 -
  Other Authorities...............................................................................- 3 -
B. Interest of Amicus Curiae……………………….................................- 5 -
C. Summary of Argument.....................................................................- 6 -
D. Argument       ....................................................................................- 7 -
  **1. Beyond hosting: Platform's Targeting and its Harmful Consequences** ……………………………………………………………………....- 7 -
  **2. Platforms can take Reasonable Measures to Prevent or Mitigation of the Consequences of Targeting the Susceptible** .....................- 10 -
  **3. Revisiting Platforms Liability**……………………….....................- 11 -
    **(1) Safety- By -Design – Mitigating Negligent Design**………………………………………….. .....................- 11 -
    **(2) Failure to Warn**
    …………………………………………………….................- 14 -
  **4 .Liability and Free Speech Concerns**……………………….......- 14 -
E. Conclusion ......................................................................................- 15 -

### A. List of Authorities

**Cases**

Doe v. Internet Brands, Inc., 824 F.3d 846 (9th Cir. 2016)
Lemmon v. Snap, Inc., 995 F.3d 1085, 1088 (9th Cir. 2021).
Lemmon v. Snap, Inc., CV 19-4504-MWF (C.D. Cal. March 31, 2022)
Maynard v. Snap, Inc., 2022 WL 779733 (Ga. Sup. Ct. March 15, 2022)
Maynard v. Snapchat, Inc., 2020 WL 6375424 (Ga. Ct. App. Oct. 30, 2020)

**Laws**

Constitutional Provisions:

U.S. CONST. amend. I

Statutes:

AB-2273 The California Age-Appropriate Design Code Act.
https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202120220AB2273

47 U.S.C. § 230(d)

**Other Authorities**

Articles

Adam E. Barry, et.al., *Alcohol Marketing on Twitter and Instagram: Evidence of Directly Advertising to Youth/Adolescents*, 51 ALCOHOL AND ALCOHOLISM 487, 490 (2016)

Karen Hao, *YouTube is Experimenting with ways to make its Algorithm even more Addictive*, MIT TECH. REV. (Sept. 27, 2019)

Jon M. Garon, *When AI Goes to War: Corporate Accountability for Virtual Mass Disinformation, Algorithmic Atrocities, and Synthetic Propaganda,* 49 N. KY. L REV. 181,206 *(2022).*

Eric Goldman, *Why Section 230 Is Better Than the First Amendment*, 95 Notre Dame L. Rev. Reflection 33,37 (2019).

Nancy Kim, *Beyond Section 230 Liability for Facebook*, 96 ST. JOHN'S L REV. (2022) https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4247282

Lawrence Lessig, *The First Amendment Does Not Protect Replicants*, *in* SOCIAL MEDIA AND DEMOCRACY (Lee Bollinger & Geoffrey Stone eds., forthcoming 2022) (manuscript at 13) (available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3922565)

Michal Lavi , Do Platforms Kill? 43 HARV. J.L & PUBLIC POL'Y 477 (2020)

Michal Lavi, *Publish, Share, Re-tweet and Repeat* 54 **U. MICH**. J.L REFORM 441 (2021)

Michal Lavi, *Targeting Exceptions*, 32 FORDHAM INTELL. PROP. MEDIA & ENT. L.J.65 (2021)

Michal Lavi, *Manipulating, Lying, Engineering the Future*, **FORDHAM** INTELL. PROP. MEDIA & ENT. L.J (forthcoming).

Derek O'Callaghan et al., *Down the (White) Rabbit Hole: The Extreme Right and Online Recommender Systems*, 33 SOC. SCI. COMPUTER REV. 459, 460 (2015)

Books

RONALD K. L. COLLINS & DAVID M. SKOVER, ROBOTICA: SPEECH RIGHTS AND ARTIFICIAL INTELLIGENCE 27 (2018)

FRANK PASQUALE, NEW LAWS OF ROBOTICS: DEFENDING HUMAN EXPERTISE IN THE AGE OF AI 12 (2020).

