No. 22-15260

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

THE ESTATE OF ISABELLA "BELLA" HERNDON, et al.

*Plaintiffs-Appellants,*

vs.

NETFLIX, INC.

*Defendant-Appellee.*

---

Appeal From The United States District Court,
Northern District of California, Case No. 4:21-cv-06561-YGR,
Hon. Yvonne Gonzalez Rogers

---

**ANSWERING BRIEF OF APPELLEE**

---

MUNGER, TOLLES & OLSON LLP    MUNGER, TOLLES & OLSON LLP
Blanca F. Young                           Jennifer L. Bryant
J. Max Rosen                                Cory M. Batza
560 Mission Street                        350 South Grand Avenue
Twenty-Seventh Floor                  Fiftieth Floor
San Francisco, California 94105-2907   Los Angeles, California 90071-3426
Telephone: (415) 512-4000          Telephone: (213) 683-9100
Facsimile: (415) 512-4077          Facsimile: (213) 687-3702

Attorneys for Appellee NETFLIX, INC.

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee Netflix, Inc., hereby certifies that it is a publicly traded company that has no parent corporation; and that no publicly held corporation owns more than 10% of Netflix, Inc.'s stock.

DATED: June 9, 2023        MUNGER, TOLLES & OLSON LLP

By:        *s/ Blanca F. Young*
          BLANCA F. YOUNG
          Attorneys for Appellee NETFLIX, INC.

i

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ....................................................i

TABLE OF CONTENTS......................................................... ii

TABLE OF AUTHORITIES ..................................................v

STATEMENT REGARDING ORAL ARGUMENT ...........................1

INTRODUCTION ..............................................................2

STATEMENT OF JURISDICTION...........................................5

STATEMENT OF ISSUES ...................................................6

BACKGROUND ...............................................................7

    A.    Netflix Releases *13 Reasons Why* ...............................8

    B.    Plaintiffs Allege That The Show Was "Dangerous" Because of How It Depicted Suicide, And That Netflix's Recommendations And Alleged Failure To Warn Were Thus Harmful..........................................................9

    C.    Procedural History...............................................11

STANDARD OF REVIEW ...................................................13

SUMMARY OF ARGUMENT ...............................................13

ARGUMENT ..................................................................17

I.    PLAINTIFFS' CLAIMS FAIL ON PROCEDURAL GROUNDS...............17

    A.    The Estate's Survivorship Claims Are Time-Barred .........................17

        1.    Death Ends Tolling Under Section 352 .....................18

        2.    The Structure, Purpose, And Legislative History Of Section 366.1 Foreclose Plaintiffs' Reading Of That Provision .........................................................21

        3.    Plaintiffs' Interpretation Would Have Absurd Consequences...................................................25

    B.    Decedent's Minor Siblings Lack Standing To Assert A Wrongful Death Claim ..........................................26

        1.    Only An "Immediate Successor" Has Standing To Bring A Wrongful Death Claim..............................26

**TABLE OF CONTENTS**

Page

2. Plaintiffs' Argument Based On Section 377.60(e) Is Meritless ...................................................................................28

II. PLAINTIFFS' CLAIMS FAIL ON THE MERITS .......................................32

A. Binding California Precedent Forecloses Plaintiffs' Claims Based On The Content Of Netflix's Expressive Speech....................33

1. Except In Cases of Incitement, California Law Does Not Recognize Tort Claims For Harms Allegedly Caused by Expressive Content ................................................................33

2. Plaintiffs Cannot Avoid Dismissal By Characterizing This As A Case Aimed At A Failure To Warn Or "Algorithmic Targeting"............................................................37

B. Plaintiffs Fail To Identify Any California Tort Doctrine That Would Allow Their Claims To Proceed............................................41

1. The Negligence Claim Fails Because Netflix Did Not Owe A Duty To Ms. Herndon Or Plaintiffs..............................41

(a) Netflix Does Not Have A "Special Relationship" With Its Users ......................................................42

(b) No Duty Exists Under The *Rowland* Factors .................44

(c) Negligence Per Se Does Not Apply To Plaintiffs' Claims .........................................................................44

2. Plaintiffs Do Not And Cannot Allege A Products Liability Claim ...........................................................................45

3. Plaintiffs Have Not Plausibly Alleged Proximate Causation.......................................................................................49

C. The First Amendment Independently Bars Plaintiffs' Claims............50

1. Plaintiffs Seek To Hold Netflix Liable Based On The Content Of Its Expression ..........................................................50

2. Plaintiffs' Claims Do Not Fall Within Any Exception To The First Amendment ...............................................................53

III. The Anti-SLAPP Statute Applies, But That Issue Is Moot..........................57

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

A.    The Statute Applies To Removed Diversity Actions ..........................58

B.    Plaintiffs' Claims Are Subject To The Anti-SLAPP Statute ..............59

    1.    Plaintiffs' Claims Arise Out Of Protected Activity ..................59

    2.    Plaintiffs Cannot Show A Probability Of Prevailing On Their Claims ..................................................................................61

    3.    No Public Policy Exception Exists ...........................................61

IV.    This Court Should Affirm The Judgment Without Leave To Amend ..........61

CONCLUSION ....................................................................................................62

STATEMENT OF RELATED CASES .................................................................63

CERTIFICATE OF COMPLIANCE ....................................................................64

iv

# TABLE OF AUTHORITIES

**Page**

**F**EDERAL **C**ASES

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).........................................................................13

*Bonin v. Calderon*,
    59 F.3d 815 (9th Cir. 1995) ...........................................................62

*Brandenburg v. Ohio*,
    395 U.S. 444 (1969)..........................................................4, 14, 53

*Broad v. Sealaska Corp.*,
    85 F.3d 422 (9th Cir. 1996) ...........................................................58

*Broadway Grill, Inc. v. Visa, Inc.*,
    856 F.3d 1274 (9th Cir. 2017) .........................................................5

*Brown v. Elec. Arts, Inc.*,
    724 F.3d 1235 (9th Cir. 2013) .......................................................13

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011)..........................................................4, 53, 56

*City of Los Angeles v. Alameda Books*,
    535 U.S. 425 (2002).......................................................................54

*Corales v. Bennett*,
    567 F.3d 554 (9th Cir. 2009) .........................................................49

*Davidson v. Time Warner, Inc.*,
    1997 WL 405907 (S.D. Tex. Mar. 31, 1997) ................................36

*Fields v. Gates*,
    233 F.3d 1174 (9th Cir. 2000) .......................................................57

*Flores v. San Diego Cnty.*,
    206 F.3d 845 (9th Cir. 2000) ...................................................13, 50

*Forsyth v. Motion Picture Assoc. of Am., Inc.*,
    2016 WL 6650059 (N.D. Cal. Nov. 10, 2016) ..............................51

v

## TABLE OF AUTHORITIES

**Page**

*Free Speech Coal. v. Reno*,
198 F.3d 1083 (9th Cir. 1999) ...............................................54

*Gardner v. Martino*,
563 F.3d 981 (9th Cir. 2009) ..........................................58, 62

*Greater L.A. Agency on Deafness, Inc. v. Cable News
Network, Inc.*,
742 F.3d 414 (9th Cir. 2014) .........................................59, 60

*Heineke v. Santa Clara Univ.*,
965 F.3d 1009 (9th Cir. 2020) ..................................................7

*Herceg v. Hustler Mag., Inc.*,
814 F.2d 1017 (5th Cir. 1987) ................................................50

*Hess v. Indiana*,
414 U.S. 105 (1973)................................................................54

*Hilton v. Hallmark Cards*,
599 F.3d 894 (9th Cir. 2010) ..........................................55, 60

*Hoffman v. Capital Cities/ABC, Inc.*,
255 F.3d 1180 (9th Cir. 2001) ...............................................55

*Hurley v. Irish-American Gay, Lesbian
and Bisexual Grp. of Boston*,
515 U.S. 557 (1995)...............................................50, 51, 52, 53

*James v. Meow Media, Inc.*,
300 F.3d 683 (6th Cir. 2002) ................................... 3, passim

*Jian Zhang v. Baidu.com Inc.*,
10 F.Supp.3d 433 (S.D.N.Y. 2014) .......................................52

*Jones v. Cate*,
2016 WL 282699 (E.D. Cal. Jan. 25, 2016) ..........................49

*Kammerdiener v. Ford Motor Co.*,
2010 WL 682297 (C.D. Cal. Feb. 24, 2010) ............................6

*Matal v. Tam*,
582 U.S. 218 (2017)................................................................51

vi

# TABLE OF AUTHORITIES

**Page**

*McKinney v. Bd. of Trustees of Mayland Cmty. Coll.*,
  955 F.2d 924 (4th Cir. 1992) ...................................................59

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ...................................................8

*Miami Herald Pub. Co. v. Tornillo*,
  418 U.S. 241 (1974)..................................................................52

*Monteiro v. Tempe Union High Sch. Dist.*,
  158 F.3d 1022 (9th Cir. 1998) ............................................4, 50

*Newsham v. Lockheed Missiles & Space Co. Inc.*,
  190 F.3d 963 (9th Cir. 1999) ..................................57, 58, 59

*Northon v. Rule*,
  637 F.3d 937 (9th Cir. 2011) ...................................................58

*Pacific Gas & Electric Co. v. Public Utilities Comm'n of Cal.*,
  475 U.S. 1 (1986).......................................................................53

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
  890 F.3d 828 (9th Cir. 2018) ...................................................57

*Reid v. Johnson & Johnson*,
  780 F.3d 952 (9th Cir. 2015) ...................................................13

*Sanders v. Acclaim Ent., Inc.*,
  188 F.Supp.2d 1264 (D. Colo. 2002)......................................36

*Schafer v. State Farm Fire & Cas. Co.*,
  507 F.Supp.2d 587 (E.D. La. 2007)........................................47

*Snyder v. Phelps*,
  562 U.S. 443 (2011)..................................................................50

*Spence v. Washington*,
  418 U.S. 405 (1974)..................................................................51

*Stanley v. Georgia*,
  394 U.S. 557 (1969)..................................................................51

# TABLE OF AUTHORITIES

**Page**

*Stoddard-Nunez v. City of Hayward*,
2015 WL 6954963 (N.D. Cal. Nov. 10, 2015) .................................................28

*Twitter, Inc. v. Taamneh*,
598 U.S. ----, 143 S.Ct. 1206 (2023) ....................................................40

*U.S. Bank, N.A., Tr. for Bank of Am. Funding Corp. Mortg. Pass-Through Certificates*,
987 F.3d 858 (9th Cir. 2021) .................................................28

*United States v. Playboy Entertainment Group*,
529 U.S. 803 (2000).................................................55

*United States v. Stevens*,
559 U.S. 460 (2010).................................................56

*Warren v. United States*,
4 Cl.Ct. 552 (Fed. Cir. 1984) ....................................................20

*Watters v. TSR, Inc.*,
904 F.2d 378 (6th Cir. 1990) ........................................36, 45

*Wenke v. Forest Labs, Inc.*,
2018 WL 1911957 (N.D. Cal. Apr. 23, 2018).................................................49

*Whooley v. Tamalpais Union High School District*,
399 F.Supp.3d 986 (N.D. Cal. 2019).................................................42

*Wilson v. Midway Games, Inc.*,
198 F.Supp.2d 167 (D. Conn. 2002).........................................36, 54

*Winter v. G.P. Putnam's Sons*,
938 F.2d 1033 (9th Cir. 1991) ................................................ 16, passim

*Zamora v. Columbia Broad. Sys.*,
480 F.Supp. 199 (S.D. Fla. 1979).................................................36

## STATE CASES

*Bill v. Superior Court*,
137 Cal.App.3d 1002 (1982) ................................................ 3, passim

## TABLE OF AUTHORITIES

**Page**

*Brennon B. v. Superior Court*,
13 Cal.5th 662 (2022) ..................................................................24

*Brown v. USA Taekwondo*,
11 Cal.5th 204 (2021) ............................................................41, 44

*Burk v. Arcata & M.R.R. Co.*,
125 Cal. 364 (1899) ....................................................................31

*California Teachers Ass'n v. Governing Bd. of Rialto Unif. Sch. Dis.*,
14 Cal.4th 627 (1997) ..................................................................61

*Dachs v. Hendrix*,
103 Ark.App. 184 (2008) ..............................................................19

*DeFilippo v. Nat'l Broad. Co.*,
446 A.2d 1036 (R.I. 1982) ................................................36, 39, 53

*Elsner v. Uveges*,
34 Cal.4th 915 (2004) ..................................................................44

*Escola v. Coca Cola Bottling Co.*,
24 Cal.2d 453 (1944) ...................................................................49

*Est. of Ayala-Gomez v. Sohn*,
823 N.W.2d 418 (Iowa Ct. App. 2012) ...........................................19

*Evans v. Shanklin*,
16 Cal.App.2d 358 (1936) .............................................................30

*Fiske v. Wilkie*,
67 Cal.App.2d 440 (1945) .............................................................30

*Flatley v. Mauro*,
39 Cal.4th 299 (2006) ..................................................................58

*Ginochio v. City & Cnty. of San Francisco*,
194 Cal. 159 (1924) ....................................................................30

*Hardin v. PDX, Inc.*,
227 Cal.App.4th 159 (2014) ..........................................................48

