No. 22-15260

---

## United States Court of Appeals
## for the Ninth Circuit

---

THE ESTATE OF ISABELLA "BELLA" HERNDON, et al.
Plaintiffs/Appellants,

v.

NETFLIX, INC.,
Defendant/Appellee.

---

On Appeal from the U.S. District Court
for the Northern District of California
No. 4:21-cv-06561
Hon. Yvonne Gonzalez Rogers

---

**Brief of the Foundation for Individual Rights and Expression (FIRE); PEN American Center, Inc. (PEN America); the National Coalition Against Censorship (NCAC); and the Student Press Law Center (SPLC) as *Amici Curiae* in Support of Appellee Netflix, Inc.**

---

Eugene Volokh*
First Amendment Clinic
UCLA School of Law
385 Charles E. Young Dr. E
Los Angeles, CA 90095
(310) 206-3926
volokh@law.ucla.edu

*   Counsel would like to thank Aaron Boudaie, Eimile Nolan, and Simon Ruhland, UCLA School of Law students who worked on this brief.

## Rule 26.1 Statement

None of the *amici* has any parent corporation, and no publicly held

corporation owns 10% or more of the stock of any of the *amici*.

# Table of Contents

Rule 26.1 Statement...................................................................i

Table of Contents ..................................................................ii

Table of Authorities..............................................................iii

Interest of *Amici Curiae*.......................................................1

Summary of Argument.............................................................3

Argument...................................................................................5

I.    Works discussing suicide, including *13 Reasons Why*, are generally protected by the First Amendment and by the California anti-SLAPP statute .........................................5

II.   Creators of fictional works that discuss suicide cannot be compelled to include the warnings that plaintiffs demand...........11

III.  The First Amendment protects the promotion of works to viewers who may especially want to see them, including works that discuss suicide ...........................................14

Conclusion ..............................................................................18

Certificate of Compliance........................................................20

Certificate of Service ..............................................................20

# Table of Authorities

## Cases

*Barasch v. CBS*, No. B275758, 2018 WL 4178450 (Cal. Ct. App. 2018) .......................................................................................... 5

*Bill v. Super. Ct.*, 137 Cal. App. 3d 1002 (1982) .................................... 16

*Blatty v. N.Y. Times Co.*, 42 Cal. 3d 1033 (1986)................................... 17

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) ........................................... 10

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011) .............................. 9

*Carter v. Super. Ct.*, No. D038091, 2002 WL 27229 (Cal. Ct. App. 2002) ......................................................................................... 5

*Davidson v. Time Warner, Inc.,* No. Civ.A. V–94–006, 1997 WL 405907, (S.D. Tex. Mar. 31, 1997) ........................................................ 8

*DeFilippo v. NBC, Inc.*, 446 A.2d 1036 (R.I. 1982) ........................... 9, 10

*Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952 (9th Cir. 2012) ............................................................................................... 15

*Dual Diagnosis Treatment Centr. v. Buschel*, 6 Cal. App. 5th 1098 (2017) ............................................................................................. 7

*Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123 (1992) ............................................................................................... 17

*Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017 (5th Cir. 1987) ........... 9

*Hess v. Indiana*, 414 U.S. 105 (1973) .................................................... 10

*James v. Meow Media, Inc.,* 300 F.3d 683 (6th Cir. 2002) ................. 8, 12

iii

*Lieberman v. KCOP Television, Inc.*, 110 Cal. App. 4th 156 (2003).................................................................................6

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001).............................18

*M.G. v. Time Warner, Inc.*, 89 Cal. App. 4th 623 (2001) .........................6

*McCollum v. CBS*, 202 Cal. App. 3d 989 (1988) ...........................9, 10, 11

*McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334 (1995).....................11

*Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790 (1995)...............................................................................14

*Musero v. Creative Artists Agency, LLC*, 72 Cal. App. 5th 802 (2021)...............................................................................5

*Navellier v. Sletten*, 29 Cal. 4th 82 (2002) .............................................16

*NIFLA v. Becerra*, 138 S. Ct. 2361 (2018)........................................11, 17

*Olivia N. v. NBC, Inc.*, 126 Cal. App. 3d 488 (1981) ...........................8, 9

*Pott v. Lazarin*, 47 Cal. App. 5th 141 (2020) ...........................................5

