**No. 22-15260**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

THE ESTATE OF ISABELLA "BELLA" HERNDON;
JOHN HERNDON; J.H., a minor; T.H., a minor;
on behalf of themselves and others similarly situated,

*Plaintiff-Appellants*,

v.

NETFLIX, INC.,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Northern District of California
No. 4:21-cv-06561-YGR
Hon. Yvonne Gonzalez Rogers, United States District Judge

---

**APPELLANTS' REPLY BRIEF**

---

Ryan Hamilton
HAMILTON LAW LLC
5125 South Durango, Suite C
Las Vegas, Nevada 89113
(702) 818-1818
Ryan@HamLegal.com

Gregory Keenan
DIGITAL JUSTICE FOUNDATION
81 Stewart Street
Floral Park, New York 11001
(516) 633-2633
Gregory@DigitalJusticeFoundation.org

Andrew Grimm
DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive
Omaha, Nebraska 68154

(531) 210-2381
Andrew@DigitalJusticeFoundation.org

*Attorneys for Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................V

INTRODUCTION & SUMMARY OF ARGUMENT...........................................1

ARGUMENT .........................................................................................2

    I.     THE ANSWERING BRIEF IS INCORRECT ON SURVIVAL LIMITATIONS AND WRONGFUL-DEATH STANDING......................................................2

          A.    On limitations, the Answering Brief does not meaningfully engage the text of the operative statute, ignores one key purpose of the minor-tolling state, and ignores prior case law.............................................................................................2

          B.    The District Court erred in holding that rules of intestate succession bar wrongful-death claims by Bella's brothers.........6

    II.    THE ANSWERING BRIEF IS INCORRECT ON AMENDMENT, DUTY, PRODUCTS LIABILITY, AND FREE SPEECH.................................................7

          A.    The Answering Brief's inapposite authorities pertain to appeals from denial of amendment, not remand for further proceedings after reversal on a threshold issue. ........................7

          B.    The Answering Brief's arguments on duty are legally incorrect and, if adopted, would expose children to unprecedented levels of harm. ....................................................9

          C.    The Answering Brief's products-liability arguments diverge from California's foundational policies on how to protect consumers from dangerous products placed on the market........................................................................................14

          D.    The Answering Brief's causation argument miscites its central authority and ignores the Opening Brief's central authority. ..................................................................................18

iii

E.    The Answering Brief's failure to cite California tort cases implicating algorithmic control and targeting show how novel these questions are—and why they Defendant's policy concerns. .......................................................................22

F.    The First Amendment does not bar these claims. .....................26

III.   THE ANSWERING BRIEF MAKES MAJOR ANTI-SLAPP CONCESSIONS IN THE FACE OF BARAL, BONNI, AND PARK AND FAILS TO DEFEND ITS UNWARRANTED EXTENSION OF NEWSHAM........39

CONCLUSION ....................................................................................42

FORM 8.  CERTIFICATE OF COMPLIANCE FOR BRIEFS ............................43

CERTIFICATE OF SERVICE ..............................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Jacoves v. United Merchandising Corp.,
    9 Cal.App.4th 88 (1992) ..................................................................14

Tate v. Canonica,
    180 Cal.App.2d 898 (1960) ............................................................14

## INTRODUCTION & SUMMARY OF ARGUMENT

The quintessence of this case is algorithmic control.

Algorithmic control is the central fact. Legally, algorithmic control is the primary distinguishing feature. Likewise, algorithmic control provides the central limiting principle. Allegations demonstrating algorithmic control permeate the complaint, including statements about the extent of algorithmic control from Defendant's own lead engineers. In fact, Defendant's exercise of its algorithmic control—with deadly effect, after forewarning, without any attempt to avoid harm as to a specific child that could have been accomplished without limiting public distribution—is the central liability-creating act here.

The central problem with the Answering Brief on the merits is that it either shies away from these central facts or that it simply

Given the lack of on point decisions of California law, Plaintiffs submit that the state law questions should be certified.

1

## ARGUMENT

**I.  THE ANSWERING BRIEF IS INCORRECT ON SURVIVAL LIMITATIONS AND WRONGFUL-DEATH STANDING.**

**A.  On limitations, the Answering Brief does not meaningfully engage the text of the operative statute, ignores one key purpose of the minor-tolling state, and ignores prior case law.**

The Answering Brief's positions on the survival-limitations statute, Answering Br.17-25 have (1) don't meaningfully engage the statutory text; (2) ignore—and would have this Court exclude—a key policy underlying minor tolling; and (3) overlook that past case law under the predecessor statute *did* make clear that what happened below should never happen to a claim that survives, including a case cited in the Opening Brief.

***First***, the essential problem is that Defendant's arguments don't meaningfully engage the statutory text.  There's the plain-text problem: all of Defendant's (and the District Court's) theories require the Court to analyze limitations as though Bell has died, but the statute says to analyze it as though Bella "***had not died***."  §366.1(b).  Likewise, there's the verb-tense problem: Defendant ignores the key tense "***would have been applicable*** if the person had not died."  §366.1(b); e.g., Hughes v. Board of Architectural Examiners, 17 Cal.4th 763, 776 (1998) ("In construing statutes, the use of **verb tense** by the Legislature is **considered significant**."); In re Steele, 32 Cal.4th 682, 696 (2004) ("conditional perfect tense—'would have been'").

2

And, there's also the statutory-context problem: the California Legislature ***expressly*** provides when it wants generally applicable tolling not to apply, but nowhere does so in ***either*** §366.1 ***or*** §352(a). This statutory context is especially indicative given that _both_ §366.2(b) and §352(b) give express indication of restricting tolling—but the key provisions here do not. <u>E.g.</u>, Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd., 40 Cal. 4th 1, 11 (2006) ("We do not construe statutory language in isolation, but rather as a thread in the fabric of the entire statutory scheme of which it is a part.").