TARLETON GILLESPIE, CUSTODIANS OF THE INTERNET: PLATFORMS, CONTENT MODERATION AND THE HIDDEN DECISIONS THAT SHAPE SOCIAL MEDIA (2018)

News Reports and Articles

*California Enacts the California Age-Appropriate Design Code Act,* HUNTON ANDREW KURTH (Sept. 15, 2022)
https://www.huntonprivacyblog.com/2022/09/15/california-enacts-the-california-age-appropriate-design-code-act/

Ysabel Gerrard & Tarleton Gillespie, *When Algorithms Think You Want to Die,* WIRED (Feb. 21, 2019), https://www.wired.com/story/when-algorithms-think-you-want-to-die/
Ryan Mac & Cecilia Kang, *Whistle-Blower Says Facebook 'Chooses Profits Over Safety'*, N.Y. TIMES,
https://www.nytimes.com/2021/10/03/technology/whistle-blowerfacebook-

Daniyal Malik, *YouTube Faces Severe Criticism For Recommending Self Harm Videos Again,* DIGIT. INFO. WORLD (Feb. 7, 2019),
https://www.digitalinformationworld.com/2019/02/youtube-recommending-self-harm-videos-in-search-results-criticized.html

Donie O'Sullivan et.al., Instagram Promoted Pages Glorifying Eating Disorders to Teen Accounts, CNN (Oct. 4, 2021),
https://www.cnn.com/2021/10/04/tech/instagram-facebook-eating-disorders/index.html.

Diya Patel , *Lawsuit Claims Netflix Series "13 Reasons Why" Caused Spike in Suicides, Could Limit Future Media Production*, Bezinga (Sept. 1, 2021)
https://www.benzinga.com/21/09/22766564/lawsuit-claims-netflix-series-13-reasons-why-caused-spike-in-suicides-could-limit-future-media-produ
Matthew Schwartz, Teen Suicide Spiked After Debut Of Netflix's '13 Reasons Why,' Study Says, NPR (Apr. 30, 2019)

https://www.npr.org/2019/04/30/718529255/teen-suicide-spiked-after-debut-of-netflixs-13-reasons-why-report-says

### B. Interest of Amicus Curiae [1]

*Amicus* Dr. Michal Lavi Ph.D (Law) - a Senior researcher at the Hadar Jabotinsky Center for Interdisciplinary Research of Financial Markets, Crises and Technology, a non-profit institute based in Israel.

Dr. Lavi has been researching and publishing on intermediaries' liability for over a decade. Dr. Lavi is the author of the book: Intermediaries' Liability for Speech Torts: Social Context Law and Technology(2018). Her researches, that were published in leading U.S. Law Reviews, focus on intermediaries' liability for speech torts, incitement, shaming and other harmful digital expressions, and on Section 230 CDA and the exceptions to it.

In particular, Dr. Lavi wrote articles about liability for algorithmic incitement,[2] ways to mitigate sharing of fake news,[3] algorithmic targeting of defamation and fake news[4] and algorithmic manipulation.[5]

Dr. Michal Lavi submits this brief to explain the practice of algorithmic recommendations and targeting, the risk such targeting causes and its harm, possible prevention measures that could be reasonably taken to prevent it. The brief also aims to explain why in light of new sophisticated algorithmic based technology to process user data content, recommend on content and process it, the questions of liability and accountability should be revisited.

---

[1] (i) no party's counsel authored the brief in whole or in part; (ii) no party's counsel contributed money that was intended to fund preparing or submitting the brief, and (ii) no person other than amicus curiae contributed money that was intended to fund preparing for submitting the brief .
[2] Michal Lavi , *Do Platforms Kill?* 43 **HARV.** J.L & PUBLIC POL'Y 477 (2020)
[3] Michal Lavi, *Publish, Share, Re-tweet and Repeat* 54 **U. MICH**. J.L REFORM 441 (2021)
[4] Michal Lavi, *Targeting Exceptions*, 32 **FORDHAM** INTELL. PROP. MEDIA & ENT. L.J.65 (2021)
[5] Michal Lavi, *Manipulating, Lying, Engineering the Future*,33 **FORDHAM** INTELL. PROP. MEDIA & ENT. L.J 221(2023).