## TABLE OF AUTHORITIES

**Page**

*Hennigan v. White*,
    199 Cal.App.4th 395 (2011) ................................................................46

*Hernandez v. Kieferle*,
    200 Cal.App.4th 419 (2011) ...............................................................27

*In re Hoenig's Est.*,
    298 N.W. 887 (Iowa 1941) .................................................................19

*J.C. Penney Casualty Ins. Co. v. M.K.*,
    52 Cal.3d 1009 (1991) .........................................................................24

*In re J.W.*,
    29 Cal.4th 200 (2002) .........................................................................25

*Jimenez v. Superior Ct.*,
    29 Cal.4th 473 (2002) .........................................................................48

*Justus v. Atchison*,
    19 Cal.3d 564 (1977) ...........................................................................27

*Loomis v. Amazon.com LLC*,
    63 Cal.App.5th 466 (2021) ..................................................................47

*Lowell v. Kier*,
    50 Cal. 646 (1875) ...............................................................................24

*Mack-Evans v. Hilltop Healthcare Ctr., Inc.*,
    226 W. Va. 257 (W. Va. 2010) ....................................................20, 22

*Martinez v. Metabolife Int'l, Inc.*,
    133 Cal.App.4th 181 (2003) ...............................................................60

*Mayo v. White*,
    178 Cal.App.3d 1083 (1986) ........................................................28, 29

*McCollum v. CBS, Inc.*,
    202 Cal.App.3d 989 (1988) .................................................... 3, passim

*Nally v. Grace Community Church*,
    47 Cal.3d 278 (1988) ....................................................................15, 42

## TABLE OF AUTHORITIES

**Page**

*Navellier v. Sletten*,
    29 Cal.4th 82 (2002) ........................................................................... 61

*Norris v. Hensley*,
    27 Cal. 439 (1865) ............................................................................ 31

*Olivia N. v. Nat'l Broad. Co.*,
    126 Cal.App.3d 488 (1981) ............................................. 3, 33, 34, 53

*People v. Fogelson*,
    21 Cal.3d 158 (1978) ........................................................................ 56

*Pierson v. Sharp Mem'l Hosp., Inc.*,
    216 Cal.App.3d 340 (1989) ............................................................... 45

*Redfield v. Oakland C. S. Ry. Co.*,
    110 Cal. 277 (1895) ............................................................... 28, 29, 30

*Regents of Univ. of California v. Superior Ct.*,
    4 Cal.5th 607 (2018) .................................................................... 42, 43

*Reich v. Purcell*,
    67 Cal.2d 551 (1967) ........................................................................ 26

*Roberson v. Teel*,
    20 Ariz.App. 439 (1973) ................................................................... 20

*Rowland v. Christian*,
    69 Cal.2d 108 (1968) ......................................................... 15, 35, 44

*Runstrom v. Allen*,
    345 Mont. 314 (Mt. 2008) ................................................................ 19

*Salinero v. Pon*,
    124 Cal.App.3d 120 (1981) ............................................................... 44

*Scott v. Thompson*,
    184 Cal.App.4th 1506 (2010) ............................................. 14, 27, 28

*Shalabi v. City of Fontana*,
    11 Cal.5th 842 (2021) ....................................................................... 17

# TABLE OF AUTHORITIES

**Page**

*Shepard v. Alexian Bros. Hosp.*,
 33 Cal.App.3d 606 (1973) ....................................................46

*Stennett v. Miller*,
 34 Cal.App.5th 284 (2019) .....................................27, 30, 31

*Tamkin v. CBS Broad., Inc.*,
 193 Cal.App.4th 133 (2011) ........................................55, 60

*Tate v. Canonica*,
 180 Cal.App.2d 898 (1960) .........................................16, 49

*Triplett v. Williams*,
 269 Cal.App.2d 135 (1969). ............................14, 19, 22, 26

*W. Shield Investigations & Sec. Consultants v. Superior Ct.*,
 82 Cal.App.4th 935 (2000) ..........................................19, 20

*Walberg v. St. Francis Home, Inc.*,
 281 Wis.2d 99 (Wis. 2005) ..........................................19, 21

*Walt Disney Prods., Inc. v. Shannon*,
 247 Ga. 402 (1981) ............................................................36

*Wilson v. Cable News Network, Inc.*,
 7 Cal.5th 871 (2019) ..........................................................60

*Young v. Haines*,
 41 Cal.3d 883 (1986) .........................................................20

*Zayed v. Clark Manor Convalescent Ctr., Inc.*,
 141 N.E.3d 767 (Il. Ct. App. 2008) .................................20

**FEDERAL STATUTES**

28 U.S.C. § 1332(d) ...............................................................5

**FEDERAL RULES**

Fed. R. Civ. P. 12(b)(6)........................................................57

# TABLE OF AUTHORITIES

**Page**

### STATE STATUTES

Cal. Civ. Code § 1798.99.29(b) ..................................................................44

Cal. Civ. Code § 1798.99.31(d) ..................................................................44

Cal. Code Civ. Proc. § 352 ..........................................................................18

Cal. Code Civ. Proc. § 366.1 ...........................................................17, 18, 24

Cal. Code Civ. Proc. § 366.1(b) ....................................................................6

Cal. Code Civ. Proc. § 377 ..........................................................................29

Cal. Code Civ. Proc. § 377.20 ......................................................................17

Cal. Code Civ. Proc. § 377.60 ..........................................27, 29, 31, 32

Cal. Code Civ. Proc. § 425.16(b)(1) ............................................................60

Cal. Prob. Code § 225 ..................................................................................29

Cal. Prob. Code § 6401 ................................................................................30

Cal. Prob. Code § 6402 (b), (c) ....................................................................27

California Age-Appropriate Design Code Act ("CAADCA") .............................44

### LEGISLATIVE MATERIALS

1850 Cal. Stat. ch. 127, § 24,
   https://clerk.assembly.ca.gov/sites/clerk.assembly.ca.gov/files/
   archive/Statutes/1850/1850.pdf ...........................................................23

1872 Cal. Stat., § 353,
   https://ia800300.us.archive.org/14/items/codecivilproced02deergoog/
   codecivilproced02deergoog.pdf............................................................23

1983 Cal. Stat. ch. 842, § 12,
   https://clerk.assembly.ca.gov/sites/clerk.assembly.ca.gov/files/
   archive/Statutes/1983/83Vol2.pdf .......................................................29

# TABLE OF AUTHORITIES

**Page**

1990 Cal. Stat. ch. 140, § 1,
 https://clerk.assembly.ca.gov/sites/clerk.assembly.ca.gov/files/
 archive/Statutes/1990/90Vol1_Chapters.pdf ......................................................23

22 Cal. L. Revision Comm'n Reports 833 (1992),
 http://www.clrc.ca.gov/pub/Printed-Reports/Pub176.pdf ...........................21, 24

Sen. Jud. Comm., SB 449, 1997-98 Reg. Session (Apr. 1, 1997),
 http://leginfo.ca.gov/pub/97-98/bill/sen/sb_0401-0450/sb_449_cfa_
 19970404_091640_sen_comm.html..................................................................31

## TREATISES

54 C.J.S. Limitations of Actions § 173 ....................................................................19

Restatement (Second) of Torts § 402A (1965)........................................................45

Restatement (Third) of Torts: Prod. Liab. § 19(b) (1998)......................................46

## OTHER AUTHORITIES

Chong, *Deep Dive Into Netflix's Recommender System* (Apr. 30, 2020),
 https://towardsdatascience.com/deep-dive-into-netflixs-recommender-system-
 341806ae3b48 ......................................................................................................52

Eisenstadt, *'13 Reasons Why' is a hit, but suicide expert told Netflix not to release
 series* (Apr. 26, 2017),
 https://www.syracuse.com/entertainment/2017/04/suicide_expert_consulted_
 by_netflix_on_13_reasons_why_told_them_not_to_release_i.html..................11

Gilbert, *What Went Wrong with 13 Reasons Why?*, THE ATLANTIC (May 4, 2017),
 https://www.theatlantic.com/entertainment/archive/2017/05/13-reasons-why-
 controversy/525237/ ..............................................................................................8

Netflix, *How Netflix's Recommendations System Works*,
 https://help.netflix.com/en/node/100639 (last visited June 8, 2023)............10, 52

## STATEMENT REGARDING ORAL ARGUMENT

Netflix does not believe oral argument is necessary for this Court to affirm the decision of the district court dismissing Plaintiffs' claims on multiple, independent grounds. Contrary to Plaintiffs' assertions in their four-page oral argument statement, this appeal raises no "novel and complex legal issues" involving the "use of powerful algorithms." (Appellants' Opening Brief ("AOB") iii). Instead, as explained below, Plaintiffs' claims are barred by clear California procedural rules on statute of limitations and standing.

On the merits, Plaintiffs' claims are also neither novel nor complex. Like dozens of claimants before them, they seek to hold the creators and disseminators of purportedly "dangerous content" liable for the harm that content allegedly caused to a viewer. Controlling California decisions that Plaintiffs do not cite, let alone distinguish, have rejected similar claims based on principles of state tort law and the First Amendment—as have uniform decisions from across the country. Plaintiffs present their claims as "novel" only by ignoring these decisions.

Finally, contrary to Plaintiffs' assertions (AOB iii), a straightforward application of California's anti-SLAPP statute to Plaintiffs' claims demonstrates that that statute applies here. But regardless, because Netflix will not seek attorneys' fees against Plaintiffs if this Court were to affirm, there is no need for this Court to engage with Plaintiffs' anti-SLAPP arguments.

**INTRODUCTION**

In this lawsuit, Plaintiffs seek to hold Netflix liable under California tort law for creating and disseminating "dangerous content." Plaintiffs allege their family member took her own life after watching a Netflix show, *13 Reasons Why*, that grapples with the subject of teen suicide. Plaintiffs claim Netflix is responsible for their loved one's death because Netflix's recommendation algorithm suggested the show and because Netflix did not adequately warn about the show's "dangerous features." The district court correctly held Plaintiffs do not have a claim against Netflix.

As an initial matter, California procedural rules bar Plaintiffs' claims. As the district court correctly held, the survivorship claims are barred by the controlling statute of limitations, and the wrongful death claims fail because they are asserted by family members who lack standing.

Plaintiffs' claims also fail as a matter of law on the merits. *13 Reasons Why* is not the first work to tell a story about teen suicide. The subject has been explored in countless literary works, movies, and television shows—from *Romeo and Juliet* to *Dead Poets Society* to many others. Plaintiffs also are not the first to claim that those who create and disseminate "dangerous content" should be liable for harm the content allegedly caused. Courts across the country have uniformly rejected such claims based on fundamental principles of tort law and the First

Amendment. Regardless of how plaintiffs have characterized those claims—
"failure to warn," "products liability," tortious "targeting," or something else—
"courts have been universally reluctant to impose tort liability upon any public
media for self-destructive or tortious acts alleged to have resulted from a
publication or broadcast." *McCollum v. CBS, Inc.*, 202 Cal.App.3d 989, 996,
1006-7 (1988) (dismissing claims alleging dissemination of Ozzy Osbourne's
music to a "target group" of adolescents "with the alleged knowledge that it would
result in self-destructive reactions among [those] individuals" caused teenager to
kill himself); *see Bill v. Superior Court*, 137 Cal.App.3d 1002 (1982); *Olivia N. v.
Nat'l Broad. Co.*, 126 Cal.App.3d 488 (1981); *James v. Meow Media, Inc.*, 300
F.3d 683 (6th Cir. 2002).

Plaintiffs urge this Court to depart from this settled law because their claims
are based on alleged "algorithmic targeting." The label Plaintiffs attach to their
claims, however, does not change the fact that Plaintiffs are basing liability on the
show's *content*. That Netflix's algorithm recommended one show or another is not
and cannot be alleged to be harmful absent the particular content that Netflix is
alleged to have recommended.

Plaintiffs also ask this Court to break new ground based on a host of policy
arguments that they say support liability. But courts have already carefully
balanced the competing policy interests of protecting vulnerable individuals and

3

safeguarding speech.  Time and again, courts have held that liability may not be imposed for targeting allegedly dangerous content to impressionable viewers, unless a plaintiff can meet the high bar of pleading and proving incitement:  i.e, that the defendant intended its speech to incite harmful conduct and directly targeted that speech in a manner likely to produce imminent harm.  *See McCollum*, 202 Cal.App.3d at 1007 (citing *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969)).  Plaintiffs do not and cannot meet this standard.  Plaintiffs allege only that Netflix recommended a show to someone whose profile and prior viewing history suggested they might want to watch it, not that Netflix intended to incite anyone to harm themselves or others, or that such a result was likely imminent.

That the recommendation was made by Netflix's algorithm, rather than by a librarian or bookstore owner, does not change the result.  "[T]he basic principles of freedom of speech and the press … do not vary when a new and different medium for communication appears."  *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011) (internal quotation omitted).  In the digital era, adopting Plaintiffs' novel rule would have devastating effects on websites' ability to organize information, on speakers' ability to disseminate their messages, and on willing listeners' ability to receive them.  "[T]he mere threat of civil liability can cause potential defendants to steer far wider of the unlawful zone" and have "far-ranging and deleterious effects."  *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1029 (9th Cir.