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ......................................18

*Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781 (1988)....11, 15

*Roe v. Puig*, CV 20-11064 FMO, 2021 WL 4557229 (C.D. Cal. 2021)...............................................................................5

*Tamkin v. CBS Broad., Inc.*, 193 Cal. App. 4th 133 (2011) ...............6, 14

*Texas v. Johnson*, 491 U.S. 397 (1989) ..................................................17

*Walt Disney Prods., Inc. v. Shannon*, 247 Ga. 402 (1981)....................8, 9

*Widdoss v. Huffman,* 62 Pa. D. & C. 4th 251 (2003) ................................8

iv

*World Fin. Grp., Inc. v. HBW Ins. & Fin. Servs., Inc.*, 172 Cal.
App. 4th 1561 (2009)............................................................................7

## Other Authorities

Mira Costa High School, *English 1-2CP Reading List*.............................3

## Interest of *Amici Curiae*[1]

The Foundation for Individual Rights and Expression (FIRE) is a non-partisan, nonprofit organization dedicated to defending the individual rights of all Americans to free speech and free thought—the most essential qualities of liberty. Since 1999, FIRE has successfully defended individual rights through public advocacy, strategic litigation, and participation as *amicus curiae* in cases that implicate First Amendment expressive rights. After defending core civil liberties at our nation's colleges and universities for more than two decades, FIRE recently expanded its mission to protect free expression beyond campus as well. FIRE has a direct interest in this case because this Court's jurisprudence on California's anti-SLAPP law affects the people FIRE represents. Lawsuits targeting protected expression threaten the speech of large corporations and independent creators alike. FIRE joins this brief to emphasize that expression

---

[1] No party or party's counsel has authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting the brief. No person has contributed money that was intended to fund preparing or submitting the brief, except that UCLA School of Law paid the expenses involved in filing this brief.

1

on matters of public significance and its distribution are protected by the First Amendment, and therefore statutorily protected from speech-chilling abuses of the judicial process.

The National Coalition Against Censorship (NCAC) is an alliance of more than 50 national nonprofit literary, artistic, religious, educational, professional, labor, and civil liberties groups that are united in their commitment to freedom of expression. Since its founding, NCAC has worked to protect the First Amendment rights of artists, authors, students, readers, and the general public. The views presented in this brief are those of NCAC and do not necessarily represent the views of each of its participating organizations.

The PEN American Center, Inc. (PEN America) is a nonprofit organization that represents and advocates for the interests of writers, both in the United States and abroad. PEN America is affiliated with more than 100 centers worldwide that make up the PEN International network. Its membership includes more than 7,300 journalists, novelists, poets, essayists, and other professionals. PEN America has a particular interest in opposing restrictions on artistic, literary, and dramatic expression.

The Student Press Law Center (SPLC) is a national, nonpartisan, non-profit organization that works to promote, support, and defend the press freedom and freedom of information rights of high school and college journalists. As the only national organization devoted exclusively to defending the legal rights of the school-sponsored and independent student press, SPLC collects information on student press cases nationwide and produces many publications on student press law, including its book, *Law of the Student Press* (4th ed. 2014). Impeding access for underage audiences to certain topics or sanitizing that content, as Plaintiffs/Appellees demand, would significantly curtail the press freedom rights of student journalists.

## Summary of Argument

Suicide is an enduring, though tragic, facet of human existence. Many great works of literature, history, and religion depict it, and those works are routinely taught to teenagers.[2] For just some of the most famous

---

[2] *See, e.g.*, Mira Costa High School, *English 1-2CP Reading List*, https://www.miracostahigh.org/apps/pages/index.jsp?uREC_ID=129841&type=u&pREC_ID=137626 (https://perma.cc/7M5M-RGRA).

literary examples, consider Shakespeare's *Romeo and Juliet*, *Othello*, and *Julius Caesar*, as well as the novels *Anna Karenina*, *Madame Bovary*, *Les Miserables*, *The Catcher in the Rye*, and *The Great Gatsby*. In political, scientific, and artistic history, consider any biography or history describing Cleopatra, Mark Antony, Hannibal, Vincent van Gogh, Alan Turing, Ernest Hemingway, Marilyn Monroe, or Kurt Cobain. In mythology, consider the myths of Hercules and of Aegeas, the father of Theseus; in the Bible, Samson and Saul. And these are just the possibly sympathetic figures: For others, see the Bible's account of Judas, or any book noting the deaths of Hitler, Himmler, Goering, or Goebbels.