***<u>Second</u>***, there's the purposive problem to the Answering Brief's position. The Answering Brief seems to want to fiat that can be only one purpose to the minor-tolling statutes—exclusive to all other purposes. Answering Br.20 ("**the** purpose" of minor tolling). <u>But see</u> Opening Br.20 California law has an additional purpose they ignore: "Our courts have repeatedly recognized the strong public policy protecting minors against **the loss of their rights due to the operation of statutes of limitations**." <u>Steketee v. Lintz</u>, 38 Cal.3d 46, 56 (1985). And, the purpose also means that interpretation favors Plaintiffs: "The principle is also well established that "[statutorily] imposed limitations on actions are **technical defenses which should be strictly construed to avoid the forfeiture of a plaintiff's rights.**" <u>Id.</u>

3

This makes sense. The California Legislature is well aware that most children (though not all) have a parent or a guardian and that many persons with disabilities have a guardian—*who can initiate suit for them*. Yet, the functional purpose of the statute is to protect their rights—to ensure a measure of reticence to harm those most vulnerable.

***Third***, there's the predecessor-statute-cases problem. Since about the founding of the State of California, the California Supreme Court has repeatedly noted that the survivor claims must survive—*i.e.*, must not be shortened on account of a plaintiff's death. Opening Br.26 E.g., Lowell v. Kier, 50 Cal. 646, 648 (1875) (The predecessor survival-limitations statute "***cannot operate in any case to shorten***" the otherwise applicable limitations period); Smith v. Hall & Huggins, 19 Cal. 85, 86 (1861) ("The object [of the predecessor survival-limitations statute] **was not to curtail, but to prolong the period for suing** in the given category."); Piller v. Southern P. R. Co., 52 Cal. 42, 45 (1877) ("**hardly to be believed that it was intended that a longer time should be given, when the person injured was not killed**").

Under the predecessor statute as well, as now, Defendant's position—that a tortfeasor would face a shorter limitations period for causing death than mere injury— is an idea the California Supreme Court found "**hardly to be believed**."

4

Yet, that's what happened below: shortening the time to sue by over 2 years—contrary to longstanding California doctrines and policies.

*****

Defendants' other points add little:

- Triplett v. Williams, 269 Cal. App. 2d 135, 136 (1969) involves a case "against the executrix of the will of George W. Hoffman, deceased, and against legatees under his will." It doesn't apply. It's analogous to contemporary §366.**2**—not §366.1.

- Defendant's purposive argument overlooks that the purpose of the statute protects Bella's rights and as a non-merits argument, the limitations period is read in favor of reaching the merits.

- As discussed above, the predecessor statute ***does*** have cases that support Plaintiffs. That means the lack of substantive change noted by the legislative history supports Plaintiffs. Regardless, "official comments of the California Law Revision Commission, while persuasive, are " 'not conclusive[] evidence of [legislative] intent.'" People v. Robinson, 47 Cal. 4th 1104, 1139 (2010).

  - The policy is not absurd: Harris v. Industrial Acci. Com., 204 Cal. 432, 438 (permitting extensions of over 20 years to limitations). And, not all crimes / torts even have limitations periods.

5

**B.    The Answering Brief is wrong on wrongful-death standing.**

A

**First**, while the holding of <u>Redfield</u> is not directly on point, the rationale employed by <u>Redfield</u> *does* indicate that Defendant's probate code method is not the proper method to determine who has standing to sue. Rather <u>Redfield</u> indicates that the common law method. <u>See</u> <u>Redfield v. Oakland C. S. R. Co.</u>, 110 Cal. 277 (1895).

<u>Redfield</u> does not necessarily mean that Plaintiffs' are right but it does mean Defendant's are wrong. <u>Redfield</u> is binding authority and good law from the California Supreme Court that forecloses Defendant's probate code method for determining standing here.

**Second**, <u>Ginochio</u> is a California Supreme Court case that demonstrates that a parent's being alive does not bar siblings' standing to bring suit for the wrongful death of their sibiling. <u>Ginochio v. San Francisco</u>, 194 Cal. 159, 167-168 (1924). In that case, siblings brought suit for the death of their sibling, despite the mother of the siblings still being alive. Though the court determined that the sibling could not sue, the reason was that the siblings couldn't show damages. But the reason for dismissal was **not** because of a lack of standing. In other words, that the mother was alive did not create a legal bar for the siblings standing.

Indeed, had the court thought that the mother's being alive created a legal bar for the siblings' standing it could have and would have simply said so. If that were proper law then <u>Ginochio</u> would not have had to engage in the lack of damages analysis. Thus, <u>Ginochio</u> indicates that Bella's siblings are not barred from bringing suit for the loss of their sister, despite their parents being alive. See also <u>In re Estate of Riccomi</u>, 185 Cal. 458, 460 (1921).

**Third**, given the lack of clear guidance on these issues from the California courts on these threshold procedural issues, and given than neither side has found clear, binding law resolving these issues from the California courts, Plaintiffs intend to move to certify these questions to the California Supreme Court.

II.  **THE ANSWERING BRIEF IS INCORRECT ON AMENDMENT, DUTY, PRODUCTS LIABILITY, AND FREE SPEECH.**

   A.  **The Answering Brief's inapposite authorities pertain to appeals from denial of amendment, not remand for further proceedings after reversal on a threshold issue.**

If Plaintiffs prevail on either limitations or wrongful-death standing, the Opening Brief had noted that this Court could—and requested that it would—remand, permitting Plaintiffs to amend as to duty, products liability, and causation. Opening Br.38 (Section II.A).

In response, the Answering Brief cites inapposite authority.  It cites appeals where the district court had "*denied*" a "request for leave to amend[.]"  Gardner v. Martino, 563 F.3d 981, 992 (9th Cir. 2009); Bonin v. Calderon, 59 F.3d 815, 844 (9th Cir. 1995) (whether trial court "abused its discretion by *denying* his May 15, 1991, motion to amend").

There was no denial of requested amendment below.