### C. Summary of Argument

Netflix released "13 Reasons Why" in March 2017. The show involves a high school student who leaves behind 13 cassette tapes that reveal the 13 reasons why she killed herself. Upon release, Netflix used its algorithms to target younger demographics, and it was claimed that Netflix targeted susceptible teens in particular. In the month following the show's release in March 2017, there was a 28.9% increase in suicide among Americans ages 10-17, according to a study, published in the Journal of the American Academy of Child and Adolescent Psychiatry. The National Institute of Mental Health has attributed the 28.9% spike in the child suicide rate in the month following the show's release to the show. When the show first appeared in public, the National Association of School Psychologists issued a warning statement: "We do not recommend that vulnerable youth, especially those who have any degree of suicidal ideation, watch this series". Moreover, suicide-prevention experts warned Netflix that the show would encourage teen suicides, but Netflix ignored the warning. Netflix continued targeting the show to susceptible teens by their algorithm. Only after robust criticism "Netflix added a "viewer warning card" before the first episode, and added language publicizing the website 13 reasonswhy.info, which offers resources for people contemplating suicide.".[6]

Because Netflix failed to warn viewers about the potential risks for children in watching their show, and because Netflix used its algorithms to market the show to younger (more vulnerable) demographics, the families of almost 1000 children that tried to commit suicide filed an action.

This Amicus Curiae Brief is submitted to support the plaintiffs' claims that social media websites deliberately use their algorithms to target the susceptible for specific types of content to increase their traffic and enhance their profits. It will demonstrate how social media use their algorithms and argue that such targeting can cause tremendous harm that can even cost lives. It will argue that targeting is different than just making content available on a website. It will also argue that intermediaries can avoid such targeting or limit it to mitigate its risks. It will also argue that as platforms increasingly develop more sophisticated algorithmic

---

[6]Diya Patel , Lawsuit Claims Netflix Series "13 Reasons Why" Caused Spike in Suicides, Could Limit Future Media Production, Bezinga (Sept. 1, 2021) https://www.benzinga.com/21/09/22766564/lawsuit-claims-netflix-series-13-reasons-why-caused-spike-in-suicides-could-limit-future-media-produ; Matthew Schwartz, Teen Suicide Spiked After Debut Of Netflix's '13 Reasons Why,' Study Says, NPR (Apr. 30, 2019) https://www.npr.org/2019/04/30/718529255/teen-suicide-spiked-after-debut-of-netflixs-13-reasons-why-report-says

based technology, and Artificial intelligence to process user data, and use it for targeting the susceptible, liability should be revisited. Rethinking liability for harmful targeting is important today, more than ever, as AI algorithm develop, they can target precisely the susceptible. Moreover, as we enter the new generation of Metaverse platforms, that relay on "virtual reality or augmented reality designed to facilitate the interaction among participants with computer-generated characters",[7] the line between the online and physical world is blurred, and the influence of abusive targeting is expected to grow. Due to targeting influences harm. Exempting platforms from duties, and accountability for targeting the susceptible will have harmful consequences. As the harm of targeting can be avoided, or mitigated (for example, by log auditing of problematic outcomes, age verification and blocking targeting of minors etc.), It is high time to rethink platforms' responsibility and duty of care for their algorithmic design.

**D. Argument**

1. **Beyond Hosting: Platform's Targeting and its Harmful Consequences**

The role of platforms is not limited to merely hosting content. Platforms shape user behavior through the design of their websites, and they know it.[8] Platforms strive to enhance profits from content and advertisement engagement. To do so, platforms "make their website "sticky" causing users to become addicted to the engagement and keeping them on the website.[9] One way to do so is to amplify content that triggers strong emotional reactions. Moreover, in their quest to enhance profits from content and advertisement, platforms personalize content by automatic algorithms that recommend content, and potential connections to users.[10] They actively promote and target content to generate greater profits, and design their products in ways that cause their users to engage in detrimental behaviors.[11] Thus, social media platforms not only host troubling

---

[7] *Jon* M. Garon, *When AI Goes to War: Corporate Accountability for Virtual Mass Disinformation, Algorithmic Atrocities, and Synthetic Propaganda, 49* N. KY. L REV. 181,206 *(2022).*

[8] "TARLETON GILLESPIE, CUSTODIANS OF THE INTERNET: PLATFORMS, CONTENTMODERATION AND THE HIDDEN DECISIONS THAT SHAPE SOCIAL MEDIA 23(2018)(" Platforms may not shape public discourse by themselves, but they do shape the shape of public discourse. And they know it.")