1998) (internal quotation marks omitted). Imposing a duty on content creators and disseminators to shield "vulnerable" viewers from "dangerous content" would present those parties with an intolerable choice: censor what they create or recommend, or intrude into audience members' private lives to somehow determine if they are too "vulnerable" to watch, listen to, or read particular content. California law does not recognize such a duty, and if it did, the First Amendment would bar it.

The judgment should be affirmed.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under the Class Action Fairness Act ("CAFA"). 28 U.S.C. § 1332(d). The district court correctly rejected Plaintiffs' argument against CAFA jurisdiction in a detailed order, which Plaintiffs do not appeal. (1-ER-28; *see also* 5-ER-845). Under CAFA, federal courts have jurisdiction over class actions with at least 100 members, at least one of whom is diverse from the defendant, and for which the amount in controversy exceeds $5 million. Plaintiffs' Original Complaint (6-ER-1068) controls the jurisdictional analysis, *Broadway Grill, Inc. v. Visa, Inc.*, 856 F.3d 1274, 1277 (9th Cir. 2017), and makes clear that (1) numerosity is met because the class is comprised of "hundreds, possibly a thousand" members (6-ER-1087 ¶69); (2) there is minimal diversity, because Plaintiffs pursue their action on behalf of a world-wide class (6-ER-1080-81, 1088-

5

90, ¶¶44, 48, 49); and (3) the amount in controversy exceeds $75,000 for each

putative class member because Plaintiffs are pursuing wrongful death claims, and

thus exceeds $5,000,000 in the aggregate for the "hundreds" or more alleged class

members (6-ER-1087 ¶69). *See, e.g.*, *Kammerdiener v. Ford Motor Co.*, 2010 WL

682297, at *2 (C.D. Cal. Feb. 24, 2010) ("wrongful death" claim "sufficient to

establish that the amount in controversy exceeds $75,000 on the face of the

Complaint.").

## STATEMENT OF ISSUES

(1) Are the survivorship claims time-barred because California's two-year

statute of limitations for tort claims expired before this lawsuit was filed? Or did

California Code of Civil Procedure (hereafter, "C.C.C.P.") Section 366.1(b)

abrogate the rule that death ends a legal disability for purposes of tolling, such that

the limitations period was tolled until Bella Herndon would have reached the age

of majority had she not died?

(2) Do Ms. Herndon's siblings have standing to bring wrongful death

claims?

(3) Does California law impose a tort duty on a content provider to warn of

"dangerous content" in an expressive work, and to avoid recommending such

content to vulnerable viewers?

6

(4) Is *13 Reasons Why* or Netflix's algorithm a tangible product that gives rise to a products liability claim?

(5) Have Plaintiffs pled that Netflix proximately caused Ms. Herndon to take her own life?

(5) Would imposing civil liability here impermissibly infringe Netflix's rights under the First Amendment?

To the degree not moot, (6) does California's anti-SLAPP statute apply to diversity suits properly removed by defendants, and (7) do Plaintiffs' claims target acts in furtherance of Netflix's speech in connection with a public issue such that the anti-SLAPP statute applies?

(8) Should Plaintiffs be afforded leave to further amend their complaint?

## BACKGROUND

Because Plaintiffs appeal from a dismissal order, this Court's review "begin[s] with the allegations in the operative complaint," *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1012 (9th Cir. 2020), here the Amended Complaint ("FAC"). (6-ER-967.)[1] Despite Plaintiffs' attempts to portray this lawsuit as one aimed at an algorithm rather than Netflix's speech, the FAC makes clear that Plaintiffs seek to impose liability on Netflix for the allegedly "dangerous content"

---

[1] Plaintiffs make a host of new allegations that appear nowhere in the FAC. *See, e.g.*, AOB at 8-15. These allegations are not part of the record on appeal and should be disregarded, but in any event could not change the outcome.

of an expressive work it created, disseminated, and recommended. (6-ER-974, 977-78, 980, 983, 989-90 ¶¶26, 41, 45, 48, 56, 67, 68, 85, 87.)

### A. Netflix Releases *13 Reasons Why*

In 2007, author Jay Asher published the acclaimed novel *13 Reasons Why*, portraying the suicide of the main character through a series of fictional audiotapes. (6-ER-972 ¶14.) The novel was extremely popular, appearing on the *New York Times* young-adult best-seller list. (*Id.*)

In March 2017, Netflix released the show *13 Reasons Why*, adapted from Asher's novel. (6-ER-969 ¶4.) Written by a Pulitzer winning playwright,[2] the show addressed important topics, including teen suicide and sexual assault.

Millions of people viewed *13 Reasons Why*. (6-ER-973, 975 ¶¶20, 32.) Its "broad exhibition was a cultural event," leading to widespread debates about the show's subject matter and its creators' expressive choices. (6-ER-973 ¶23.) The show's creators believed that "depicting the ugliness and brutality of suicide" could spur an important conversation and deter teenagers from taking their own

---

[2] *See* Gilbert, *What Went Wrong with 13 Reasons Why?*, THE ATLANTIC (May 4, 2017), https://www.theatlantic.com/entertainment/archive/2017/05/13-reasons-why-controversy/525237/ (cited at 6-ER-973 ¶21). The FAC cites this and other articles, incorporating them by reference. *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).

lives.  (6-ER-974 ¶28.)  Some observers lauded the show[3]; others believed that the show's content could negatively impact viewers struggling with suicidal thoughts. (6-ER-975, 977-78 ¶¶29, 40, 48.)

> **B.**  **Plaintiffs Allege That The Show Was "Dangerous" Because of How It Depicted Suicide, And That Netflix's Recommendations And Alleged Failure To Warn Were Thus Harmful**

The FAC expressly alleges that the content of *13 Reasons Why* was "dangerous."  (6-ER-974 ¶26.)  The "features" that allegedly made it "dangerous" include its pacing (6-ER-972 ¶17); the way it depicts the main character's suicide (6-ER-973-74, 978 ¶¶18, 28, 48 ("florid, dramatic, and explicit … portrayal")); and what Plaintiffs allege to be its central message, that "seeking help for suicidal ideation is fruitless and useless whereas committing suicide may be a source of individual agency."  (6-ER-977 ¶40.)  Plaintiffs allege that "[d]epicting suicide as the Show does to children would likely result in deaths."  (6-ER-974 ¶28.)

Plaintiffs allege that their family member Bella Herndon was harmed because she viewed this "dangerous content" after Netflix's algorithm recommended the show to her.  (6-ER-974, 977-78, 980, 983, 989-90 ¶¶26, 41, 45, 48, 56, 67, 68, 85, 87.)  Plaintiffs make the conclusory allegation that Netflix collects "nearly limitless data about its users" and targeted recommendations for *13*

---

[3] Gilbert, *supra* note 2 (psychologist thought it "succeed[ed] overall in the way it portray[ed] the manifold pressures teens encounter at high school").

*Reasons Why* at viewers it knew were "vulnerable." (6-ER-980-82 ¶¶57-65.) But the FAC does not concretely allege that Netflix collects any more information than viewing history: it does not, for instance, allege that Netflix collects demographic information on its users, let alone information about their psychological state. (*See* 6-ER-981 ¶59 (citing *How Netflix's Recommendations System Works*, https://help.netflix.com/en/node/100639 (last visited June 8, 2023), Netflix Help Center, which states: "The recommendations system does not include demographic information (such as age or gender) as part of the decision making process.").) Rather, the FAC alleges that, based on information Netflix has "like viewing history, time of day a user watches, devices watched on, how long a viewer watches, and information about the titles watched," Netflix recommends content to a viewer that they might enjoy. (6-ER-981 ¶59.) The viewer is not required to watch these titles, and of course, a viewer may search for a title regardless of whether it is recommended. Plaintiffs nonetheless claim that Netflix should have avoided recommending *13 Reasons Why* to "vulnerable viewers" who might be susceptible to self-harm, and that Ms. Herndon died because Netflix did not do so. (6-ER-970, 980 ¶¶7, 56.)

Plaintiffs also allege that Netflix should have done more to warn viewers about the show's "dangerous content." (6-ER-977 ¶¶40, 41.) While Plaintiffs

acknowledge that Netflix provided warnings[4], Plaintiffs claim those warnings were insufficient because "Netflix failed to warn that some of its themes" would "inhibit" viewers from seeking help; "fail[ed] to indicate where the most dangerous content would appear in the show" as it "becomes dramatically more graphic over the course of its first season," *id*.; and did not "frame its advisories" to address "the psychological differences between an intense emotional reaction to disturbing content and dangerous signs of suicidal ideation" (*id.* ¶42).

## C. Procedural History

On April 28, 2017, Bella Herndon took her own life (6-ER-983 ¶69). On April 30, 2021, Plaintiffs filed suit against Netflix in California state court. They alleged survivorship claims, for strict liability failure to warn and negligence, on behalf of Ms. Herndon's estate; and wrongful death claims on behalf of her minor siblings. (6-ER-1068.)

Netflix timely removed under CAFA. (6-ER-1062.) Netflix then moved to dismiss the complaint and to strike it under California's anti-SLAPP statute. (6-ER-1010.) Plaintiffs amended their complaint (6-ER-967), and Netflix again moved to dismiss and strike. (5-ER-871.)

---

[4] The show was rated TV-MA, for mature viewers. Eisenstadt, *'13 Reasons Why' is a hit, but suicide expert told Netflix not to release series*, SYRACUSE.COM (Apr. 26, 2017), https://www.syracuse.com/entertainment/2017/04/suicide_expert_ consulted_by_netflix_on_13_reasons_why_told_them_not_to_release_i.html (cited at 6-ER-975 ¶29).

On January 12, 2022, the district court granted Netflix's motions. (1-ER-3.) It held that the statute of limitations barred the survivorship claims, and Ms. Herndon's siblings lacked standing to bring a wrongful death claim. (1-ER-5-6.) The district court further held that the claims failed on the merits. The negligence claim failed because "California courts have declined to find a duty as a matter of law … for claims implicating expression"; and the strict products liability claim failed because "there is no strict liability for books, movies, or other forms of media." (1-ER-6-7.) The court did not reach Netflix's arguments for dismissal under the First Amendment. (*Id.*) The court also held that Plaintiffs' claims were subject to the anti-SLAPP statute.

At the hearing on Netflix's motion, the court observed that amendment would likely be futile. (1-ER-24-25 ("I would typically give people leave to amend. But in this case, I'm not sure that you can really do anything…").) Plaintiffs thereafter elected not to amend, conceding amendment would be futile as to the procedural issues. (2-ER-53.) They noted, however, that if the district court's procedural rulings were reversed, they would *then* seek to amend to address their failure to state a claim. They did not identify what facts could cure those deficiencies. (2-ER-55-57.)

On January 19, 2022, the court dismissed the FAC with prejudice. (1-ER-2.)

## STANDARD OF REVIEW

This Court reviews *de novo* the order dismissing the FAC. *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015). Plaintiffs' allegations "must be enough to raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007), and a court need not "accept any unreasonable inferences or assume the truth of legal conclusions cast in the form of factual allegations." *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1248 (9th Cir. 2013) (citation omitted).

This Court may "affirm … on any basis fairly supported by the record.…" *Flores v. San Diego Cnty.*, 206 F.3d 845, 847 (9th Cir. 2000) (per curiam) (internal quotation marks omitted).

## SUMMARY OF ARGUMENT

Plaintiffs' claims fail for both procedural and substantive reasons.

***Plaintiffs' Claims Are Procedurally Defective.*** Plaintiffs' survivorship claims are time-barred. The statute of limitations for those claims expired by April 28, 2019, two years after Ms. Herndon's death, but Plaintiffs did not file suit until April 30, 2021. Contrary to Plaintiffs' argument, the fact that Ms. Herndon was a minor at the time of her death does not mean that the limitations period was tolled until she would have turned 18. It is well-established that death terminates a legal disability such as minority or mental incompetence and thus ends any tolling for

13

that disability. *See Triplett v. Williams*, 269 Cal.App.2d 135 (1969). C.C.C.P. Section 366.1, on which Plaintiffs rely, did not abrogate that rule. To the contrary, the Legislature made clear when it enacted Section 366.1 that it was *not* changing any substantive law.

The only other claims asserted in this case are wrongful death claims brought by Ms. Herndon's siblings. These claims were also properly dismissed because "California's wrongful death statute vests priority and exclusive standing in decedent's surviving parent over a surviving sibling," and Ms. Herndon's father is still alive. *See, e.g.*, *Scott v. Thompson*, 184 Cal.App.4th 1506, 1510-11, *as modified on denial of reh'g* (2010). Plaintiffs argue that the wrongful death statute preserved standing for anyone "having standing under prior law," which they claim recognized that anyone in the line of succession could bring a wrongful death claim. That is an incorrect statement of prior California law, which has never recognized wrongful death standing for individuals who are not immediate successors.