Yet all the books, plays, and films that include such suicides are of course fully protected by the First Amendment, whether or not they include minors among their audience, and however they may be sold or marketed. None of them, from Shakespeare to the Bible, has to be distributed with a warning label. Publishers and distributors are free to promote them based in part on what they can infer about their target audience. And there is no First Amendment exception or California anti-SLAPP law exception for *13 Reasons Why*.

4

## Argument

### I. Works discussing suicide, including *13 Reasons Why*, are generally protected by the First Amendment and by the California anti-SLAPP statute

"Creating a television show is an exercise of constitutionally protected expression." *Musero v. Creative Artists Agency, LLC*, 72 Cal. App. 5th 802, 816 (2021). "Steps taken to advance such constitutionally protected expression are properly considered 'conduct in furtherance of' the exercise of the right of free speech within the meaning of section 425.16, subdivision (e)(4)." *Id.*

That is true even of purely frivolous entertainment, but it is even more clearly true for works that discuss important topics such as suicide, sexual assault, and substance abuse, all of which have been found to be issues of public interest under the anti-SLAPP statute. *Pott v. Lazarin*, 47 Cal. App. 5th 141, 148-49 (2020) (suicide); *Roe v. Puig*, CV 20-11064 FMO, 2021 WL 4557229, *3, n.3 (C.D. Cal. Aug. 13, 2021) (sexual assault); *Carter v. Super. Ct.*, No. D038091, 2002 WL 27229, *3 (Cal. Ct. App. Jan. 10, 2002) (substance abuse); *Barasch v. CBS*, No. B275758, 2018 WL 4178450, *1 (Cal. Ct. App. Aug. 31, 2018) (mental health and substance

abuse). "Major societal ills are issues of public interest." *Lieberman v. KCOP Television, Inc.*, 110 Cal. App. 4th 156, 164 (2003).

More broadly, "an issue of public interest is any issue in which the public is interested." *Tamkin v. CBS Broad., Inc.*, 193 Cal. App. 4th 133, 143 (2011) (cleaned up); *see, e.g.*, *id.* (finding the creation and broadcasting of a single *CSI* episode was an issue of public interest "because the public was demonstrably interested in the creation and broadcasting of that episode, as shown by the posting of the casting synopses on various Web sites and the ratings for the episode"). Indeed, as the plaintiffs themselves noted, the novel upon which *13 Reasons Why* was based "was a hit, making the *New York Times*' young-adult best-seller list a few times." *See* 6-ER-972. It "had a 'huge following' and 'huge fan base.'" *Id.* The show itself was also "a huge hit" and "popular." 6-ER-973. Its "broad exhibition was a cultural event. Twitter debates ignited." *Id.*

And it is enough that the program's "broad topic" is of public concern. *M.G. v. Time Warner, Inc.*, 89 Cal. App. 4th 623, 629 (2001). To be sure, a brief reference to a public issue may not suffice to imbue a purely private dispute with public concern. *See, e.g.*, *World Fin. Grp., Inc. v. HBW*

*Ins. & Fin. Servs., Inc.*, 172 Cal. App. 4th 1561, 1572 (2009) (cleaned up) (rejecting the claim that solicitation of an employer's customers concerned a matter of public interest related to "workforce mobility and free competition," because the specific communications "were not about these broad topics," "designed to inform the public of an issue of public interest," or "made in the context of any public discussion"); *Dual Diagnosis Treatment Center v. Buschel*, 6 Cal. App. 5th 1098, 1104-05 (2017) (concluding that there was no public interest in a claim about the "licensing status of a *single* rehabilitation facility," because it was far removed from the broad topic of "the treatment of individuals with substance abuse addictions" and lacked the "potential to impact[] a broad segment of society") (emphasis added). But the whole point of plaintiffs' allegations is that *13 Reasons Why* is centered around topics of public concern, such as suicide. *E.g.*, 6-ER-972-73.