Rather, the District Court *inquired* about amendment.  1-ER-7.  Plaintiffs acknowledged that *threshold* procedural issues would be a barrier to amendment unless reversed, but believed amendment could address other issues—duty, causation, *etc.*  2-ER-55-57, 2-ER-57 ("amendment could permit Plaintiffs to plead additional facts").

In turn, the District Court acknowledged this "possibility of amendment *after* […] appeal." 1-ER-2.

Thus, the Answering Brief's denial-of-amendment authorities elide the relevant posture. The relevant posture would be what to do if this Court reverses on either limitations or wrongful-death standing—such that a threshold barrier to amendment was reversed.

In such a situation, this Court routinely remands while granting leave to amend. <u>See</u>, <u>e.g.</u>, <u>Murguia v. Langdon</u>, 61 F.4th 1096, 1120 (9th Cir. 2023) ("remand with instructions to grant Plaintiffs leave to amend"); <u>Hoang v. Bank of Am., N.A.</u>, 910 F.3d 1096, 1103 (9th Cir. 2018) (Plaintiff's "claim is not time barred. Therefore, an amendment by Hoang may not be futile."); <u>Garmon v. County of L.A.</u>, 828 F.3d 837, 846 (9th Cir. 2016) ("The court shall grant Garmon leave to amend on remand.").

And, the Answering Brief's inapposite authorities give no reason to depart from this Court's practice of remanding after threshold legal issues are resolved. It gives no reason to prejudge a yet-unfiled amended pleading. <u>See</u> <u>Shirk v. United States</u>, 773 F.3d 999, 1007 (9th Cir. 2014) ("[W]e must always be mindful that we are a court of review, not first view."); <u>Detrich v. Ryan</u>, 740 F.3d 1237, 1248-49 (9th Cir. 2013) (en banc) ("[W]e operate more effectively as a reviewing court than as a court of first instance.").

Plaintiffs respectfully request remand with leave to amend if this Court reverses on threshold issues.

8

**B.** **The Answering Brief's arguments on duty are legally incorrect and, if adopted, would expose children to unprecedented levels of harm.**

The Opening Brief argued that Defendant owed Bella, a minor user of Defendant's online platform, at least the ordinary duty of care and likely a special-relationship duty. Opening Br. 38-45. That's because Defendant's subjected Bella to incredibly sophisticated and powerful algorithms designed to control her behavior. 6-ER-980-982.

In response, Defendant argues that, despite wielding these sophisticated algorithms to control Bella, Defendant did not owe Bella any duty whatsoever–not even the ordinary duty of care. Answering Br. 41-44.

That view of duty is as radical as it is untenable under California tort law.

**First**, the Opening Brief analogized the present case to <u>Regents</u>. In <u>Regents</u>, the California Supreme Court recognized that colleges have a special-relationship with their students because of the college's level of supervision; "vulnerability" of students; and college's **control** over the students. See <u>Regents of University of California v. Superior Court</u>, 4 Cal. 5th 607, 620-21 (2018). Plaintiffs argue an analogous special duty should apply when Defendant uses their algorithms to control minors' decisions on its platform.

Defendant's try to distinguish the present case from <u>Regents</u>. Answering Br. 43. Yet tellingly Defendant ignores all the factual allegations of staggering levels of algorithmic *control* over its vulnerable minor users' behavior on its platform. Answering Br. 43.

Defendants ignore the extreme amounts of control Defendant's exert on minors like Bella by using their algorithms to control her decisions. e.g., 6-ER-987¶63; 6-ER-985¶57 ("control what you watch");

<u>h**ttps://www.govinfo.gov/content/pkg/CHRG-117shrg53136/pdf/CHRG-117shrg53136.pdf at 1--2.**</u> **(**"these **algorithms make the decision for them[.]"**)


And there is no serious dispute that Defendant's minor users like Bella are vulnerable. See Cal. Age-Appropriate Design Act §§1798.99.31(a)(1)(B)(vi); 1798.99.30(b)(6); AB-2273 §1(2)-(8).

Yet Defendants nowhere account for these hallmarks of special duty: 1) high levels of control; (2) vulnerability of an impressionable child; and (3) a high degree of supervision. See e.g. 6-ER-985¶57

Simply put, <u>Regents</u> supports the application of a special duty to online platforms that are algorithmically targeting their minor users. Defendant does not meaningfully distinguish <u>Regents</u> by simply ignoring the allegations of algorithmic control.

**Second**, under California law, "[g]enerally speaking, all persons have a duty to take reasonable care in their activities to avoid causing injury[.]" Brown v. USA Taekwondo, 11 Cal. 5th 204, 209 (2021).

Yet for some reason Defendant thinks it is immune from that ordinary duty of care. Answering Br. 39.

Notably, Defendant nowhere accounts for Jacoves and nowhere accounts for specific warnings in the present case that Netflix received from its own retained expert about the risk of causing child suicides. E.g., Jacoves v. United Merchandising Corp., 9 Cal. App. 4th 88, 112 (1992) (**"[S]uicide, itself, was the foreseeable risk** and cannot, therefore, be a superseding cause."). So too here. Netflix's own experts warned that its actions could result in child deaths via suicide. 6-ER-974-975¶¶27-31. Yet Netflix took no precautions.

Indeed, that's the extremity of Defendant's position laid bare. Even though it is now common knowledge that these powerful algorithms are harming children, especially young girls, and even though Netflix was warned, Netflix believes it is under no duty whatsoever to avoid foreseeable harms to children.

And, it's not that they can't. Indeed, Netflix "continually seek[s] to improve" there algorithms "by advancing the state-of-the-art in the field." https://research.netflix.com/research-area/recommendations. Indeed, they "continue to improve our algorithms and look for new areas we can personalize." Id. They just won't lift a finger to improve safety. And why would they given that they believe they have no duty whatsoever to their users.

And Defendant's reliance on <u>Nally</u> is readily distinguishable. That case did not involve algorithms known to be dangerous to children . See e,g. Cal. Age-Appropriate Design Act; h**ttps://www.govinfo.gov/content/pkg/CHRG-117shrg53136/pdf/CHRG-117shrg53136.pdf at 1--2.** It also did not involve the type of causal nexus between warned of conduct and warned of harm.