[9] Lavi , *Do Platforms Kill?*, *supra* note 2, at 500; Karen Hao, *YouTube is Experimenting with ways to make its Algorithm even more Addictive*, MIT TECH. REV. (Sept. 27, 2019)

[10] Lavi , *Do Platforms Kill?*, *supra* note 2

[11] Nancy Kim, *Beyond Section 230 Liability for Facebook*, 96 ST. JOHN'S LAW REV. (2022) https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4247282

content; they end up recommending it to the people most vulnerable to it, without regard to whether it is psychologically harmful to users.

To target the susceptible platforms first collect information on their users, analyze the data and users' profile and influence users' consumption of specific types of content. Such algorithmic recommendations and targeting could be made based on past interactions with users, or content, location and even personality traits.[12] Such practices, that were dubbed the surveillance capitalism, allow platforms to accurately target users, recommend them on content and create a context of vulnerability. Thus, making it easier to manipulate users, promote engagement with content and influence users to consume more extreme and harmful content that keeps them on the platform. For example, YouTube's personalized recommendations based on past searches, and playing recommended videos from a bottomless queue, that leads users to consume more extreme content. This phenomenon was dubbed "YouTube's rabbit hole".[13]
Such recommendations are different than just hosting content and making it available to public.[14] As professor Kim explained:

> "The use of sophisticated technology and the engineering of its products creates a harm that is separate and distinct from any harm that the content itself might inflict…. Facebook's algorithms feed the user's interest, and its design features encourage obsessions, physical inactivity, and other unhealthy and harmful behavior".[15]

Targeting the susceptible can amplify the content and in fact change the context of the message and the way, and timing it is represented. It pinpoints the audience and the social structure in a given net-work that forms the context of the situation. These contextual factors, the timing of targeting and the audience, have arguably more influence on the flow of information and on how it is perceived more influence than the content of the message itself.[16]

Sometimes this amplification and contextual influence on the message even stands in contrast to     a platform's terms of services or community guidelines. A platform can ban specific types of content, but at the same time promote such content by algorithmic targeting, [17]that could have extremely grave consequences. For example, in 2017 British teenager Molly Russell sought out images of suicide and self-harm online before committing a suicide. These

---

[12] Lavi, *Manipulating, Lying, Engineering the Future*, *supra* note 5
[13] Derek O'Callaghan et al., *Down the (White) Rabbit Hole: The Extreme Right and Online Recommender Systems*, 33 SOC. SCI. COMPUTER REV. 459, 460 (2015);
[14] Ysabel Gerrard & Tarleton Gillespie, *When Algorithms Think You Want to Die,* WIRED (Feb. 21, 2019), https://www.wired.com/story/when-algorithms-think-you-want-to-die/
[15] [15] Kim, *supra* note 11, at 123-124.
[16] *See* Michal Lavi, *Taking Out of Context, 31* HARV. J.L. & TECH. 145, 150(2017)
[17] Lavi , *[Do Platforms Kill?](#)*, *supra* note 2, at 503.

images were also being delivered to her, recommended by her favorite social media platforms. Even in the months after her death, Pinterest continued to send her automated emails, its algorithms automatically recommending graphic images of self-harm, including a slashed thigh and cartoon of a young girl hanging.[18] There are plenty of examples for such harmful amplification and targeting the susceptible. Instagram promoted fake 13-year-old girl interested in extreme dieting content, Instagram's algorithm again promoted accounts like "Prettily Skinny," and "Wanna Be Skinny".[19] Instagram also allowed underaged users to receive promotional materials from alcohol brands.[20] YouTube recommended self-harm videos with titles like "how to self-harm tutorial" to many users that were young children.[21] The harm is tremendous as children's brains are more susceptible and vulnerable to influence than adult's brain.[22]

The practice of recommendations and targeting by Artificial Intelligence algorithmic propaganda machine may encourage susceptible social media users to consume harmful content such as extreme content, inciting content, violence, and other harmful content.[23] Such targeting creates a feedback loop that enforces itself. Such algorithmic targeting inflicts real harm, and can even cost lives. For example, algorithmic recommendations could push susceptible teens to self-harm, and suicide. Recommendations can also make it easier for terror organizations to incite susceptible individuals to commit terror attacks that result in many victims.[24]

The design of websites and algorithmic operations is a feature and part of the platform business model, not a bug and not a fate decree. Algorithmic recommendations are not without human intervention. Intermediaries that operate platforms structures it. The operation of the algorithm thus depends on the

---

[18] Gerrard & Gillespie id.