***Plaintiffs' Claims Also Fail as a Matter of California Law.*** Binding California authority precludes tort liability for claims premised on allegedly harmful speech unless the speech meets the incitement test under *Brandenburg v. Ohio*, 395 U.S. 444. *See, e.g.*, *McCollum*, 202 Cal.App.3d at 1006. Because Plaintiffs do not and cannot allege incitement, this authority forecloses their

claims. The fact that Plaintiffs have labeled their claims as addressing a "failure to warn" and "algorithmic targeting" does not change this result. *See, e.g.*, *Bill*, 137 Cal.App.3d at 1011. The only reason those acts are claimed to be harmful is because of the allegedly "dangerous" content that Netflix recommended and about which it allegedly failed to warn. California law does not recognize liability in tort for such conduct. *See id.*

Plaintiffs cite no other basis under which their claims may proceed. Plaintiffs fail to identify a duty sufficient to support their negligence claim. Plaintiffs' argument that Netflix, a streaming service with millions of subscribers, has a "special relationship" with its viewers conferring tort duties, is illogical and directly contrary to *McCollum*, 202 Cal.App.3d at 996, which found no such relationship between disseminators of creative works and their audience. Plaintiffs' alternative argument that a duty exists under the factors laid out in in *Rowland v. Christian*, 69 Cal.2d 108, 113 (1968) is foreclosed by both *Nally v. Grace Community Church*, 47 Cal.3d 278 (1988), which held no duty to prevent a suicide exists outside of special relationships, and *McCollum* and *Bill*, which weighed the *Rowland* factors and rejected any duty. And Plaintiffs' argument that Netflix's conduct amounts to negligence per se fails because the argument is premised on a statute that does not go into effect until 2024.

15

Plaintiffs' products liability claim is likewise meritless. Products liability applies to harms caused by "tangible" products, not to "ideas and expression" such as *13 Reasons Why* or Netflix's recommendations. *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034-36 (9th Cir. 1991).

In addition, both the negligence and strict products liability claims fail because the FAC includes no allegations that any wrongful act by Netflix proximately "cause[d] mental illness which result[ed] in an uncontrollable impulse to commit suicide." *Tate v. Canonica*, 180 Cal.App.2d 898, 915 (1960).

***The First Amendment Also Bars Plaintiffs' Claims.*** Even if state tort law did not bar Plaintiffs' claims, the First Amendment does. Imposing civil liability here would infringe Netflix's rights to create and distribute creative content; to communicate recommendations to its subscribers; to exercise editorial discretion in arranging titles and content in subscriber's landing pages; and to choose whether, and how, to warn about content. No First Amendment exception allows these claims to proceed: neither the *Brandenburg* incitement test; secondary effects doctrine; commercial speech doctrine; nor minor speech doctrine applies, and this Court has no basis to fashion a new, freestanding exception as Plaintiffs request.

***Whether The Anti-SLAPP Statute Applies Is Moot.*** The only difference the anti-SLAPP statute makes to this appeal is that it authorizes Netflix to seek attorneys' fees upon prevailing. Netflix will not seek its attorneys' fees against

Plaintiffs if it prevails in this appeal. Regardless, a straightforward application of binding precedent demonstrates that the district court correctly applied the anti-SLAPP statute to Plaintiffs' claims.

***Leave to Amend Should Be Denied.*** Finally, because Plaintiffs cannot identify any facts that would fix the flaws in the FAC, leave to amend should be denied.

## ARGUMENT

## I.     PLAINTIFFS' CLAIMS FAIL ON PROCEDURAL GROUNDS

Because Plaintiffs' claims are either time-barred or pursued by plaintiffs who lack standing, the district court correctly dismissed them on that basis alone.

### A.     The Estate's Survivorship Claims Are Time-Barred

Ms. Herndon died on April 28, 2017. (6-ER-983 ¶69.) "Except as otherwise provided by statute," a claim survives a person's death "subject to the applicable limitations period." C.C.C.P. § 377.20. "California's statute of limitations governing a personal injury claim is two years." *Shalabi v. City of Fontana*, 11 Cal.5th 842, 847 (2021) (citing C.C.C.P. § 335.1.) Thus, the statute of limitations on the estate's claims ran on April 28, 2019. Because the representative of Ms. Herndon's estate, her father, did not file this lawsuit until April 30, 2021 (6-ER-1068), the survivorship claims are time-barred.

Plaintiffs argue against this straightforward application of the relevant statute of limitations by trying to combine two different California statutes.

17

First, Plaintiffs point to C.C.C.P. Section 366.1, which provides:

If a person entitled to bring an action dies before the expiration of the applicable limitations period, and the cause of action survives, an action may be commenced before the expiration of the later of the following times:

(a) Six months after the person's death.
(b) The limitations period that would have been applicable if the person had not died.

Second, they point to C.C.C.P. Section 352, which provides:

If a person entitled to bring an action … is, at the time the cause of action accrued either under the age of majority or lacking the legal capacity to make decisions, the time of the disability is not part of the time limited for the commencement of the action.

Plaintiffs argue that if Ms. Herndon had not died, then under Section 352, the two-year limitations period on the underlying claims would not have started to run until she turned 18, on May 1, 2019. Plaintiffs thus insist that the survivorship claims were timely under Section 366.1 so long as Ms. Herndon's father filed them before May 1, 2021.

This argument fails. California law, like that of other states with statutes similar to Section 352, holds that death terminates a claimant's legal disability and thus ends any tolling under Section 352 for survivorship claims. Section 366.1(b) does not abrogate that well-established rule.

1. *Death Ends Tolling Under Section 352*

Section 352 is a "legal disability" tolling provision that tolls a claim while

the claimant is under a legal disability such as minority or mental incapacity. *E.g.*, *W. Shield Investigations & Sec. Consultants v. Superior Ct.*, 82 Cal.App.4th 935 (2000), *as modified on denial of reh'g* (Aug. 23, 2000).

The rule in California for decades has been that death removes a legal disability under such a provision. In *Triplett v. Williams*, a cause of action accrued in favor of a woman of "unsound mind," who died several months later. 269 Cal.App.2d at 135. The California Court of Appeal held that, "during whatever time" the decedent "was of unsound mind," that is to say, under a legal disability, "the statute was tolled." *Id.* at 137. However, "[u]pon her death …, the tolling of the statute ended." *Id.* Because the claim was otherwise untimely, the estate's claim was properly dismissed as time-barred. *Id.*

The same rule has long been applied across the country. Thus, for tolling statutes like Section 352, "a minor's 'disability' terminates at his or her death, and … the statute of limitations on the minor's survival claims commence at that time." 54 C.J.S. Limitations of Actions § 173 (collecting cases); *see Est. of Ayala-Gomez v. Sohn*, 823 N.W.2d 418 (Iowa Ct. App. 2012) ("if the child is not living, the representative cannot take advantage of [legal disability tolling] to extend the time for filing the lawsuit because the disability of minority is terminated by the child's death"); *In re Hoenig's Est.*, 298 N.W. 887, 891 (Iowa 1941); *Runstrom v. Allen*, 345 Mont. 314, 319-20, (Mt. 2008); *Dachs v. Hendrix*, 103 Ark.App. 184, 191-92

19

(2008); *see also Zayed v. Clark Manor Convalescent Ctr., Inc.*, 141 N.E.3d 767, 776 (Il. Ct. App. 2008) (applying rule to mental incapacity); *Walberg v. St. Francis Home, Inc.*, 281 Wis.2d 99, 110 (Wis. 2005) (same); *Mack-Evans v. Hilltop Healthcare Ctr., Inc.*, 226 W. Va. 257, 267 (W. Va. 2010) (same); *Roberson v. Teel*, 20 Ariz.App. 439, 450 (1973) (same); *Warren v. United States*, 4 Cl.Ct. 552, 555-56 (Fed. Cir. 1984), *aff'd*, 746 F.2d 1489 (Fed. Cir. 1984) (same).

This rule is grounded in the purpose of Section 352. The "rationale for the minor's tolling provision relates to a minor's legal disability. Because a minor does not have the understanding or experience of an adult, and because a minor may not bring an action except through a guardian ... special safeguards are required to protect the minor's right of action." *W. Shield Investigations*, 82 Cal.App.4th at 947 (alteration in original) (internal quotation marks omitted).[5] When a minor dies, their claims pass to the adult representative of their estate, and there is no need for continued tolling. *See Warren*, 4 Cl.Ct. at 555-56 (Because "[t]he legal disability provisions of statutes of limitations are designed to provide relief from some personal handicap or impediment affecting the individual … any

---

[5] *Young v. Haines*, 41 Cal.3d 883 (1986), cited by Plaintiffs, did not address tolling under Section 352, but is in accord. *See id.* at 898 ("tolling" can be "peculiarly appropriate for minors, who typically must depend on a parent or guardian to initiate legal action on their behalf").

tolling of the statute of limitations due to disability was removed when [the claimant] died ….") (citation omitted).

2. *The Structure, Purpose, And Legislative History Of Section 366.1 Foreclose Plaintiffs' Reading Of That Provision*

Plaintiffs resist this well-established rule based on a myopic reading of Section 366.1(b) that ignores the statute's structure, purpose, and legislative history. All of those sources make clear that Section 366.1(b) does not abrogate the decades-old rule that death ends a legal disability under Section 352.

Section 366.1 is a savings statute: it ensures that when a person dies, their estate will have at least six months from the date of death to file a claim, even if there is less time remaining under the statute of limitations that would otherwise apply. *See* 22 Cal. L. Revision Comm'n Reports 833 at 920 (1992), http://www.clrc.ca.gov/pub/Printed-Reports/Pub176.pdf (addressing C.C.C.P. § 366.1). The purpose of such a "saving statute" is to "provide[] an [adequate] opportunity for the representatives of any deceased person to evaluate the potential claims and complete the procedures necessary to commence an action" after the claimant's death. *Walberg*, 281 Wis.2d at 108.

Section 366.1 effectuates this purpose through its two subsections. Subsection (a) provides a six-month grace period if a claim would otherwise expire sooner. Subsection (b), on which Plaintiffs base their argument, does not further extend the statute of limitations. It merely explains that if the time remaining in

21

the ordinary limitations period is *longer than* six months, then Subsection (a)'s grace period is inapplicable and the ordinary period applies.

Plaintiffs read Subsection (b) in a vacuum, without acknowledging Subsection (a) or the statute's purpose. Subsection (b) does not affect the rule that death ends a legal disability when calculating the ordinary limitations period. And there would be no reason for it to do so. Section 366.1 was intended to allow at least six months for the decedent's estate's representative to evaluate and bring a claim. There is no reason why it would alter other tolling rules to add years, or even decades, to the limitations period of a claim.

Plaintiffs cite no case adopting their position. To the contrary, courts in states with survivorship statutes identical to Section 366.1(b) have applied without hesitation the rule that death ends a legal disability to dismiss untimely claims. *See Mack-Evans*, 226 W. Va. at 266 (holding that "[i]n the event the injured person dies before the mental disability ends, the statute of limitations begins to run on the date of the injured person's death," notwithstanding savings clause providing that "[a]ny [survivorship action] shall be instituted within the same period of time that would have been applicable *had the injured party not died.*") (citing *Triplett*, 269 Cal.App.2d 135) (emphasis added).

The legislative history of Section 366.1(b) further confirms that Plaintiffs' interpretation is incorrect. The Legislature enacted Section 366.1—including the

language on which Plaintiffs rely that the applicable limitations period is the one

had Ms. Herndon "not died"—in 1992. Before then, C.C.P. Section 353(a) was

the operative savings statute. It provided:

> If a person entitled to bring an action dies before the expiration of the time limited for the commencement thereof, and the cause of action survives, an action may be commenced by the person's representatives, after the expiration of that time, and within six months from the person's death.

*See* 1990 Cal. Stat. ch. 140, § 1 at 1172, https://clerk.assembly.ca.gov/sites/

clerk.assembly.ca.gov/files/archive/Statutes/1990/90Vol1_Chapters.pdf (quoting

C.C.P. § 353(a).).

Section 353 does not include language that the limitations period is the one

if a decedent "had not died," nor any other textual hook for Plaintiffs' argument.

This statute was first passed in 1850 and remained unchanged until 1992. *See, e.g.*,

1850 Cal. Stat. ch. 127, § 24 at 346, https://clerk.assembly.ca.gov/sites/

clerk.assembly.ca.gov/files/archive/Statutes/1850/1850.pdf; 1872 Cal. Stat., § 353

at 134, https://ia800300.us.archive.org/14/items/codecivilproced02deergoog/

codecivilproced02deergoog.pdf. It was in place when *Triplett* was decided in

1969, and co-existed for decades with *Triplett's* rule that death ends a legal

disability when a claim passes from a decedent to the decedent's estate.

If Plaintiffs are right about Section 366.1(b), then that would mean that in

1992 the Legislature altered the scope of Section 353 as it had existed for over 140

years; abrogated the rule that death ends a legal disability that *Triplett* adopted

more than two decades prior; and rendered California an outlier among states with similar savings and legal disability tolling statutes. *Cf. J.C. Penney Casualty Ins. Co. v. M.K.*, 52 Cal.3d 1009, 1027 (1991) (rejecting interpretation of insurance statute "contrary to the almost unanimous rule in other states").

The legislative history makes clear that no such sea-change was intended by Section 366.1(b)'s enactment. To the contrary, the California Law Revision Commission explained that "Section 366.1 restates part of former Section 353(a) *without substantive change*," and was intended to "make[] clear that the decedent's death *does not shorten* the limitations period applicable to the decedent's cause of action, *but may extend it for up to six months*." 22 Cal. L. Revision Comm'n Reports 833 at 920 (1992) (addressing C.C.C.P. § 366.1) (emphases added).[6]

A statute should not be construed to effect a "monumental" change to the law when the Legislature refers to that change as "merely a 'technical' one." *Brennon B. v. Superior* Court, 13 Cal.5th 662, 688 (2022). Here, the Legislature was explicit about its intention to preserve existing substantive law when it enacted

---

[6] Under Section 353, parties had wrongly argued that the statute of limitations upon a claimant's death must be *limited* to six months, even when it would otherwise be longer. *See Lowell v. Kier*, 50 Cal. 646, 647-48 (1875) (rejecting argument). The revised version clarified that the "later of" the grace period or ordinary limitations period would apply. C.C.C.P. § 366.1.