Nor is this constitutional and anti-SLAPP law protection lost because some small portion of the audience for a book, film, TV program, song, or even a video game does something harmful in a way that was misguidedly inspired by the speech. Thus, for instance, when plaintiffs claimed

that a video game helped lead a 14-year-old player to commit murder, on the theory that it "communicated . . . a disregard for human life and an endorsement of violence," the First Amendment precluded such liability. *James v. Meow Media, Inc.,* 300 F.3d 683, 696-97 (6th Cir. 2002). The same was true for claims that a rap song helped motivate a listener to murder a police officer, *see Davidson v. Time Warner, Inc.,* No. Civ.A. V-94-006, 1997 WL 405907, *12 (S.D. Tex. Mar. 31, 1997), or that the film *The Fast and the Furious* led a viewer to race and crash his car, *see Widdoss v. Huffman,* 62 Pa. D. & C. 4th 251, 257 (2003), or that the TV program *Born Innocent* led some underage viewers to sexually attack a small child in copying a scene shown on the program, *Olivia N. v. NBC, Inc.*, 126 Cal. App. 3d 488, 492-94 (1981).

And this logic applies equally to self-harm, whether accidental or intentional: The First Amendment precluded liability, for instance, when an 11-year-old partially blinded himself when performing a stunt that he had seen on the *Mickey Mouse Club* TV program, *see Walt Disney Prods., Inc. v. Shannon*, 247 Ga. 402, 405 (1981); when a 13-year-old hanged himself when simulating a stunt from *The Tonight Show*, *DeFilippo v. NBC,*

*Inc.*, 446 A.2d 1036, 1038 (R.I. 1982); when a 14-year-old hanged himself when simulating behavior described in *Hustler*, *Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1023 (5th Cir. 1987); or when a 19-year-old shot himself after listening to a song called "Suicide Solution," *see McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989, 1003 (1988). Allowing liability for such speech, the court in *Walt Disney* held, would "open the Pandora's Box" and "have a seriously chilling effect on the flow of protected speech through society's mediums of communication." *Walt Disney*, 247 Ga. at 405.

To be sure, there are narrow exceptions to First Amendment protections—but none apply here. There is of course no general exception for speech to minors, including speech that depicts violence. *See, e.g.*, *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 792-93 (2011). The greater latitude for restricting sexually themed speech to minors is a narrow and limited exception, which the Court has refused to extend beyond pornography. *Id.* at 793-94. Outside that exception, "the First Amendment precludes censorship of programming content even where the restraint is designed to protect children." *Olivia N.*, 126 Cal. App. 3d at 494. Nor can the

9

censorship be justified simply by some "mental-health experts" being worried that speech may lead some "impressionable viewers," Appellants' Brief at 16, to behave in harmful ways—whether the speech is a violent video game, *Brown*, 564 U.S. at 800-01 & nn.7-8, or a dramatic program that deals with suicide.

And the exception that focuses on the risk that speech will promote violent conduct—the incitement exception—only applies to speech that was "intended to produce, and likely to produce, *imminent*" harmful conduct. *Hess v. Indiana*, 414 U.S. 105, 109 (1973) (emphasis added); *see also Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). For speech about suicide to be unprotected, "[i]t is not enough that [Decedent's] suicide may have been the result of an unreasonable reaction to the [speech]; it must have been a specifically intended consequence." *McCollum*, 202 Cal. App. 3d at 1000-01. Mere allegations of "knowledge that [a work] would produce an uncontrollable impulse to self-destruction in persons like [the victim]" does not suffice. *Id.* at 997-98.

The incitement exception "must be applied with extreme care," *DeFilippo*, 446 A.2d at 1042, and close attention to its elements. And here, as

in *McCollum*, 202 Cal. App. 3d at 1006-07, there is no plausible allegation that the elements of (1) specific intent to promote (2) imminent suicide were satisfied.

## II. Creators of fictional works that discuss suicide cannot be compelled to include the warnings that plaintiffs demand

Constitutionally protected speech generally cannot be required to carry content-based disclaimers. "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech," and is thus a presumptively unconstitutional "content-based regulation of speech." *Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988) (striking down a requirement that professional fundraisers include in their pitches information about the percentage of raised funds that goes to the fundraisers); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 348, 355 (1995) (holding that a law compelling self-identification on campaign literature impermissibly compels a speaker to include "content that the author is free to include or exclude"); *NIFLA v. Becerra*, 138 S. Ct. 2361, 2378 (2018) (holding that a law requiring unlicensed crisis pregnancy centers to notify patients of their lack of license "imposes

an unduly burdensome disclosure requirement that will chill their protected speech").