Moreover, "the law in California is clear that one is liable for injuries arising out of the negligent entrustment of a dangerous instrumentality to a person who the supplier knows, or **has reason to know, is a danger to himself or herself**, or others[.]" <u>Jacoves</u>, 9 Cal. App. 4th 88, 116 (1992). Given the personalization and personalized big data analytics that Netflix runs on each user it had reason to know that Bella was especially vulnerable to its dangerous and reckless algorithmic targeting of her. 6-ER-980-982; Opening Br. 11-16.

13

**C.    The Answering Brief's products-liability arguments diverge from California's foundational policies on how to protect consumers from dangerous products placed on the market.**

The Opening Brief explained that California products-liability law, guided by Chief Justice Traynor's foundational and enduring Escola test, readily applies to the algorithms.  Opening Br.46-52.

Defendant contends that such claims are foreclosed as a matter of law. Answering Br.45-49.  Yet, Defendant makes this argument only by diverging from the foundational policies and doctrines animating California's doctrine of products liability.

*First*, Defendant's first argument is that this Court's Winter decision and the RESTATEMENT §402 forecloses Plaintiffs products liability claims under California law.

Not so.  Winter applied the RESTATEMENT's test to determine the "scope of products liability [.]"  Winter v. G.P. Putnam's Sons, 938 F.2d 1033, 1034 (9th Cir. 1991); id. at n.2.

Yet, *after* Winter was decided, California courts have subsequently clarified that the RESTATEMENT does **not** limit the scope of California products liability law. E.g.,  Bolger v. Amazon.com, LLC, 53 Cal. App.5th 431, 459 (2020) ("ha[ve] ***not*** hesitated to disagree with the RESTATEMENT").

Id. Contrary to Defendant's Winter argument, the Restatement just doesn't set the scope of California products liability law. See Id. (rejecting argument that claims were "outside the rule of this Restatement."); Horn v. General Motors Corp., 17 Cal. 3d 359, 374 (1976) ("Rejecting the Restatement test[.]"). And, courts and scholars have read Winter to mean that "software might be considered a product for purposes of strict products liability in tort." Restat 3d of Torts: Products Liability, § 19. Thus, Defendant overreads Winter and regardless Winter's Restatement analysis is not dispositive.

Next, Defendant argues that "the algorithm is itself not a "tangible" product." Answering Br. 46-47. But Defendant doesn't cite any California case supporting that tangible-intangible distinction. And the Opening Brief cited California cases rejecting such label-based arguments. See Opening Br. 47-48; see e.g. Pierce v. Pac. Gas & Elec. Co., 166 Cal. App. 3d 68, 81-82; n.6.

The Answering Brief doesn't bother responding to such cases.

Finally, Defendant argues that Chief Justice Traynor's famous Escola test should not be applied to claims involving "ideas and expression[.]" Answering Br. 48-49; Escola v. Coca Cola Bottling Co., 24 Cal.2d 453, 461 (1944) (Traynor, J., concurring)). Yet, Defendant never cites a California case for that proposition.

And, Defendant never even tries to explain how the <u>Escola</u> test would somehow foreclose products liability here. Regardless, Justice Traynor's enduring <u>Escola</u> test imbues California's products liability law with an "**infinite capacity for growth** to meet changing needs and mores." <u>Bolger</u> at 462.

****

California courts have been clear that one must "return to the principles underlying [California's] doctrine of strict products liability to determine whether it applies." <u>Bolger v. Amazon.com, LLC</u>, 53 Cal. App. 5th 431, 438 (2021).

That didn't happen below. 1-ER-6. And, it didn't happen in the Answering Brief. 45-49. The Answering Brief fails to demonstrate that California products liability does not apply to algorithms as a matter of law.

And although formalistic labeling games don't matter under California law, it's worth noting that Netflix sings a different tune when not arguing over products liability. Publicly, Netflix proudly boasts that its "algorithms are at the core of the Netflix **product**." https://research.netflix.com/research-area/recommendations.

16

17

**D. The Answering Brief's causation argument miscites its central authority and ignores the Opening Brief's central authority.**

The Opening Brief discussed causation, emphasizing <u>Jacoves</u>. Opening Br.72-74 (Section II.C); <u>Jacoves v. United Merchandising Corp.</u>, 9 Cal.App.4th 88 (1992). The Answering Brief raises causation, emphasizing <u>Tate</u> but ignoring <u>Jacoves</u>. Answering Br.49-50 (Section II.B.3); <u>Tate v. Canonica</u>, 180 Cal.App.2d 898 (1960).

Notably, the District Court did <u>*not*</u> address causation below. 1-ER-3-7. This Court doesn't need to either—because amendment could specify further intimate details of Bella's death on remand if Defendant continues to press this point. <u>See</u> Section II.A, *supra*.

For causation, two threshold points are critical:

- Bella's death was **<u>foreseeable</u>** to Netflix. 6-ER-978¶48-982¶65; 6-ER-978¶48 ("not unforeseeable"). Indeed, her death was not only foreseeable, but it was foreseen—*by Netflix's own retained suicide-prevention expert and data.* 6-ER-974¶27-975¶32.

- Netflix's acts were a **<u>substantial factor</u>** in the harm to Bella because it algorithmically directed her to watch the show—*i.e.*, by algorithmically controlling what she watched on its platform. <u>E.g.</u>, 6-ER-982¶63.

18

Given the allegations of *foreseeable-and-foreseen death* on this posture, Netflix's causation arguments fail.

***First***, the Answering Brief miscites its central authority—Tate.

Tate expressly states that its holding doesn't apply to cases where the risk of suicide is "reasonably foreseeable":

> **[We] do not now decide whether**, in those cases where **it would be proper to treat the act of suicide as an independent intervening act** because it was truly voluntary, this would still not be a defense **if, under the particular circumstances of the case, a truly voluntary suicide was a reasonably foreseeable result of the defendants' wrongdoing.**

Tate, 180 Cal.App.2d at 918.