[19], Donie O'Sullivan et.al., Instagram Promoted Pages Glorifying Eating Disorders to Teen Accounts, CNN (Oct. 4, 2021), https://www.cnn.com/2021/10/04/tech/instagram-facebook-eating-disorders/index.html.

[20] Kim at 104, 110 ("The fictitious 13-year-old girl's Instagram account was bombarded with recommendations to follow more and more extreme dieting accounts, which could confirm and encourage self-harming inclinations and lead to eating disorders in a vulnerable young teenager") referring to Adam E. Barry, et.al., *Alcohol Marketing on Twitter and Instagram: Evidence of Directly Advertising to Youth/Adolescents*, 51 ALCOHOL AND ALCOHOLISM 487, 490 (2016)

[21] Daniyal Malik, *YouTube Faces Severe Criticism for Recommending Self Harm Videos Again,* DIGIT. INFO. WORLD (Feb. 7, 2019), https://www.digitalinformationworld.com/2019/02/youtube-recommending-self-harm-videos-in-search-results-criticized.html

[22] Kim, *supra* note 11, at 124.

[23] Lavi , *Do Platforms Kill?*, *supra* note2 at 486.

[24] *See generally* Lavi , *Do Platforms Kill?*, *supra* note2/

discretion of its programmers that might push harmful content to users, or tinker with the results ex-post. .[25]

Intermediaries that operate social media platforms are aware of the potential harmful consequences of targeting the susceptible. For example, according to testimony from former Facebook product manager Frances Haugen in front of the Senate committee, Facebook is aware that its algorithm promotes harmful content, and the company still avoids deploying counter-measures.[26] In our case of Netflix, prevention experts warned Netflix that the show would encourage teen suicides, but Netflix ignored the warning and targeted teens. Only after robust criticism, it added a "viewer warning card" before the first episode.

## 2. Platforms can take Reasonable Measures to Prevent or Mitigation of the Consequences of Targeting the Susceptible

Netflix should know children and teens use it. Therefore, the platform's operators can take reasonable measures to avoid harmful recommendations and targeting. Such steps are not directed to the content itself but rather at the design features, and its functionality.

First, platform operators can avoid algorithmic targeting for children and teens all together, or avoid targeting teens videos that are intended for adults, by **age verification** and **age gate targeting.** For example, Twitter gate age and "prevent underage profiles from following the official company pages and from receiving promotional advertising and updates from alcohol brands."[27]

Second, as mentioned, algorithmic recommendation is not without human intervention. Programmers can **tinker with the algorithm** and decrease the visibility of specific content, or its exposure, and thus, reducing the potential risk of such content, [28] or audit the logs of the algorithm to **limit the consequences of design** and reduce problematic outcomes.[29] For example, limiting the targeting harmful content or unlawful views to susceptible individuals, based not only on demographic parameters. Such limitation of design is technological possible. For example, Apple's Siri limits the design features of its system and sidesteps medical, legal, or spiritual counsel, and eschews criminal advise.[30]

---

[25] Id. at 502.

[26] Ryan Mac & Cecilia Kang, *Whistle-Blower Says Facebook 'Chooses Profits Over Safety'*, N.Y. TIMES, https://www.nytimes.com/2021/10/03/technology/whistle-blowerfacebook-frances-haugen.html, Lavi, *Targeting Exceptions, supra* note 4, at 88.

[27] Kim, *supra* note 11 at 126, referring to Barry, *supra* note 20 at 487

[28] Lavi, *Targeting Exceptions, supra* note 4 at 88.

[29] FRANK PASQUALE, NEW LAWS OF ROBOTICS: DEFENDING HUMAN EXPERTISE IN THE AGE OF AI 12 (2020).