Section 366.1.  Because Section 366.1 cannot be read to abrogate the rule that death ends a legal disability, Plaintiffs' interpretation fails.

3.       *Plaintiffs' Interpretation Would Have Absurd Consequences*

Plaintiffs' argument also fails because California courts will not adopt a "literal meaning" of statutory words "if doing so would result in absurd consequences that the Legislature could not have intended."  *In re J.W.*, 29 Cal.4th 200, 210 (2002).  Here, the absurdities that would follow from Plaintiffs' reading are many.  If an infant were to be injured and then die, the adult representatives of the estate would have more than 18 years—up to the decedent's projected 18th birthday, plus the applicable limitations period—within which to bring the claim.

In the case of other legal disabilities, to which Plaintiffs' reading of Section 366.1(b) would necessarily apply, Plaintiffs' interpretation would create tremendous problems of administration.  When a mentally incapacitated person dies, when would tolling end?  Would the parties have to prove whether, and when, the mental incapacity might have gone away had the individual "not died"?

Plaintiffs justify their interpretation by arguing that "'a defendant cannot reasonably complain' when sued under claims that would be indisputably timely had that defendant merely injured her—instead of ending her life."  AOB 28

(quoting *Reich v. Purcell*, 67 Cal.2d 551, 556 (1967)).[7] But the purpose of Section 352's legal disability tolling is not to punish a tortfeasor by prolonging the statute of limitations, but to toll a claim while the *reason* for tolling—the legal disability—remains. And the purpose of Section 366.1 is to provide a six-month grace period for the estate to assert claims. Plaintiffs provide no sound rationale for their tolling framework, and there is none.

Legal disability tolling ended with Ms. Herndon's death. *See Triplett*, 269 Cal.App.2d at 135. Because the estate, through its adult representative, did not assert survivorship claims within the applicable two-year limitations period, those claims are time-barred.

## B. Decedent's Minor Siblings Lack Standing To Assert A Wrongful Death Claim

The only other claims asserted in this case are Ms. Herndon's siblings' wrongful death claims. As the district court correctly held, the siblings do not have standing to assert those claims.

### 1. *Only An "Immediate Successor" Has Standing To Bring A Wrongful Death Claim*

"Because it is a creature of statute, the cause of action for wrongful death 'exists only so far and in favor of such person as the legislative power may

---

[7] Plaintiffs' quote from *Reich* did not address the statute of limitations, but rather which state's law should govern damages in a wrongful death claim arising from a vehicular accident.

declare.'" *Stennett v. Miller*, 34 Cal.App.5th 284, 290 (2019) (quoting *Justus v. Atchison*, 19 Cal.3d 564, 575 (1977). "The category of persons eligible to bring wrongful death actions is strictly construed." *Id.*

> Under C.C.C.P. § 377.60(a), a wrongful death claim may be asserted by:
>
> The decedent's surviving spouse, domestic partner, children, and issue of deceased children, or, if there is no surviving issue of the decedent, *the persons, including the surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession.*

(emphasis added). Ms. Herndon died without a spouse, partner, children, or grandchildren. Thus, the standing question turns on whether the siblings are persons "who would be entitled to the property of the decedent by intestate succession." *Id.* They are not.

When a person dies "without a spouse, domestic partner, … issue [or grandchild] … the rules of intestate succession control standing …." *Scott*, 184 Cal.App.4th at 1510-11. Under those rules, "only those persons identified as *immediate* successors to the decedent's estate constitute heirs." *Hernandez v. Kieferle*, 200 Cal.App.4th 419, 437 (2011) (emphasis added) (internal quotation marks omitted).

Under the Probate Code, when someone dies with a living parent, the decedent's siblings are not the immediate successors, the living parent(s) is/are. Cal. Prob. Code § 6402 (b), (c). Thus, California courts have held that such

27

siblings lack standing to bring a wrongful death claim. *See Scott*, 184 Cal.App.4th at 1510 ("California's wrongful death statute vests priority and exclusive standing in a decedent's surviving parent over a surviving sibling"); *Mayo v. White*, 178 Cal.App.3d 1083, 1088-89 (1986); *accord, e.g.*, *Stoddard-Nunez v. City of Hayward*, 2015 WL 6954963, at *4-5 (N.D. Cal. Nov. 10, 2015) (collecting cases).

Sitting in diversity, this Court "must follow" the "published decisions of a state's intermediate appellate court" absent "'convincing evidence' that the state's highest court would decide otherwise." *U.S. Bank, N.A., Tr. for Bank of Am. Funding Corp. Mortg. Pass-Through Certificates*, 987 F.3d 858, 863 (9th Cir. 2021). Here, there is no basis to depart from the unanimous rule applied by the California courts of appeal.

2.     *Plaintiffs' Argument Based On Section 377.60(e) Is Meritless*

Plaintiffs argue that the foregoing authorities were wrongly decided because Section 377.60(e) states that Section 377.60 was "not intended to adversely affect the standing of any party having standing under prior law," and under "prior law"—specifically, the California Supreme Court's 1896 decision in *Redfield v. Oakland C. S. Ry. Co.*, 110 Cal. 277 (1895), *modified*, 110 Cal. 277 (1896)—wrongful death standing belonged to anyone *anywhere* in the line of succession, "ad infinitum." AOB 34. Plaintiffs' argument fails for multiple reasons.

28

First, Section 377.60(e) does not say that if any decision in the history of "prior law" supports a standing argument, Section 377.60 recognizes standing. Its reference to "prior law" is to Section 377, the wrongful death statute that existed prior to "[t]he addition of [Section 377.60] by Chapter 178 of the Statutes of 1992." C.C.C.P. § 377.60(e). Section 377 afforded standing to "heirs," defined as "[t]hose persons who would be entitled to succeed to the property of the decedent according to … the Probate Code." C.C.C.P. § 377(a), (b)(1); 1983 Cal. Stat. ch. 842, § 12 at 3022-23, https://clerk.assembly.ca.gov/sites/clerk.assembly.ca.gov/files/archive/Statutes/1983/83Vol2.pdf. Courts addressing wrongful death standing under Section 377—like courts addressing it under Section 377.60—held that only immediate successors had standing to bring a wrongful death claim. *See, e.g.*, *Mayo*, 178 Cal.App.3d at 1088 (1986) ("The brother and sisters of decedent, while potential heirs under Probate Code section 225, are not proper heirs at law and are ineligible to bring an action under [C.C.C.P. §] 377.").

Second, *Redfield* did not endorse Plaintiffs' argument that anyone within the line of succession has standing to bring a wrongful death suit. The question in *Redfield* was whether the children of a decedent had wrongful death standing when the decedent died with a surviving spouse. *See* 110 Cal. at 289-90. Under the Probate Code, when a decedent leaves behind a spouse and children, "the entire *community* property … belongs to" the spouse, but the *separate* property belongs

29

to both the spouse and the children. *See id.* at 290 (emphasis added); Cal. Prob. Code § 6401. Because the decedent in *Redfield* died with only community property, the defendant argued the minor children were not "heirs" with standing to sue—as they did not actually inherit any property.

The California Supreme Court rejected that argument. It held that anyone who is an immediate successor to community *or* separate property is an "heir" for purposes of wrongful death standing—even if an estate happens to include no separate property. In this context, the Court observed that an heir is one who is "capable of inheriting from the deceased person generally." *Redfield*, 110 Cal. at 289-90. In other words, an immediate successor under the Probate Code of community *or* separate property has standing to sue for wrongful death, irrespective of whether there is actually any property for them to inherit. *Id.*; *see also Fiske v. Wilkie*, 67 Cal.App.2d 440, 444 (1945); *Stennett*, 34 Cal.App.5th at 294-95.

Other early California decisions further confirm that California has never recognized standing for non-immediate successors. *See Ginochio v. City & Cnty. of San Francisco*, 194 Cal. 159, 166-68 (1924) ("it is quite clear that the adult sister of the decedent (who left surviving him two minor children of his body) is not an heir"); *Evans v. Shanklin*, 16 Cal.App.2d 358, 360-63 (1936) ("the mother of the decedent would not, under [California's] statutes of succession, succeed to

any of her deceased son's estate" and thus "by reason thereof and the decision of our Supreme Court as announced in [*Redfield* and *Ginochio*] is not an heir.")[8]

Third, the legislative history is contrary to Plaintiffs' argument. The reference to "prior law" on which Plaintiffs rely was not intended to expand standing beyond immediate successors, but to affirm that limitation. In 1992, the Legislature spelled out specific individuals with standing in order to codify the *Redfield* and *Fiske* rule. *See Stennett*, 34 Cal.App.5th at 295. But in doing so, it accidentally left out parents who—if the decedent died with a spouse but no children—stood to inherit separate property. *See* Sen. Jud. Comm., SB 449, 1997-98 Reg. Session (Apr. 1, 1997), http://leginfo.ca.gov/pub/97-98/bill/sen/sb_0401-0450/sb_449_cfa_19970404_091640_sen_comm.html. The 1996 amendment fixed that problem and made the fix retroactive by stating that the 1992 statute did not abrogate "prior law." *See id.* (legislature "amend[ed] Section 377.60 to restore the right of parents to sue for wrongful death damages when there was no surviving issue of the decedent, as it was prior to the enactment" of the 1992 law).

---

[8] In *Burk v. Arcata & M.R.R. Co.*, 125 Cal. 364 (1899), cited by Plaintiffs (AOB 33), the siblings were the immediate successors with standing: the decedent had "never been married" and had no children. *Id.* at 365. *Norris v. Hensley*, 27 Cal. 439 (1865), AOB, 33, did not address wrongful death standing, but involved a will that left real property to individuals and, later, to their "heirs." *Id.* at 442. The court held that "heirs" did not mean "particular persons" because the parties could not specify in advance who the heirs would be—not because non-immediate successors could ultimately be "heirs." *See id.* 447.

In explaining that revision, the Legislature affirmed that under longstanding rules, a non-dependent parent would only have standing if "there was no surviving issue of the decedent," as only then would the parent be an immediate successor.  *See id.* Plaintiffs' argument that non-dependent siblings who are not immediate successors have standing is no different from the one the Legislature rejected.

## II.  PLAINTIFFS' CLAIMS FAIL ON THE MERITS

Plaintiffs argue that, if the Court finds there is no procedural deficiency with their claims, it should remand without reaching the merits.  AOB 38.  Plaintiffs' proposal is unsupported by any authority and makes no sense.  The district court's order addressed both the procedural and substantive failings in Plaintiffs' complaint, and the merits issues are fully briefed.  Those issues are ripe for this Court's review and provide an independent basis for affirmance.

Plaintiffs' claims fail on the merits for multiple reasons.  First, binding California authority precludes tort liability for claims premised on the expressive content of speech, regardless of the label attached to the claim.  Second, Plaintiffs fail to identify any duty that Netflix owed to avoid the harms alleged in this lawsuit, which defeats their negligence claim.  Third, Plaintiffs cannot assert a products liability claim based on Netflix's expressive acts.  Fourth, Plaintiffs fail to allege proximate cause.  Finally, the First Amendment bars Plaintiffs' claims.

A. **Binding California Precedent Forecloses Plaintiffs' Claims Based On The Content Of Netflix's Expressive Speech**

1. *Except In Cases of Incitement, California Law Does Not Recognize Tort Claims For Harms Allegedly Caused by Expressive Content*

California courts have for decades held that tort liability may not be imposed on those who create and disseminate expressive works based on the possibility that that content may cause vulnerable audience members to engage in harmful behavior. As these courts have recognized, "it is simply not acceptable to a free and democratic society to impose a duty upon performing artists to limit and restrict their creativity in order to avoid the dissemination of ideas in artistic speech which may adversely affect emotionally troubled individuals." *McCollum*, 202 Cal.App.3d at 1005-06. Thus, unless the speech at issue intentionally incited immediate harm, courts in California—and around the country—have repeatedly rejected claims premised on injuries allegedly caused by expressive content.

In *Olivia N.*, a young girl brought a negligence suit against NBC for broadcasting a movie that depicted a sexual assault, which she claimed led other girls to assault her. 126 Cal.App.3d at 491. Similar to Plaintiffs here, Olivia N. alleged that "NBC had knowledge of studies on child violence and should have known that susceptible persons might imitate the crime enacted in the film'"; and that "NBC televised the film without proper warning in an effort to obtain the largest possible viewing audience." *Id.* at 492. The Court of Appeal disposed of

the tort claim on First Amendment grounds, emphasizing that "[t]he deterrent effect of subjecting the television networks to negligence liability because of their programming choices would lead to self-censorship which would dampen the vigor and limit the variety of public debate." *Id.* at 494.