And the constitutional objection is even stronger when plaintiffs seek to impose liability after the fact, based on the absence of a warning that no legislature or regulatory body had expressly defined. As the Sixth Circuit noted with respect to liability for murders supposedly caused by violent video games,

> We cannot adequately exercise our responsibilities to evaluate regulations of protected speech, even those designed for the protection of children, that are imposed pursuant to a trial for tort liability. Crucial to the safeguard of strict scrutiny is that we have a clear limitation, articulated in the legislative statute or an administrative regulation, to evaluate. "Whither our children" . . . is an important question, but their guidance through the regulation of protected speech should be directed in the first instance to the legislative and executive branches of state and federal governments, not the courts.

*James*, 300 F.3d at 696-97.

Thus, for instance, plaintiffs suggest that courts should examine a program's content to determine its supposed dangerousness, which they seek to establish based on characteristics such as the "pacing" of the plot, 6-ER-972, the level of detail used in certain depictions, 6-ER-973, the length of certain scenes, *id.*, and the content of the story's climax, 6-ER-

972. And given plaintiffs' dissatisfaction with the warnings Netflix *did* affix, 6-ER-977, factfinders would presumably have to retroactively determine the adequacy of the warnings attached to each episode to ensure the wording matched what they viewed as the most significant aspects of an episode's content. 6-ER-975, 977.

Such evaluations would require judges and juries to engage in subjective, unpredictable, and content-based evaluations and artistic judgments about dramatic, literary, historical, and theological works. Any such standard would offer no guidance going forward for filmmakers, authors, and others; as a result, it would chill those writers' creative expression, by discouraging them from including materials that might potentially trigger ill-defined obligations to warn. And in any event, it would unconstitutionally affect the content of the program by revealing what would otherwise be unexpected plot elements, undermining the emotional impact a scene might convey, and undercutting the force of the program's message.

Plaintiffs' claims are at bottom predicated on the assertion that the *content* of Netflix's show is dangerous and immoral. Appellants' Brief at

21 ("Netflix made the decision to air the Show, despite the warnings and advice from the mental-health experts that it engaged," warnings and advice that specifically related to the subject matter). Plaintiffs therefore seek warnings that would, as noted above, necessarily change the content of the work. The First Amendment precludes such content-based speech restrictions and compulsions.

### III. The First Amendment protects the promotion of works to viewers who may especially want to see them, including works that discuss suicide

Plaintiffs also urge that courts should police the speech filmmakers and distributors use to reach their audiences. But the promotion of speech is protected alongside the content of the speech. *See, e.g.*, *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790, 797 (1995) (holding that a "newspaper has a constitutional right to promote itself by reproducing its originally protected articles or photographs"); *Tamkin,* 193 Cal. App. 4th at 143 (recognizing that acts that "advance" or "assist" the broadcasting of a television show are protected by the California anti-SLAPP statute).

After all, such promotion is itself speech. Just as a film is constitutionally protected, so is a billboard urging people to watch the film, and so is an item displayed in a Netflix window urging the same. Though such displays do have a commercial purpose, such speech "still receives full First Amendment protection" when "the commercial aspects of the speech are 'inextricably intertwined' with otherwise fully protected speech." *Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952, 958 (9th Cir. 2012) (citing *Riley*, 487 U.S. at 796). And when speech promoting a film is faulted precisely because the film is seen as supposedly harmful—*i.e.*, for reasons focused on the content of the underlying film—then the commercial aspects of the promotional speech are indeed inextricably intertwined with the fully protected work.

All this remains true when the speech is displayed in part based on Netflix's inferences about what a viewer might particularly like. Distributors of speech, like distributors of other products in a consumer-focused economy, routinely seek to promote their work to those who they think would find it most interesting. Bookstore staff, for example, may recommend books to patrons based on the interests that the patrons express—

and, if patrons are regulars, based on their past purchases. Publishers of tragedies are likely to focus on the tragedy-minded, rather than wasting money advertising to those who prefer farces.