Indeed, Defendant's *1960* case expressly disclaimed answering the pertinent legal question here. Id. By contrast, Jacoves—the *1992* case Netflix wholly ignores—did: **"[S]uicide, *itself*, was the foreseeable risk and cannot, therefore, be a superseding cause**." Opening Br.73 (quoting 9 Cal.App.4th at 112) (emphasized in Opening Brief).

Because the Answering Brief both misstates the law of its central case and ignores the Opening Brief's authority, it overlooks that Bella's suicide cannot be a superseding cause because her suicide was a foreseeable risk of Defendant's algorithmic targeting.

19

***Second***, the Answering Brief's causation argument fails for a separate, reason: Defendant's burden of proof.

Even assuming *arguendo* that <u>Jacoves</u> hadn't held that suicide is ***not*** an intervening cause when foreseeable, Defendant bears the burden to prove it: "<u>*The defendant has the burden to prove the affirmative defense of superseding cause*</u>, that is, [to prove] that the intervening event is so highly unusual or extraordinary that it was unforeseeable." <u>E.g.</u>, <u>Arreola v. County of Monterey</u>, 99 Cal.App.4th 722, 760 (2002).

Therefore, when the Answering Brief says the operative complaint "includes no allegations" showing that the suicide was involuntary (*i.e.*, by uncontrollable impulse), Answering Br.49, it's ignoring that Defendant's burden of proof requires *Defendant* to show this was somehow a "voluntary" suicide by a fifteen-year-old girl. On this procedural posture of a motion to dismiss, Defendant cannot make that showing.

The superseding-cause defense cause is "usually one for the trier of fact." <u>Arreola</u>, 99 Cal.App.4th at 760. Simply put, Netflix "has ***not*** met ***its*** burden of demonstrating that any subsequent superseding causes of [Bella's] death[.]" <u>See Jacoves</u>, 9 Cal.App.4th at 112.

***Third***, the complaint *does* make a showing of causation and uncontrollable impulses when discussing scientific research on suicidal contagion and Netflix's algorithmic control over Bella.  E.g., 6-ER-975¶31; 6-ER-982¶63.

*****

The Answering Brief misstates the holding of its 1960 authority (Tate); ignores the Opening Brief's 1992 authority (Jacoves); ignores Defendant's burden of proof on its affirmative defense; and ignores that there are scientific bases to demonstrate the uncontrollable impulse that it was warned about by its own suicide-prevention expert—but just didn't care about.

**E. The Answering Brief's failure to cite California tort cases implicating algorithmic control and targeting show how novel these questions are—and why they Defendant's policy concerns.**

Defendant argues that Plaintiffs' tort claims are foreclosed by binding California caselaw because the claims implicate Defendant's expression. Answering Br. 32-40. Defendant cites a host of cases to try to make out this case but this Court need not trifle long with those cases.

**First**, these "expressive tort" cases are all factually inapposite and, so, readily distinguishable. See Answering Br. 32-40 (collecting cases). Notably, many of them are pre-Internet and **none** of them deal with an algorithm. And, certainly, none of them deal with the type of powerful algorithm here–a sophisticated algorithm that exerted extreme control over it

The key factual distinguishing feature between this case and Defendant's expressive tort cases is that this case involves an algorithm that controlled users behaviors and forced them to watch what was destructive of them.

Simply put these personalized algorithmic technologies are highly distinguishable from general broadcast technologies like TV or radio.

22

**Second**, the policy concern animating Defendant's expressive tort cases was an inability to impose tort liability without limiting *public* access to the works. These policy concerns are inapplicable here because of the highly personalized nature of Netflix's algorithmic control here.

Defendant's algorithms and algorithmic targetings are *personalized* to each user. https://research.netflix.com/research-area/recommendations. Defendants collects troves of personalized data from each *specific* user, runs big data analytics on *that* user, and then personalizes an algorithmic targeting at each particular user. 6-ER-980-982; Opening Br. 11-15, 7 ("personalization at the core of our product").

For example, in McCollum, Ozzy Osburn was not constantly surveilling and analyzing via Big Data analytics particular users and then targeting those specific users individually via personalized algorithmic targeting. That claim involved claims of tort liability "for the *general* public dissemination" of the song. But, had Ozzy Osburn known that a specific child was at high risk for suicide and then specifically targeted that child with "Suicide Solution," things would be different under California law. See Jacoves ("has reason to know, is a danger to himself").

Thus, two minor tweaks here could have avoided Bella's death–and without compromising the public availability of the Show. One, is that Defendant could have refrained from specifically targeting *Bella* in this dangerous fashion because Defendant's big data analytics and algorithm could ascertain that she was uniquely high risk for suicide (as opposed to the general public) and because their own expert had warned that this reckless conduct for forseeably lead to the deaths of specific children.

So two minor tweaks would have avoided Bella's death here, without compromising public availability. One, is you don't target Bella (and those known to be especially vulnerable like her) in this dangerous fashion because Defendant's big data and algorithm could ascertain that she was uniquely high risk for suicide (as opposed to the general public) and because their expert had warned that this conduct foresaw that specific children would die as a result of Netflix's conduct.

And, there's every reason to think that Defendant could have taken such modest precautions. They are constantly improving and personalizing their algorithms, "A/B testing", and running "experiments" their algorithmic targeting of specific users. https://research.netflix.com/research-area/recommendations. Indeed, many technology companies hire algorithmic-safety officers to try to improve

safety and avoid foreseeable harms. See e.g.

https://careers.tiktok.com/position/7284141529042635064/detail.

Here, Netflix believes it is under no such duty when deploying powerful and personalized algorithms at minors.