[30] RONALD K. L. COLLINS & DAVID M. SKOVER, ROBOTICA: SPEECH RIGHTS AND ARTIFICIAL INTELLIGENCE27 (2018)

Legislators have already promoted bills that attempt to minimize algorithmic negative effects. For instance, California enacted Assembly Bill 2273, known as the California Age-Appropriate Design Code Act. The Act, that will take into effect in July 1, 2024 includes provisions that protect children's data protection. It will require social media companies to design their platforms and develop their codes with the best interests of child users in mind.[31] For example Section 1 (8) to the Act explicitly refers to profiling of children and stipulates:

> "Online services, products, or features that are likely to be accessed by children should offer strong privacy protections by design and by default, including by disabling features that profile children using their previous behavior, browsing history, or assumptions of their similarity to other children, to offer detrimental material."

Third, beyond restricting the design features, platforms could at least **warn** parents that subscribe and pay Netflix about shows that are not intended for children, and "notify parents that parental control protections (such as computer hardware, software, or filtering services) are available and can assist them in limiting access to material that is harmful to minors".[32] In addition, platforms can also add a "viewer warning card" before the first episode, as Netflix eventually did, only after robust criticism.

Indeed, the design of websites and algorithmic operations that promote harmful content and target it to the susceptible, is not a fate decree and there are measures that platforms can take to mitigate such consequences.

## 3. Revisiting Platforms Liability

### (1) Safety- By -Design – Mitigating Negligent Design

Platforms perform many roles that extend beyond hosting content. Therefore, their liability should be revisited to correspond the action they take. Platforms liability should not be evaluated according to a uniform standard. As explained, targeting content is different than making content available, or hosting third party content. It amplifies the content, changes the context, and exacerbates the damage it causes. When platforms target the susceptible the very act of targeting might be negligent, especially when children are involved.

---

[31] AB-2273 The California Age-Appropriate Design Code Act.
https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202120220AB2273 For further information see *California Enacts the California Age-Appropriate Design Code Act,* HUNTON ANDREW KURTH (Sept. 15, 2022) https://www.huntonprivacyblog.com/2022/09/15/california-enacts-the-california-age-appropriate-design-code-act/

[32] There is even a legal obligation of platforms to provide information regarding possible filtering possibilities See 47 U.S.C. § 230(d), Kim, *supra* note 11 at 107.

The law is slow to update to developing technologies, however, courts have already taken steps to accommodate negligent design decisions. For example, the case of Maynard v. Snap.[33] In this case Christal McGee was driving with three passengers in her family's car. McGee began driving at an excessive rate of speed, attempting to reach 100 miles per hour so that she could capture that speed on a photo using the Speed Filter. Her car hit Maynard's car and caused permanent brain damage to a passenger in the car. Maynards sued Snapchat and claimed that the App provider knew that its users could use its service in a manner that might distract them from obeying traffic or safety laws, and encouraged dangerous speeding that resulted in the accident.[34] The Georgia Supreme Court concluded that " manufacturer has a statutory duty to ensure that products it sells are not defectively designed, see OCGA § 51-1-11 (b) (1), and a duty under our decisional law to use reasonable care to reduce foreseeable risks of harm from a product when selecting from alternative designs".[35] Because "the Maynards adequately alleged that Snap could reasonably foresee the particular risk of harm from the Speed Filter at issue", the judgment of the Court of Appeals,[36] was reversed and remand for further proceedings.[37] Thus, court recognized that App providers owe duties with respect to the design of their products.