*Bill v. Superior Court* followed *Olivia N.*, but rejected similar claims as a matter of tort law. The plaintiff in that case alleged that she was shot near a movie theater showing *Boulevard Nights*, a "violent movie." 137 Cal.App.3d at 1005. She alleged that the film's creators and promoters knew it might foment violence in attendees and failed to warn about that risk. *See id.* at 1005-06, 1009. The court rejected plaintiff's attempt to impose a duty in tort based on the creation and distribution of a "dangerous" expressive work:

> It is an unfortunate fact that in our society there are people who will react violently to movies, or other forms of expression, which offend them, whether the subject matter be gangs, race relations, or the Vietnam war. … To impose upon the producers of a motion picture the sort of liability for which plaintiffs contend in this case would, to a significant degree, permit such persons to dictate, in effect, what is shown in the theaters of our land.

*Id.* at 1008-09.

In *McCollum*, the court applied the principles developed in these earlier cases to dismiss a complaint materially indistinguishable from the FAC. In that case, plaintiffs alleged that their 19-year-old son took his life after listening to Ozzy Osbourne's song "Suicide Solution." 202 Cal.App.3d

at 995-96.  Plaintiffs alleged that Osbourne's music caused the tragedy by glorifying suicide and sending a message "that life is filled with nothing but despair and hopelessness and suicide is not only acceptable, but desirable." *Id.* at 995; *cf.* 6-ER-977 ¶40.  Plaintiffs further alleged that defendants "knew" the music's audience included "troubled adolescents and young adults who were having a difficult time during this transition period of their life"; and that they "sought to appeal" to that "specific target group." *McCollum*, 202 Cal.App.3d at 996.

The court dismissed the claim, affirming that California law does not impose a duty based on the dissemination of an expressive work.  The decedent's "tragic self-destruction, while listening to Osbourne's music, was not a reasonably foreseeable risk or consequence of defendants' remote artistic activities." *Id.* at 1005 (applying factors from *Rowland*, 69 Cal.2d 108).  Further, "perhaps [the] most significant[]" reason to reject a tort duty for content creators and disseminators to avoid such consequences was the chilling effect it would have on speech. *Id.*  The court noted that the theme of suicide is "often seen in literature and music." *See id.* at 995 n.4.  Creating liability for such speech would be unacceptable under California law as a matter of both "law" and "public policy." *Id.* at 1005-06.

35

California is no outlier.  Courts throughout the country have uniformly refused to recognize a duty to avoid creating or disseminating allegedly dangerous expressive works.  *See James*, 300 F.3d at 687, 692  (dismissing claim that "distribution of" violent video games, movies, and internet sites to "impressionable youth[s]" led adolescent to murder his classmates); *Watters v. TSR, Inc.*, 904 F.2d 378, 381 (6th Cir. 1990) (dismissing claim that defendant intentionally "disseminated" a board game to "mentally fragile persons" and "failed to warn" about the content, thereby causing suicide); *Sanders v. Acclaim Ent., Inc.*, 188 F.Supp.2d 1264, 1268 (D. Colo. 2002) (dismissing claim that creators of film *The Basketball Diaries*, which depicts "a student massac[ring] his classmates with a shotgun," negligently caused the Columbine massacre); *Wilson v. Midway Games, Inc.*, 198 F.Supp.2d 167, 169, 171 (D. Conn. 2002) (dismissing claim that the "design and marketing" of a violent video game caused a teen to fatally stab his friend); *Davidson v. Time Warner, Inc.*, 1997 WL 405907, at *1 (S.D. Tex. Mar. 31, 1997) (dismissing claim that criminal was incited to shoot a state trooper after listening to Tupac Shakur's music); *DeFilippo v. Nat'l Broad. Co.*, 446 A.2d 1036, 1038 (R.I. 1982) (dismissing claim that minor hanged himself because he saw a television stunt involving a hanging); *Walt Disney Prods., Inc. v. Shannon*, 247 Ga. 402, 402 (1981) (dismissing claim that children's television show instructing on how to use a BB gun caused child to blind himself); *Zamora v. Columbia Broad.*

*Sys.*, 480 F.Supp. 199, 200 (S.D. Fla. 1979) (dismissing claim that violent television shows caused teenager to commit murder).

Applying *Olivia N.*, *Bill*, and *McCollum*, the FAC must be dismissed. As in those cases, Plaintiffs' claims target the expressive content of *13 Reasons Why*. (1-ER-4.) Throughout the FAC (and in their brief in this Court), Plaintiffs allege that the structure, content, themes, and message of *13 Reasons Why* were "dangerous," and made Netflix's dissemination of the show "likely [to] result in deaths." (6-ER-972-74, 977-78 ¶¶17, 18, 26, 28, 40, 48; *see supra* Background.B; 1-ER-4-5; AOB 10, 18.) California law does not recognize a tort claim under these circumstances.

> ### 2. *Plaintiffs Cannot Avoid Dismissal By Characterizing This As A Case Aimed At A Failure To Warn Or "Algorithmic Targeting"*

Ignoring controlling authority, Plaintiffs argue their claims should proceed because they are based on "algorithmic targeting" or "failure to warn," and not the show's content (AOB 7, 54). But California law requires this Court to look past how a plaintiff labels their theory to the substance of whether the plaintiff is complaining about expressive content. *See, e.g.*, *Bill*, 137 Cal.App.3d at 1011. That analysis shows Plaintiffs have no cognizable claim.

Plaintiffs actually say little about their failure to warn claim. This is not surprising, since courts have repeatedly rejected such claims where, as here, what the defendant allegedly failed to warn about was tied to the content of an expressive work. In *Bill*, the plaintiffs claimed they did "not seek to impose

liability on the basis of the content of the motion picture," arguing that "so far as their theory is concerned, the movie might as well have been 'Mary Poppins' rather than 'Boulevard Nights.'" 137 Cal.App.3d at 1008. The court rejected their argument that they were merely complaining about a failure to warn, because "it is apparent that if the showing of the movie … tended to attract violence-prone persons to the vicinity of the theater, it is precisely *because of the film's content*, and for no other reason." *Id.* at 1007 (emphasis added). So it is here. Were it not for *13 Reasons Why's* allegedly "dangerous" expressive content—specifically its portrayal of suicide—Plaintiffs would have no basis for their claim that Netflix had a duty to warn viewers that the content might be harmful.

Plaintiffs' theory that Netflix should be liable in tort because its algorithm allegedly "target[ed] its most vulnerable viewers" (6-ER-970 ¶7) likewise is inseparable from the expressive content of Netflix's speech. If Ms. Herndon hadn't viewed a show *about suicide*, Plaintiffs would have no basis for claiming that Netflix should have avoided recommending it to her. As the FAC's allegations make clear, Plaintiffs' allegation that the alleged "targeting" was harmful necessarily depends on the premise that the underlying content that was "targeted" was harmful. (6-ER-982-83 ¶¶4, 68 (alleging Netflix's algorithm recommended "dangerous" content to Bella Herndon that allegedly "exposed [her]

to the dangerous health risks associated with watching the Show, proximately causing the resultant harms to her, including her death by suicide.".)

California courts have not hesitated to dismiss claims just like Plaintiffs' that alleged that the defendant intentionally "targeted" harmful content to vulnerable viewers. *McCollum*, for example, dismissed claims based on allegations that Ozzy Osbourne's music "sought to appeal" to "troubled adolescents and young adults" who were alleged to be a "specific target group" vulnerable to self-harm. 202 Cal.App.3d at 996. *McCollum* held that a plaintiff cannot assert a tort claim based on such allegations unless the plaintiff can plead and prove "incitement" under the test articulated in *Brandenburg v. Ohio*, which balances the need to protect the right of free expression against the legitimate aim of preventing true incitement of violence. *See* 202 Cal.App.3d at 1007. Imposing tort liability in the absence of speech that meets that test would result in "inevitabl[e] … self-censorship on the part of broadcasters, thus depriving both broadcasters and viewers of freedom and choice." *See DeFilippo*, 446 A.2d at 1042.

Plaintiffs' algorithm theory is not only foreclosed by *McCollum*—it is flawed on its own terms. Although Plaintiffs portray Netflix's algorithm as a sci-fi weapon of the future, the algorithm is fundamentally an organizational and editorial tool that helps viewers identify content that might be of interest to them. Recommending content to readers, listeners, and viewers is the essential task of

every local bookseller; of every librarian; and of every newspaper, magazine, and blog publisher that makes editorial decisions about how and where to display its content. If Netflix can be liable for recommending *13 Reasons Why* using an algorithm, then where will this Court draw the line between protected recommendations, and "harmful" ones subject to liability? If a bookseller places a violent novel on display as the book of the week, is she liable if a reader reads it and commits an act of violence? What if the bookseller knows the patron— possessing more biographical information than Netflix does—and recommends the book based on the patron's reading habits? If these activities don't give rise to liability, then by what standard can they be distinguished from "algorithmic targeting"? And if they *do* give rise to liability, as Plaintiffs urge, the consequences would be staggering.

Algorithms organize all manner of online content. Plaintiffs' theory, if accepted, would mean that no streaming service, online library, or online seller of expressive content (whether books, movies, music, or video games) could suggest controversial content through an algorithm without being exposed to civil liability. In today's digital age, that would profoundly interfere with the ability of speakers to disseminate expressive content, and of willing listeners to receive it. *Cf. Twitter, Inc. v. Taamneh*, 598 U.S. ----, 143 S.Ct. 1206, 1228-29 (2023) (rejecting attempt to predicate aiding and abetting liability on use of algorithms to organize and

recommend content in part because "[t]hat conclusion would run roughshod over the typical limits on tort liability"). Plaintiffs' theory would also impose an affirmative duty on content providers to probe into the private lives and psyches of their users "to ascertain which users were at high risk." AOB 14. Such a rule would be as invasive as it would be impossible to administrate. Plaintiffs do not and cannot explain how content providers would comply with this rule, let alone how they could do so by making just "modest tweaks" (AOB 10).

### B. Plaintiffs Fail To Identify Any California Tort Doctrine That Would Allow Their Claims To Proceed

Unable to distinguish binding precedent, Plaintiffs ignore it. Instead, as if no California decision has already rejected their claims, Plaintiffs cite a series of inapposite cases and doctrines to argue that this Court should allow their negligence and strict products liability claims to proceed. These arguments fail. Plaintiffs' negligence claim fails because Plaintiffs cannot identify a legal duty that Netflix breached. The products liability claim fails because no tangible product is alleged to have caused any harm. Further, both claims also independently fail because the FAC does not allege proximate cause.

1. *The Negligence Claim Fails Because Netflix Did Not Owe A Duty To Ms. Herndon Or Plaintiffs*

To assert a negligence claim, Plaintiffs must identify a cognizable legal duty Netflix owed to them. *See Brown v. USA Taekwondo*, 11 Cal.5th 204, 213 (2021).

41

"[T]he threshold determination that a duty is owed [to a] plaintiff is primarily a question of law." *Bill*, 137 Cal.App.3d at 1009-1010. Plaintiffs root through various California tort doctrines in search of a duty that could apply here. AOB 39-45. None does.

> (a) Netflix Does Not Have A "Special Relationship" With Its Users

Generally, "one owes no duty to control the conduct of another, nor to warn those endangered by such conduct." *Regents of Univ. of California v. Superior Ct.*, 4 Cal.5th 607, 663-64 (2018) (internal quotation marks omitted). In particular, under California law, there is no duty to prevent the suicide of another absent a "special relationship." *Nally*, 47 Cal.3d at 293. California courts have construed this exception narrowly, recognizing special relationships that can give rise to such a duty only in extraordinary circumstances involving defendants that have "a custodial relationship over others that uniquely place the defendant in a position to detect and prevent suicide." *Whooley v. Tamalpais Union High School District*, 399 F.Supp.3d 986, 1001 (N.D. Cal. 2019) (collecting cases). No such facts exist here. Plaintiffs' argument that Netflix, a streaming service with millions of viewers, had a "special relationship" with the daughter of one of its subscribers is absurd. AOB 39-40.

California decisions have long rejected the existence of a special relationship between the creators and disseminators of a work and the "target group" of that

work.  *See McCollum*, 202 Cal.App.3d at 996.  Ignoring *McCollum*, Plaintiffs instead analogize to *Regents*, which held that a university has a special relationship with its resident students.  4 Cal.5th at 619-20.  In *Regents*, the California Supreme Court made clear that the *sine qua non* of a special relationship was "where[] one party is dependent" and "the other has superior control over the means of protection."  *Id.* at 621.  The Court cited, as examples, "a jailer and prisoner," and the "parent-child relationship."  *Id.* at 619-20.  It held that because colleges similarly have power over the defined, closed "environment" in which vulnerable students live and study, including the ability to impose "rules and restrictions, both in the classroom and across campus," a special relationship existed in certain circumstances.  *See id.* at 625-26.

The relationship between Netflix and its viewers is nothing like the relationship between a university and its students or a parent and child.  Using someone's viewing history to suggest titles does not give Netflix any control over them, let alone the substantial control that is necessary to give rise to a special relationship.  And Netflix is in no position to monitor or prevent the sort of harm at issue in this case.  Unlike a parent, who *is* in a special relationship with a child, Netflix knows nothing about its viewers' lives beyond the shows streamed in their households.