Plaintiffs call on this Court to mandate unspecified but clearly content-based constraints on speech distributors' ability to promote their work to those who they think might want to view it. Plaintiffs' repeatedly stressing the show's content reveals this. *See Navellier v. Sletten*, 29 Cal. 4th 82, 90 n.6 (2002) (finding the action arose out of protected activity where the complaint "expressly refer[red] to [the] activity"). Plaintiffs stress the show's pacing and style, the placement of the climax, the detail of the depiction of plot points, and how "graphic" the scenes are. 6-ER-972-73. While plaintiffs argue these details are merely "provided for . . . context," 6-ER-974, plaintiffs presumably viewed this context as important because they needed to establish the supposed dangerousness of the show before asserting any sort of claim. *See, e.g.*, *Bill v. Super. Ct.*, 137 Cal. App. 3d 1002, 1007-08 (1982) (finding that "if liability were imposed upon the petitioners" for displaying a film that allegedly drew a gang member crowd that then committed a crime, "First Amendment

concerns would undoubtedly be implicated," since the defendants' film was supposedly dangerous "because of [its] content, and for no other reason"). Just as listing books as bestsellers—an important tool that leads some readers to buy them—is constitutionally protected, *Blatty v. N.Y. Times Co.*, 42 Cal. 3d 1033, 1041 (1986), so more individualized recommendations are likewise constitutionally protected.

Nor can plaintiffs avoid the First Amendment protection offered to *13 Reasons Why*, or to speech that markets *13 Reasons Why*, by claiming that the restrictions they urge target the "secondary effects" of the speech. "The emotive impact of speech on its audience is not a 'secondary effect' unrelated to the content of the expression itself." *Texas v. Johnson*, 491 U.S. 397, 412 (1989) (cleaned up). "Listeners' reaction to speech is not a content-neutral basis for regulation." *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 134 (1992). The plaintiffs' proposal is thus content-based, and thus subject to "the normal prohibition on content-based restrictions." *NIFLA*, 138 S. Ct. at 2372 (cleaned up).

The tendency of speech to persuade people to do bad things, and the harms that flow from such persuasion, are likewise not treated as

17

secondary effects. When "the chain of causation . . . necessarily run[s] through the persuasive effect of the expressive component of the conduct," the law "regulates on the basis of the primary effect of the speech—i.e., its persuasive (or repellant) force." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 394 n.7 (1992) (cleaned up).

And the presence of underage listeners does not affect this analysis. The tendency of speech to send bad messages to children is not seen as a secondary effect, and neither is its tendency to cause harms that flow from such messages—for instance, the harms flowing from tobacco use, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 574 (2001) (Thomas, J., concurring in part and concurring in the judgment), or from viewing pornography, *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 814-15 (2000).

## Conclusion

Many works, whether they depict murder, assault, or suicide, may regrettably contribute to a small number of viewers copying the depicted conduct. Even if, as plaintiffs allege, this happened here, it cannot justify opening the programs to vast and ill-defined liability—whether based purely on their content, on their lack of some hypothetical disclaimer that

would be demanded by a jury after the fact, or on the way the programs are marketed.

Courts have routinely recognized that the First Amendment precludes tort liability based on such programs, even when it is alleged that the programs have helped cause injury or even death, and even when the injury or death was caused by underage viewers. The same applies to *13 Reasons Why*. This Court should therefore affirm the judgment below.

Respectfully Submitted,

s/ Eugene Volokh

Counsel for *Amici Curiae*
UCLA School of Law
385 Charles E. Young Dr. E
Los Angeles, CA 90095
(310) 206-3926
volokh@law.ucla.edu

## Certificate of Compliance

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,545 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Dated: June 12, 2023

> s/ Eugene Volokh
> Counsel for *Amici Curiae*

## Certificate of Service

I certify that today I electronically served this brief (1) by filing it via this Court's CM/ECF system, (2) by serving proposed *amicus* Dr. Michal Lavi by e-mail at michal24000@walla.co.il and michal24000@gmail.com, with Dr. Lavi's consent, and (3) by serving proposed *amicus* Cindy Ku by mail at 731 Market St., suite 200, San Francisco, CA 94103.

Dated: June 12, 2023

> s/ Eugene Volokh
> Counsel for *Amici Curiae*