**F.     The First Amendment does not bar these claims.**

As to the First Amendment issues, there are three key points: (1) that certification of the California questions to the California Supreme Court should precede engaging them; (2) the Answering Brief essentially ignores the crux of this case: algorithmic control; (3) as a result, the Answering Brief makes a similar mistake as the District Court in thinking that the claims are inseparable from the Show;

**First**, before this Court delves into these Constitutional questions, this Court should certify threshold, *open* questions of _California_ law to the _California_ Supreme Court for dispositive resolution.

Notably, **none** of Defendant's cited California cases addressing algorithmic control, algorithmic manipulation, or harms caused by algorithms. See Answering Br.32-56 (Section II). That's because these tort claims present open questions of California law.


In such situations, the Supreme Court has offered guidance:

> We think that the Fifth Circuit's interpretation of state law is too uncertain a premise on which to address the question presented. **The constitutional issue, though undeniably important, is implicated only if Louisiana law permits recovery under these circumstances in the first place**. The

dispute thus could be **greatly simplifie[d] by guidance** from the Louisiana

Supreme Court on the meaning of Louisiana law.

Mckesson v. Doe, 141 S. Ct. 48, 50 (2020).


So too here. Defendant presents no California law addressing algorithmic

control, algorithmic manipulation, or harms caused by algorithms. As, in

Mckesson, "state law is too uncertain" to prematurely wade into Constitutional

challenges. Id. After all, the constitutional issues are "implicated only" if

California law permits recovery for such algorithmic torts in the first place. Id.

And, as in Mckesson, this dispute would be "greatly simplified" by guidance on

California law from the California Supreme Court. Id.


In situations like this, "certification is advisable ***before*** addressing a

constitutional issue." Id. at 51. Indeed, the Answering Brief's failure to find any

California case law on point simply indicates the appropriateness of certification

here. And, Defendant provides no reason to wade into Constitutional matters on

open, threshold questions of California state law.


**Second**, this Court's been clear that Rule 12(b)(6) dismissals are "especially

disfavored in cases where the complaint sets forth a novel legal theory that can best

27

be assessed after factual development." <u>McGary v. City of Portland</u>, 386 F.3d 1259, 1270 (9th Cir. 2004). That's because it's "that new legal theories be explored and assayed **in the light of _actual facts_**[.]" <u>Elec. Constr. & Maint. Co., Inc. v. Maeda Pac. Corp.</u>, 764 F.2d 619, 623 (9th Cir. 1985).

That makes sense. Indeed, at core, this case is about algorithmic control and algorithmic manipulation of minors. 6-ER-985-987¶¶57-65. Yet, Defendant's Constitutional arguments refuse to engage these facts.

**<u>None</u>** of Defendant's cases involve algorithmic control and algorithmic manipulation. Not on the merits. Answering Br. 32-49. And, not on the Constitution. Answering Br. 50-56.

Instead, Defendant tries to dismiss Plaintiffs' allegations about Defendant's algorithm as "sci-fi"--i.e., science fiction. Answering Br. 39. But that's a non-starter. <u>See</u> <u>Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.</u>, 768 F.3d 938, 945 (9th Cir. 2014) ("we must accept as true all factual allegations in the complaint"). Defendant had every opportunity to file an answer and dispute the factual allegations–it didn't.

Here, the truth is that these algorithms do control, manipulate, and harm minors like Bella. Indeed, a core feature and factual allegations of the complaint was this algorithmic control. Opening Br. 11; 39; 6-ER-985-989¶¶57-70. Netflix's *own* engineering director explained their algorithms "**control** what you watch." 6-ER-980; 6-ER-981 ("The Science Behind the Netflix **Algorithms That Decide** What You'll Watch Next"). Opening Br. 11; 39; 6-ER-985-989¶¶57-70.

Defendant nowhere engages.

And, Congress has also recognized this technological reality. "Data scientists and engineers at these companies design these algorithm[.]" DISRUPTING DANGEROUS ALGORITHMS: ADDRESSING THE HARMS OF PERSUASIVE TECHNOLOGY at 1 (https://www.govinfo.gov/content/pkg/CHRG-117shrg53136/pdf/CHRG-117shrg53136.pdf). Critically here, "[r]ather than users choosing what they see online, **these algorithms make the decision** for them to maximize growth and revenue. Id.1-2.

Defendant can't just pretend these factual allegations about such algorithmic control is "sci-fi". Answering Br. 39. Indeed, it's Defendant who is not entitled to *its* fantasy version of events at 12(b)(6).

And, it's remarkably callous to trivialize a grieving family's loss by characterizing Plaintiffs' allegations about "Netflix's algorithm as a sci-fi weapon of the future" Answering Br. 39. The allegations are that Netflix's algorithm killed Bella Herndon. 6-ER-985-987¶¶57-65. The allegations are that Netflix's algorithm controlled Bella Herndon. Id. Netflix never responds to *those* allegations. Not on the merits. And not on the First Amendment.

Defendants' refusal to engage the actual factual allegations involving algorithmic **control** is a non-starter to their Constitutional arguments. And, those factual allegations readily distinguish this case from Defendant's cited cases. Answering Br. 50-56. And, those factual allegations provide the limiting principle that Defendant seeks. Answering Br. 40 ("where will this Court draw the line").

******

*****

Defendant argues that there are "four" different First Amendment problems with Plaintiff's "expressive tort" claims. Answering Br.50-53 (Section IIC). Each of these purported problems is illusory and presents nothing more than a red herring.

**First**, Defendant argues that "Plaintiffs seek to impose liability on 13 Reasons Why's creators for the content of their work." Answering Br. 51. That's false. Indeed the complaint didn't name any such creative persons as defendants. The complaint didn't name novelist Jay Asher (who wrote the novel 13 Reasons Why), as a defendant. 6-ER-967-992. Nor did the complaint name producer Selena Gomeze as a defendant nor any actor. Id. Nor did the complaint name Brian Yorkey, the "Pulitzer winning playwright" who adapted the novel into a screenplay as a Defendant.

Indeed, there's only one party here– Defendant who deploys its technology products–i.e., its powerful algorithms, on vulnerable children. There's a plain difference between suing Ozzy Ozburne for writing and singing songs and suing Defendant for algorithmically controlling children.