Similarly, in Lemmon v. Snap, Inc. two boys died in a high-speed car accident allegedly because the negligent design of Snapchat speed filter encouraged the boys to drive carelessly and speed, what resulted in a crush into a tree and led to their deaths. Their parents sued the App provider Snap. The Ninth Circuit found that the defendant, the social media company Snap, could be liable for unreasonable negligent design decisions regarding Snapchat.[38]

On remand from the Ninth Circuit's Section 230 denial, the centra district court of California held that:

> "The Speed Filter's design encouraged Plaintiffs to drive at dangerous speeds. If Snapchat users are seeking to obtain an unknown trophy associated with using the Speed Filter, it is plausible that they would seek this trophy by increasing their speed — the only metric recorded by the Speed Filter. Even if there were no reward system whatsoever, the basic design of the Speed Filter itself appears to encourage reckless driving. There is realistically no purpose for the Speed Filter

---

[33] Maynard v. Snap, Inc., 2022 WL 779733 (Ga. Sup. Ct. March 15, 2022)
[34] *Id.* ("Speed Filter was motivating, incentivizing, or otherwise encouraging its users to drive at excessive, dangerous speeds in violation of traffic and safety laws.").
[35] *Id.*
[36] Maynard v. Snapchat, Inc., 2020 WL 6375424 (Ga. Ct. App. Oct. 30, 2020)(affirmed the trial courts' dismissal of the complaint).
[37] Maynard v. Snap, Inc., 2022 WL 779733 (Ga. Sup. Ct. March 15, 2022)
[38] Lemmon v. Snap, Inc., 995 F.3d 1085, 1088 (9th Cir. 2021).

other than to encourage users to travel at high speeds and record themselves doing so."[39]

The court also held that there is a strong causal connection between the Speed Filter and the speeding, "given that the accident occurred while the Plaintiffs were using the Speed Filter for the exact purpose for which it appears to have been designed: to record the user"[40] Thus, "there is no "gap" between the design of the Speed Filter and the Plaintiffs' accident….It is ***extremely*** foreseeable that minors and young adults would use the Speed Filter to record themselves driving at excessive speeds, and even more so if there are potential reward "trophies" for so doing."[41]

The duty of care should evolve as technology improves and accommodate to the challenges of algorithmic targeting. In one of my Articles, I proposed to adopt a "safety by design" approach regarding intermediaries algorithmic targeting that incites to terrorism. My proposal focused on a duty of care for algorithmic recommendation systems.[42] Such a duty was de- facto adopted by court in the cases of Maynard[43] and Lemmon,[44] and should adopted to algorithmic targeting of susceptible children. There should be a duty to design a reasonably safe algorithm ex ante, or at least remove harmful targeting of recommendations ex post. In our case, expert warned Netflix that the show would encourage teen suicides. Netflix however, ignored the warning and continued targeting the show to susceptible teens by their algorithm. Only after robust criticism "Netflix added a "viewer warning card" before the first episode. Thus, Netflix breached its duty of care.

Netflix did not take reasonable measures to prevent, or mitigate the foreseeable harm of increased risk for suicide, even though as explained, the platform could verify the age of users and block targeting the susceptible minors. Not blocking recommendations of "13 reasons why" for susceptible minors and continuing to do so even after expert's warnings, increase the risk that they commit suicide and in increase the risk that the minors and their families suffer harm.

---

[39] Lemmon v. Snap, Inc., CV 19-4504-MWF (C.D. Cal. March 31, 2022)
[40] *Id.*
[41] *Id.*
[42] Lavi , *Do Platforms Kill?*, *supra* note 2, at 552-559
[43] Maynard v. Snap, Inc., 2022 WL 779733 (Ga. Sup. Ct. March 15, 2022)
[44] Lemmon v. Snap, Inc., CV 19-4504-MWF (C.D. Cal. March 31, 2022)

### (2) Failure to Warn

Another basis of liability can be failure to warn, or failure to inform. Netflix placed added a "viewer warning card" before the first episode, and publicized the website 13 reasonswhy.info, which offers resources for people contemplating suicide, only after robust criticism. Thus, the platform did not adequately inform the users of the potential risk that may occur by using the platform. The 9th Circuit recognized a claim of "negligent failure to warn" when a website did not warn or provide information that third parties targeted and lured victims through a website and raped them.[45] Similarly, Netflix failed to warn its users of the risks of "13 reasons why", and added a "viewer warning card" before the first episode, only after robust criticism. Moreover, it is unclear whether Netflix notified its subscribers on parental control protections to assist them to limit access to material that is harmful to minors, as required by law.[46] Netflix can be held accountable on this basis as well.