43

(b)     No Duty Exists Under The *Rowland* Factors

Plaintiffs next argue that Netflix owed Ms. Herndon an "ordinary duty of care" under the factors set forth in *Rowland v. Christian*, 69 Cal.2d at 113.  AOB 40.  That is incorrect.  First, under *Nally*, no duty to prevent a suicide exists absent a special relationship.  *See supra* p. 42.  Second, the binding California authorities discussed above carefully weighed the *Rowland* factors and found no duty to exist. *See supra* Part II.A; *see also Brown*, 11 Cal.5th 204 (clarifying duty analysis for negligence claims).

(c)     Negligence Per Se Does Not Apply To Plaintiffs' Claims

Plaintiffs next argue the vague duties under the California Age-Appropriate Design Code Act ("CAADCA"), including that companies should "prioritize the privacy, safety, and well-being of children over commercial interests," give rise to a negligence per se claim.  AOB 45 (quoting Cal. Civ. Code § 1798.99.29(b)).

CAADCA does not become operative until July 1, 2024.  *See* Cal. Civ. Code § 1798.99.31(d).  "It is well established that statutes not in effect at the time of an accident have no relevance to a defendant's statutory duty of care."  *Salinero v. Pon*, 124 Cal.App.3d 120, 132-33 (1981) (collecting cases); *accord  Elsner v. Uveges*, 34 Cal.4th 915, 938 n.21 (2004).  Plaintiffs' negligence per se argument is frivolous.

44

### 2. *Plaintiffs Do Not And Cannot Allege A Products Liability Claim*

In addition to their negligence claim, Plaintiffs assert a "strict liability—failure to warn" claim under California products liability law. (6-ER-988-89 ¶¶78-83.) California law attaches strict products liability only to the manufacture and distribution of *tangible products*. "A product is a *physical article* which results from a manufacturing process and is ultimately delivered to a consumer." *Pierson v. Sharp Mem'l Hosp., Inc.*, 216 Cal.App.3d 340, 345 (1989) (emphasis added); *Winter*, 938 F.2d at 1034 (defining products as "tangible items, such as tires, automobiles, and insecticides"); Restatement (Second) of Torts § 402A (1965).

Words and ideas are *not products*—even when they are produced through a tangible medium. *See Winter*, 938 F.2d at 1034-36 (products liability law is "focused on the tangible world" and does not apply to "ideas and expression"); *Watters*, 904 F.2d at 381 ("the doctrine of strict liability has never been extended to words or pictures"); *James*, 300 F.3d at 701 (video games, movies, and internet transmissions alleged to have incited violence not "products"). As this Court recognized in *Winter*, "products liability" law does not "take into consideration the unique characteristics of ideas and expression" and cannot be applied to communicative acts. *Winter*, 938 F.2d at 1034. "The threat of liability without fault" if attached to such communication "could seriously inhibit those who wish to share thoughts and theories." *Id.* at 1035.

45

Plaintiffs attempt to sidestep these cases by calling the "product" here the recommendations algorithm. AOB 46. That argument fails.

*First*, the algorithm was not the primary object of any transaction between Netflix and any of its viewers. To maintain "a strict products liability claim, a plaintiff must show the transaction in which she obtained the product was one in which the transaction's primary objective was to acquire ownership or use of a product" rather than "a service." *Hennigan v. White*, 199 Cal.App.4th 395, 403 (2011); Restatement (Third) of Torts: Prod. Liab. § 19(b) (1998). Here, the algorithm is not the "primary objective" of a Netflix subscription—access to the content it recommends is. *See Hennigan*, 199 Cal.App.4th at 403 (the "primary objective" of going to a beauty salon was to "obtain a service," not to "purchase a bottle of pigment"); *Shepard v. Alexian Bros. Hosp.*, 33 Cal.App.3d 606, 611 (1973) (primary function of health care is health care, not provision of blood). As Plaintiffs do not dispute, that content is not a product as a matter of law. *Winter*, 938 F.2d at 1034-36.

*Second*, the algorithm is itself not a "tangible" product. *Winter*, 938 F.2d at 1034. It is code that embodies and expresses Netflix's editorial judgments about what to recommend and to whom. And Plaintiffs seek to impose liability because of what the algorithm *communicated*—the specific recommendations it made. Such "communicative content" is not a basis for products liability, even if

46

delivered by a tangible product. *James*, 300 F.3d at 701 (distinguishing such content from a video cassette "explod[ing] and injur[ing] its user"); *Winter*, 938 F.2d at 1036.

Plaintiffs try to get around this problem by pointing to decisions that have suggested that "[c]omputer software that fails to yield the result for which it was designed may be" a defective product. *Winter*, 938 F.2d at 1036; *Schafer v. State Farm Fire & Cas. Co.*, 507 F.Supp.2d 587, 600-01 (E.D. La. 2007); AOB 50. But those cases contemplate that software sold commercially to perform a specific "mechanical" function can give rise to a products liability claim if the software then fails to carry out that mechanical function—such as aeronautical charts that inaccurately "depict geographic features or instrument approach information," *Winter*, 928 F.3d at 1035, or estimating software for insurance companies with incorrect price lists, *Schafer*, 507 F.Supp.2d at 600-01. Here, the algorithm was not sold in commerce to perform a mechanical task, and Plaintiffs fault the algorithm for what it communicated—not for a technical failing.

*Loomis v. Amazon.com LLC*, 63 Cal.App.5th 466 (2021), cited by Plaintiffs, also does not help them. There, the plaintiff sued after a physical product (a hoverboard) malfunctioned and caused a fire. The question was whether Amazon could be held liable for selling the hoverboard. Contrary to Plaintiffs' description (AOB 47), the court rejected Amazon's claim that it was merely a "service

47

provider" not by holding that the website (which in any event did not recommend expressive content) was a product—but on the basis that Amazon had facilitated the "sale of a product." *Id.* at 483.

*Hardin v. PDX, Inc.*, 227 Cal.App.4th 159, 164 (2014), *as modified on denial of reh'g* (July 21, 2014) does not support Plaintiffs' argument either. In *Hardin*, plaintiffs attempted to bring a failure-to-warn claim against a software manufacturer on the basis that it provided software to a supermarket that limited the length of a warning pamphlet for medication, resulting in the omission of information about health risks. The court observed that the plaintiff's "theory is that [the] software program, not the information it produces, is the defective product," and further noted that the defendant had "not argued, let alone shown, that [the plaintiff] cannot prevail under that theory." *Id.* at 170. Here, Plaintiffs do take issue with the "information" Netflix's algorithm "produced"—the recommendation of the show. And, unlike in *Hardin*, the software here was not sold commercially but was used to facilitate Netflix's provision of a service.

<u>Finally</u>, Plaintiffs argue that this Court should invent a new products liability rule based on policy considerations. AOB 47-51. California courts look to policy concerns to determine which entities that manufacture and distribute tangible products "should be liable in tort for placing on the market a defective product that causes personal injury." *Jimenez v. Superior Ct.*, 29 Cal.4th 473, 477 (2002)

(quoting *Escola v. Coca Cola Bottling Co.*, 24 Cal.2d 453, 461 (1944) (Traynor, J., concurring)). By contrast, the policy concerns applicable to claims targeting ideas and expression are different. *Winter*, 938 F.2d at 1034. Courts addressing those policy concerns have consistently balanced them in favor of free speech and against any liability. *See id.*; *James*, 300 F.3d at 701.

      3.    *Plaintiffs Have Not Plausibly Alleged Proximate Causation*

Plaintiffs' claims fail for the additional reason that the FAC does not allege Netflix proximately caused the decedent to take her life. Under California law, absent a special relationship or intent to cause suicide, a defendant may be liable only if its wrongful breach of a duty "cause[d] mental illness which result[ed] in an uncontrollable impulse to commit suicide." *Tate v. Canonica*, 180 Cal.App.2d 898, 915 (1960). Otherwise, the intervening act doctrine alone requires dismissal. *See, e.g.*, *Jones v. Cate*, 2016 WL 282699, at *10 (E.D. Cal. Jan. 25, 2016) (citing *Tate*, 180 Cal.App.2d at 915).

The FAC includes no allegations that attempt to make this showing. *Compare Corales v. Bennett*, 567 F.3d 554, 572-73 (9th Cir. 2009) (no uncontrollable impulse as a matter of law where decedent spoke with family members and "wrote a detailed suicide note before committing suicide"); *e.g.*, *Wenke v. Forest Labs, Inc.*, 2018 WL 1911957, at *4 (N.D. Cal. Apr. 23, 2018), *aff'd*, 796 F.App'x 383 (9th Cir. 2020) (in the "context of suicide," courts have

49

held that "an act that was premeditated cannot be an uncontrollable impulse" (collecting cases)). For this reason as well, Plaintiffs claims were properly dismissed.

**C.    The First Amendment Independently Bars Plaintiffs' Claims**

Even if Plaintiffs' claims did not fail as a matter of California law, the First Amendment independently requires their dismissal. *See Flores*, 206 F.3d at 847 (Court affirms on any basis in record).

1.    *Plaintiffs Seek To Hold Netflix Liable Based On The Content Of Its Expression*

The most basic principle of the First Amendment is that it protects even "those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 574 (1995). That protection extends to both direct restraints on speech by the government and to civil suits seeking to impose liability based on the exercise of First Amendment rights. *See Snyder v. Phelps*, 562 U.S. 443, 451 (2011) ("The Free Speech Clause of the First Amendment … can serve as a defense in state tort suits …."); *Monteiro*, 158 F.3d at 1029; *Herceg v. Hustler Mag., Inc.*, 814 F.2d 1017, 1019-20 (5th Cir. 1987).

The FAC seeks to hold Netflix liable based on the content of its expression in at least four ways.

*First*, Plaintiffs seek to impose liability on *13 Reasons Why*'s creators for the content of their work. *See Hurley*, 515 U.S. at 569 (First Amendment "unquestionably shield[s]" creative works). As discussed above, Plaintiffs' claims cannot be separated from the content of the show and the expressive choices of the show's creators. *See supra* Part II.A. Plaintiffs' claims offend the bedrock First Amendment principle that "public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Matal v. Tam*, 582 U.S. 218, 244 (2017) (internal quotations omitted).

*Second*, Plaintiffs' algorithm theory seeks to hold Netflix liable for the content of its recommendations to its users. These recommendations "convey a particularized message," *Spence v. Washington*, 418 U.S. 405, 410-11 (1974)— namely, what shows and movies Netflix believes a viewer might enjoy. Netflix has the right to convey that message, and its subscribers have the right to receive it. *See Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (First Amendment protects the "right to receive information and ideas" not just to communicate them); *Forsyth v. Motion Picture Assoc. of Am., Inc.*, 2016 WL 6650059, at *4 (N.D. Cal. Nov. 10, 2016) (association providing movie ratings "holds First Amendment rights to express its opinions that are reflected in the ratings system").

*Third*, Plaintiffs' algorithm theory seeks to penalize Netflix for the exercise of its editorial discretion. Publishers have a First Amendment right to determine

51

how to organize the content they present to readers and viewers. *See Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *Hurley*, 515 U.S. at 570 ("[T]he presentation of an edited compilation of speech generated by other persons" falls "squarely within the core of First Amendment security").

Netflix's recommendations involve the exercise of "editorial control and judgment." As the FAC, and articles incorporated into it, allege, Netflix uses its algorithm to arrange options for recommended viewing in the user's landing page based on Netflix's determination of "the best possible ordering of titles that" a viewer "may enjoy." Netflix, *supra*, *How Netflix's Recommendations System Works* (cited at 6-ER-981 ¶59); Chong, *Deep Dive Into Netflix's Recommender System* (Apr. 30, 2020), https://towardsdatascience.com/deep-dive-into-netflixs-recommender-system-341806ae3b48 (describing "Netflix's … two-tiered row-based ranking system" and various curated lists Netflix provides) (cited at 6-ER-981 ¶60).

The fact that these recommendations "may be produced algorithmically" makes no difference. *See Jian Zhang v. Baidu.com Inc.*, 10 F.Supp.3d 433, 438-39 (S.D.N.Y. 2014) (search engine results protected by the First Amendment). "After all, the algorithms themselves were written by human beings, and they 'inherently incorporate … engineers' judgments ….'" *Id.* (internal citation omitted). As the Supreme Court has repeatedly affirmed, the specter of "ever-advancing

technology" is no excuse to erode "the basic principles of freedom of speech." *Brown*, 564 U.S. at 790 (second quote quoting another source).

*Fourth*, Plaintiffs' claims predicated on a failure to warn violate Netflix's right not to speak. Netflix has the right to determine what to say—if anything—about the content it offers, including to say nothing at all. *See Hurley*, 515 U.S. at 573 ("[O]ne important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say[.]'") (quoting *Pacific Gas & Electric Co. v. Public Utilities Comm'n of Cal.*, 475 U.S. 1, 16 (1986)*; Olivia N.*, 126 Cal.App.3d at 492; *DeFilippo*, 446 A.2d at 1038.

### 2. *Plaintiffs' Claims Do Not Fall Within Any Exception To The First Amendment*

Because Plaintiffs seek to predicate civil liability on the content of Netflix's speech, their claims are barred unless that speech falls within one of a narrow set of recognized exceptions to the First Amendment. It does not. AOB 61-64.