**Second**, Defendant argues that "Plaintiffs' claims cannot be separated from the content" Answering Br. 51. Not so. As the Opening Brief explained, there's a clear

31

distinction between creating and *publicly* broadcasting content, on the one hand, and targeting specific children with personalized algorithms on the other. They are conceptually separable, historically separable, and legally separable acts. Opening Br. 56-58; 6-ER-974¶¶24-26; 6-ER-988¶78; 6-ER-989¶84.

Indeed, Netflix still could have *publicly* broadcast whatever content it wanted to without targeting Bella specifically with personalized algorithms. And the California Age Appropriate Design Act indicates that legislatures are not struggling to distinguish between content and algorithmically targeting and controlling children on online platforms.

**Third**, Netflix tries to argue that "its subscribers have the right to receive" Netflix's personalized messages. Answering Br. 51 (""right to receive information and ideas"). There's an irony in Netflix trying to stand on Bella's purported First Amendment rights to receive information in order to defeat her and her family's claims for her wrongful death. Moreover, the Supreme Court has also recognized a correlative First Amendment right **not** to receive information. See e.g. <u>FCC v. Pacifica Foundation</u>, 438 U.S. 726 (1978); <u>Breard v. City of Alexandria</u>, 341 U.S. 622, 641-45 (1951); <u>Kovacs v. Cooper</u>, 336 U.S. 77, 87-89 (1949).

Indeed, these claims turn on Defendants' algorithmic **control** of Bella not simply sharing a recommendation or information. The core of the claim is that Defendant used sophisticated algorithms to **control** Bella's behaviors, to force her to watch certain content, and to subject her to unreasonable risk of death. 6-ER-980-982; 6-ER-987¶63; 6-ER-985¶57; https://www.govinfo.gov/content/pkg/CHRG-117shrg53136/pdf/CHRG-117shrg53136.pdf at 1-2 (Rather than users choosing what they see online, these algorithms make the decision for them[.]"). Netflix is simply wrong to claim a First Amendment right to control and force Bella to watch certain material via its algorithmic control.

**<u>Fourth</u>**, Netflix argues that it has a First Amendment right not to warn of known dangers. Answering Br.53. Indeed, Netflix argues that Plaintiff's failure to warn claims must fail because "Netflix has the right to determine what to say[.]". <u>Id.</u>

But this argument moves too fast. Under Netflix's view, no company would ever have to warn of known dangers in its products. Indeed, there would be no failure to warn liability at all under Netflix's world view.

Moreover, Netflix's cited cases are readily distinguishable. Indeed, Netflix's own case stresses that "the essential thrust of the First Amendment is to prohibit

improper restraints on the voluntary **_public_** expression[.]" Pacific Gas & Electric Co. v. Public Utilities Comm'n of Cal., 475 U.S. 1, **16** (1986). Yet here Defendant used **_personalized_** algorithms to individually target a specific child (Bella) for the purpose of clandestinely controlling that child for profit on its **_private_**, pay-walled platform. 6-ER-980-983. Such private, for-profit, personalized algorithmic targeting and control of a specific child is not "public expression."

Indeed, the threshold question is whether algorithms, operating latently and clandestinely, invisible even to the user that they're surveilling children and manipulating them would even constitute speech. See, e.g., Corales v. Bennett, 567 F.3d 554, 562 (9th Cir. 2009) ("First

Amendment protection applies only when [conduct] is intended to convey a particularized message and the likelihood is great that the message would be so understood."). Here Defendant's algorithmic control is covert. And, that distinguishes this case all the further from cases like Spence involving the uses of "symbol[s]" for the "purposes of expression[.]" Answering Br. 51 (quoting Spence v. Washington, 418 U.S. 405, 410-11 (1974).

Indeed, Defendant's use of covert, clandestine algorithms to control its minor users is a far cry from using symbols like the "wearing of black armbands" to convey

concern about the Vietnam War or the waving of a "flag bearing a peace symbol".

<u>Spence</u> at  418 U.S. 405, **410-11.**


This covert, clandestine feature of Defendant's algorithmic control readily distinguishes this from Defendant's attempts to rely on cases involving "convey[ing]" messages or "editorial discretion" cases, Answering Br. 51-52. After all, the fact that this algorithmic control is clandestine and imperceptible to the user raises the question of whether *any* expression or message is being conveyed at all.



*****

<u>Finally</u>, even if the First Amendment were implicated here, that challenge would pass whatever tier of scrutiny was applied, even if the highest form of scrutiny–i.e., strict scrutiny–were to be applied.


We don't concede strict scrutiny applies. But, given word constraints here, *even if* strict scrutiny did apply, arguendo, it would be satisfied here. And, a fortiori, then all lower tiers of scrutiny would also be satisfied as well.

35

**First**,, even strict scrutiny is not insurmountable. *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 237, 115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995) ("we wish to dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact'"). Notably, the First Amendment is not an absolute bar. Because "the freedom of speech is not absolute. …even speech that enjoys the most extensive First Amendment protection may be restricted on the basis of its content if the restriction passes "strict scrutiny" (i.e., if the government shows that the restriction serves "to promote a compelling interest" and is "the least restrictive means to further the articulated interest"). <u>Sable Communications of California, Inc. v. Federal Communications Commission</u>, 492 U.S. 115, 126 (1989).

**Second**, preventing suicide and preserving a human life is a compelling interest. See <u>Cruzan v. Director, Missouri Dep't of Health</u>, 497 U.S. 261 (1990) at 282 ("unqualified interest in the preservation of human life"); <u>Washington v. Glucksberg</u>, 521 U.S. 702 at 747 (1997) (STEVENS, J., concurring) (""the State has a compelling interest in preventing persons from committing suicide because of depression or coercion by third parties.").

The glaring omission from the Answering Brief is that Netflix never explains why a generally applicable law, aimed at preventing avoidable harm, including death,would not present a compelling governmental interest. Answering Br. 50–56.