### 4. Liability and Free Speech Concerns

In the U.S., freedom of speech is a constitutional right[47] that enjoys stronger protections than in other Western democracies. The digital age and the transition from an "internet society" to an "algorithmic society", raise old concerns regarding this right.[48] It can be argued that algorithmic recommendations are the speech of the operators of the platforms and are protected under the First Amendment. Thus, imposing liability for negligent design infringes on platform's owner free speech rights and is therefore unconstitutional.

Indeed, making the show "13 reasons why" available on Netflix is protected by constitution. However, as explained, algorithmic recommendations and targeting of children changes the context of the show, and inflicts harm that is distinct from the harm that the content itself might inflict. The theory of free speech should be revisited considering the shift to the algorithmic society. As scholars argue, software, algorithms, and artificial intelligence have only secondary free speech protections if at all. It is doubtful whether ascribing the same free speech rights to algorithms as human promote the values under free

---

[45] *See* Doe v. Internet Brands, Inc., 824 F.3d 846 (9th Cir. 2016), Kim, *supra* note 11 at 111.
[46] *See* 47 U.S.C. § 230(d), Kim, *supra* note 11 at 107.
[47] U.S. CONST. amend. I, Lavi, *Targeting Exceptions, supra* note 4, at 123.
[48] Id. at 124

speech theory (autonomy of speaker, marketplace of ideas and democracy),[49] as algorithmic recommendations only automatically replicate the speech of others.[50]

Even if there are same speech rights to algorithmic recommendations and targeting as to humans, such recommendations and targeting aim to promote commercial goals: increase the interest of viewers and make them stay longer on the platforms. Because algorithmic recommendations and targeting are in fact commercial speech; the First Amendment only requires a reduced level of scrutiny for such speech, usually intermediary scrutiny for truthful commercial speech.[51] A duty of care for the design and code passes the intermediate scrutiny test as it advances a substantial important governmental interest in protecting the safety of children and preventing self-harm; It is narrowly tailored as it restricted to targeting algorithmic recommendations to minors that are susceptible to such recommendations. It does not limit of restrict making the show available to public to see on the website, but only the targeting. Therefore, limiting the targeting of susceptible minors does not substantially burden speech more than necessary.

**E. Conclusion**

Targeting susceptible minors of a show after suicide-prevention experts warned Netflix that the show "13 reasons why" would encourage teen suicides, is different than making it available to public to see. It changes the context, amplify it and inflicts a distinct harm from any harm of the show itself. Netflix continued to target susceptible minors, even though the platform could easily block algorithmic recommendations of the show that target minors, or at least warn from the dangers of the show at an earlier stage. By neglecting to do so, it increased the risk that they commit suicide. There should be duty to design a reasonably safe algorithm ex ante, or at least remove harmful targeting ex post. Netflix designed the algorithmic code negligently and failed to fix it after expert warned Netflix regarding the show. For the reasons stated above the court should conclude that Netflix breached a duty of care.

---

[49] FRANK PASQUALE, NEW LAWS OF ROBOTICS: DEFENDING HUMAN EXPERTISE IN THE AGE OF AI 109(2020) ("109 ("Free speech protections are for people, and only secondarily (if at all) for software, algorithms, and artificial intelligence.").

[50] Lawrence Lessig, *The First Amendment Does Not Protect Replicants*, in SOCIAL MEDIA AND DEMOCRACY (Lee Bollinger & Geoffrey Stone eds., forthcoming 2022) (manuscript at 13) (available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3922565) ("[T]he replicant targeting the ads in Facebook's algorithm would have no presumptive constitutional protection.").

[51] Eric Goldman, *Why Section 230 Is Better Than the First Amendment*, 95 Notre Dame L. Rev. Reflection 33,37 (2019).

As the case focuses on algorithmic speech, that arguably have only secondary free speech rights if at all, and on commercial speech, First Amendment concerns are mitigated.

Respectfully,

Date:2/1/2023

_____

Dr. Michal Lavi, Ph.D (Law)

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

This motion contains 5,193 words.

This motion has been prepared in proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point font.

_____

Dr. Michal Lavi, Ph.D (Law)

CERTIFICATE OF SERVICE

I hereby certify that I have requested that this Amicus Brief be filed electronically and that service will be effectuated upon that submission.

_____

Dr. Michal Lavi, Ph.D (Law)