*First*, Plaintiffs tepidly assert that Netflix's speech "arguably" constitutes "incitement." AOB 63. Under *Brandenburg*, which Plaintiffs do not even cite, speech can give rise to liability if it is "[1] directed to inciting or producing imminent lawless action and [2] is likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447. Plaintiffs do not even try to meet these requirements, and they cannot. Speech is "directed to" incitement if "the speaker 'intended' his words to produce violent conduct." *James*, 300 F.3d at 698 (quoting

53

*Hess v. Indiana*, 414 U.S. 105, 108 (1973)).  The FAC does not allege that Netflix intended to cause anyone to commit suicide, nor could it.  To the contrary, the FAC acknowledges that the creators of *13 Reasons Why* depicted the "ugliness and brutality of suicide" with the intent to "*deter*" suicides.  (6-ER-974 ¶28 (emphasis added).)

As to the second element, *13 Reasons Why* was not likely to imminently cause harm.  Incitement cannot be found where, as here, the speaker is physically and temporally removed from the viewer and the speech conveys abstract ideas as opposed to overt encouragement.  It is not sufficient that the speech "has a tendency to lead to suicide or other violence."  *See McCollum*, 202 Cal.App.3d at 1001; *James*, 300 F.3d at 698 (creators of video games "certainly did not 'intend' to produce violent actions by the consumers" and the "threat" of such a reaction was not "imminent"); *Wilson*, 198 F.Supp.2d at 182 (same).

<u>Second</u>, Plaintiffs invoke the "secondary-effects doctrine," but it plainly does not apply.  AOB 63. That doctrine permits time, place, and manner restrictions that regulate the *secondary* effects of expressive conduct, such as crime near an adult-themed business. *See City of Los Angeles v. Alameda Books*, 535 U.S. 425 (2002).  The doctrine does not allow the regulation of speech because of its *primary* effect, that is, the "speech['s] impact[] [on] the listener or viewer." *Free Speech Coal. v. Reno*, 198 F.3d 1083, 1095 (9th Cir. 1999) (law regulating

virtual child pornography to prevent it from influencing viewers did not target "secondary effects"; it targeted "how speech impacts the listener or viewer"); *United States v. Playboy Entertainment Group*, 529 U.S. 803, 811 (2000) ("concern for the effect of [television] subject matter on young viewers" is not a secondary effect).

Here, Plaintiffs seek to hold Netflix liable for the primary effect of its speech on viewers—the emotional response the content allegedly evoked when viewed—not a secondary effect.

*Third*, Plaintiffs assert without analysis that Netflix's speech is "commercial speech." AOB 64. It is not. "[T]he 'core notion of commercial speech' is that it 'does no more than propose a commercial transaction.'" *Hilton v. Hallmark Cards*, 599 F.3d 894, 905 n.7 (9th Cir. 2010) (quoting *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1184 (9th Cir. 2001)). *13 Reasons Why* is obviously not commercial speech—it is core expressive speech. *See, e.g.*, *Tamkin v. CBS Broad., Inc.*, 193 Cal.App.4th 133, 143 (2011) ("The creation of a television show is an exercise of free speech."). Netflix's recommendation of *13 Reasons Why* also is not commercial speech. It did not propose any commercial transaction; it recommended content to subscribers who had already paid for a subscription. (6-ER-977, 981-82, 988 ¶¶39, 58-64, 79 (alleging recommendations were made in "Netflix's paywalled streaming" platform).) Moreover, the

"commercial solicitation or promotion of constitutionally protected written works is protected as an incident to the First Amendment value of the underlying speech or activity." *See People v. Fogelson*, 21 Cal.3d 158, 165, n.7 (1978).

*Fourth*, Plaintiffs argue that certain speech directed towards minors is less deserving of First Amendment protection. AOB 63. The only case they cite *rejected* that argument in the context of a tort suit. *See James*, 300 F.3d at 697 ("We cannot adequately exercise our responsibilities to evaluate regulations of protected speech, even those designed for the protection of children, that are imposed pursuant to a trial for tort liability."). The Supreme Court has likewise rejected as "unprecedented and mistaken" the argument that First Amendment protection disappears when violent content will be viewed by minors. *Brown*, 564 U.S. at 794.

Finally, unable to rely on any existing exception to the First Amendment, Plaintiffs simply ask this Court to fashion a new one. AOB 63 & n.17. There is no basis for this Court to take that unprecedented step. *See Brown*, 564 U.S. at 792 (rejecting the "'startling and dangerous' proposition" that the Supreme Court "could create new categories of unprotected speech by applying a 'simple balancing test' that weighs the value of a particular category of speech against its social costs and then punishes that category of speech if it fails the test" (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)).

56

## III.    The Anti-SLAPP Statute Applies, But That Issue Is Moot

The final issue Plaintiffs raise is whether California's anti-SLAPP statute applies.  This Court need not reach that issue in the event it affirms.  The applicability of the anti-SLAPP statute does not affect whether the FAC was properly dismissed.  *See Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 833-34 (9th Cir. 2018) (anti-SLAPP motion based on a complaint's legal deficiencies is "treated in the same manner as a motion under Rule 12(b)(6).").  It affects only whether Netflix can seek attorneys' fees.  *See Newsham v. Lockheed Missiles & Space Co. Inc.*, 190 F.3d 963, 971 (9th Cir. 1999).  Netflix will not seek attorneys' fees against the Plaintiffs if it prevails in this appeal.  Thus, the applicability of the anti-SLAPP statute is moot at this stage.  *See Fields v. Gates*, 233 F.3d 1174, 1175 (9th Cir. 2000) (fee order "moot" where appellees "stated at oral argument that they have not sought, and will not seek, to enforce the order for payment" of those fees).[9]

Should this Court reach the issue, the anti-SLAPP statute applies to Plaintiffs' claims.

---

[9] Should this Court reverse to allow Plaintiffs another amendment, Netflix reserves the right to move to strike under the Anti-SLAPP statute and seek fees.

### A.    The Statute Applies To Removed Diversity Actions

Plaintiffs concede that anti-SLAPP statutes apply to diversity actions—at least where the *plaintiff* files them in federal court. *See Newsham*, 190 F.3d 963; AOB 79. They argue that *Newsham*'s holding does not apply to diversity actions removed by *defendants*. AOB 75-79.[10] But this Court has repeatedly applied *Newsham* to removed actions. *See, e.g.*, *Gardner v. Martino*, 563 F.3d 981, 990, 983 (9th Cir. 2009); *Northon v. Rule*, 637 F.3d 937, 937-38 (9th Cir. 2011).

Indeed, Plaintiffs' argument, even as it purports to distinguish *Newsham*, is merely a disguised attempt to overturn it. Plaintiffs ask this panel to abrogate *Newsham*'s conclusion that the anti-SLAPP statute's fee-shifting provisions are "substantive," *Newsham*, 190 F.3d at 973, on the basis that the California Supreme Court in *Flatley v. Mauro*, 39 Cal.4th 299 (2006) referred to the anti-SLAPP statute as "procedural." AOB 76. But *Flatley* did not address whether the anti-SLAPP provisions are substantive or procedural under the *Eerie* doctrine, which was the issue *Newsham* decided. It simply observed in passing that the anti-SLAPP provisions set forth "procedure[s]." *Flatley*, 39 Cal.4th at 312. *Newsham* did not make a different observation; it instead recognized correctly that even a

---

[10] Below, Plaintiffs argued only that *Newsham* was wrong. (3-ER-435-37.) Their new attempt to instead limit *Newsham* is waived. *See Broad v. Sealaska Corp.*, 85 F.3d 422, 430 (9th Cir. 1996).

"plainly procedural" "state law" can have an "objective" that is "manifestly substantive." *See* 190 F.3d at 972-73.

Plaintiffs' policy-based arguments for narrowly reading *Newsham* fare no better. Under Plaintiffs' rule, if a plaintiff chose to file a diverse action in state court, it could leverage the unavailability of the anti-SLAPP law in federal court to deter a defendant from removing. That rule derives no support from *Newsham*. *Cf. McKinney v. Bd. of Trustees of Mayland Cmty. Coll.*, 955 F.2d 924, 927 (4th Cir. 1992) (A "defendant's right to remove a case that could be heard in federal court is at least as important as the plaintiff's right to the forum of his choice.").

## B. Plaintiffs' Claims Are Subject To The Anti-SLAPP Statute

An anti-SLAPP motion involves two steps: (1) the defendant must show that each challenged claim arises from protected activity; and (2) if the defendant does so, the burden shifts to the plaintiff to demonstrate a probability of prevailing on each of the challenged claims (which for a pleadings motion is the 12(b)(6) standard). *Greater L.A. Agency on Deafness, Inc. ("GLAAD") v. Cable News Network, Inc.*, 742 F.3d 414, 422 (9th Cir. 2014). Both requirements are met.

### 1. *Plaintiffs' Claims Arise Out Of Protected Activity*

A claim arises out of "protected activity" if it involves an act (1) "in furtherance of [a] person's right of petition or free speech under the United States

Constitution or the California Constitution" that (2) is "in connection with a public issue." C.C.C.P. § 425.16(b)(1).

The first requirement is met because the "principal thrust or gravamen" of Plaintiffs' claims targets the expressive content of *13 Reasons Why*. *GLAAD*, 742 F.3d at 422 (quoting *Martinez v. Metabolife Int'l, Inc.*, 133 Cal.App.4th 181, 188 (2003); *Hilton*, 599 F.3d at 903; *see supra* Part II. Additionally, Netflix's warnings and recommendations for the show are *in furtherance* of the speech embodied in the show. *See, e.g.*, *GLAAD*, 742 F.3d at 423 (CNN's decisions about "what content to post on its web site and how that content is displayed" were protected).

The second requirement is also met. As Plaintiffs acknowledge, the show was a matter of public interest: the "broad exhibition" of *13 Reasons Why* "was a cultural event" that spurred "debates." (6-ER-973 ¶23); *see Tamkin*, 193 Cal.App.4th at 143 ("creation and broadcasting of" popular television show "issue of public interest.") Additionally, the topics addressed by the show are matters of public interest. Plaintiffs argue that Netflix improperly relies on a "synecdoche theory," but the cases they cite are distinguishable. AOB 70-71. Those cases hold that a statement that vaguely implicates a public subject is not automatically a statement about the public subject itself. *See Wilson v. Cable News Network, Inc.*, 7 Cal.5th 871, 902 (2019) (decision to fire journalist for plagiarism not "a conversation about the ethical lapses of all journalists everywhere.") Here, in

contrast, Plaintiffs allege that *13 Reasons Why* itself was of monumental public significance, (6-ER-973 ¶23), and their claims arise from the controversial nature of that show and its content.

>     2.    *Plaintiffs Cannot Show A Probability Of Prevailing On Their Claims*

Because Plaintiffs' claims arise out a protected activity, they are subject to the anti-SLAPP statute unless Plaintiffs can show a probability of prevailing on their claims. For the reasons discussed above, they cannot.

>     3.    *No Public Policy Exception Exists*

Plaintiffs argue that this Court should not apply the anti-SLAPP statute based on various policy arguments. AOB 52-53, 60-61, 79. As the California Supreme Court held in rejecting similar arguments, "[n]othing in the [anti-SLAPP] statute itself categorically excludes any particular type of action from its operation, and no court has the 'power to rewrite the statute so as to make it conform to a presumed intention which is not expressed.'" *Navellier v. Sletten*, 29 Cal.4th 82, 92 (2002) (quoting *California Teachers Ass'n v. Governing Bd. of Rialto Unif. Sch. Dis.*, 14 Cal.4th 627, 633 (1997)).

## IV.    This Court Should Affirm The Judgment Without Leave To Amend

This Court should affirm the judgment below without remanding to allow Plaintiffs to amend their complaint for a second time. If a "proposed amendment would be futile, there is no need to prolong the litigation by permitting further

amendment." *Gardner*, 563 F.3d at 990 (internal quotation marks omitted).

Plaintiffs concede that they cannot fix the statute of limitations and standing

problems with their claims.  (2-ER-55.)  And they have never articulated how, after

already amending their complaint once, they could amend again to cure its

substantive defects.  All of Plaintiffs' claims rest on the same basic factual

foundation that courts have repeatedly rejected as a basis for liability—the fact that

their family member died by suicide after watching an allegedly harmful television

show.  When a party "presents no new facts" it could allege to successfully state a

claim, it is proper to deny any motion for leave.  *Bonin v. Calderon*, 59 F.3d 815,

845 (9th Cir. 1995).

## CONCLUSION

Netflix respectfully submits that the judgment should be affirmed.


DATED: June 9, 2023                    MUNGER, TOLLES & OLSON LLP


                                       By:    *s/ Blanca F. Young*
                                              BLANCA F. YOUNG
                                       Attorneys for Appellee NETFLIX, INC.


62

## STATEMENT OF RELATED CASES

Netflix is not aware of any related cases pursuant to Federal Rule of

Appellate Procedure 28-2.6.

**CERTIFICATE OF COMPLIANCE**

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 22-15260

I am the attorney or self-represented party.

**This brief contains 13,991 words,** excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[**X**] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  [  ] it is a joint brief submitted by separately represented parties.

  [  ] a party or parties are filing a single brief in response to multiple briefs.

  [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Blanca F. Young*          **Date June 9, 2023**

## CERTIFICATE OF SERVICE

I certify that on June 9, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


DATED: June 9, 2023                    By: _____*s/ Blanca F. Young*_____
                                            Blanca F. Young