**Third**, the restrictions imposed by tort liability here would be narrowly tailored. Indeed, a mere two modest tweaks would have avoided the problem. Indeed, the personalized nature of algorithm enables narrowly tailoring here–Netflix could still publicly broadcast their show to whomever they want. They would just have to avoid specifically targeting the most vulnerable viewers individually via personalized algorithms. And, two, they should provide a warning to viewers they know to be vulnerable as a result of their Big Data analytics.

Thus, while the combination of personalized algorithms and big data is what is so destructive about Netflix's reckless use of its algorithms here, this combination of personalized algorithms and big data also provides the simple solution.

Netflix could still *publicly* broadcast but not *personally* target the most vulnerable children users.

### III. THE ANSWERING BRIEF MAKES MAJOR anti-SLAPP CONCESSIONS IN THE FACE OF <u>BARAL</u>, <u>BONNI</u>, AND <u>PARK</u> AND FAILS TO DEFEND ITS UNWARRANTED EXTENSION OF <u>NEWSHAM</u>.

The Opening Brief explained that the anti-SLAPP order made many errors. Opening Br.52-71 (Section III).

Chief among them was the District Court's recasting of Plaintiff's complaint rather than engaging the *specific* acts actually complained of—namely the private, paywalled, algorithmic targeting and algorithmic control over Bella. <u>Compare</u> 6-ER-974¶¶24-26 (claims <u>*not*</u> arising from "public dissemination") <u>with</u> 1-ER-3-5-5.n.3 (recasting complaint).

Under the California Supreme Court's <u>Baral</u>, <u>Bonni</u>, and <u>Park</u> decisions, such recasting is untenable. In turn, that might be why, only <u>*after*</u> the Opening Brief was filed, Defendant decided to make concessions to attempt to render the anti-SLAPP issues "moot at this stage"—albeit subject to refiling if this Court reverses. Answering.Br 57-57.n.9.

Specifically, Defendant now commits that it "will <u>***not***</u> seek attorneys' fees against the Plaintiffs" if this Court affirms. Answering Br.57. Or, if this Court remands, Defendant intends to renew its anti-SLAPP attacks through a new motion, rather than defend the flawed order currently on appeal. Answering Br.57.n.9. Either way, the Answering Brief's concessions do render anti-SLAPP issues unnecessary to decide.

Yet, if this Court does reverse or vacate on the merits, it would nonetheless still have the authority to provide guidance on anti-SLAPP. This Court may wish to do so, both because the anti-SLAPP order's recasting of the complaint was egregiously wrong and because those errors, if not vacated, could supply a weapon for less-than-fully scrupulous counsel to weaponize against grieving families—as happened here.

*****

The California Supreme Court's <u>Park</u>, <u>Bonni</u>, and <u>Baral</u> decisions make clear that this anti-SLAPP order should be vacated. The Opening Brief discussed all three cases. Tellingly, the Answering Brief's ignores all three—and then reiterates an untenable approach to California anti-SLAPP. Answering Br.v-xiv (TOA); 59-61 (Section III.B).

As the Opening Brief explained, California's anti-SLAPP statute requires consideration of the *specific* "act" from which the cause of action arises. Opening Br.52-58. Nonetheless, the Answering Brief deploys a "principle thrust" approach to anti-SLAPP. Answering Br.60-61.

After purporting to moot the issue, Defendant argues the "'**principal thrust** or gravamen' of Plaintiffs' claims targets the expressive content of *13 Reasons Why*." Answering Br. 60.

40

That's an approach expressly rejected by the California Supreme Court in

Bonni:

> **Bonni urges** that when, as here, a motion has been filed to strike an entire cause of action, a court should not examine the underlying acts individually, but instead should identify **the "gravamen" or "principal thrust"** of the cause of action and consider only whether that gravamen arises from protected activity. **The Hospitals** disagree; they **insist Bonni's argument is contradicted by our decision in Baral v. Schnitt (2016)**. The Hospitals have the better of this debate.

Bonni v. St. Joseph Health System, 11 Cal.5th 995, 1009-1010 (2021) (quoting

Baral v. Schnitt, 1 Cal. 5th 376 (2016).

Accordingly, the Answering Brief's "principal thrust" approach is incompatible with Bonni and Baral. It's also at odds with Park: anti-SLAPP applies "**only if the speech** [...] *itself* is the wrong complained of[.]" Park v. Bd. of Trustees of Cal. State Univ., 2 Cal.5th 1057, 1060 (2017). By contrast, a claim cannot be struck when the speech is merely "**a step leading to some different act** for which liability is asserted." Id.

Here, the complaint is clear that the Show itself was **not** the wrong complained of. 6-ER-974¶¶24-26. Rather, the precise act "complained of" was Defendant's algorithmic control over Bella Herndon. 6-ER-980¶57-984¶70. Yet, the anti-SLAPP order doesn't even mention algorithms—let alone algorithmic control over a fifteen-year-old girl.

Accordingly, the anti-SLAPP order is plainly untenable.

41

## CONCLUSION

This Court should reverse and remand.

Date: October 20, 2023

Respectfully submitted,

DIGITAL JUSTICE FOUNDATION

*/s/ Gregory Keenan*
Gregory Keenan
DIGITAL JUSTICE FOUNDATION
81 Stewart Street
Floral Park, NY 11001
(516) 633-2633
Gregory@DigitalJusticeFoundation.org

*Attorney for Appellants*

42

**FORM 8.  CERTIFICATE OF COMPLIANCE FOR BRIEFS**

*Instructions for this form:*

*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 22-15260

I am the attorney or self-represented party.

**This brief contains 6902 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f).  The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.

    [ ] a party or parties are filing a single brief in response to multiple briefs.

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Gregory Keenan*      **Date** October 20, 2023
    *(use "*s/[typed name]*" to sign electronically-filed documents)*

43

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users have been served by the appellate CM/ECF system.

Date: October 20, 2023

Respectfully submitted,

*/s/ Gregory Keenan*
Gregory Keenan